UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BARBARA CORDI-ALLEN and JOHN ALLEN,<br><br>Plaintiffs,<br><br>v.<br><br>R. BARTLEY HALLORAN and R. BARTLEY HALLORAN, P.C.,<br><br>Defendants. | CIVIL ACTION NO. 05-30083-MAP |

**R. BARTLEY HALLORAN, P.C. and R. BARTLEY HALLORAN'S
MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

This is an action for breach of contract and breach of fiduciary duty brought by the plaintiffs Barbara Cordi-Allen ("Barbara") and her husband John Allen ("John" and together with Barbara, the "Allens") against the defendants R. Bartley Halloran, P.C. and R. Bartley Halloran (collectively, "Halloran") for various allegations resulting from the Allens' retention of Halloran as counsel in a Connecticut personal injury case and associated workers' compensation case. This case should be dismissed as a matter of law. Counts II and III should be dismissed because the Allens failed to file suit within the three-year statute of limitations period governing tort claims; and, because the Allens failed to offer an expert opinion to evaluate Halloran's actions in light of the applicable standard of care. Count I should be dismissed because the Allens suffered no harm. Accordingly, Halloran's motion for summary judgment should be allowed because there are no genuine issues of material fact to be tried and Halloran is entitled to a dismissal as a matter of law.

Pursuant to Local Rule 56.1, Halloran submits herewith a Concise Statement of Material Facts, which are incorporated by reference into this memorandum.

1

ARGUMENT

I.   THE SUMMARY JUDGMENT STANDARD.

Summary judgment is appropriate "when the record shows that 'the pleadings, depositions, answers to interrogatories and admissions on file together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material if it carries with it the potential to affect the outcome of the suit under the applicable law." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000). "An issue is genuine if the evidence presented is such that a reasonable jury could resolve the issue in favor of the nonmoving party." *Fajardo Shopping Ctr., S.E. v. Sun Alliance Ins. Co. of Puerto Rico, Inc.*, 167 F.3d 1, 7 (1st Cir. 1999).

The party moving for summary judgment "bears the initial burden, which may be discharged by pointing to the absence of adequate evidence supporting the nonmoving party's case." *Michelson v. Digital Financial Services,* 167 F.3d 715, 720 (1st Cir.1999) (citations omitted). Once the moving party has met its burden, "the onus is on the nonmoving party to present facts that show a genuine issue for trial." Id. (citations omitted). In determining whether summary judgement is proper, the Court "view[s] all the facts in the light most favorable to the nonmoving party and indulge[s] all inferences advantageous to that party, provided they arise reasonably from the record." *Villanueva v. Wellesley College,* 930 F.2d 124, 127 (1st Cir.), *cert. denied,* 502 U.S. 861 (1991) (citation omitted). The party opposing summary judgment may not rest on mere allegations or denials of his pleadings but must produce "definite, competent evidence" on which the nonmovant bears the ultimate burden of proof. *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 822 (1st Cir.1991), *cert. denied,* 504 U.S. 985 (1992) (citations omitted). *See*

34015883v3 856230

*also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (stating that summary judgment must enter "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

**II.     THIS ACTION IS GOVERNED BY CONNECTICUT LAW.**

In a diversity action such as this, the federal court must apply the choice of law rules of the forum state. *New Ponce Shopping Ctr. v. Integrated Assurance Co.*, 86 F.3rd 265, 267 (1st Cir. 1996); *New England Utilities v. Hydro-Quebec*, 10 F. Supp.2d 53, 60 (1998). Massachusetts conflicts law requires the Court to follow a "functional choice-of-law approach that responds to the interest of the parties, the states involved, and the interstate system as a whole." *St. Paul Fire and Marine Ins. Co., v. Birch, Stewart, Kolasch & Birch, LLP*, 233 F. Supp.2d 171, 175 (D.Mass. 2002), quoting, *Bushkin Assoc., Inc. v. Raytheon Co.*, 393 Mass. 622, 631 (1985). "Massachusetts courts consider choice of law issues by assessing various choice-influencing considerations, including those provided in the Restatement (Second) of Conflict of Laws (1971)." *Goebel v. Schmid Bros., Inc.*, 871 F. Supp 68, 75 (D.Mass. 1994).

Where the parties have not expressed an intent as to which law is to apply, Massachusetts has both a statutory and a common law choice-of law rule for contract cases. Both rules lead to the same result since the Supreme Judicial Court has read the common-law conflicts analysis into the statutory one. *Travenol Laboratories v. Zotal, Ltd.*, 394 Mass. 95, 98 (1985). Massachusetts courts will apply the law of the state having the most significant relationship to the transaction and to the parties with respect to that issue. *Buskin Assocs. v. Raytheon Co.*, 393 Mass. 622, 631 (1985); *Restatement (Second) of Conflict of Laws*, § 188(1) (1971). Here, no contract contains a choice-of-law provision; therefore, this analysis will apply.

34015883v3 856230

In addition, there are tort issues to be analyzed in this action. All issues in tort are governed by Section 145 of The Restatement (Second) of Conflict of Laws. *St. Paul Fire and Marine Ins. Co.,* 233 F. Supp.2d at 176-77. "The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence." Id., quoting, Restatement (Second) of Conflict of Laws, § 145 (1971). To determine the most significant relationship, Massachusetts courts review contacts including "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." Id. at 176.

In this case, there are two Halloran defendants: Mr. Halloran is a resident of the State of Connecticut and an attorney licensed to practice in the State of Connecticut; and, R. Bartley Halloran, P.C., is a Connecticut corporation and a law firm, handling cases in the State of Connecticut. See Defendants' Concise Statement of Material Facts (hereafter, "Facts"), ¶ 4, filed herewith. The plaintiffs retained Halloran in Connecticut as legal counsel for a case that arose out of injuries sustained in the Hartford, Connecticut while Barbara was working for the Hartford Public School System as a math teacher. Facts ¶¶ 1-5,. Halloran also represented Barbara in a worker's compensation case (the "Workers' Compensation Case") before the Compensation Review Board of the State of Connecticut Workers' Compensation Commission. ("The Workers Compensation Commission") Facts, ¶ 11. While the plaintiffs do reside in the Commonwealth of Massachusetts, their Complaint, combining both contract-based allegations and tort-based allegations, is based on Halloran's conduct in two Connecticut legal matters. Therefore, the underlying claims and Halloran's actions/inactions, which allegedly caused the plaintiffs'

injuries, all occurred in Connecticut. As a result, Connecticut law should apply.

**III.    THE PLAINTIFFS' COUNT II (Breach of Contract – Failure to Represent) AND COUNT III (Breach of Fiduciary Duty) SHOULD BE DISMISSED FOR FAILURE TO BE FILED WITHIN THE THREE-YEAR STATUTE OF LIMITATIONS FOR TORTS**

**A.    Count II (Breach of Contract – Failure to Represent) Alleges Legal Malpractice.**

The interpretation of pleadings is always a question of law for the court. *Caffery v. Stillman*, 79 Conn.App. 192, 197 (2003); *United Components, Inc. v. Wdowiak*, 239 Conn. 259, 264 (1996). The Connecticut Supreme Court has recognized that claims against attorneys can sound in both negligence and contract. *Westport Bank & Trust Co. v. Corcoran, Mallin & Aresco*, 221 Conn. 490 (1992). "[W]here the plaintiff alleges that the defendant negligently performed legal services and failed to use due diligence, the complaint sounds in negligence, even though he also alleges that he retained him or engaged his services." *Alexandru v. Strong*, 81 Conn.App. 68, 76, cert. denied, 268 Conn. 906 (2004); *Shuster v. Buckley*, 5 Conn.App. 473, 478 (1985). Under Connecticut law, a claim that an attorney "promised to work diligently or in accordance with professional standards is not made a contract claim simply because it is couched in the contract language of promise or breach." *Caffery v. Stillman*, 79 Conn.App. at 1971.

In Count II of the Complaint, plaintiffs allege that Halloran was in breach of contract by withdrawing as counsel for Barbara in the workers' compensation case. This is a claim for negligence cloaked as a breach of contract claim.

> [A] breach of contract action against an attorney is, essentially, governed by the same principles as a negligence action, and both are predicated on the standard of care applicable to the attorney… an attorney does not, by agreeing to represent or to provide professional services to a client, impliedly contract to see the client's claim through to conclusion. To read an attorney-client relationship to contain an implied promise to pursue a claim to conclusion would lead to bizarre and untenable results. There are conceivably many valid reasons why an attorney might decide, after taking a case, to not pursue it to conclusion.

5

*Celentano, et al. v. Grudberg, et al.*, 76 Conn.App. 119, 125 (2003).

Under the standards discussed above, Count II sounds in negligence or legal malpractice, rather than breach of contract. Hence, where the plaintiff asserts a breach of contract claim which is "couched in the language of tort rather than contract…[,]" the tort statute of limitations is applicable. *Mac's Car City, Inc. v. DeNigris*, 18 Conn.App. 525, 530, cert. denied, 212 Conn. 807 (1989).

### B.   The Plaintiffs' Failed To File Their Complaint Within Connecticut's Three-Year Statute Of Limitations For Torts.[1]

The plaintiffs failed to file their Complaint within Connecticut's three-year statute of limitations for torts. Halloran's representation of the plaintiffs terminated, at the latest, in July, 2001. This action was not filed until over three years later on December 21, 2004. Connecticut General Statutes § 52-577 states that "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of." See C.G.S. § 52-577 (2005). The relevant date of the act or omission complained of, as that phrase is used above, is the date when the negligent conduct of the defendant occurs and not the date when the plaintiffs first sustain damage. *Farnsworth v. O'Doherty*, 85 Conn.App. 145, 149 (2004). "When conducting an analysis under §52-577, the only facts material to the trial court's decision on a motion for summary judgment are the date of the wrongful conduct alleged in the complaint and the date the action was filed…The three year limitation period begins with the date of the act or omission complained of, not the date when the plaintiff first discovers an injury." Id., citing, *Collum v. Chapin*, 40 Conn.App. 449, 451 (1996) (citation omitted; internal quotation marks omitted).

---

[1] Massachusetts no longer considers the applicable statute of limitations to be a strictly procedural issue. See *New England Telephone & Telegraph Co. v. Gourdeau Construction Co.*, 419 Mass. 658 (1995). Rather, the focus is now on the State the "has the more significant relationship to the occurrence and to the parties with respect to the issue of limitations." Id. at 661. As discuss earlier in this memorandum, this case concerns allegations of legal malpractice against a Connecticut lawyer and his Connecticut firm where the underlying cases were brought in Connecticut. Accordingly, the Connecticut statute of limitations for torts must govern.

6

The crux of the plaintiffs' Complaint is that Halloran failed to properly represent the Allens by, among other things, refusing to file suit against the City of Hartford due to a conflict of interest, and withdrawing as counsel in the workers' compensation suit. The alleged wrongful conduct by Halloran, however, all occurred more than three years before the Allens commenced suit. The Allens simply failed to act within the statutory period. Because the Allens' suit comes more than three years after any alleged wrongful act, the Allens' claims are barred.

There is no dispute that by July, 2001, Halloran no longer represented the Allens. Facts, ¶ 27. By that time, the Delta Action was long since concluded and the Workers' Compensation Commission affirmed Halloran's motion to withdraw as Barbara's counsel in the Workers' Compensation Case. Accordingly, even under the most generous reading of the Allens' complaint, any alleged wrongful conduct had to occur well before three years of the filing of this action.[2]

Although Connecticut recognizes the continuous representation doctrine, it is of no help to the plaintiffs in this case. see *DeLeo v. Nusbaum, et al.*, 263 Conn. 588 (2003). According to *DeLeo*, the plaintiff may invoke the doctrine and thus toll the statute of limitations, when the plaintiff can show: (1) that the defendant continued to represent him with regard to the same underlying matter; *and* (2) either that the plaintiff did not know of the alleged malpractice *or* that the attorney could still mitigate the harm allegedly caused by that malpractice during the continued representation period." Id. at 597, supra. (Original emphasis).

To satisfy the first prong, the Connecticut courts have concluded that the representation

---

[2] With respect to the failure to sue the City of Hartford, the Allen' claims are even tardier. The filing of the Delta Action on January 5, 1998 is considered the "occurrence" to trigger the statute of limitations in § 52-577. The act or omission was the alleged failure to disclose a conflict of interest and to file a claim against the City of Hartford. See *Farnsworth v. O'Doherty*, 85 Conn.App. 145 (2004) (finding that the complained of omission, which was the defendant's failure to sue the proper entities, occurred on the date the defendant filed the allegedly defective complaint). Under this analysis, the Allens missed the filing deadline for a tort claim against Halloran by over 3 ½ years.

continues for the purposes of the continuous representation doctrine until either the formal or the de facto termination of the attorney-client relationship. Id.

> The formal termination of the relationship occurs when the attorney is discharged by the client, the matter for which the attorney was hired comes to a conclusion, or a court grants the attorney's motion to withdraw from the representation. A de facto termination occurs if the client takes a step that unequivocally indicates that he has ceased relying on his attorney's professional judgment in protecting his legal interests, *such as hiring a second attorney to consider a possible malpractice claim or filing a grievance against the attorney*. Once such a step has been taken, representation may not be said to continue for purposes of the continuous representation doctrine. A client who has taken such a concrete step may not invoke this doctrine, because such actions clearly indicate that the client no longer is relying on her attorney's professional judgment but instead intentionally has adopted a clearly adversarial relationship toward the attorney.

Id.

As noted above, it is undisputed that Halloran's representation of the Allens terminated no later than July, 2001. Facts, ¶ 11. Thus, even if the statute of limitations was tolled while the Workers Compensation Commission ruled on Halloran's motion to withdraw, it began to run when the motion to withdraw was granted in July, 2001.

With respect to the second prong, it is clear that as early as 1999, the Allens not only believed that Halloran committed malpractice, but they bitterly complained about it. On or about September 13, 1999, the Delta Action was mediated with Magistrate Judge Egan. Facts, ¶ 8. At the end of the mediation, Barbara was "disgusted" and "felt Mr. Halloran had no interest in [the Allens] case at all." Barbara "began to have doubts" about Halloran's intentions. Facts, ¶ 9. After the mediation, in the fall of 1999, Barbara thought of retaining new counsel and "spoke with [the law firm] Ricassi & Davis" because she questioned Halloran's representation of [the Allens] in the Delta Action. Facts, ¶ 10.

In addition, after the settlement of the Delta Action and the disbursement of the

settlement proceeds, Barbara continuously complained about Halloran's representation. On May 4, 2001, and again on May 21, 2001, Barbara wrote to Halloran via e-mail, questioning his skills as an attorney and the work he had performed on the Delta Action. Facts, ¶ 21. On or about May 10, 2001, Halloran responded, stating that he never agreed to sue the City of Hartford. Facts, ¶ 22.

On or about May 10, 2001, Halloran wrote to Barbara to address her recent correspondence, Halloran wrote as follows:

> First, if you wish to make a compliant to the bar about my actions, that is your right. I have tried to zealously represent you while at the same time dissuade you from taking actions which would hurt your case. I did obtain what I consider to be an excellent result, a result which you have sabotaged by your actions after a settlement was reached. I feel that you are on a losing and self-destructive course in turning in the over One Hundred Thousand Dollars of proceeds to the carrier and insisting on pursuing a total temporary disability claim when your primary physician, the two examining physicians and the retained experts in the third party case all say you have residual work capacity.
>
> * * *
>
> I strongly urge you to reconsider your position. As I have told you repeatedly, I believe that the workers';  compensation carrier would be willing to give back the money we have paid to them, over $125,000.00 and supplement this amount with at least an additional $50,000 and possibly as much as $100,000 to settle your claim.
>
> * * *
>
> I will wait a week before I take any further action in your case. If you do wish to accept my advise, or if you instead wish to proceed with whatever complaint or action you wish to file against me, I will withdraw from the workers compensation case and respond to those complaints.

Facts, ¶ 22

On May 24, 2001, Barbara wrote to Halloran, stating the following:

> I have been told to pursuit (sic) a malpractice lawsuit for your handling of my injury. This came from a very prestigious lawyer and firm.

9

34015883v3 856230

Facts, ¶ 23.  At that point, Barbara believed that "Halloran failed to do his job properly."  Id.

Following Barbara's threat to file a malpractice suit against him, on May 29, 2001, Halloran requested to withdraw his appearance in the Workers' Compensation Case.  Facts, ¶ 24.  As of May 2001, Barbara believed that the attorney-client relationship had broken down between her and Halloran.  Facts, ¶ 25.  On May 30, 2001, Barbara threatened to report Halloran to the Connecticut State Bar.[3]  Facts, ¶ 26.  In July, 2001 the Worker's Compensation Commission ruled that, "the attorney-client relationship has broken down to the extent that there exists a mutual breakdown of trust and confidence between the attorney and claimant."  Facts, ¶ 27.  The Workers' Compensation Commission granted Halloran's motion to withdraw as Barbara's counsel.  Id.  Accordingly, it is undisputed that by July, 2001, Halloran no longer represented the Allens.  Id.  Consequently, the three-year statute of limitations began to run, at the latest, in July, 2001.  The plaintiffs' Complaint, not filed until December 21, 2004, is time barred.  Therefore, Counts II and III should be dismissed as a matter of law because they were not brought within the three-year statute of limitations.

      **C.**    **Count II and III Should Be Dismissed Because The Plaintiffs Fail To Offer An Expert Opinion To Support Their Claims.**

Counts II and III should be dismissed because the plaintiffs do not offer expert opinions to support their legal malpractice claims against Halloran.  *Anderson v. Schoerhorn*, 89 Conn. App. 666 (2005) (summary judgment dismissing claims for legal malpractice and breach of fiduciary duty).  In essence, Counts II and III allege that Halloran breached a duty owed to the Allens arising out of his representation.  In order to prove their claims, the Allens are required to show that Halloran's representation constituted a breach of the applicable standard of care.

---

[3] In June or July, 2001, Barbara filed a formal grievance with the Connecticut Bar.  No disciplinary action was ever taken as a result of the grievance.

34015883v3 856230

*Celentano. v. Grudberg,* 76 Conn.App. 119, 125, cert. den. 264 Conn. 904 (2003). As a general rule, "where [an attorney's] exercise of proper professional skill and care is in issue, expert testimony tending to establish the want of such skill and care is essential to recovery." *Anderson v. Schoerhorn*, at 671 89 Conn. (2005) quoting *Celentano. v. Grudberg,* 76 Conn.App. at 126. "The only exception to that rule is where there is present such an obvious and gross want of care and skill that the neglect is clear even to a layperson." *Bent v. Green*, 39 Conn.Sup. 416, 420 (1983).

> The rationale underlying that rule is that in most cases, the determination of an attorney's standard of care, which depends on the particular circumstances of the attorney's representation, is beyond the experience of a layperson, including members of the jury and perhaps even the presiding judge.

*Celentano. v. Grudberg,* 76 Conn.App. at 126.

In this case, the plaintiff have failed to disclose any expert to offer testimony on their behalf. Pursuant to this Court's Order dated, May 17, 2005, the deadline for plaintiffs to disclose such an expert was November 30, 2005. Remarkably, at her deposition Barbara declared that the plaintiffs have not retained an expert in this case. Facts, ¶ 32. In the absence of an expert, Halloran's motion for summary judgment on Counts II and II should be allowed.

**IV.    THE PLAINTIFFS' COUNT I (Breach of Contract – Settlement) SHOULD BE DISMISSED BECAUSE THEY HAVE SUFFERED NO HARM.**

Count I should be dismissed because the Allens suffered no harm as a result of any alleged breach of contract by Halloran. "In the absence of a justiciable controversy, the courts have no jurisdiction." *Kleinman v.* Marshall, 192 Conn. 479, 484 (1984). "Justiciability requires . . . that the determination of the controversy will result in practical relief to the complainant." Pelligrino v. O'Neill, 193 Conn. 670, 674, cert. den. 469 U.S. 875 (1984). To recover for breach of contract, the Allens must establish "the formation of an agreement, performance by one party,

11

breach of the agreement by the other party and [resulting] damages." *Fontanella, et al. v. Marcucci, et al.*, 89 Conn.App. 690 (2005), citing, *Rosato v. Mascardo*, 82 Conn.App. 396 (2004). Here, even if the Court determines that Halloran failed to disburse the settlement proceeds according to the terms of a retainer agreement, the plaintiffs suffered no damages and are entitled to nothing. Accordingly, Count I should be dismissed.

The Allens allege that Halloran breached a retainer agreement ("Retainer Agreement") by failing to distribute certain settlement proceeds in accordance with its terms. In essence, the Allens disagree with the order of the distribution of the settlement proceeds. Where they miss the boat, however, is that regardless of the manner of distribution of the settlement proceeds, the entire settlement would have been absorbed by a lien on the proceeds as a result of workers' compensation benefits paid to Barbara.

On July 21, 1997, Barbara executed the Retainer Agreement by which she retained Halloran to represent her in "a claim or claims against any party or parties arising out of . . . injury to [her] left foot 1/10/97." Facts, ¶ 3. Section II of the Retainer Agreement provides, in relevant part, as follows:

> **FEES** – The Client agrees that the Law Offices of R. Bartley Halloran, P.C. shall receive fees of thirty-three and one third percent (33 1/3 %) of the recovery whether by way of settlement or award, after deduction of liens, costs and expenses, including payback of any workers' compensation benefits. The Client authorizes the Law Offices of R. Bartley Halloran, P.C. to deduct said fees, liens, costs and expenses out of monies received from said party or parties. . . .

On January 5, 1998, Halloran, on behalf of the Allens, filed a complaint against Delta Elevator Services Corporation ("Delta Elevator") in the Superior Court in Hartford, Connecticut alleging that Barbara's injuries were caused by Delta Elevator's negligence (the "Delta Action").

12

Facts, ¶ 6. On January 15, 1998, the City of Hartford intervened in the Delta Action to enforce its workers' compensation lien and recover payments made to, and on behalf of, Barbara as a result of her personal injuries sustained while she was employed by the City of Hartford. Facts, ¶ 7.

By March, 2000, the workers' compensation lien totaled $195,921.58. Facts, ¶ 12. As noted by counsel for the City of Hartford, the lien was broken down as follows:

| | |
|---|---|
| Medical | $47,578.44 |
| Temporary total | $8,814.00 |
| Permanent partial | $42,997.00 |
| (City) Salary continuation | $66,853.00 |
| (City) Health insurance to 3/31/00 | $29,679.14 |

Id.

Barbara was aware of the lien and knew that the amount was high because she had a "lot of medical [bills]." Facts, ¶ 12. Barbara knew, at least as of March 2000, that the workers' compensation lien was approaching $200,000. Id.

On or about October 3, 2000, in exchange for a payment by Delta Elevator of $235,000, the Allens executed a general release in the Delta Action (the "Release") Facts, ¶ 13. Barbara understood that she was releasing Delta Elevator from the lawsuit. Facts, ¶ 14. In connection with the settlement, the Allens signed a Settlement Statement, indicating the total settlement for the Delta Action as $235,000, less attorneys' fees totaling $78,333.33, less expenses totaling $26,946.22 leaving a balance of $126,720.45. Facts, ¶ 15. The balance was subject to the workers' compensation lien. C.G.L. § 31-293 The settlement negotiated by Halloran originally called for the City of Hartford to waive its lien (resulting in a net distribution to Barbara of $150,000) in exchange for Barbara agreeing to a final settlement of her workers' compensation claim. Facts, ¶ 16. After executing the Settlement Statement and Release, Barbara decided,

against the advice of Halloran, to pursue her disability claims against the City of Hartford. Id. Barbara instructed Halloran "not to pay the above listed amount [$126,720.45] until further order of the Compensation Commission or the court." Facts, ¶ 17. Per Barbara's instructions, Halloran placed the $126,720.45 in escrow. Id.

On or about April 20, 2001, the City of Hartford brought suit against Barbara, seeking reimbursement for its workers' compensation lien totaling approximately $205,000. Facts, ¶ 19. Several years later, after successor counsel began representing Barbara, the Workers Compensation Commission ordered the City of Hartford to pay Barbara additional benefits totalling $31,018.89. Facts, ¶ 30. Connecticut law allows the payor of workers' compensation benefits full reimbursement out of the net proceeds of a third party settlement. C.G.L. § 31-293; *Enquist v. General Datacom*, 218 Conn. 19, 26 (1991).[4] Accordingly, the City of Hartford was entitled to reimbursement of approximately $236,000.

The Allens claim that they suffered harm as a result of the distribution of the settlement proceeds is meritless. The flaw in their argument is that, given the amount of the workers compensation lien, the Allens would have received no funds from the settlement even if Halloran had disbursed the settlement according to the specific terms of the Retainer Agreement.[5] As the benefits paid by the workers compensation carrier exceeded the amount of the settlement proceeds, the Allens suffered no harm by the disbursement. In fact, the plaintiffs admit they would have received "zero" even if Halloran's settlement calculation had been performed differently. Facts, ¶ 18. Accordingly, they have suffered no damage as a result of Halloran's

---

[4] General Statutes § 31-293 entitled "Liability of Third persons to employer and employee" provides in relevant part that "(a) … any employer or custodian of the Second Injury Fund, having paid, or having become obligated to pay, compensation under the [Workers' Compensation Act] may bring an action against such person to recover any amount that he has paid or has become obligated to pay as compensation to the injured employee."

actions. A comparison of the distribution of settlement proceeds illustrates the point:

|  | Distribution of Funds Per Halloran | Distribution of Funds Per the Allens |
|---|---|---|
| SETTLEMENT PROCEEDS | $235,000.00 | $235,000.00 |
| ATTORNEY FEES | ($78,333.33) |  |
| EXPENSES | ($29,946.22) | ($24,014.61) |
| WC LIEN | ($126,720.45) | ($236,000.00) |
| NET TO PLAINTIFFS | $0 | $0 |

## CONCLUSION

WHEREFORE, the plaintiffs' claims against the defendants should be dismissed as a matter of law because there are no genuine issues of material fact to be tried.

                                        R. BARTLEY HALLORAN and
                                        R. BARTLEY HALLORAN, P.C.,

                                        By their attorneys,

                                        /s / Kenneth D. Small
                                        Kenneth D. Small (BBO# 567868)
                                        Hinshaw & Culbertson LLP
                                        One International Place, 3rd Floor
                                        Boston, MA 02110
                                        (617) 213-7000

Dated: February 17, 2006

34015883v3 856230