UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BARBARA CORDI-ALLEN and JOHN ALLEN,     ) <br><br> *Plaintiffs,*            ) <br><br> v.                        ) <br><br> R. BARTLEY HALLORAN and R. BARTLEY <br> HALLORAN, P.C.,         ) <br><br> *Defendants.*       ) | CIVIL ACTION NO. 05-30083-MAP |

## <u>AFFIDAVIT OF KENNETH D. SMALL</u>

I Kenneth D. Small, hereby depose and say as follows:

1.     I am an attorney duly licensed in the Commonwealth of Massachusetts and employed by Hinshaw & Culbertson LLP. I represent the defendants R. Bartley Halloran and R. Bartley Halloran, P.C. in this action. I make this affidavit based upon personal knowledge.

2.     Attached as <u>Exhibit A</u> is a true and accurate copy of the deposition transcript of Barbara Cordi-Allen dated November 15, 2005.

3.     Attached as <u>Exhibit B</u> is a true and accurate copy of the deposition transcript of Barbara Cordi-Allen dated November 17, 2005.

4.     Attached as <u>Exhibit C</u> is a true and accurate copy of the executed a retainer agreement dated July 21, 1997. Exhibit C was identified and marked as Exhibit 2 at the deposition of Barbara Cordi-Allen.

5.     Attached as <u>Exhibit D</u> is a true and accurate copy of complaint in the action captioned barbara *Cordi Allen v. Delta Elevator Services Corporation.* Exhibit D was identified

1

and marked as Exhibit 3 at the deposition of Barbara Cordi-Allen.

6.    Attached as <u>Exhibit E</u> is a true and accurate copy of Motion to Intervene City of Hartford/Board of Education as Co-Plaintiff and to File Intervening Complaint. Exhibit E was identified and marked as Exhibit 4 at the deposition of Barbara Cordi-Allen.

7.    Attached as <u>Exhibit F</u> is a true and accurate copy a of letter of appearance from the Law Offices of R. Bartley Halloran to Workers' Compensation Commission dated October 5, 1999. Exhibit F was identified and marked as Exhibit 10 at the deposition of Barbara Cordi-Allen.

8.    Attached as <u>Exhibit G</u> is a true and accurate copy of letter from Pomeranz & Drayton & Stabnick, LLC to R. Bartley Halloran, Esq. dated March 20, 2000.

9.    Attached as <u>Exhibit H</u> is a true and accurate copy of letter from R. Bartley Halloran to Mr. and Mrs. John Allen dated October 2, 2000.   Exhibit H was identified and marked as Exhibit 14 at the deposition of Barbara Cordi-Allen.

10.    Attached as <u>Exhibit I</u> is a true and accurate copy of a General Release.  Exhibit I was identified and marked as Exhibit 13 at the deposition of Barbara Cordi-Allen.

11.    Attached as <u>Exhibit J</u> is a true and accurate copy of a Settlement Statement. Exhibit J was identified and marked as Exhibit 16 at the deposition of Barbara Cordi-Allen.

12.    Attached as <u>Exhibit K</u> is a true and accurate copy of a letter from R. Bartley Halloran to Barbara Cordi-Allen dated October 12, 2000.  Exhibit K was identified and marked as Exhibit 15 at the deposition of Barbara Cordi-Allen.

13.     Attached as <u>Exhibit L</u> is a true and accurate copy of the Complaint in action captioned *City of Hartford v. Barbara Cordi-Allen*, dated April 20, 2001. Exhibit L was identified and marked as Exhibit 18 at the deposition of Barbara Cordi-Allen.

14.     Attached as <u>Exhibit M</u> is a true and accurate copy of e-mail correspondence dated May 4, 2001 and May 21, 2001. Exhibit M was identified and marked as Exhibits 20-21 at the deposition of Barbara Cordi-Allen.

15.     Attached as <u>Exhibit N</u> is a true and accurate copy of letter R. Bartley Halloran to Barbara Cordi-Allen dated May 10, 2001. Exhibit N was identified and marked as Exhibit 23 at the deposition of Barbara Cordi-Allen.

16.     Attached as <u>Exhibit O</u> is a true and accurate copy of e-mail correspondence from Barbara Cordi-Allen to R. Bartley Halloran dated May 24, 2001. Exhibit O was identified and marked as Exhibit 27 at the deposition of Barbara Cordi-Allen.

17.     Attached as <u>Exhibit P</u> is a true and accurate copy of a letter R. Bartley Halloran to Workers Compensation Commission dated May 29, 2001. Exhibit P was identified and marked as Exhibit 30 at the deposition of Barbara Cordi-Allen.

18.     Attached as <u>Exhibit Q</u> is a true and accurate copy of an e-mail from Barbara Cordi-Allen to R. Bartley Halloran dated May 30, 2001. Exhibit Q was identified and marked as Exhibit 31 at the deposition of Barbara Cordi-Allen.

19.     Attached as <u>Exhibit R</u> is a true and accurate copy of Memorandum Re: Motion to Withdraw as Counsel dated July 17, 2001. Exhibit R was identified and marked as Exhibit 32 at the deposition of Barbara Cordi-Allen.

20.     Attached as <u>Exhibit S</u> is a true and accurate copy of Finding and Award dated March 19, 2004.  Exhibit S was identified and marked as Exhibit 34 at the deposition of Barbara Cordi-Allen.

21.     Attached as <u>Exhibit T</u> is a true and accurate copy of Barbara Cordi-Allen's Response to Interrogatories.  Exhibit T was identified and marked as Exhibit 36 at the deposition of Barbara Cordi-Allen.

Signed under the pains and penalties of perjury this 17th day of February, 2006

Kenneth D. Small

4

Page 1

1                                    Volume:    I

2                                    Pages:     1-177

3                                    Exhibits:  1-17

4              UNITED STATES DISTRICT COURT

5              DISTRICT OF MASSACHUSETTS

6                           C.A. NO. 05-30083-MAP

7    - - - - - - - - - - - - - - - - - - - - - x

8    Barbara Cordi-Allen and John Allen,

9                     Plaintiffs,

10       v.

11   R. Bartley Halloran and

12   R. Bartley Halloran, P.C.,

13                     Defendants.

14    - - - - - - - - - - - - - - - - - - - - - x

15

16         DEPOSITION OF BARBARA CORDI-ALLEN

17            Tuesday, November 15, 2005

18                   11:00 a.m.

19            HINSHAW & CULBERTSON LLP

20      One International Place, Third Floor

21         Boston, Massachusetts 02110

22

23   Reporter:  Lori-Ann London, RPR

24

Barbara Cordi-Allen

11/15/2005

Page 2

```
 1   A P P E A R A N C E S :
 2
 3      By Paul Revere, III, Esquire
 4      LAW OFFICES OF PAUL REVERE, III
 5      226 River View Lane
 6      Centerville, Massachusetts 02632
 7      508.778.7126
 8      Appearing for the Plaintiffs
 9
10      By Kenneth D. Small, Esquire
11      HINSHAW & CULBERTSON LLP
12      Fort Hill Square
13      One International Place, Third Floor
14      Boston, Massachusetts 02110
15      617.213.7000
16      Appearing for the Defendants
17
18   ALSO PRESENT:
19
20      John Allen
21
22
23
24
```

Page 3

```
 1              I N D E X
 2
 3   DEPOSITION OF:                PAGE
 4   BARBARA CORDI-ALLEN
 5
 6   EXAMINATION BY MR. SMALL           6
 7                                        X
 8           E X H I B I T S
 9   NO.                   PAGE
10    1  Notice of Taking Deposition       6
11    2  Retainer Agreement               24
12    3  Complaint                        38
13    4  Motion to Intervene City of Hartford/   44
14       Board of Education as Co-Plaintiff and
15       to File Intervening Complaint
16    5  Letter, 9/25/98, Pomeranz to Doyle    45
17    6  Letter, 10/7/98, Halloran to Cordi-Allen  49
18    7  Defendant's Disclosure of Expert     56
19    8  Amended Disclosure of Expert       57
20    9  Defendant's Supplemental Notice of   62
21       Disclosure of Expert Witness
22   10  Letter dated 10/5/99, Jean Baril to    81
23       Workers' Compensation Commission
24   11  Letter dated 4/27/00, Casarello to    86
```

Page 4

```
 1            E X H I B I T S
 2   NO.                      PAGE
 3     B. Allen
 4   12  Fax dated 3/20/00              90
 5   13  General Release               92
 6   14  Letter, 10/2/00, Halloran to Allens    95
 7   15  Letter, 10/12/00, Halloran to      139
 8       Cordi-Allen
 9   16  Settlement Statement           145
10   17  Email string, 3/28/01          164
11
12
13
14
15
16
17
18      *Original exhibits retained by Mr. Small
19
20
21
22
23
24
```

Page 5

```
 1            P R O C E E D I N G S
 2
 3       (Exhibits 1 through 6 premarked.)
 4       MR. SMALL:  Before we swear the
 5   witness in, counsel have agreed to reserve all
 6   objections, except as to form, till the time of
 7   trial.  The witness will read and sign the
 8   deposition; we'll waive the requirement of a
 9   notary.
10       MR. REVERE:  Okay.
11       MR. SMALL:  30 days after today's
12   deposition, would that be acceptable -- well, not
13   today's deposition, when she get today's
14   transcript.
15       MR. REVERE:  Yeah, I think that --
16   I've never had much of an issue with that.
17       MR. SMALL:  Okay.  Would you swear
18   the witness, please?
19       BARBARA CORDI-ALLEN,
20   a witness called for examination by the Defendant,
21   having been satisfactorily identified by the
22   production of her Massachusetts driver's license,
23   and duly sworn by the Notary Public, was examined
24   and testified as follows:
```

2 (Pages 2 to 5)

Barbara Cordi-Allen

11/15/2005

Page 6

1   EXAMINATION
2   BY MR. SMALL:
3       Q   Good morning, Ms. Cordi-Allen. As you
4   know, my name is Kenneth Small. I represent Bart
5   Halloran and R. Bartley Halloran, P.C. here this
6   morning.
7           Would you please state your name?
8       A   Barbara Cordi-Allen.
9       Q   And your address, please?
10      A   143 Ardsley Road, Longmeadow, Mass.
11      Q   Ms. Cordi-Allen, we've marked as Exhibit
12  No. 1 today a copy of your notice of deposition.
13  I ask you to just take a look at that, please.
14          (Document exhibited to witness.)
15      Q   Have you seen this document before?
16      A   No.
17      Q   In any event, you're here in relation to
18  the case that you have filed titled Barbara
19  Cordi-Allen and John Allen v. R. Bart Halloran and
20  R. Bart Halloran, P.C.; that's correct, isn't it?
21      A   Yes.
22      Q   And I know you've been deposed before in
23  a couple of matters, but you understand, do you
24  not, that I will be asking some questions today,

Page 7

1   and you will be required to answer them unless
2   instructed by your counsel not to answer them,
3   correct?
4       A   Yes.
5       Q   And you're doing a great job so far.
6   I'd ask you to just be verbal with your answers.
7   Okay?
8       A   Um-hm. Yes.
9       Q   And I will do my best to allow you to
10  finish your answer so the court reporter can take
11  down your answer in full. I would just ask that
12  you allow me to try to get my question out before
13  beginning to answer the question. Is that
14  agreeable?
15      A   Yes.
16      Q   If at any point you don't understand my
17  question, just ask me -- tell me you don't
18  understand it, ask me to repeat it, and we'll do
19  that for the course of the deposition.
20          MR. REVERE: Can we go off the
21  record?
22          MR. SMALL: Sure.
23          (Off record.)
24      Q   Ms. Cordi-Allen, are you on medications

Page 8

1   today?
2       A   Yes.
3       Q   What medications are you on today,
4   please?
5       A   The Duragesic patch, 50 milligrams, and
6   Hydrocodone, which I don't know, wait a minute.
7   I'm going to take another one. I've already taken
8   one. It's 10-325, and the Hydro -- no.
9       Q   And Hydrocortal?
10      A   This is Hydrocodone. I take at least
11  four a day.
12      Q   Can you tell me to the best of your
13  knowledge what Duragesic is for?
14      A   Pain, both of them are for pain. It's
15  supposed to last three days. I use it -- I
16  replace it every two days with the doctor's
17  instructions, because it's -- as much as it is,
18  it's not, basically, you know, really working, but
19  it beats being on OxyContin, although that helped
20  my back more.
21      Q   Besides the Duragesic and the
22  Hydrocortal, are you on any other medications
23  today?
24      A   Today, I haven't taken anything else,

Page 9

1   but I -- oh, yeah -- no, I haven't taken anything
2   else.
3       Q   Okay.
4       A   No, I have like Imitrex if I get a
5   migraine, and I haven't taken it.
6       Q   Okay. You take Duragesic and
7   Hydrocortal on a regular basis on a daily basis;
8   is that correct?
9       A   Oh, yes.
10      Q   Within the last month, let's say, have
11  you taken any other medications on a regular basis
12  besides those two?
13      A   I've taken Imitrex as needed, but -- I
14  do take it usually a couple times a week. I think
15  it might be because of the medication giving me
16  headaches at this point. I take Crestor for
17  cholesterol, C-R-E-S-T-O-R, and I take fosa --
18  fosamax, something like that, once a week.
19      Q   What is fosamax?
20      A   It's to strengthen my bones.
21      Q   And you mentioned OxyContin?
22      A   I was on that.
23      Q   When did you stop taking OxyContin?
24      A   About a year ago.

3 (Pages 6 to 9)

Barbara Cordi-Allen

11/15/2005

1    Q    Are you currently treating with a
2    physician who is --
3    A    Yes.
4    Q    -- prescribes this medication to you?
5    A    Yes.
6    Q    And who is that?
7    A    Dr. Pierangelo, and I also see
8    Dr. Michna at Brigham Women's.  Dr. Michna's tried
9    other medicines, but I'm very sensitive and I've
10   had reactions, so...
11   Q    Are you currently undergoing any
12   treatment for any psychiatric care?
13   A    Oh, no.
14   Q    Are you taking any other medications for
15   psychiatric needs?
16   A    No.
17   Q    Will any of these -- you mentioned today
18   you are on Duragesic and Hydrocortal?
19   A    Right.  Hydrocodone.
20   Q    Hydrocodone.  I apologize.
21        Will either of these medications
22   affect your ability to testify today?
23   A    I am like spacey, so...
24   Q    Well, do you believe that that's going

1    to affect your ability to testify truthfully and
2    understand my questions?
3    A    No, but I might go off target, so if I
4    do, you need to tell me.
5    Q    Well, when you say go off target,
6    Ms. Cordi-Allen, what do you mean?
7    A    Well, when you ask me a question, I
8    might not answer it directly.  I may, you know,
9    side track from it without realizing it.  So if I
10   do, just keep me focussed on the question.
11   Q    Besides being potentially sidetracked,
12   are you going to have a problem understanding my
13   questions?
14   A    I don't think so.
15   Q    We talked -- you previously took
16   OxyContin?
17   A    Yes.
18   Q    We talked about that, right?
19   A    Um-hm.
20   Q    Now, you understand that this lawsuit
21   relates to representation by Mr. Halloran,
22   correct?
23   A    Correct.
24   Q    And that was in relation to a dispute

1    that you had with Delta Elevator Company; is that
2    correct?
3    A    Yes, and the city of Hartford.
4    Q    Right.  And the city of Hartford was in
5    connection with your workers' compensation?
6    A    Yes.
7    Q    Okay.  Were you on different medications
8    at that time?
9    A    Oh, yes.
10   Q    Okay.  Did those medications affect your
11   ability to understand questions and to communicate
12   with others?
13   A    Definitely.
14   Q    What medications were those?
15   A    I don't know.  OxyContin was one of
16   them.  They tried so many different medicines and
17   I had reactions trying to stop RSD.  I know one of
18   them was neurontin, and I slept like 23 out of 24
19   hours when I was on that.  I don't even remember.
20   I know they gave me Ambien, they said because I
21   wasn't sleeping through the night because of pain.
22   Like, you know, if a sheet touched my foot, I'd
23   wake up in pain, or any weight on my foot would
24   cause me to wake up with pain.  So I wasn't

1    sleeping.  They said if you don't sleep your body
2    doesn't heal.  So they tried different
3    antidepressants, and I don't even remember what
4    they were, to trigger something to stop RSD, which
5    they find -- pain doctors even at Brigham and
6    Women uses it to stop RSD or to interfere with
7    the -- what's it called -- neuropathic.  Does that
8    make sense, neuropath; is that such a thing?
9    Q    Just testify to the best of your
10   ability.
11        When did you stop undergoing
12   treatment for psychiatric needs?
13   A    Well, I only went because that was part
14   of the treatment plan, and it was compulsory at
15   the pain center, at Baystate Pain Center.
16   Q    And you saw a Dr. -- I forget her name.
17   Do you remember the name of the doctor that you --
18   A    Wise.
19   Q    Thank you.
20        You saw Dr. Wise there for a time;
21   is that correct?
22   A    Um-hm.  Yes.
23   Q    And at some point did that change to a
24   different doctor?

Barbara Cordi-Allen

11/15/2005

Page 14

1    A    Yes.
2    Q    And who did that become?
3    A    Heller.
4    Q    When did you stop receiving treatment
5    for psychiatric care?
6    A    When I was at Baystate Pain Center, must
7    have been two, three years ago.
8    Q    So since that time have you undergone
9    any psychiatric care?
10    A    No.
11    Q    Ms. Cordi-Allen, have you ever heard of
12    brain atrophy?
13    A    I've heard it mentioned, yes.
14    Q    Do you know what that is?
15    A    No.
16    Q    Do you believe you suffer from brain
17    atrophy?
18    A    Definitely not.
19    Q    Not, is that what you said?
20    A    Right.  Correct.  Do you want me to
21    expand on that?
22    Q    No, you answered the question.  Thank
23    you.
24    A    Okay.

Page 15

1    Q    Can you tell me what you did to prepare
2    for today's deposition?
3    A    Today's deposition?  Paul sent me the
4    directions here and he sent me a copy of the
5    interrogatories, and that's -- I kind of looked at
6    some of them on my way here and that was it.
7    Q    When you say interrogatories, are you
8    referring to your answers to interrogatories?
9    A    Yes.
10    Q    Okay.
11    A    The ones that you prepared.  These are
12    from you, right?
13    Q    Well, did you look at any other
14    documents?
15    A    No.
16    Q    Did you speak with anyone --
17    A    No.
18    Q    -- concerning today's deposition?
19    A    No.
20    Q    Allow me to finish the question.
21    A    Oh, I'm sorry.
22    Q    Did you speak with anyone to prepare for
23    today's deposition?
24    A    No.

Page 16

1    Q    Did you meet with anyone to prepare for
2    today's deposition?
3    A    No.
4    Q    Okay.  And aside from the answers to
5    interrogatories, you didn't review any
6    documents --
7    A    No.
8    Q    -- to prepare for today's deposition?
9        Again, please allow me to finish the
10    question.
11    A    I'm sorry.
12    Q    She can only take town one of us
13    speaking at a time.
14    A    That's how I am.  I definitely don't
15    have brain atrophy.
16    Q    I know some of my questions are easily
17    answered but --
18    A    Yeah.
19    Q    -- allow me to finish for the record,
20    okay?
21        MR. SMALL:  Why don't we go off the
22    record for a second.
23        (Off record.)
24        MR. SMALL:  Okay.  Back on.

Page 17

1    Q    Ms. Cordi-Allen, you mentioned that your
2    counsel showed you some documents prior to today's
3    deposition, the answers to interrogatories?
4    A    Yes.
5    Q    Were there any other documents included
6    in that?
7    A    No, just what I have here.
8    Q    Had you seen the answers to
9    interrogatories before?
10    A    Yes, when I signed them.
11        MR. SMALL:  Okay.  I don't have a
12    signed --
13        MR. REVERE:  Oh.
14        MR. SMALL:  -- answers to
15    interrogatories.  Mine are unsigned.
16    Q    Are you sure you signed them?
17    A    Yes.
18        MR. SMALL:  I would request,
19    counsel, for -- I don't have signed
20    interrogatories from either party.
21        MR. REVERE:  I thought they were
22    going to send them to you.  I know I've got her
23    copy here.  I can have her sign and we'll just
24    hand you, they're the same.

5 (Pages 14 to 17)

Barbara Cordi-Allen

11/15/2005

Page 18

1    MR. SMALL: I'll take the
2  representation.
3    Q   Ms. Cordi-Allen, you've been deposed
4  before today, correct?
5    A   Yes.
6    Q   Okay. In what cases were those
7  depositions taken in, please?
8    A   Delta Elevator.
9    Q   Any others?
10   A   That's it.
11   Q   Were you ever deposed in the matter
12 pending in Truro?
13   A   No.
14   Q   Any other cases that you were deposed
15 in?
16   A   No.
17   MR. REVERE: Can we go off the
18 record for a minute?
19   MR. SMALL: Sure.
20   (Off record.)
21   MR. SMALL: Back on.
22   Q   Ms. Cordi-Allen, could you briefly,
23 please, describe your educational background?
24   A   I'm on the doctoral level.

Page 20

1  guidance counselor, and then I went on. I always
2  kept going to school.
3    Q   Besides what you've already testified
4  to, any other formal education?
5    A   I don't understand what you mean.
6    Q   Do you have any other degrees, any other
7  classes that you've taken?
8    A   Yes, I told you 120 credits about after.
9    Q   Right. I said any besides what you've
10 already testified.
11   A   It's not a degree.
12   Q   Allow me to ask the question.
13       Besides what you've already
14 testified to, have you undertaken any other formal
15 education?
16   A   Yes.
17   Q   Can you tell me, please?
18   A   Tell you what, the courses or...
19   Q   What other formal -- you've mentioned
20 that you have a master's degree.
21   A   They all were in education.
22   Q   Let me finish my question.
23       You mentioned you have a master's
24 degree.

Page 19

1    Q   You have a doctorate?
2    A   No, I have the equivalent of it.
3    Q   What does that mean?
4    A   I have a master's in CAGS and probably
5  120 credits after that. So I was considered on
6  the doctoral level for my education at work. You
7  know, that's your scale.
8    Q   And you were a teacher; is that correct?
9    A   Yes.
10   Q   So you would consider yourself highly
11 educated?
12   A   Very.
13   Q   Besides a master's degree, do you have
14 any other post-college degrees?
15   A   Yes.
16   Q   What is that?
17   A   CAGS.
18   Q   What does that stand for?
19   A   Certificate of Advanced Graduate
20 Studies. It's a six-year degree.
21   Q   And what was that in?
22   A   It was in education, concentration,
23 special education. My master's was in
24 primarily -- it was in education, primarily

Page 21

1    A   Right.
2    Q   You mentioned you have a CAGS --
3    A   Right.
4    Q   -- degree. You mentioned you took 120
5  additional credits.
6    A   Credits.
7    Q   And so I've asked you, besides what
8  you've just testified to, do you have any other
9  formal education?
10   A   Besides the 120 credits?
11   Q   Correct.
12   A   Oh, no.
13   Q   Okay. Now, Ms. Cordi-Allen, prior to
14 your retirement you were a teacher --
15   A   I did not retire.
16   Q   You did not retire --
17   A   No.
18   Q   -- I'm sorry.
19       Prior to your leaving the city of
20 Hartford --
21   A   No, I'm on disability.
22   Q   You're still on disability?
23   A   Yes.
24   Q   And you're receiving disability

6 (Pages 18 to 21)

Barbara Cordi-Allen

11/15/2005

Page 22

1  benefits?
2     A    Yes.
3     Q    And that's from the city of Hartford?
4     A    Yes -- no, the state of Connecticut.
5     Q    And what are those benefits for, to the
6  best of your knowledge?
7     A    Being disabled from teaching due to this
8  injury.
9     Q    And when you're saying this injury,
10  we're referring to the incident that occurred at
11  the elevator in January of 1997; is that correct?
12     A    Yes.
13     Q    And how much are the disability benefits
14  you receive from the state of Connecticut?
15     A    It's about -- net it comes out to about
16  1700 a month, because I have to pay 1300, I think,
17  somewhere around there, for medical insurance.
18  But I gross about 3,000 a month.  Does that make
19  sense?  I get 3,000 from the state, and then I
20  have to pay about 1300, somewhere around there,
21  for medical insurance.  So I wind up with 1700 a
22  month.
23     Q    And how long are those benefits going to
24  last?

Page 23

1     A    Indefinitely.
2     Q    Okay.  Until sometime it's ruled that
3  you are no longer disabled; is that right?
4     A    No.
5     Q    Okay.
6     A    I think it goes into retirement then.
7     Q    But then it's a different benefit,
8  correct?  This is a disability benefit?
9     A    No, it's basically all the same, I
10  believe.  I don't know.
11     Q    What is your age?
12     A    53.
13     Q    Okay.  At the time of the accident -- we
14  referred to the injury, January 10th, 1997; is
15  that right?
16     A    Yes.
17     Q    You were employed with the city of
18  Hartford; is that correct?
19     A    Yes.
20     Q    In what capacity?
21     A    Math teacher.
22     Q    And how long had you been a math
23  teacher?
24     A    24 -- 24 years.

Page 24

1     Q    With the same school?
2     A    No.
3     Q    Same school system?
4     A    One year I was at a Catholic school in
5  Holyoke, but 23 of the years I was in Hartford.
6  One year at Hartford public and then the rest --
7  the other 22 at Weaver.
8     Q    And that's -- Weaver, is that a middle
9  school or a high school?
10     A    High school.
11     Q    Ms. Cordi-Allen, I'm going to show you
12  what's now been marked as Exhibit No. 2 in this
13  deposition.
14         (Document exhibited to witness.)
15     A    Um-hm.
16     Q    I ask you to take a look at that,
17  please.
18         (Witness perusing document.)
19     Q    Do you recognize this document?
20     A    I've received three different contracts,
21  so I want to make sure I read.
22         (Witness perusing document.)
23     A    Okay.
24     Q    Do you recognize this document?

Page 25

1     A    Yes.
2     Q    Okay.  And this document purports to be
3  a retainer agreement; is that right?
4     A    Yes.
5     Q    And if we turn to page 2 --
6     A    Um-hm.
7     Q    -- it is dated July 21st, 1997; is that
8  correct?
9     A    Yes.
10     Q    And there's a signature under the term
11  "the client"; do you see that there?
12     A    Yes.
13     Q    Okay.  And is that your signature?
14     A    Yes.
15     Q    At the time you signed this agreement,
16  did you understand that you were executing a
17  retainer agreement?
18     A    Yes.
19     Q    And you retained Mr. Halloran to
20  represent you in connection with the injuries you
21  sustained as a result of the elevator accident; is
22  that correct?
23     A    Yes.
24     Q    Prior to retaining Mr. Halloran, had you

LegaLink Boston
(617) 542-0039

Barbara Cordi-Allen

Page 26

1  known him before?
2      A    No.
3      Q    How did you come to hear of
4  Mr. Halloran?
5      A    A lawyer had given me -- I don't --
6  maybe -- a list of lawyers that are trial lawyers,
7  and we met with -- my husband and I met with the
8  different lawyers, law firms, and Mr. Halloran
9  came to my house.
10     Q    Okay.  What lawyer provided you with a
11 list of names?
12     A    I don't even remember.
13     Q    And how many lawyers did you meet with
14 before selecting Mr. Halloran?
15     A    I know -- I can remember definitely two.
16     Q    Okay.  And who were they?
17     A    The law firm of Ricassi & Davis and
18 somebody named Ryan.
19     Q    You say Mr. Halloran came to your home?
20     A    Yes.
21     Q    Do you recall when that was?
22     A    No.
23     Q    Was it -- fair to say that -- this
24 retainer agreement is dated July 21st, 1997.  Is

Page 27

1  it fair to say that it was on or before that day?
2      A    Yes.
3      Q    And do you recall the conversation that
4  you had with Mr. Halloran --
5      A    Yes.
6      Q    -- at that time?
7      A    Yes.
8      Q    And what was that conversation?
9      A    At which time?
10     Q    You said you met with him.
11     A    Right.  Before he came or the day he
12 came?
13     Q    Well, let's start with did you have a
14 conversation with him before he came?
15     A    Well, before I signed this, could we say
16 that, because I'm not sure of which day.
17     Q    Okay.
18     A    Okay.  Yes, I do remember the highlights
19 of the conversation.
20     Q    Had you talked to him on the phone prior
21 to him coming to your home?
22     A    I don't remember.
23     Q    Okay.  In any event, you set up a
24 meeting for him to come to your home?

Page 28

1      A    Yes.
2      Q    And he arrived at your home?
3      A    Yes.
4      Q    Was he alone?
5      A    Yes.
6      Q    And who met with Mr. Halloran at that
7  time?
8      A    I remember I did.  I don't remember if
9  John did.  I don't remember if John was there.
10     Q    Okay.  And you remember the -- what you
11 term the highlights of that conversation?
12     A    Yes.  Um-hm.
13     Q    Can you relate to me in as great of
14 detail as you can the highlights of that
15 conversation, please?
16     A    Yeah.  He told me how he won the
17 L'Ambiance Plaza lawsuit, and that was a large
18 case, and he was a trial bar lawyer or something,
19 and he came with a book of a law case, and the law
20 case he cited was a settlement or a judgment,
21 whatever you call it, over a million dollars for a
22 man who was a contractor on a bridge who crushed
23 his heel, and he said that was the closest that he
24 could come to a case like mine.

Page 29

1          He said, however, this happened many
2  years before, and by the time it came to trial,
3  years had gone by, and from the date of my injury
4  it would take years for it to come to trial, so
5  mine should be quite a bit more than what that
6  was, just right off the top he mentioned that.
7  And he also said -- are you done writing?
8      Q    I'm listening.
9      A    He also said that this contract, which
10 was very important to us, was after workers' comp
11 was paid back, that if there was a lien, and
12 obviously there would be, that this would be after
13 workers' comp would be paid back.  And only
14 because of that clause we signed with -- I signed
15 with Mr. Halloran versus Ricassi & Davis.  Ricassi
16 & Davis was -- we would have signed with them if
17 everything was equal, but that clause tilted the
18 scale.  So we signed with Bart Halloran.
19     Q    So you relied on Mr. Halloran and the
20 statement in the contract concerning the division
21 of fees --
22     A    Yes.
23     Q    -- to select Mr. Halloran?
24          Did you rely on anything else

Barbara Cordi-Allen                                                    11/15/2005

Page 30

1  Mr. Halloran told you in selecting him as counsel?
2      A    Well, I mentioned that he did L'Ambiance
3  Plaza.
4      Q    Right.
5      A    And that he said that he was a trial bar
6  lawyer, which Ricassi & Davis is also. I didn't
7  know either one of them, so I went on credentials,
8  basically.
9      Q    Okay. Mr. Halloran didn't make any
10  guarantees to you at that time, did he?
11          MR. SMALL: Can you repeat the
12  question, please?
13          (Question read.)
14      A    He just suggested what my case would be
15  minimally worth.
16      Q    Well, prior to him coming to your home,
17  did you have a conversation with him concerning
18  the facts of your case?
19      A    The facts of my case or my injury?
20      Q    Your injury.
21      A    My injury, yes, he knew what happened to
22  me.
23      Q    And did you discuss with him your prior
24  medical history?

Page 31

1      A    I don't remember.
2      Q    Did you discuss with him -- strike that.
3          Is it fair to say that at the time
4  he met with you at the home that there were facts
5  left to be learned concerning your injury and your
6  then case against Delta Elevator?
7      A    That there were facts?
8      Q    Correct.
9      A    I think they had to research the
10  elevator, and a lot of facts have not -- he did
11  not research.
12      Q    Okay. Because it was at the very
13  beginning, it was his first meeting with you,
14  correct?
15      A    Well, there's quite a few things he
16  didn't find out.
17      Q    Well, that --
18      A    Is that what you're --
19      Q    No. We'll talk about that, but I'm
20  talking about the first meeting you had with
21  Mr. Halloran.
22      A    It was in the beginning, you know,
23  whenever you sit with somebody, you know, the
24  first couple times you don't know them. You don't

Page 32

1  know the case. How could you, you know.
2      Q    Now, referring to Exhibit 2 --
3      A    What's that?
4      Q    Retainer agreement.
5      A    Okay.
6      Q    -- there is a section, Roman numeral II,
7  where it says "Fees"; do you see that there?
8      A    Yes.
9      Q    You understood, did you not, that you
10  agreed to pay Mr. Halloran a certain percentage of
11  a recovery, correct?
12      A    Yes.
13      Q    And you also understood, did you not,
14  when you signed this document that you would be
15  responsible for the costs and expenses of the
16  case; is that correct?
17      A    Can you explain?
18      Q    Sure. If you look at paragraph two, the
19  second sentence down, it says, "The client
20  authorizes the Law Offices of R. Bart Halloran,
21  P.C. to deduct said fees, liens, costs, and
22  expenses out of moneys received --
23      A    Yes. Okay.
24      Q    -- from said party or parties." Do you

Page 33

1  see that there?
2      A    Yes.
3      Q    And if you turn to page 2, please, there
4  is a section called "Waiver." Did you understand
5  when you executed this document that you were
6  waiving the statutory fee limitations?
7      A    I didn't -- I don't think I really even
8  knew that. I thought it was standard to be a
9  third.
10      Q    Did you read the document before you
11  signed it?
12      A    Yes.
13      Q    And in fact you read it carefully, did
14  you not, because there was a provision in there
15  that was very important to you in --
16      A    Well, that would --
17      Q    Let me finish my question.
18          -- in retaining Mr. Halloran,
19  correct?
20      A    Yeah, under 2, No. 2, right, is that
21  what we're talking about?
22      Q    Yes, Exhibit 2.
23      A    Yes, um-hm.
24      Q    During this initial meeting with

LegaLink Boston
(617) 542-0039

Page 34

1  Mr. Halloran, did you discuss with Mr. Halloran
2  potential defendants in this case?
3      A   When?
4      Q   During this initial meeting with
5  Mr. Halloran?
6      A   Initial meeting?  I believe I told him
7  that there were witnesses.
8      Q   To your accident?
9      A · Yes.
10     Q   Did you discuss bringing a potential
11 claim against the elevator company?
12     A   I think that's what his interest was.  I
13 had never done anything like this.  I relied on a
14 lawyer's expertise to know what to do.
15     Q   So did he and you discuss researching
16 and bringing a potential claim against the
17 elevator company?
18     A   Whoever was at fault basically.
19     Q   Okay.
20     A   You know, I don't know that it was the
21 elevator company.  I don't know who made -- you
22 know what I'm saying?  It could have been --
23 you're saying the elevator company.  Is that the
24 person that owned the elevator?  Is it the person

Page 35

1  that built the elevator?  Is it the person who was
2  supposed to fix the elevator?  That may be three
3  different companies.
4      Q   Did you have any discussions with
5  Mr. Halloran about bringing a potential suit
6  against the city of Hartford during this initial
7  meeting?
8      A   Initial meeting?  I don't remember.
9      Q   Did you discuss, again, during the
10 initial meeting and your decision to retain
11 Mr. Halloran, did you discuss the chances --
12         THE WITNESS:  I'm sorry.
13         MR. SMALL:  Why don't we go off the
14 record for a second.  Take your time.
15         (Off record.)
16         MR. SMALL:  We'll go back on.
17         Can you repeat the last question,
18 please?
19         (Question read.)
20     Q   Why don't we strike the question.  I'll
21 just ask a new question.
22         Ms. Cordi-Allen, during this initial
23 meeting and in your discussions with Mr. Halloran,
24 did you discuss the chances of success in bringing

Page 36

1  a claim against any responsible party?
2      A   No, not to my knowledge.
3      Q   Okay.  You understood, did you not, that
4  in any litigation there's no guaranteed outcome,
5  correct?
6      A   I can't say that.
7      Q   Okay.  You think that there are
8  guaranteed outcomes in litigation?
9      A   I would -- it depends on the lawyer.  If
10 you're a good lawyer, you'll do your job.  If
11 you're not a good lawyer, then you won't do your
12 job.  Just like a teacher.  If you want a kid to
13 learn, you'll explain it and explain it in
14 different ways.  And if you're a lawyer and you
15 want to win a case, you'll win it; and if you
16 don't want to win it, you can blow it.
17     Q   You mentioned you met with two other
18 attorneys --
19     A   Yes -- firms, yes.
20     Q   Firms.
21     A   Yeah, um-hm.
22     Q   -- prior to retaining Mr. Halloran, a
23 Rackison & Davis, is that correct, or --
24     A   Ricassi, I think.

Page 37

1      Q   Ricassi & Davis.  Okay.
2      A   Or Roncassi, something like that.
3      Q   How many times did you meet with them?
4      A   I think once or twice.  I don't
5  remember.  At least once, though, in their office.
6      Q   And did you discuss bringing a potential
7  claim with them?
8      A   Yes.
9      Q   And who did they see as a potential
10 defendant in this case, if anyone?
11     A   Oh, I don't think any -- I think
12 everybody was pretty much looking at anybody
13 connected with the elevator at least.
14     Q   Did you have any discussions with this
15 law firm concerning bringing a potential claim
16 against the city of Hartford?
17     A   I don't remember.  The city -- the city
18 owned -- I don't remember, but it may have
19 happened because -- and I'm just throwing this
20 out, because it happened in a city-owned building.
21 Does that make sense?  But I don't remember is
22 basically...
23     Q   Did they give you any indication of the
24 potential value of your case?

Barbara Cordi-Allen                                                                11/15/2005

Page 38

1    A    No. Only Mr. Halloran did.
2    Q    How about Mr. -- you said you met with
3  an Attorney Ryan?
4    A    Right.
5    Q    Is that a first name or a last name?
6    A    His last name.
7    Q    And what potential claims did you
8  discuss with Mr. Ryan, if you recall?
9    A    I just -- it was about my injury to my
10  leg, my knee, my back, my arm. You know, my -- I
11  was crushed but I was twisted also, so there were
12  other injuries involved. But it was all related
13  to the January 10th incident.
14    Q    And did you discuss with Attorney Ryan a
15  potential claim against the city of Hartford?
16    A    Again, I don't -- I don't remember. It
17  may have happened, because, like I said, the city
18  owned the school.
19    Q    But you don't remember?
20    A    I don't remember, no.
21    Q    Ms. Cordi-Allen, I'm going to show you
22  what has been marked as Exhibit No. 3 in your
23  deposition and ask you to take a look at that,
24  please.

Page 39

1        (Document exhibited to witness.)
2    Q    I'm not going to go into great detail on
3  it, but I'll represent to you that this is the
4  complaint that was filed in your case against
5  Delta Elevator Services.
6    A    Oh.
7    Q    Have you seen this document before, to
8  your knowledge?
9    A    I don't recall.
10    Q    The date on this, you'd agree with me,
11  is February 3, 1998, correct --
12    A    That's --
13    Q    Pardon me, is January 5th, 1998?
14    A    I don't recall seeing this, because, to
15  be honest with you, right off the bat there's, you
16  know, spelling errors, so I would have said
17  something about that, or a typo error, rather, but
18  I -- truthfully I don't think I ever saw this.
19    Q    Okay. Were you aware that on or about
20  January 5th, 1998 a suit was filed by Mr. Halloran
21  and his office on your behalf?
22    A    I don't remember the date at all, but I
23  knew he was bringing one.
24    Q    You knew he was bringing a claim?

Page 40

1    A    Yes.
2    Q    Okay. Did you know he was bringing a
3  claim against the Delta Elevator Services
4  Corporation?
5    A    Yes.
6    Q    You discussed with Mr. Halloran that
7  Delta Elevator Services Corporation -- Delta
8  Elevator, is that okay if I call it --
9    A    Sure.
10    Q    -- would be a potential defendant?
11    A    He said that.
12    Q    Okay. What -- do you recall any
13  conversations you had with Mr. Halloran concerning
14  bringing a claim against Delta Elevator?
15    A    He said that they were the maintenance
16  company. Is that -- do you know what I mean by
17  that?
18    Q    Um-hm. Any other -- do you recall
19  anything else about conversations you had with
20  Mr. Halloran?
21    A    Regarding the company or --
22    Q    Regarding bringing Delta Elevator --
23  bringing a case against Delta Elevator Services
24  Corporation.

Page 41

1    A    No, not -- I can't -- I mean, there's
2  been a lot. It's like too broad kind of. I
3  don't --
4    Q    I'm focussing you on the time before
5  this complaint was filed --
6    A    Right.
7    Q    -- okay? And I'm trying to determine if
8  you had any conversations with Mr. Halloran
9  concerning what defendants you were going to bring
10  a claim against. You obviously brought a claim
11  against Delta Elevator Services, correct?
12    A    Yes.
13    Q    And you had discussions with
14  Mr. Halloran about bringing a claim against Delta
15  Elevator?
16    A    Yes.
17    Q    Did you have any conversations with
18  Mr. Halloran about bringing a potential claim
19  against any other entity?
20    A    I figured that he would explore that.
21    Q    That wasn't my question.
22        MR. SMALL:  Can you repeat the
23  question, please?
24    A    Oh, okay.

11 (Pages 38 to 41)

Barbara Cordi-Allen

11/15/2005

Page 42

1          (Question read.)
2     A    I may have, in that there may have been
3    others involved.
4     Q    Okay.
5     A    Does that make sense?
6     Q    Do you recall any conversations or are
7    you speculating that you may have?
8     A    I can't remember any conversations per
9    se saying -- you know, on this day, but I remember
10   questioning, you know, who else was involved in
11   it, who was responsible, since so many people had
12   fallen into the elevator, you know, it wasn't put
13   out of order, it wasn't fixed, you know, and
14   subsequently I found out that it wasn't even
15   permitted on my own.  He never told me that.  That
16   elevator never should have been operating.  So
17   there should have been additional --
18    Q    And that was after the fact --
19    A    Oh, yeah.
20    Q    I'm sorry.  That was after the fact that
21   this complaint was filed, correct?
22    A    Yes.
23    Q    This complaint that we're looking at,
24   which is Exhibit 3 --

Page 43

1     A    Um-hm.  Okay.
2     Q    -- was a complaint also brought on
3    behalf of your husband; is that correct?
4     A    I believe so, yes.
5     Q    And if you look to --
6     A    No. 2?
7     Q    -- Count II --
8     A    Um-hm, yes.
9     Q    -- that's a count for loss of
10   consortium; is that correct?
11    A    Where is Count II?  Oh, wait a minute.
12    Q    It's BCA 01841.  And if you look down,
13   it's paragraph No. 14 there.  It says, "Has lost
14   the consortium of his wife."  Do you see that
15   there?
16    A    Yes.
17    Q    You understood when Mr. Halloran filed
18   this complaint that this complaint was also going
19   to be brought on behalf of your husband?
20    A    Like I said, I never saw this.  I'm
21   positive I never saw this, you know, 99.9 percent,
22   but I did know that he was bringing a complaint --
23    Q    Okay.
24    A    -- on behalf of my husband.

Page 44

1     Q    You understand that you produced this
2    document to me, Ms. Cordi-Allen, in the box of
3    documents that you provided to me.  Does that help
4    refresh your memory whether you saw this or not
5    before?
6     A    No.  Mr. Halloran sent me a copy of his
7    file.  You know, I still don't have the complete
8    file.  There are things that he has of mine that
9    he hasn't returned.
10    Q    Ms. Cordi-Allen, I'm going to show you
11   what's been marked as Exhibit No. 4 and ask you to
12   take a look at that document, please.
13          (Document exhibited to witness.)
14    A    I don't need 1 and 2 anymore?  Where is
15   1?  Oh, is this 1?  Okay.
16          (Witness perusing document.)
17    Q    Have you seen this document before,
18   Ms. Cordi-Allen?
19    A    No.
20    Q    Were you aware in your suit against
21   Delta Elevator that the city of Hartford had
22   intervened with respect to its workers'
23   compensation lien in the matter?
24    A    Yes.

Page 45

1     Q    And you understood, did you not, that
2    the city of Hartford was entitled to be repaid for
3    any benefits it paid in connection with workers'
4    compensation, correct?
5     A    Yes.  And that was before --
6     Q    There's no question pending.
7          MR. REVERE:  Off the record for a
8    second.
9          (Off record.)
10         MR. SMALL:  Back on, please.
11    Q    Ms. Cordi-Allen, I'm going to show you
12   what's been marked as Exhibit No. 5.
13         (Document exhibited to witness.)
14    Q    And this is a document dated
15   September 25th, 1998.  You see that there?  Do you
16   see that?
17    A    Um-hm.
18    Q    You need to be verbal.  Yes?
19    A    Yes.
20    Q    And this is written by James L.
21   Pomeranz?
22    A    Yeah.
23    Q    Do you know who Mr. Pomeranz is?
24    A    He I think was Travelers lawyer.

12 (Pages 42 to 45)

Page 46

1    Q    He represented the city of Hartford,
2  didn't he, in connection with the workers'
3  compensation matter?
4    A    Well, Travelers and the city of Hartford
5  are like one.
6    Q    Right.  Okay.
7    A    Okay.
8    Q    And in this letter he indicates that you
9  were communicating directly with numerous
10  individuals at Travelers.  Do you see that there?
11    A    Um-hm, yes.
12    Q    Were you communicating with Travelers on
13  or about September 25th, 1998?
14    A    I -- I don't recall.  I did call, but I
15  don't remember when.
16    Q    Did you understand at some point that
17  Travelers requested that you stop calling them?
18    A    I don't recall.
19    Q    Did you ever have any conversations
20  with -- strike that.
21        Up at the top, this letter is
22  written to a Brian Doyle?
23    A    Yes.
24    Q    Of Ferguson and Doyle; is that correct?

Page 47

1    A    Yes.
2    Q    And at some point Mr. Doyle represented
3  you; is that correct?
4    A    He was the union lawyer.
5    Q.   Okay.  And when you say union lawyer,
6  what do you mean by that?
7    A    The lawyer for the Teachers Union for
8  the city of Hartford, and he handled workers' comp
9  case, he was my workers' comp lawyer.
10    Q    Because you had filed a claim for
11  workers' compensation, correct?
12    A    Yes.
13    Q    Did you ever have any conversations with
14  Mr. Doyle concerning Travelers' request that you
15  stop communicating with them?
16    A    I don't remember.
17    Q    Do you recall what purpose you were
18  attempting to contact Travelers for?
19    A    I remember I had been getting calls from
20  the president of Travelers when I was working for
21  donating to my department a huge amount of money
22  for graphing calculators, and he -- I donated --
23  his wife passed away and I gave a scholarship I
24  set up in her memory, and I know he said if

Page 48

1  there's anything that we ever needed, if I ever
2  needed anything call him.
3        And when I was found to have RSD,
4  they wanted me to go to one of the hospitals in
5  Connecticut, Hartford somewhere, and I called him
6  and I asked him, I said, Could I go to Baystate,
7  you know, because it's close, and he said sure and
8  he wrote a letter to Baystate Pain Center
9  referring me there, and that has disappeared, it's
10  been shredded somewhere.  Baystate's lost it,
11  basically.
12    Q    Do you recall when that telephone call
13  to --
14    A    I don't remember.
15    Q    What is his name?
16    A    Lipp, Bob Lipp.
17    Q    Do you know how to spell the last name?
18    A    L-I-P-P, something like that.
19    Q    And do you recall --
20    A    I remember that specifically, but I
21  don't --
22    Q    Do you recall if this conversation with
23  Mr. Lipp was before or after September 25th, 1998?
24    A    It was before.

Page 49

1    Q    After September 25th, 1998, are you
2  aware of any communications that you had with
3  Travelers?
4    A    I don't remember.
5    Q    I show you what's been marked as Exhibit
6  No. 6 in your deposition.
7        (Document exhibited to witness.)
8        (Witness perusing document.)
9    Q    Ms. Cordi-Allen, I'm showing you a
10  document dated October 7, 1998.  Do you recall
11  this document?
12    A    No.
13    Q    This is addressed to you at
14  146 Pleasantview; do you see that up there?
15    A    Right.
16    Q    Were you living on 146 Pleasantview on
17  or about October 7, 1998?
18    A    Pleasantview Avenue, yes.
19    Q    And this mentions a Dr. Kruger; do you
20  see that there?
21    A    Right.
22    Q    Who is Dr. Kruger?
23    A    He operated on my foot.
24    Q    As a result of the injury in January?

Page 50

```
1    A   Yes.
2    Q   And was he going to be a witness in your
3  case against Delta Elevator?
4    A   I guess, he should have been, you know.
5    Q   Because he was the treating physician,
6  correct?
7    A   Right, one of the treating physicians.
8    Q   And you continued to treat with him
9  after the injury; is that right?
10   A   Yes.
11   Q   How long did you continue to treat with
12  Dr. Kruger for?
13   A   I still once in a while see him.
14   Q   So you're still undergoing some
15  treatment with him?
16   A   Yes.
17   Q   Did you have any conversations with
18  Mr. Halloran about the fact that you believed that
19  Mr. Kruger had committed malpractice?
20   A   That he may have?
21   Q   Correct.
22   A   Yes.
23   Q   And when were those conversations?
24   A   I don't remember, but I found out at
```

Page 51

```
1  Baystate that there was a problem with the RSD not
2  being diagnosed in time for it being stopped. It
3  was harder to stop if it's not diagnosed and
4  treated within maybe seven weeks, something like
5  that. And Dr. Kruger did not listen to my
6  problems, the pain, and in fact his partner is the
7  one over the phone that told me that something was
8  wrong and it may be RSD.
9    Q   Did you ever bring a malpractice claim
10  against Dr. Kruger?
11   A   No.
12   Q   Did you ever inform Dr. Kruger that you
13  were considering bringing a malpractice claim
14  against him?
15   A   No.
16   Q   Did you ever retain a lawyer to
17  investigate bringing a malpractice claim against
18  Dr. Kruger?
19   A   No.
20   Q   Did you ever ask Mr. Halloran or anyone
21  at his office for a recommendation for an attorney
22  to investigate a claim against Dr. Kruger?
23   A   I don't remember, but I never called
24  anybody, so...
```

Page 52

```
1    Q   Okay.
2        MR. SMALL:  Let's go off the record
3  for a second.
4        (Off record.)
5    Q   Ms. Cordi-Allen, I'm going to talk a
6  little bit now about your case against Delta
7  Elevator.  Were you in communication with
8  Mr. Halloran and his office concerning the case?
9    A   Yes.
10   Q   And you understood, did you not, that
11  Mr. Halloran retained experts on your behalf?
12   A   Yes.
13   Q   Would you agree with me that this was a
14  highly contested matter?
15   A   I wouldn't know, because I don't know,
16  you know, what you guys are up against, you know
17  what I mean, to compare.
18   Q   Were you aware that Delta Elevator had
19  retained experts?
20   A   I -- I think they had some elevator man.
21   Q   Do you know a Dr. Jeffrey Blank?
22   A   Blank, yes.
23   Q   Okay.  And what did he do?
24   A   He did vocational testing or something
```

Page 53

```
1  like that.  He did some kind of testing.  He said
2  I was not employable.
3    Q   So he was an expert retained on your
4  behalf, correct?
5    A   Yes.
6    Q   And you wouldn't question the amounts
7  that were paid to Dr. Blank for his services,
8  would you?
9    A   I don't remember what they were, but...
10   Q   Did you question amounts that were paid
11  to Dr. Blank?
12   A   Did I question what was paid to
13  Dr. Blank?
14   Q   Correct.
15   A   I don't remember.
16   Q   Have you ever heard of a Joseph
17  Cunningham?
18   A   I think he was -- I'm not positive, but
19  I think he was the elevator expert.
20   Q   Okay.  And he was retained as an expert
21  on your behalf, correct?
22   A   I believe so.
23   Q   And a Douglas Merrill, are you familiar
24  with that name?
```

Barbara Cordi-Allen

11/15/2005

Page 54

1     A   I've heard of it. I've heard it but I
2  don't remember who he is.
3     Q   And are you aware that he was an expert
4  also retained on your behalf?
5     A   I don't remember.
6     Q   Are you aware of any other experts that
7  were retained on your behalf?
8     A   Doctors?
9     Q   Any expert.
10    A   Well, you said Dr. Kruger. The -- my
11 other doctor was elderly, he was 81, and I
12 remember telling Mr. Halloran, I said, Have you
13 deposed him? Because he was deposing people. And
14 I don't remember everybody he deposed. And I kept
15 telling him, I said, Why don't you -- because, you
16 know, god forbid, his age, and lo and behold he
17 never did depose him and the guy died a year later
18 or two years later, so -- that was critical,
19 because he said that he had no doubt I would have
20 gotten RSD from the injury, right off the get-go.
21 And Dr. Kruger actually sent me back to him
22 because he was baffled, you know, what was going
23 on with the pain. So he -- that would have --
24 that was one that wasn't, but should have been.

Page 55

1     Q   What was that doctor's name?
2     A   Turko.
3     Q   And do you know when he passed away?
4     A   I think maybe two years -- a year or two
5  years after I got hurt.
6     Q   So sometime between '98 and '99?
7     A   Around there, yeah.
8     Q   So it's fair to say prior to that time
9  of his passing you had requested Mr. Halloran to
10 depose him?
11    A   Numerous times, yes, numerous times,
12 because he was probably one of the best foot
13 surgeons in the country, and I don't know how they
14 saved my leg, you know, and I credit Dr. Turko for
15 his, you know, expertise as a surgeon.
16    Q   And Delta was also represented by
17 counsel in the case; is that correct?
18    A   Yes.
19    Q   And that was a Richard Kenny?
20    A   Yes.
21    Q   Had you heard of Attorney Kenny prior to
22 the Delta Elevator case?
23    A   Never.
24    Q   And are you aware that Delta Elevator

Page 56

1  retained experts to defend the case?
2     A   I think they had an elevator person. I
3  don't remember who else.
4     Q   Okay. Have you ever heard of a
5  Dr. Richlin?
6     A   Richlin. Richlin. Could you tell me
7  where he's from? I've heard the name, but I don't
8  remember where he's from. I don't want to get
9  confused with the --
10         MR. SMALL: Let me -- let's mark
11 this then as an exhibit, please.
12         (Document marked as Exhibit No. 7.)
13         (Document exhibited to witness.)
14    Q   I'm going to show you what's been marked
15 as Exhibit 7. Does this document help --
16    A   Yes.
17    Q   -- refresh your memory?
18    A   Um-hm.
19    Q   And, in fact, you actually were examined
20 by Dr. Richlin; isn't that true?
21    A   Yes. Yes.
22    Q   And where did that exam take place?
23    A   I don't know. It was in Connecticut
24 somewhere.

Page 57

1     Q   And are you aware that Dr. Richlin was
2  prepared to testify that you had not been properly
3  diagnosed with RSD?
4     A   That's what he was saying?
5     Q   Correct.
6     A   Some doctor said I had it, some said I
7  didn't. I know he said I had temperature changes
8  and different...
9         MR. SMALL: Let me show you this
10 exhibit then. Let's mark that, please.
11    A   Yeah, that would help because I haven't
12 gone through these, so...
13         (Document marked as Exhibit No. 8.)
14    Q   Ms. Cordi-Allen, I'm showing you what's
15 been marked as Exhibit No. 8 and ask you to take a
16 look at that document.
17         (Document exhibited to witness.)
18         (Witness perusing document.)
19    Q   I'm not going to ask you in detail, but
20 if you compare 7 and 8 together, one is a
21 disclosure of an expert, which is Dr. Richlin --
22    A   Wait a minute. 7 and 8, page 7?
23    Q   No. I'm sorry. Exhibit 7 and
24 Exhibit 8.

Page 58

1    A    Okay. All right. Say that again.
2    Q    Exhibit 7 is a Defendant's Disclosure of
3 Expert --
4    A    Okay.
5    Q    -- of David Richlin.
6    A    All right.
7    Q    And Exhibit 8 is an amended disclosure
8 of that expert. Do you see that there?
9    A    Yes.
10    Q    And in the second paragraph, second
11 sentence -- excuse me, third sentence, it says,
12 "It is also anticipated that Dr. Richlin will
13 offer an opinion that Barbara Cordi-Allen has not
14 been properly diagnosed with reflex sympathetic
15 dystrophy and that his examination revealed no
16 evidence of this condition based upon reasonable
17 medical certainty, and that the treatment afforded
18 her -- and then it, unfortunately -- we don't have
19 the other pages.
20         MR. REVERE: I was just about to
21 bring up that point. Okay.
22         MR. SMALL: I don't know why, but...
23    A    What do you mean?
24    Q    If you look at Exhibit 8 --

Page 59

1         MR. REVERE: Exhibit 8, he was
2 reading at the bottom here, treatment afforded her
3 -- this should probably be off the record.
4         MR. SMALL: Sure. We can go off the
5 record.
6         (Off record.)
7         MR. SMALL: Back on.
8    Q    Did I read that portion correctly,
9 Ms. Cordi-Allen?
10    A    That I have not been properly diagnosed?
11    Q    Did I read it correctly?
12    A    Would you read it again? Which one,
13 page --
14    Q    Amended --
15    A    -- the first one or the second one?
16    Q    Exhibit 8.
17    A    Okay.
18    Q    I was reading Exhibit 8, and I read a
19 portion of it for you.
20    A    Page 1 or 2?
21    Q    I read page 1. And I'm asking you
22 simply if I read it correctly.
23    A    Yes.
24    Q    So were you aware that Dr. Richlin was

Page 60

1 prepared to testify for Delta Elevator that you in
2 fact had not been properly diagnosed with RSD?
3    A    I believe so.
4    Q    Thank you.
5         Ms. Cordi-Allen, what is RSD?
6    A    What is it? It's reflex sympathetic
7 dystrophy.
8    Q    And would you agree with me that RSD was
9 a major part of your case against Delta Elevator?
10    A    It was one of the parts.
11    Q    And that went to the pain you were
12 experiencing, correct?
13    A    That was one factor. I was -- my knee
14 was torn, my back, I have a torn disc in it, and I
15 lost -- in the hospital I lost feeling, like
16 numbness, in my arm, upper arm, but the nerves
17 were all fine after I went to a Dr. Watson, like
18 within a couple of weeks he saw me and he tested
19 it, and then subsequently Dr. Kruger did something
20 and found that there was something wrong with a
21 cervical disc, because like I told you, I was
22 twisted, so there were other issues besides the
23 RSD. My injury was not just the foot being
24 crushed, but as a result of my foot being crushed,

Page 61

1 I was twisted and it caused other injuries.
2    Q    And are you aware of a Dr. Steven
3 Selden?
4    A    I've heard the name. He was one of the
5 doctors I saw. I don't remember who he was.
6    Q    So you were examined by Dr. Selden?
7    A    I think so.
8    Q    And are you aware that the defendants
9 had disclosed Dr. Selden as an expert in the Delta
10 Elevator case?
11    A    Can I ask you who he was, where his
12 address is?
13    Q    I can ask the questions. If you don't
14 know the answers, just --
15    A    Oh, okay.
16    Q    -- just answer the question to the best
17 you can, okay?
18    A    I'm trying to figure out who he was,
19 which one.
20         MR. SMALL: Will you repeat my
21 question, please?
22         (Question read.)
23    A    They sent me to him, so they were
24 probably going to use him.

16 (Pages 58 to 61)

Barbara Cordi-Allen                                                                                        11/15/2005

Page 62

1    Q    And you were examined by Dr. Selden; is
2    that correct?  I can represent to you that it
3    occurred on or about January 28th, 1999.  It's a
4    long time ago, but...
5    A    Yeah.
6         MR. SMALL:  Let's mark that.
7    A    If I -- I probably was.
8         (Document marked as Exhibit No. 9.)
9    Q    I'm going to show you what's been marked
10   as Exhibit No. 9, and ask you to take a look at
11   that document, please.
12        (Document exhibited to witness.)
13        (Witness perusing document.)
14   Q    Have you seen this document prior to
15   today?
16   A    No.
17   Q    Were you aware during the Delta Elevator
18   case that the experts had retained Dr. Selden who
19   was going to testify that there was no evidence of
20   RSD when he examined you in January of 1999?
21   A    I don't -- if he's the one I'm thinking
22   of, I can't say that he really examined me
23   properly or what I would consider an examination,
24   because if he's the one I'm thinking of, I was

Page 63

1    there for my foot and he never looked at the bone
2    scan for my foot.
3    Q    Okay.  Let me ask the question again.
4    Are you aware that the defendants had disclosed
5    Dr. Selden as an expert who was prepared to
6    testify that there was no evidence of RSD when he
7    examined you in January of 1999?
8    A    I guess I'll say yes.  I --
9    Q    Thank you.
10        Ms. Cordi-Allen, have you ever heard
11   of a Dr. Selig?
12   A    Selig.  Selig.  I think he was one of
13   their doctors.
14   Q    Right.  He was an expert that was
15   retained by the defendants; is that correct?
16   A    I believe so.
17   Q    And were you aware during the pendency
18   of your case against Delta Elevator that Dr. Selig
19   was prepared to testify -- strike that.
20        Were you aware that Dr. Selig
21   believed you had a personality disorder unrelated
22   to the elevator incident?
23   A    I -- no.
24   Q    I think we talked about a Dr. Merrill;

Page 64

1    is that correct?
2    A    Merrill.
3    Q    And he was a pain management specialist;
4    is that right?
5    A    I don't remember.  Where was -- if you
6    told me where he was, I could remember.
7    Q    Please, I ask the questions today.
8         Were you aware that the defendant
9    had retained Dr. Merrill and that he was expected
10   to testify that if you were disabled it was caused
11   by psychiatric issues and not physical?
12   A    No.
13   Q    Prior to the elevator incident in
14   January of 1997, had you been treated by a
15   Dr. Hazratji?
16   A    Yeah, um-hm.
17   Q    When did you begin treatment with
18   Dr. Hazratji?
19   A    Maybe a couple years before that for
20   migraines.
21   Q    And during your treatment with
22   Dr. Hazratji, he believed that you suffered from a
23   severe medical condition; isn't that correct?
24   A    I don't know.  What's a severe medical

Page 65

1    condition?
2    Q    And prior to the incident, Dr. Hazratji
3    believed you had degeneration of the brain; isn't
4    that right?
5    A    No, I don't know that.  Well, I know he
6    did some test, but I know I spoke with him
7    about -- you mentioned brain atrophy or something
8    like that before --
9    Q    Um-hm.
10   A    -- and I said, Why are they saying that?
11   And I said, Do you know I had a fractured skull
12   when I was 15 months old?  And he said, You did?
13   And I said, Yeah.  He said, Oh, well, that
14   explains everything.  But nobody ever asked me.  I
15   went down a flight of stairs.  And it never
16   interfered with me and my education or, you know,
17   whatever.  So he said, Oh, that explains
18   everything, so...
19   Q    Now, prior to the elevator incident you
20   had been treating for depression and anxiety; is
21   that correct?
22   A    I don't recall -- maybe when my -- wait
23   a minute.  I think there was once that my
24   daughter, there was an attempted kidnapping on

17 (Pages 62 to 65)

Barbara Cordi-Allen

11/15/2005

Page 66

1  her, and after that like I couldn't sleep, so the
2  doctor gave me some medicine for a couple days and
3  then I was fine.
4      Q    When was that?
5      A    I think in 1996.
6      Q    Were you ever treated with a
7  Dr. McGuire?
8      A    Yes.
9      Q    And what was that for?
10     A    I had Crohn's disease way back when.
11  It's been in remission for, I don't know, 25
12  years, something like that.
13     Q    You treated with Dr. McGuire for
14  Crohn's?
15     A    Yes.
16     Q    When was the last time you were treated
17  by Dr. McGuire?
18     A    Treated? I haven't gone to him in
19  years. I just go for check-ups here and there
20  just to make sure I'm fine. I haven't had any
21  problems. Virtually it's gone, it's been gone.
22     Q    Did you ever have any discussions with
23  Mr. Halloran or anyone in his office concerning
24  the ongoing developments of your litigation

Page 67

1  against Delta Elevator?
2      A    Periodically I tried to find out.
3      Q    I'm sorry, did you finish your answer?
4      A    I periodically I'd try to find out
5  things, like if dates were set or if he got
6  depositions from people that he was supposed to,
7  and I know he never got. Like some of my students
8  were eye witnesses and he never deposed them.
9      Q    So you had discussions with Mr. Halloran
10  about that?
11     A    And/or his assistant.
12     Q    Who was that?
13     A    I think her name was Maureen, and
14  sometimes I spoke with another woman there Jean.
15     Q    Were they attorneys or were they just
16  assistants in the office?
17     A    Well, I think Maureen's a paralegal.
18  Pretty much she did everything there. And Jean
19  ran the office, and I spoke with her about
20  different things, and my concerns about he wasn't
21  returning calls, like rarely could I talk with
22  him, very rarely. He was not accessible. And she
23  told me actually he wasn't -- his interests were
24  not with my case; he was more interested in

Page 68

1  Adrian's Landing.
2      Q    When did she tell you that?
3      A    Probably around -- around the time the
4  case was supposed to come up to trial.
5      Q    Okay. We'll get into that a little bit
6  later. We talked about a Dr. Wise and a
7  Dr. Heller?
8      A    Yes.
9      Q    Did Dr. Heller take over the treatment
10  for Dr. Wise?
11     A    Yes. Um-hm.
12     Q    How long did you treat with Dr. Wise
13  for?
14     A    Too long. I don't remember. You mean
15  the length?
16     Q    And what was her area of practice?
17     A    I -- I think she was a psychologist.
18  She's supposed to be one.
19     Q    And at some point you stopped treating
20  with her?
21     A    Yes.
22     Q    Why was that?
23     A    She could not get a full-time job,
24  nobody would hire her, and she used to complain

Page 69

1  about that, I remember, and finally she got a job
2  in another place, full time, and she started
3  acting different.
4      Q    When you say different, what do you
5  mean?
6      A    Well, I know she was deposed and she
7  said, Well, you don't want this. And I'm like,
8  What are you talking about? She goes, Well, I
9  have two different books, and you don't want them
10  to depose me. And I'm like -- you know, because I
11  know I said things to her, and then in reading
12  what she -- her responses were, which were
13  confidential, she goes, she didn't believe certain
14  things, and I'm like, This lady is like off the --
15  well, she shouldn't be a doctor, to be blunt,
16  because the people I was concerned about are now
17  in jail, federal jail, and she didn't believe that
18  they did what they did, but they've been convicted
19  by the FBI.
20     Q    This is your brother?
21     A    My brother's been convicted and
22  sentenced to two and a half years, and somebody
23  else that I spoke to her about is in federal jail
24  now.

18 (Pages 66 to 69)

Barbara Cordi-Allen

11/15/2005

Page 70

1    Q    For what?
2    A    For what?
3    Q    Um-hm.
4    A    It all deals with organized crime, but
5    what his specific charges are, I don't think
6    they're done yet with him. I'm sure more is
7    coming. It has to do with what's going on in
8    Springfield. Pick up the newspaper.
9    Q    And at some point you began treating
10    with Dr. Heller?
11    A    Um-hm. Yes. She took over when Wise
12    went to the other job.
13    Q    Okay. And are you aware that
14    Dr. Heller's opinion was that there were multiple
15    causes of your mental health issues unrelated to
16    your elevator accident?
17    A    They did not believe what I told them.
18    Q    That's a yes or no. That is a yes?
19    A    Yes. Do you want — I brought papers if
20    you want proof of my brother.
21    Q    There's no question pending.
22        I may have asked this before. When
23    you retained Mr. Halloran to represent you in this
24    Delta Elevator case —

Page 71

1    A    Yes, um-hm.
2    Q    — did you discuss with Mr. Halloran
3    that you had received prior psychological
4    treatment?
5    A    No.
6    Q    Did you inform Mr. Halloran that you had
7    recently been passed over for a promotion?
8    A    Oh, no, because that didn't even come
9    up. It wasn't even a promotion.
10    Q    So the answer is no?
11    A    No.
12    Q    Did you have any discussions with
13    Mr. Halloran or anyone in his office concerning
14    the defendants' retention of various experts in
15    the case?
16    A    Did I — I'm sorry, I'm fogging out.
17    Can you say that again?
18    Q    Sure. Let me break it down.
19        We just went through numerous
20    experts —
21    A    Right.
22    Q    — that were hired by the defendants,
23    correct?
24    A    Yes.

Page 72

1    Q    And we discussed what their opinion —
2    A    Um-hm.
3    Q    — was expected to be, correct?
4    A    Well, they work for the elevator
5    company, of course.
6    Q    Right. But we discussed what their
7    opinion was going to be, correct?
8    A    Yes.
9    Q    Did you have any discussions with
10    Mr. Halloran or anyone in his office concerning
11    what opinions those experts were going to give in
12    this case?
13    A    More than likely.
14    Q    Do you recall any discussions with
15    Mr. Halloran?
16    A    Do I recall any specific ones? I can't
17    — no, I can't, but there probably were at some
18    point.
19    Q    Okay. But you understood, did you not,
20    that there were more than one opinion in this case
21    concerning your injury, correct?
22    A    Of course.
23    Q    Now, at some point this case was
24    mediated; is that correct —

Page 73

1    A    Yes.
2    Q    — with a Magistrate Egan?
3    A    Yes.
4    Q    Can you tell me what discussions that
5    you had with Mr. Halloran prior to agreeing to
6    going to the mediation concerning the case and —
7    A    He said I had to go and we went and I
8    wasn't part of it.
9    Q    So prior to attending the mediation,
10    Mr. Halloran informed you that you had to take the
11    case to mediation?
12    A    Yes.
13    Q    Did you not want to do that?
14    A    I had no idea what it was. I've never
15    done it. I've never — I had no experience with
16    mediation, so...
17    Q    Did Mr. Halloran or anyone in his office
18    explain to you what the mediation process was?
19    A    That people go back and forth, you know.
20    Q    So you had some idea —
21    A    Some idea, but, I mean, I don't know
22    what happened because I wasn't part of it.
23    Q    Okay. And from the records it seems
24    that the mediation occurred on September 13, 1999.

19 (Pages 70 to 73)

Page 74

1  Does that sound about right?
2      A    It may have.
3      Q    And do you recall who participated in
4  the mediation?
5      A    No, because I wasn't in the room.  John
6  and I were in another room, and, frankly, I was in
7  too much pain.  I was told not to take my pain
8  medicine, and I was -- the last place I should
9  have been was sitting in a room without -- I was
10 not well at all.  I was in too, too much pain.  I
11 remember I was like laying on the table just
12 about.
13     Q    Do you recall anything about the
14 mediation day at all, besides the pain?
15     A    It was long and I was exhausted and I
16 wanted to go home, and I told Mr. Halloran I
17 didn't feel well, you know, and it just kept going
18 on and on, and then when I left, I remember
19 Mr. Egan gave me a look, and I didn't like it.
20     Q    What kind of a look?
21     A    It was like I'm sorry type of look.  And
22 I told him, I said, By the way, your elevator is
23 broken, it was off level.  And Halloran goes,
24 Well, just don't trip on it.  And I'm like, I

Page 75

1  was -- I had no respect at that point for him.
2      Q    For who?
3      A    Halloran.  Because you don't talk to
4  somebody like that --
5      Q    Did you discuss that with him?
6      A    -- because I didn't trip on it.
7          Did I?
8      Q    Um-hm.
9      A    I didn't.  I was in too much pain to.  I
10 don't think I could have.
11     Q    Did you -- besides the look that
12 Magistrate Egan gave you, did you have any other
13 conversations with Magistrate Egan?
14     A    Just like maybe have a good day or
15 something like that.
16     Q    Were you involved at all in the back and
17 forth negotiations of the case?
18     A    I remember Bart came and said, Well,
19 this is it type of -- you know, this is what they
20 offer or whatever.  And I questioned him, because
21 when I signed the case, it was one thing.  And he
22 said, Well, I will do the workers' comp and that
23 will balance -- you know, bring it up and
24 whatever.

Page 76

1      Q    Okay.  So workers -- well, let me ask
2  you.  How did the day end, do you recall?
3      A    I was disgusted.
4      Q    Disgusted.  Why were you disgusted?
5      A    I felt Mr. Halloran had no interest in
6  this case at all.
7      Q    And why is that?
8      A    He didn't put any effort in.  As far as
9  a lawyer, I didn't think his interests were in
10 this case.
11     Q    Where did you think they were?
12     A    I questioned -- I had my concerns,
13 especially after his assistant said that he was
14 more concerned with Adrian's Landing than my case,
15 I really began to have my doubts.
16     Q    Did she say that before or after this
17 mediation in September of 1999, if you know?
18     A    It was all around the same time.
19     Q    So sometime around --
20     A    But he wasn't calling me.  You know, if
21 I called him about something about this, about
22 mediation or whatever, one time he popped into my
23 house, and I don't have men over my house unless
24 John's home or he knows about it, if it's a

Page 77

1  coworker or something like that.  But he came over
2  uninvited.  And I had gone to the doctors for an
3  emergency because I was hemorrhaging.  And I
4  said -- he told me he came over.  I said, I'm
5  sorry you came all that way, you know, because
6  it's a polite thing to do, and I was like.  Then
7  he started questioning like where I was and that.
8  I got a letter from my doctor that I was there
9  because it was an emergency.
10     Q    Did you finish your answer?
11     A    I think I did.
12     Q    Okay.  Did you -- in the fall of 1999,
13 which is the time frame we're discussing now, did
14 you think about retaining different counsel in the
15 case?
16     A    Actually, I may have and I remember at
17 one point I spoke with Ricassi & Davis.
18     Q    Do you know when that was?
19     A    No, but I remember what they said.
20     Q    And what did they say?
21     A    They wouldn't touch anything he was
22 involved in.
23     Q    That Mr. Halloran was involved in?
24     A    And that they don't practice law the way

Barbara Cordi-Allen

Page 78

1  he does.
2      Q    Who said this?
3      A    One of the lawyers at the firm. I don't
4  remember who.
5      Q    So they denied the case?
6      A    Um-hm.
7      Q    Did you talk to any other --
8      A    They wanted it initially. I'm sorry?
9      Q    Did you talk to anyone else?
10     A    At that time?
11     Q    Yeah.
12     A    I don't think so.
13     Q    And you don't recall exactly when you
14  talked to Ricassi & Davis, correct?
15     A    No, but they were the ones that I -- we
16  were going to sign with outside of -- because all
17  things were kind of equal, like on the
18  credentials --
19     Q    Um-hm.
20     A    -- but it was because of the stipulation
21  of the contract, which -- and I was given two
22  different contracts from Mr. Halloran, which
23  altered the workers' comp part, and his paralegal
24  said, Oh, I never would have done that. And I

Page 79

1  said, Excuse me? That's what I signed with him.
2  I said, Read it. She said, Oh, he never would
3  have. And I said, Well, he did. And that was our
4  agreement.
5      Q    Now, when was this conversation with --
6  I want to try to --
7      A    This was -- well, I remember I got a
8  couple different contracts. One was --
9      Q    We know there's one, the retainer
10  agreement, correct?
11     A    Right. And then he sent me another one
12  to get rid of, and I was on a lot of medication,
13  so if I didn't catch it --
14     Q    Let's slow down --
15     A    -- I would have --
16     Q    -- and not get ahead of ourselves.
17          At the mediation -- I want to focus
18  us on the mediation.
19     A    That would be good.
20     Q    Did the case settle that day?
21     A    No. You mean the whole case?
22     Q    Correct.
23     A    No.
24     Q    Was there a discussion at the mediation

Page 80

1  about your workers' compensation case?
2      A    Yes. Oh, wait a minute. What do you
3  mean at mediation? Because I wasn't in the room.
4      Q    Okay.
5      A    Are you talking with me and Bart?
6      Q    Correct.
7      A    Yes.
8      Q    And what was that discussion?
9      A    That he would handle my workers' comp
10  and that will give me more money.
11     Q    Okay. And how would that give you more
12  money?
13     A    Because you get paid for workers' comp
14  every week.
15     Q    But how would Bart taking over the
16  representation --
17     A    Oh, he took it over. He demanded the
18  workers' comp case and took it from Brian Doyle.
19  He dictated a letter to me. He said, Write this
20  down and send it to Brian Doyle. I want the
21  workers' comp case. And he took it. And I didn't
22  want to give it to him, because I wanted it
23  separate.
24     Q    So you told Bart that you didn't want

Page 81

1  him to represent you in the workers' comp case?
2      A    Well, I told him I wanted to keep things
3  separate; I wanted a workers' comp lawyer and I
4  wanted a lawyer for whoever caused -- was the
5  responsible person or people or companies,
6  whatever. And he said, I have to have it. I want
7  it, so do this. And he dictated a letter to me.
8  He said, Get a pen and paper and write this and
9  send it to Brian Doyle and release him. And
10  that's what I did.
11         MR. SMALL: Let's mark that, please.
12         (Document marked as Exhibit No. 10.)
13     Q    Ms. Cordi-Allen, I'm showing you what
14  has been marked as Exhibit No. 10.
15     A    Sure.
16     Q    And ask if you have seen that document
17  before.
18     A    Give me a minute.
19         (Witness perusing document.)
20     Q    This is dated October 5, 1999; do you
21  see that up at the top?
22     A    Yes.
23     Q    And it's a letter from Mr. Halloran to
24  the Workers' Compensation Commission?

Barbara Cordi-Allen                                                                  11/15/2005

Page 82

1      A    Yes.
2      Q    And it's entering an appearance for
3   Mr. Halloran on your behalf; is that correct?
4      A    Yes.
5      Q    Okay. Now, you had filed a claim with
6   the workers' compensation commission for
7   disability benefits, correct?
8      A    For injuries?
9      Q    Well, this case is Barbara Cordi-Allen
10   -- referring to Exhibit 10, Barbara Cordi-Allen v.
11   City of Hartford/Board of Education, Compensation,
12   File number 100112917, correct?
13      A    I guess, but I don't know what you mean
14   disability case.
15      Q    What were you seeking in this matter?
16      A    Compensation for my leg, my knee, my
17   back, my arm, and their doctor actually said that
18   I was disabled.
19      Q    Just answer my question. What were you
20   seeking? You were seeking disability benefits; is
21   that right?
22      A    If that's what they call it. Benefits.
23   I don't know what you're -- maybe they are --
24   yeah, maybe it is called disability benefits.

Page 83

1      Q    Were there any discussions at the
2   mediation, Ms. Cordi-Allen --
3           MR. SMALL: Why don't we go off the
4   record.
5           (Off record.)
6      Q    Ms. Cordi-Allen, during the mediation
7   that we've discussed at Magistrate Egan's
8   office --
9      A    Yeah.
10      Q    -- was there a discussion that the case,
11   the Delta Elevator case, would be difficult to
12   settle due to a workers' compensation lien?
13      A    That the Delta Elevator case would be
14   difficult to settle? I guess I don't understand,
15   because they're separate.
16      Q    Right. Did you understand that the city
17   of Hartford, we talked about this previously, had
18   a lien, correct --
19      A    Yes.
20      Q    -- on any benefits it paid you --
21      A    Yes.
22      Q    -- workers' compensation benefits,
23   correct?
24      A    Yes.

Page 84

1      Q    And you understood, did you not, that at
2   that time of the mediation in October of 1999 the
3   city of Hartford still had a lien outstanding,
4   correct?
5      A    Yes.
6      Q    And you understood that if you were to
7   settle with Delta Elevator for any amount of money
8   that there would be a lien attached to those
9   funds, correct?
10      A    No, not necessarily.
11      Q    What did you understand would happen to
12   the funds in respect to the lien placed by the
13   city of Hartford?
14      A    I think there were offsets or you could
15   negotiate with them or something like that.
16      Q    Okay. So you understood that you could
17   negotiate with the city of Hartford concerning
18   their lien, correct?
19      A    Yes, you can. They might lower it or --
20      Q    Or waive it, correct?
21      A    Possibly.
22      Q    Right. And that was part of the
23   discussion, was it not, at the mediation, that you
24   had to --

Page 85

1      A    I wasn't in the mediation.
2      Q    Let me finish the question.
3           -- that one had to negotiate with
4   the city of Hartford about their lien to determine
5   the end result to you in settling the Delta
6   Elevator case, correct?
7      A    I wasn't in the mediation. I don't know
8   what happened.
9      Q    Did you have any discussions with
10   Mr. Halloran during the mediation or after the
11   mediation that it was important to deal with the
12   workers' compensation at the same time as the
13   Delta Elevator case?
14      A    That contra -- no, because that
15   contradicts him saying at that time that he would
16   handle and pursue the workers' comp case.
17      Q    That's right.
18      A    And he said that, so...
19      Q    Because as you mentioned before, you had
20   to negotiate with the workers' comp carrier --
21      A    You could.
22      Q    -- to determine if you could reduce the
23   lien or waive the lien, correct?
24      A    You could.

22 (Pages 82 to 85)

Barbara Cordi-Allen

11/15/2005

Page 86

1    Q    And, in fact, the reason Mr. Halloran
2    took over the representation of the workers' comp
3    case was an effort to negotiate with the city of
4    Hartford so you would benefit from the settlement
5    with Delta Elevator; isn't that right?
6    A    No.  He just said he wanted it.
7    Q    There's no question pending.
8            MR. SMALL:  Mark that, please.
9            (Document marked as Exhibit No. 11.)
10   Q    Ms. Cordi-Allen, before I get to the
11   next exhibit, did you have any discussions with
12   Magistrate Egan concerning the relationship
13   between the workers' comp matter and the Delta
14   Elevator matter?
15   A    I think I tried getting a copy of the
16   file from him because I wasn't getting my file
17   back from Mr. Halloran.
18   Q    So this is much later?
19   A    I would assume so.
20   Q    I'm focussing again on September of 1999
21   at the mediation.
22   A    At the meeting?
23   Q    Correct.
24            Do you recall any discussions

Page 87

1    concerning the relationship between your workers'
2    compensation claim and the Delta Elevator matter?
3    A    No, not with Mr. Egan.
4    Q    Okay.
5    A    I don't remember.
6    Q    Let me show you an exhibit marked
7    No. 11.
8            (Document exhibited to witness.)
9    Q    Have you had a chance to review this
10   document?
11           (Witness perusing document.)
12   Q    Ms. Cordi-Allen, have you had a chance
13   to review this document?
14   A    I don't remember.  I don't remember.
15   Q    This purports to be a letter dated
16   April 27, 2000 to you from a Charles R.
17   Casartello, Jr.  Are you familiar with the firm
18   Pellegrini, Seeley, Ryan & Blakesley?
19   A    Yes, they're in Springfield.
20   Q    Now, on the left-hand side it says
21   Phyllis P. Ryan.  Do you see that there, under the
22   names of attorneys on the left side?
23   A    Right.  Yes.
24   Q    Is that the Attorney Ryan that you were

Page 88

1    referring to previously?
2    A    No.
3    Q    It's a different Ryan?
4    A    Yeah, Ryan's in Hartford somewhere.
5    Q    And this -- it says date of incident,
6    1/7/1997.  That was the date of your elevator
7    incident, correct?
8    A    Yeah.
9    Q    Did you retain this law firm --
10   A    No.
11   Q    -- for any purposes?
12   A    No.
13   Q    Do you know what this is referring to?
14   A    I'm not sure, but I remember reading,
15   and if this was the firm, and it very well may be,
16   I don't remember the name, there was somebody who
17   was totally disabled in an elevator incident and
18   was totally disabled and it was in the paper.  So
19   he may have been the person who handled that case.
20   Q    Well, he's asking you for a check for
21   $350 to appeal an administrative judge's order.
22   Did you forward a check for $350?
23   A    No.
24   Q    So you don't know what this is referring

Page 89

1    to?
2    A    He may have been, like I said, the
3    person who handled the other -- the case for the
4    person who was injured in an elevator, totally
5    disabled in an elevator.  I may have talked with
6    him, but I don't --
7    Q    So why would he be asking you for $350
8    to appeal an administrative judge's order?
9    A    Got me.  Because I never -- I remember
10   -- I remember talking to somebody about -- and it
11   may have been this person.  I don't -- like I
12   said, I remember seeing something in the newspaper
13   or somebody had called me about it, about this
14   other person being severely injured, and I spoke
15   with somebody about it, but I never did anything
16   legally with it.
17   Q    So you don't know what this refers to;
18   is that the answer?
19   A    It may have been that.  I don't know.
20   Q    But you don't know?
21   A    I don't remember.
22           MR. SMALL:  Okay.  We'll go off the
23   record.
24           (Lunch recess taken at 1:00 p.m.)

23 (Pages 86 to 89)

Page 90

1          (Document marked as Exhibit No. 12.)
2          MR. SMALL:  Back on.
3      Q    Good afternoon, Ms. Cordi-Allen.  You
4  understand you're still under oath, correct?
5      A    Yes.
6      Q    I'm going to show you now what's been
7  marked as Exhibit No. 12 --
8          (Document exhibited to witness.)
9      Q    -- and ask have you seen that document
10 before?
11     A    No.
12     Q    The answer is no?
13     A    No, not to my recollection.
14     Q    Okay.  This is a letter, is it not, from
15 a paralegal at the office of Pomeranz, Drayton &
16 Stabnick dated March 20, 2000?
17     A    Well, I don't know.  It's from somebody
18 named Kathy.
19     Q    That's what it purports to be?
20     A    Yeah, probably.
21     Q    And this is addressed to Mr. Halloran
22 and to a Richard J. Kenny, correct?
23     A    Yes.
24     Q    And we discussed Mr. Kenny represented

Page 91

1  Delta Elevator --
2      A    Correct.
3      Q    -- is that right?
4          And in this letter it is informing
5  Mr. Halloran and Mr. Kenny that as of the end of
6  March of 2000 there was a workers' compensation
7  lien, and it lists $195,921.58.  Do you see that
8  there?
9      A    Yes.
10     Q    Were you aware in or around March of
11 2000 that there was a lien relating to the
12 workers' compensation of $195,921?
13     A    No.
14     Q    Were you aware that there was a lien?
15     A    Yes.
16     Q    What did you believe the lien to be at
17 that time?
18     A    I don't even remember.
19     Q    But you're not -- you didn't know the
20 exact amount?
21     A    Right.
22     Q    Did you ever have any discussions with
23 Mr. Halloran in or around March of 2000 concerning
24 the amount of the lien?

Page 92

1      A    Not that -- not this number.  If there
2  was -- I don't -- this does not stand out to me,
3  so I would say no, to my rec -- you know, to what
4  I can recall, because I don't recall that number.
5      Q    Do you recall any number associated with
6  the workers' compensation lien?
7      A    Right offhand, I can't.  It was up
8  there, you know.
9      Q    So you knew it was --
10     A    I knew there was -- yeah.  Well --
11     Q    It was high, correct?
12     A    Of course.  There was a lot of medical.
13     Q    Right.  And you understood, did you not,
14 that the city of Hartford, as we discussed
15 previously, had intervened in your case against
16 Delta Elevator to seek to be compensated for the
17 amount that it paid out in workers' compensation,
18 right?
19     A    Yes.
20         (Document marked as Exhibit No. 13.)
21     Q    Ms. Cordi-Allen, I'm going to show you
22 now what's been marked as Exhibit 13 in this
23 matter.
24         (Document exhibited to witness.)

Page 93

1      Q    And if you'd turn to page 2, it is dated
2  October 3rd, 2000; is that correct?
3      A    October 3rd, yeah, 2000.
4      Q    And right below that there is a
5  signature above Barbara Cordi-Allen.  Is that your
6  signature?
7      A    Yes.
8      Q    And if you turn to page -- the first
9  page, this is a General Release; is that what it's
10 titled, correct?
11     A    Yes.
12     Q    Do you recall seeing this document
13 before?
14     A    (No response.)
15     Q    Let me withdraw that.
16     A    I don't.
17     Q    Let me withdraw that question.
18         You don't deny that that's your
19 signature, do you, on page 2?
20     A    Page 2?  No, that's how I sign.
21     Q    That's your signature, okay.
22         And do you recall that in or about
23 October of 2000 you executed a General Release and
24 accepted $235,000 from Delta Elevator Corporation

24 (Pages 90 to 93)

Barbara Cordi-Allen                                                                    11/15/2005

Page 94

1  to settle the case against them?
2      A    Could you repeat that again?
3          (Question read.)
4      A    Yes.
5      Q    Does that help refresh your memory about
6  this document?
7      A    I don't -- I don't recall this here.
8  There's no letterhead, you know.
9      Q    You remember the general concept,
10  though, that you --
11      A    There was something, you know.
12      Q    And you agreed, did you not, to settle
13  the Delta Elevator case for $235,000, correct?
14      A    I was basically told we had to.
15      Q    Okay.  Well, that's your signature, is
16  it not --
17      A    Yes.
18      Q    -- on the General Release?
19      A    Um-hm.
20      Q    And you understood at the time you
21  signed this, did you not, that you were releasing
22  Delta Elevator from the lawsuit in exchange for
23  payment of $235,000, correct?
24      A    Yes.

Page 95

1      Q    Ms. Cordi-Allen, I'm going to show you
2  the next exhibit, which is marked Exhibit No. 14.
3          (Document marked as Exhibit No. 14.)
4          (Document exhibited to witness.)
5          (Witness perusing document.)
6      Q    And this letter is a letter from
7  Mr. Halloran to you and to your husband dated
8  October 2nd, 2000; is that correct?
9      A    That's what it says.
10      Q    Do you recall receiving this letter?
11      A    No.
12      Q    You don't deny receiving it, though, do
13  you?
14      A    I don't remember this document.
15      Q    In the --
16      A    It says --
17      Q    I'm sorry, what?
18      A    This is October 2nd.
19      Q    The day before the release, that's
20  correct.
21      A    The release was October 3rd, right?
22      Q    That's right.  This says hand delivered.
23      A    I don't -- I didn't -- I don't recall
24  seeing anybody on October 2nd.

Page 96

1      Q    Did you meet with Mr. Halloran at some
2  point in October prior to signing the release that
3  is marked as Exhibit No. 12?
4      A    I don't believe so.
5      Q    In the second paragraph of this document
6  marked Exhibit 14 --
7      A    Second paragraph.  Okay.
8      Q    -- Mr. Halloran recommended to you, did
9  he not, to settle your case against Delta
10  Elevator, which would result in approximately
11  $150,000 net to you; is that correct?
12          (Witness perusing document.)
13      A    That I should settle for 150,000 net to
14  me?
15      Q    Correct, which would be the result of
16  the 235,000-dollar payment from Delta.
17      A    That's what this says.
18      Q    Well, I'm asking you if that comports
19  with what your memory is.
20      A    Partially.
21      Q    Okay.  Did Mr. Halloran recommend to you
22  that you accept the 235,000-dollar settlement from
23  Delta?
24      A    Did he recommend it?

Page 97

1      Q    Correct.
2      A    Yes.  Oh, yeah.
3      Q    And did Mr. Halloran indicate to you
4  that he had negotiated a successful waiver of the
5  workers' compensation lien from the city of
6  Hartford at that time?
7      A    I saw nothing in writing if that's what
8  you're --
9      Q    Well, that's not the question.  Did he
10  explain to you that he had successfully negotiated
11  that the workers' compensation lien would be
12  waived which would result in a payment to you of
13  $150,000 from the Delta Elevator settlement of
14  235?
15      A    Well -- 235.  Those numbers aren't
16  adding up, so I don't...
17      Q    Did you authorize Mr. Halloran to tell
18  the magistrate at a pretrial that if you could net
19  $150,000 and have medical insurance continued that
20  you would accept that settlement?
21      A    Along with workers' compensation?
22      Q    So you believe you were going to get the
23  $150,000 and be able to continue your case?
24      A    Well, that's what Mr. Halloran said.  He

25 (Pages 94 to 97)

Barbara Cordi-Allen

11/15/2005

Page 98

1  was continuing the workers' comp and that he would
2  represent us in it.
3      Q    Okay. I think we're getting a little
4  confused, though, because didn't Mr. Halloran tell
5  you that as part of getting that $150,000 net
6  payment to you, you were going to be required to
7  waive your claim for disability benefits?
8      A    I don't believe so.
9      Q    Where did you believe the $150,000 was
10  going to come from?
11      A    For -- somehow there was money from
12  Delta Elevator, which was insulting, and there was
13  moneys that were owed in the past for medical and
14  things like that to the city of Hartford. But I
15  told Bart, I said, Bart, $150,000 is a joke. And,
16  in fact, I told him point blank, Send the check
17  back to Delta Elevator, and he refused.
18      Q    Now, you told him that after you had
19  signed the General Release, correct?
20      A    You mean the check or --
21      Q    You told Mr. Halloran to send the check
22  back to Delta after you had executed a release,
23  correct, that we've marked? We've looked at the
24  General Release. (Indicating.)

Page 99

1      A    That. Okay. That's the general --
2  okay.
3      Q    You signed that, did you not, Exhibit
4  No. 13?
5      A    That's what it says, yeah.
6      Q    Okay. So you understood, did you not,
7  that you were releasing Delta Elevator when you
8  executed this document, correct?
9      A    Delta Elevator?
10      Q    Correct.
11      A    From what I was told, that basically we
12  had no choice. So at that time that's what was
13  signed.
14      Q    Okay. And you understood when you
15  signed this, I think we just talked about and
16  looked at that, there was a substantial workers'
17  compensation lien, correct?
18      A    Yeah.
19      Q    And you understood, did you not, that
20  the workers' compensation lien was approaching in
21  March of 2000, already approaching $200,000,
22  correct?
23      A    Um-hm.
24      Q    And when Mr. Halloran indicates to you

Page 100

1  in this letter, Exhibit 14, that there would be a
2  net payment to you of $150,000 --
3      A    Um-hm.
4      Q    -- you understood, didn't you, that that
5  meant that you had to waive -- excuse me -- that
6  part of that deal was that the attorney -- the --
7  strike that.
8          You understood, did you not, when
9  Mr. Halloran indicated to you in October of 2000
10  that there would be a payment to you of
11  $150,000 --
12      A    Um-hm.
13      Q    -- that part of that was your agreeing
14  to waive your going forward on the disability
15  claim --
16      A    No.
17      Q    -- and them agreeing to --
18      A    No.
19      Q    -- waive their lien?
20      A    I would never have settled for $150,000,
21  believe me, without workers' compensation and
22  medical insurance --
23      Q    Now, part of it was --
24      A    -- because that's nowhere near what

Page 101

1  Mr. Halloran came to me with a figure when I
2  signed with him, and I had in mind what his
3  paralegal said to me before this, and his not
4  returning my calls and his not doing some other
5  things that he should have done.
6      Q    Well, turn the page, Ms. Cordi-Allen.
7      A    Um-hm.
8      Q    On page 2 it indicates Mr. Halloran
9  says, "In order to assist you in the analysis of
10  the value of the settlement, I came up to your
11  house and tried to thoroughly explain all the
12  aspects of the settlement."
13      A    Um-hm.
14      Q    Does that help refresh your memory as to
15  a meeting that you had with Mr. Halloran?
16      A    I think one time he said — and I don't
17  know when or where, but he scribbled out some
18  figures, and he said, Well, if you got 600,000, or
19  something like that, and then you paid back
20  whatever, and then if I took a third, and
21  dah-dah-dah-dah, you know, like it would basically
22  equate to a $600,000 judgment. And he said, And
23  in Connecticut that's very, very good. And I'm
24  like, You won't take a case under millions of

LegaLink Boston
(617) 542-0039

Barbara Cordi-Allen

11/15/2005

Page 102

1  dollars. He doesn't. I mean, he said that. And,
2  you know, here he's telling me when he wanted me
3  to sign with him that my case was in the millions
4  of dollars. And he's still in Connecticut,
5  nothing's changed. Something is wrong in Denmark.
6  I'm not stupid. And I began having doubts about
7  just what he was saying and what really was going
8  on.
9      Q    When did you begin having doubts?
10     A    When his paralegal told me that he was
11 more interested in Adrian's Landing than my case.
12     Q    And that was around the fall of '99?
13     A    Well, yeah, '99. Yeah. Yeah.
14     Q    But you didn't do anything as a result
15 of that, correct?
16     A    When?
17     Q    When you learned that information from
18 his paralegal.
19     A    Oh, yeah, I did do stuff.
20     Q    What did you do?
21     A    I told him when -- when he came to our
22 house with a check, I told his secretary, I said,
23 I'm not signing a check. Don't -- if he wants to
24 come here, fine, but I'm not signing the check and

Page 103

1  tell him that. And he came to our house, and he
2  said, You have to sign this check. And I said, I
3  don't have to do anything. He said, You have to.
4  He said, I'm closing my office and I have to close
5  the books. It's the end of the year. You have to
6  sign the check. And I'm like, Huh?
7          And then some other things were
8  said. And then I'm like, I just was completely
9  puzzled by him. And I said, You know, this is
10 nowhere near worth my injury, what I'm going
11 through, my family's gone through, and I'm totally
12 disabled. And I told him at that point, I said,
13 you know what, you can take this check and send it
14 back to Delta. I said, And --
15     Q    He told you he couldn't do that, right?
16     A    Huh?
17     Q.   He told you he couldn't do that, right?
18     A    No. He said, I won't do that.
19     Q    Right. Because you had signed the
20 General Release already, hadn't you?
21     A    Oh, wait a minute. No. The thing is --
22     Q    Just answer the question. I ask the
23 questions.
24          Because you had signed the General

Page 104

1  Release, correct?
2      A    No, that's not why he said that.
3      Q    Did you already sign the General
4  Release, Ms. Cordi-Allen?
5      A    Did I? That was in October, yes.
6      Q    Correct. And the case had already been
7  reported to the court as settled, correct?
8      A    I don't know. I don't know. I never
9  went to court, and I should have gone to court
10 from what I was told.
11     Q    If you look at Exhibit No. 14 --
12     A    14. Is this 14? (Indicating.)
13     Q    It is.
14     A    Okay.
15     Q    Under Roman Numeral I on page 2, we
16 looked previously at the workers' compensation
17 lien --
18     A    Um-hm.
19     Q    -- in March was approaching 200,000.
20 Here Mr. Halloran indicates to you that it's over
21 $230,000, do you see that there, first paragraph
22 under Roman Numeral IA?
23     A    That's what it says.
24     Q    Were you aware in October of 2000 that

Page 105

1  the --
2      A    No.
3      Q    -- lien had approached 230,000?
4      A    No.
5      Q    You knew it was substantial, correct?
6      A    I knew, yeah.
7      Q    Did you have a discussion with
8  Mr. Halloran on October of 2000 or the fall of
9  2000 about how the lien would relate to any
10 amounts recovered from Delta Elevator?
11     A    On how a lien would what?
12     Q    Relate to amounts recovered from Delta.
13 In other words, what would happen if you recovered
14 any amount at trial from Delta with the lien.
15     A    They would offset it. Right? Yeah.
16     Q    And if you turn to page 3 --
17     A    Um-hm.
18     Q    -- Mr. Halloran indicates at the top, he
19 says, "It is extremely unusual to get the workers'
20 compensation carrier to waive its entire lien. I
21 have been able to accomplish this for you in this
22 settlement."
23          Were you aware in October that the
24 workers' compensation carrier had agreed to waive

27 (Pages 102 to 105)

Barbara Cordi-Allen

11/15/2005

Page 106

1   its lien?
2       A    I think it was talked about.
3       Q    So you had discussions with Mr. Halloran
4   about that?
5       A    After we went to -- when?
6       Q    This is in the fall of 2000.
7       A    I know. When in the fall, after --
8       Q    This letter is dated October 2nd, 2000.
9   We know you signed the General Release the next
10  day, on October 3rd, 2000. So around that time in
11  early October or late September you were aware,
12  were you not, that Mr. Halloran had negotiated for
13  the workers' compensation carrier to waive its
14  lien, you understood that, correct?
15      A    I think that's partial.
16      Q    What do you mean by you think it's
17  partial?
18      A    Well, there was the workers' comp case
19  that he was going to carry forward.
20      Q    But as of this time, Ms. Cordi-Allen, in
21  October --
22      A    Um-hm.
23      Q    -- part of the settlement with Delta,
24  part of the agreement was Delta would pay you

Page 107

1   235,000, the workers' compensation carrier would
2   waive its lien, you would give up the claim for
3   total disability, and the end result would be a
4   net payment to you of approximately $150,000;
5   isn't that correct?
6       A    I never said I would give up -- no, I
7   never agreed to giving up a claim for workers'
8   compensation.
9       Q    So why -- to your knowledge, why would
10  the workers' compensation carrier agree to waive
11  its lien?
12      A    For what was owed. Because I told
13  Mr. Halloran, as I said before, that I had to have
14  medical insurance as well, and there were other
15  things thrown in, and I said to him that this here
16  is no way reflective of my injury. And,
17  furthermore, I could still be out of work today
18  with full pay and full benefits had he not told me
19  to take teachers retirement, and he knew my
20  contract.
21      Q    Well, in fact, you lost the workers'
22  compensation case for total disability, didn't
23  you?
24      A    It's open.

Page 108

1       Q    In fact --
2       A    In fact, it's open.
3       Q    -- Commissioner Miles determined that
4   you didn't have RSD; he believed the other experts
5   in the case, didn't he?
6       A    The other experts -- his expert didn't
7   look at the bone scan of my leg at all.
8       Q    But the end result, Ms. Cordi-Allen, was
9   your claim for permanent disability was denied,
10  correct?
11      A    I didn't have to go for workers'
12  compensation, No. 1, or even get this, okay, and I
13  wouldn't even be here today had Mr. Halloran
14  honored my teaching contract, which as a
15  politician, as a lawyer, as much as he knows about
16  contracts, my contract said I could stay out
17  forever on sick leave with full pay and full
18  benefits.
19      Q    Well, aren't you getting disability now?
20      A    I said pay, my salary. And their doctor
21  said I couldn't teach anymore, Santoro. It was
22  their doctor that disabled me from teaching. For
23  my contract, we have a sick bank, and you can stay
24  out and use the sick bank forever, and --

Page 109

1       Q    Now, did Mr. Doyle indicate that to you
2   when he represented you?
3       A    Mr. Halloran took the case from
4   Mr. Doyle.
5       Q    I understand that, but did Mr. Doyle,
6   prior to Mr. Halloran taking over the case,
7   represent to you that you should not sue anybody
8   and you should not file a claim for workers'
9   compensation and you should simply draw on sick
10  leave?
11      A    If Mr. Halloran --
12      Q    I'm not asking about Mr. Halloran,
13  Ms. Cordi-Allen. Listen to the question.
14      A    If I --
15      Q    I ask the questions.
16           When you were represented by
17  Mr. Doyle --
18      A    Right.
19      Q    -- prior to Mr. Halloran taking over,
20  okay, Mr. Doyle, in fact, filed a claim for
21  workers' compensation on your behalf; isn't that
22  correct?
23      A    I don't know, because they called me,
24  workers' compensation called me, Travelers, when I

28 (Pages 106 to 109)

Barbara Cordi-Allen

11/15/2005

Page 110

1  came home -- well, actually in the hospital,
2  because the city of Hartford never reported my
3  injury, they were kind of hoping nobody found out
4  about it, and they wouldn't even release me from
5  the hospital until something was -- somehow they
6  were notified that I was crushed in an elevator.
7      Q  Ms. Cordi-Allen, I'm going to refer you
8  again to Exhibit No. 10, which is Mr. Halloran's
9  appearance.
10      (Document exhibited to witness.)
11      A  Um-hm.
12      Q  And if you look there, there's a re
13  line?
14      A  A what?
15      Q  A re, regarding line.
16      A  Oh.
17      Q  And that indicates, does it not, that
18  there was already a pending workers' compensation
19  claim --
20      A  Um-hm.
21      Q  -- at the time Mr. Halloran took over
22  your appearance, correct?
23      A  Um-hm.
24      Q  So it was Mr. Doyle that filed a

Page 111

1  workers' compensation claim on your behalf; isn't
2  that right?
3      A  No, not necessarily and I don't
4  remember.  Like I said to you, Mr. Small, when I
5  was in the hospital, they would not release me,
6  okay, because I got crushed in an elevator at
7  work.  And they said workers' comp knows nothing
8  about this, i.e., Travelers, because they had to
9  pay the hospital bills.
10      So it was at that point when the
11  hospital called about who's going to pay us that
12  Travelers was notified.  City of Hartford did not
13  want anybody to know I was crushed in an elevator
14  because, one, they never called the police
15  department, i.e., and other people that were
16  supposed to have known.  My students are sergeants
17  down there and they told me this.  They said, We
18  should have known immediately because of this.
19  And the state told me the same thing.
20      Q  Okay.  Now, I don't mean to cut you off,
21  but what does that have to do with whether or not
22  Mr. Halloran and your teachers retirement
23  benefits?
24      A  As far as the medical bills, workers'

Page 112

1  comp paying my medical bills and all that, they
2  found out, like I said, when I was in the
3  hospital, okay.  This business about suing Delta
4  Elevator and all that, that was going to benefit
5  the city of Hartford, and had I not done anything
6  at Mr. Halloran's suggestion to sue Delta
7  Elevator, I would still be getting full teachers
8  pay and full benefits right now.
9      Q  And who would have paid your --
10      A  The city of Hartford.
11      Q  Would have paid your medicals?
12      A  Um-hm.  Blue Cross Blue Shield, city of
13  Hartford.
14      Q  Under workers' comp, correct?
15      A  I don't know.  I think -- I'm not an
16  insurance expert or purport to be, but I have Blue
17  Cross and Blue Shield and they're paying my bills
18  now.
19      Q  Right.  But that's your medical
20  insurance?
21      A  Yes, that I pay for.
22      Q  But your bills and whatnot you would
23  have had to have filed a workers' compensation
24  claim, correct, because it was workers' comp, it

Page 113

1  was Travelers that actually paid your medical
2  bills, wasn't it?
3      A  I could have -- the hospital is the one
4  that called them, like I said, when I was in the
5  hospital, so I don't -- I think that's what --
6      Q  Ms. Cordi-Allen, let's look again at
7  Exhibit No. 12.
8      (Document exhibited to witness.)
9      A  Okay.
10      Q  And, again, this is the letter dated
11  March 20, 2000.
12      A  Um-hm.
13      Q  And it says here the lien at that time
14  you had received -- or there had been amounts paid
15  on your behalf of $47,578 for medical?
16      A  Um-hm.
17      Q  And you also received $8,814 for
18  temporary total?
19      A  Um-hm.
20      Q  I assume that's disability benefits; is
21  that correct?
22      A  I guess.
23      Q  And you received $42,997 for permanent
24  partial disability?

29 (Pages 110 to 113)

Barbara Cordi-Allen

11/15/2005

Page 114

1    A    Right.
2    Q    You received $66,853 for salary
3  continuation?
4    A    Well, that's -- and I, you know --
5    Q    Did you receive it?
6    A    Not from workers' compensation.
7    Q    You received it from the city of
8  Hartford?
9    A    That's my pay.
10   Q    That's right, but you received it --
11   A    That's my contract.
12   Q    Answer my question.  You received it
13 from the city of Hartford, correct?
14   A    I received it from the Board of
15 Education, not from the city of Hartford.
16   Q    And you also received $29,679.14 for
17 health insurance; isn't that correct?
18   A    No.
19   Q    No.  So this is an incorrect statement?
20   A    I think it's very blown up, yes.
21   Q    So you question this number, you
22 question the accuracy of the --
23   A    Most definitely.
24   Q    -- lien?

Page 115

1    A    Yes.  Um-hm.
2    Q    Let me ask you, Ms. Cordi-Allen, in your
3  case for workers' compensation that went to a
4  hearing, correct, the workers' compensation case?
5    A    The workers' compensation hearing, yes.
6    Q    Did you raise the fact that you
7  disagreed with their lien numbers?
8    A    I told you I didn't remember seeing
9  this.
10   Q    At any point during that hearing did you
11 raise the fact that you disagreed with their lien
12 numbers?
13   A    I did not see those figures.
14   Q    Answer my question.  At any point did
15 you disagree with their lien numbers?
16   A    Did I disagree?
17   Q    Did you raise that as an issue in the
18 hearing?
19   A    Did I at the -- I don't remember.
20   Q    In fact, you didn't; isn't that correct?
21   A    I said I don't remember.
22   Q    Going back, Ms. Cordi-Allen, to
23 Exhibit 14, please --
24   A    Yes.

Page 116

1    Q    -- the letter from Mr. Halloran to you
2  dated October 2nd --
3    A    Yeah.
4    Q    -- Mr. Halloran in around this time,
5  okay, so fall of 2000, he explained to you, did he
6  not, that even if you won at trial that whatever
7  amount you won would be subject to offsets,
8  paybacks, and credits, correct?
9    A    Yes.
10   Q    And you understood that that would
11 diminish the value of what would be the end result
12 to you, correct?
13   A    Of course.
14   Q    And it's true, is it not, at around this
15 time, fall of 2000, Mr. Halloran recommended that
16 you take the settlement because in his opinion if
17 you took the case to trial you would end up in
18 worse case than had you accepted the settlement;
19 isn't that right?
20   A    That's what this says.
21   Q    Did he explain that to you?
22   A    (No response.)
23   Q    You understood his advice is my
24 question; isn't that right?

Page 117

1    A    I don't -- I don't recall this, and as
2  far as his advice, what about his advice?
3    Q    You recall his advice to settle the
4  case, to settle the Delta Elevator case?
5    A    Oh, he said we had to.
6    Q    And you recall that he advised you not
7  to go forward with the workers' compensation claim
8  and allow the workers' carrier to waive its lien,
9  he advised you of that.  I understand you didn't
10 accept it and agree with it, but that's what he
11 advised you of, correct?
12   A    What was -- exactly what was he
13 recommending?  What are you saying that he
14 recommended?
15   Q    He recommended you to take the 235 from
16 Delta, correct?
17   A    Yes.
18   Q    And he told you he had successfully
19 negotiated that you would be able to keep your
20 medical insurance, that they would waive the lien,
21 the workers' compensation lien?
22   A    He did not, no.  Okay.  Then the answer
23 to that is no.
24   Q    He didn't advise you that he had

Barbara Cordi-Allen

11/15/2005

Page 118

1  negotiated for them to waive the lien; is that
2  what you're saying?
3      A   No, he did that.
4      Q·  He did tell you that?
5      A   I believe -- I believe so.
6      Q   Okay.  And he told you that in order for
7  them to waive the lien you would have to not go
8  forward with your claim for workers' compensation,
9  correct?
10     A   No, he said that he would handle that.
11     Q   I understand he said he would handle
12  it --
13     A   Right --
14     Q   -- Ms. Cordi-Allen.
15     A   -- going forward.  I told him --
16     Q   But that came later, did it not?
17     A   No, it was while we were in the room.
18     Q   What room?
19     A   I believe this was when we were in the
20  room at Egan's office or whatever his name is.
21     Q   Magistrate Egan?
22     A   Yeah.
23     Q   And Bart had that conversation with you?
24     A   I believe so.  And I told him that --

Page 119

1      Q   That you wanted to go forward with the
2  workers' compensation, correct?
3      A   Definitely, yes.
4      Q   Okay.  But --
5      A   And --
6      Q   I'm sorry.  Go ahead.
7      A   And he signed actually that he --
8  because he had verbally said that he would take
9  the workers' comp case --
10     Q   Okay.
11     A   -- when he took it from Brian Doyle, but
12  he never put anything in writing.  So at some
13  point he did.
14     Q   And you understood, did you not, that
15  although he agreed to represent you --
16     A   Um-hm.
17     Q   -- he didn't agree with the strategy;
18  isn't that right?
19     A   (No response.)
20     Q   He advised you against doing it; isn't
21  that right?
22     A   I don't -- can I speak with my lawyer?
23     Q   Well, there's a question pending.  I'd
24  like you to answer the question first.

Page 120

1      A   I don't know.
2          WITNESS:  I want to speak with my
3  lawyer privately.
4          (Off record.)
5          MR. SMALL:  Back on.
6      Q   Ms. Cordi-Allen, you've now had a chance
7  to meet with your counsel.  Do you need to add
8  anything to the prior answer?
9      A   Yes.  I didn't agree with his strategy
10  was part of the statement, and having heard what I
11  heard from his office, Jean Baril, having seen
12  Justice Egan's face, having questioned
13  Mr. Halloran why he never sent me to the doctors
14  he told me he was going to who were experts, and
15  he didn't like the treatment I was getting at
16  Baystate.  Little did I know what was going on.
17  That I was going to Yale New Haven.  I said, Why
18  didn't you ever send me there?  What happened to
19  all these doctors?  You know.  What about, you
20  know, the best doctors in the country?  He just
21  didn't care, and I could see that, and that's why
22  we hit heads, basically, because I would never
23  have signed with him, I never would have brought a
24  case for him.

Page 121

1          In fact, when he came to our house
2  to sign the check, I won't say what he said
3  because I think you'll find it very offensive, it
4  was anti-Jewish comments and I looked at him, I
5  go, What the hell are you talking about?  Okay?
6  If you're Jewish, I'm sorry.  But he said that.
7  And like the Jews are killing the Palestinians and
8  the Palestinians throw rocks at them and on and on
9  and on.  And I'm like, What the hell are you
10  talking about?  Okay?  Now, the court happened.
11  Okay?  And you don't say that if you're a lawyer.
12  Anyways, that's Mr. Halloran.  So,
13  you know, I mean, things like that add up and you
14  kind of wonder, okay, about the person, at least I
15  do.  And he said, Well -- he showed me a breakdown
16  of the fees, and as you'll see, there are check
17  marks there.  I questioned them.  And that was to
18  be done.  He was supposed to get back to me before
19  he deposited any check.  And he never did.  And I
20  said what about my contract?  He null and voided
21  my contract.  Okay?  There's a whole lot more.  He
22  didn't work for me.  He didn't work for me at all,
23  and we'll prove it.  And there's no way in hell
24  that somebody in a car accident who doesn't get

Barbara Cordi-Allen

11/15/2005

Page 122

1  hurt gets compensated more than this, and it's
2  disabled me. I had a job I loved. I went to work
3  at 5:00 every morning. I was one of the best
4  teachers in the school, let alone in the city. I
5  have school systems calling me up offering me
6  jobs. I don't think anybody's going to call
7  Mr. Halloran. He's got one hell of a rotten
8  reputation amongst his colleagues, and they told
9  me. That's why I don't trust him.
10      MR. REVERE: Moving on.
11      MR. SMALL: Just on the record I'm
12  going to move to strike the entire answer, and
13  I'll just -- we've reserved motions to strike. I
14  just want to remind myself of that.
15      Q   Ms. Cordi-Allen, if you turn on
16  Exhibit 14, please, to page 4 --
17      A   Um-hm.
18      Q   -- you referred earlier to Mr. Halloran
19  doing some numbers for you as a way of
20  illustration?
21      A   Yeah.
22      Q   Okay. And in this letter here he seems
23  to go through I think what you're referring to as
24  sort of a set of hypotheticals, if you will, of

Page 123

1  what could happen; is that right?
2      A   I don't recall seeing this. So this is
3  what --
4      Q   Do you recall discussing with
5  Mr. Halloran that the current agreement, if you
6  accepted the 235 from Delta, dealt with the
7  workers' compensation lien, would net to you
8  $150,000, do you recall that, do you recall a
9  conversation about that?
10      A   There was something like that.
11      Q   And do you recall him telling you that
12  if you got a verdict of $500,000 that according to
13  his calculations the net to you would be
14  approximately $70,000?
15      A   I don't -- I mean, I do have a degree in
16  math too, my bachelor's, I forgot to tell you
17  that, I'm sorry about that, but where in the heck
18  does 210 come from out of 500?
19      Q   Well, he says attorneys fees and
20  expenses. Do you recall having a discussion in
21  general about the terms of if you had a half a
22  million dollar verdict, and what the result would
23  be and what the breakdown would be?
24      A   No, not -- not -- because I'll tell you

Page 124

1  why. This here is in contradiction to his
2  contract.
3      Q   I'm not asking that question,
4  Ms. Cordi-Allen.
5      A   So I --
6      Q   I'm not asking that question. You need
7  to listen to the question, Ms. Cordi-Allen.
8      MR. REVERE: Yes. Thank you. I was
9  going to say, Barbara, just answer the question
10  that's asked.
11      THE WITNESS: But these are wrong.
12      MR. REVERE: He didn't ask you about
13  this. He asked you if you had a discussion.
14  Okay? Answer the question. Listen to what he's
15  asking you, please.
16      Could I have a moment with my
17  client?
18      (Off record.)
19      A   You have to understand, too, that this
20  is a long -- for me --
21      Q   I understand.
22      A   All right. So -- but there was some
23  discussion, okay. But about this, these here
24  figures, no. Okay? Does that answer it?

Page 125

1      Q   But there was some discussion about what
2  a substantial verdict would render to you, there
3  was some discussion about that, correct, in
4  analyzing whether or not you should take the
5  settlement that was brought to you, correct?
6      A   On a figure that was not what he had
7  told me, if that's --
8      Q   I understand that. But you had
9  discussions, did you not, about whether or not you
10  should accept the $235,000 from Delta or not; you
11  had those discussions with him, did you not?
12      A   Some, somewhat.
13      Q   Okay. And here Mr. Halloran on page 4
14  indicates to you that he disagrees with your
15  position about the future value of your workers'
16  compensation case, correct? It's in bold; do you
17  see that?
18      A   Yeah. I'm reading it.
19      (Witness perusing document.)
20      Q   Did you understand around this time that
21  Mr. Halloran disagreed with the strength of your
22  case for workers' compensation disability benefits
23  with you, disagreed with you?
24      A   That we disagreed?

32 (Pages 122 to 125)

Barbara Cordi-Allen

11/15/2005

Page 126

1    Q    Correct.
2    A    We definitely disagreed.
3    Q    Okay.  Thank you.
4         Mr. Halloran indicates to you in
5    this letter that in his opinion the chances of you
6    getting total disability benefits --
7    A.   Um-hm.
8    Q    -- he says, "There will be no chance
9    that you will receive total disability benefits."
10   Do you see that on the bottom of page No. 4?
11   A    Yes.
12   Q    Did you have a discussion with
13   Mr. Halloran about your chances of obtaining total
14   disability benefits around this time?
15   A    I believe so.
16   Q.   Okay.  Did you understand that his
17   advice to you was that the chances of you getting
18   total permanent disability benefits were no
19   chance?
20   A    As far as he was concerned?
21   Q    That was my question, what he was
22   telling you.
23   A    That's what he wanted.
24   Q    That's not what I'm asking,

Page 127

1    Ms. Cordi-Allen.  That's what he told you, wasn't
2    it?
3    A    That's what it says.
4    Q    So the answer is yes?
5    A    Yes.
6    Q    And then he goes on in the letter, and
7    he says, "That leaves you with a claim" -- and I'm
8    on page 5 --
9    A    Um-hm.
10   Q    -- "under 31-308A," okay?
11   A    Okay.
12   Q    And he says in the next paragraph down
13   in bold, "I have clearly told you that I disagree
14   with this assessment and feel that the chances of
15   receiving a substantial award of temporary partial
16   disability payments are remote."  Do you see that
17   there?
18   A    Temporary.  It's not total.
19   Q    We already talked about total.  We're
20   talking about temporary now.
21   A    Okay.
22   Q    You see that where it's on the paper?
23   A    It's on the paper.
24   Q    Okay.  And he indicates here that he has

Page 128

1    told you that he disagrees with your assessment
2    and feels that the chances of receiving a
3    substantial reward of temporary partial disability
4    payments are remote.
5         Did you have discussions with
6    Mr. Halloran concerning whether or not you would
7    be able to get temporary partial disability
8    payments in the workers' comp case?
9    A    I think I talked to -- to him regarding
10   what types of jobs would be -- that he felt I
11   could do, and he actually told me my job.  He said
12   tutoring.  And I said, That's a teaching position
13   with full benefits.  Oh, no, it's not.  And I'm
14   like, I did it for two years at Weaver High
15   School.  He didn't listen.  He knew.  He's a
16   lawyer, he knew what teaching was.
17        But when you tutor, it's called
18   resource room in a school and you work one on one,
19   sometimes two on one, and you tutor kids, and I
20   did it myself, and so I -- when he said something
21   about that, and I said, That's a teaching
22   position, which you and everybody said I couldn't
23   teach.  And teaching -- he said, Well, it's
24   sededentary [phonetic] work or something.  And

Page 129

1    I'm like, Teaching is said sededentary -- I'm not
2    saying the right word.  So --
3    Q    Ms. Cordi-Allen, with all due respect --
4    A    You asked me about --
5    Q    I didn't ask you that.  I'm going to
6    move to strike, and let me ask the question one
7    more time.  Okay?
8         MR. REVERE:  Okay.
9    Q    I'm trying to move this along, okay, and
10   I would just ask you, please, listen to my
11   questions and just answer the question that I've
12   asked.  Okay?  I've tried to be very patient.  I
13   know that you have some emotion in this, and I
14   understand that, but we've got to move this
15   process along.  So I'd ask you, please, just to
16   listen to my question and answer it as best you
17   can.
18        MR. REVERE:  Can we go off the
19   record for just a second?
20        MR. SMALL:  Sure.
21        (Off record.)
22        MR. SMALL:  We're back on.
23   Q    Ms. Cordi-Allen on page 5 --
24   A    5.  Okay.

33 (Pages 126 to 129)

Barbara Cordi-Allen

11/15/2005

Page 130

1    Q    -- I'm going to direct your attention to
2    the second full paragraph.
3    A    Okay.
4    Q    And it says here, "As I explained last
5    Saturday," do you see that there?
6    A    Yeah.
7    Q    Okay.  Does that help refresh your
8    memory as to a meeting you may have had with
9    Mr. Halloran at your home?
10    A    No.
11    Q    He states in bold, "I have clearly told
12    you that I disagree with this assessment and feel
13    that the chances of receiving a substantial award
14    of temporary partial disability payments are
15    remote."  Did I read that correctly?
16    A    Yes.
17    Q    Did you have any discussions with
18    Mr. Halloran at or around this time concerning his
19    assessment that the chances of receiving a
20    substantial award of temporary partial disability
21    payments were remote?
22    A    I think so.
23    Q    Thank you.
24        And if you'd turn to page 6, please,

Page 131

1    under No. 1 up at the top --
2    A    Um-hm.
3    Q    -- it says, "In order to make the award
4    he will have to find that the RSD exists and is
5    related to the injury and, additionally, that it
6    is sufficiently disabling.  I know that you
7    believe that this is a foregone conclusion.  It is
8    my responsibility to tell you it is not.  In
9    attempting to establish the above position, you
10    will encounter the following obstacles."
11    A    Um-hm.
12    Q    Did you have discussions with
13    Mr. Halloran on or around this time of
14    October 2000 that it was not a foregone conclusion
15    that the commissioner would find that RSD exists?
16    A    Yes or no, right?
17        MR. REVERE:  That would be a fine
18    answer.
19    A    Or I don't know.  I don't remember.
20    Q    But you don't deny that you had those
21    conversations with Mr. Halloran, you just don't
22    remember?
23    A    I don't re --
24    Q    Okay.

Page 132

1    A    I just don't remember.  That's the
2    best --
3    Q    But we previously discussed, did we not,
4    that in the Delta Elevator case they had hired
5    experts that you knew of that were going to
6    testify that you in fact didn't have RSD, correct?
7    A    Of course they were going to, yeah.
8    Q    So the answer is yes?
9    A    Yes.
10    Q    And did you have any discussions with
11    Mr. Halloran that the counsel for the workers'
12    compensation carrier would introduce testimony
13    relating to your psychiatric care and treatment in
14    the workers' compensation matter?
15    A    I don't -- maybe.  I don't know.  I
16    don't remember.
17    Q    Now, do you recall -- I know you don't
18    recall this letter, but do you recall Mr. Halloran
19    indicating to you some of the things that he
20    workers' carrier would bring up in the workers'
21    compensation matter that would adversely or
22    possibly adversely affect your case?
23    A    I think there were like disputes, like
24    on both sides, is that what you're --

Page 133

1    Q    Well --
2    A    Like is that -- if that's what you mean.
3    There were -- you know, like one would say one
4    thing and the other side -- you know, one doctor
5    says you have RSD, another doctor said you didn't.
6    So is that what you're asking?
7    Q    Well, what I'm asking, for example, did
8    Mr. Halloran discuss with you that the workmen's
9    compensation carrier would argue that your
10    disability was a result of preexisting unrelated
11    psychiatric conditions?
12    A    I -- I never had any, so, I mean, I
13    don't know where that came from.
14    Q    Well, in fact in 1990 Dr. McGuire --
15    A    1990?
16    Q    -- had reported that patient anxious and
17    having difficulty in her family, and he prescribed
18    Valium to you; isn't that correct?
19    A    I don't -- I don't know, but that's
20    not -- I mean, to me that's --
21    Q    You've answered the question.  Thank
22    you.
23        And in 1992 Dr. McGuire states that
24    you were upset about your husband and not sleeping

Barbara Cordi-Allen

11/15/2005

Page 134

1  well and the weight down to 103. Do you see that
2  there?
3      A    Yeah. Um-hm.
4      Q    Did you have a discussion with
5  Mr. Halloran that that report would be admitted
6  into your workers' compensation case?
7      A    I don't -- I don't remember.
8      Q    How about Dr. McGuire's report of April
9  of 1994 where you were having problems with work
10 and unhappy?
11     A    I didn't have problems with work. There
12 were problems at work, racial problems at work at
13 that time.
14     Q    And in January of 1995, Bad things
15 happening, described as unhappy and receiving
16 Vicodin. March 6, 1996, things are bad in work,
17 headaches, steroids. Were you aware that these
18 matters would be admissible into your workers'
19 compensation case?
20     A    March 1996. Oh, I know what that was.
21 Yeah, I remember what that was.
22          MR. REVERE: Do you remember what
23 the question was you're being asked?
24          MR. SMALL: Can you read back the

Page 135

1  question, please?
2          (Question read.)
3      A    Maybe, yeah.
4      Q    In fact, in this letter, and I know you
5  don't recall the letter, but there are four pages,
6  if you look at the letter, of reasons that
7  Mr. Halloran lays out?
8      A    Where, here? (Indicating.)
9      Q    Correct.
10          Four pages of reasons Mr. Halloran
11 lays out of why your case --
12     A    Um-hm.
13     Q    -- would be a very difficult case to
14 establish disability benefits in the workers'
15 compensation claim. Do you agree with that?
16     A    That's what he says.
17     Q    Did you have those types of
18 conversations with Mr. Halloran aside from this
19 letter?
20     A    I think I requested some of the things
21 he said. Like, you know -- like, he didn't even
22 listen. Like, if he said something to me, like
23 about my brother, okay? He didn't listen to what
24 I had to say, but -- or other people in

Page 136

1  Springfield, yet they've all been convicted. So,
2  you know, that --
3      Q    My question, though -- my question,
4  though, relates to your workers' compensation
5  case --
6      A    Um-hm.
7      Q    -- and discussions that you may have had
8  with Mr. Halloran.
9      A    Um-hm.
10     Q    He indicates in this letter --
11     A    Um-hm.
12     Q    -- okay, in four pages he goes on with
13 reasons that your workers' compensation case is a
14 very difficult case, okay? And I'm asking you, do
15 you recall outside the context of this letter
16 conversations that you had with Mr. Halloran
17 discussing the difficulties of the workers'
18 compensation case?
19     A    Oh, okay. Some of them, yeah.
20     Q    Okay. Thank you.
21     A    Okay. Thank you.
22     Q    On the last page, under the
23 conclusion --
24     A    Wait a minute. Okay.

Page 137

1      Q    It says, "I have rarely felt as strongly
2  as I do in this case that you must take the offer
3  of a net of $150,000. You will still receive your
4  pension and the pension-related medical insurance.
5  At trial the defense will raise many negative
6  factors so that the likelihood of an award which
7  would exceed this amount is nil."
8      A    Um-hm.
9      Q    "In addition, if we lose this case, a
10 factor which cannot be discounted, you would be
11 liable not only for the expenses of trial, about
12 $50,000, but also liable for the defendant's costs
13 which approximate at least that amount."
14          Do you see that there?
15     A    I see it.
16     Q    Did you have discussions with
17 Mr. Halloran along the lines of what he states in
18 this letter?
19     A    I have to say that what I see here is
20 not what was discussed.
21     Q    What was discussed?
22     A    Well, there is no such thing as a
23 pension-related medical insurance. So right there
24 is a false statement, another one of his. First

35 (Pages 134 to 137)

Page 138

1  he said that he got me medical insurance, and here
2  it says pension-related medical insurance, which
3  there is none. So what can I say?
4      Q   Anything else in that paragraph that you
5  take issue with?
6      A   That's a big thing, right there. "At
7  the trial the defense will raise many negative
8  factors." Of course, that's their job. And his
9  job is, or was, to prove or disprove the doctors
10  or any other witnesses that they used to dispute
11  it. So I would say that that would be a false
12  statement. "That the likelihood of an award would
13  exceed this amount is nil." His -- you asked me
14  about like what I found wrong with this, right?
15      Q   Well, I asked you what you disagreed
16  with.
17      A   What I disagree with is that a net
18  over -- to receive an offer of net over $150,000,
19  that was nowhere near why I went to him. I never
20  would have had he ever laid anything out, and this
21  here is nothing what he sold himself as. So I
22  disagree with this stuff here, and obviously he
23  didn't do his job, so... And he never told me --
24  actually, Dr. Hazratji is the one that warned me

Page 139

1  about the medicines that they were giving me at
2  Baystate --
3              (Cell phone ringing.)
4              THE WITNESS: That's mine. Let it
5  go.
6      A   -- and I'm not on them, I took myself
7  off of them, and they weren't too happy. I'm not
8  one to take medication, and nobody warned me until
9  Dr. Hazratji said to me, he said, Barbara, watch
10  out. And I'm like, They told me to stop RSD.
11              (Document marked as Exhibit No. 15.)
12      Q   I'm going to show you what's been marked
13  as Exhibit 15.
14              (Document exhibited to witness.)
15      Q   This is a letter from Mr. Halloran to
16  you dated October 12, 2000.
17      A   Um-hm.
18      Q   Okay. Do you recall this document?
19      A   Can I read it?
20      Q   Of course.
21              (Witness perusing document.)
22      A   Okay, yeah, I've read it.
23      Q   Do you recall this document?
24      A   Not really.

Page 140

1      Q   Do you recall --
2      A   I can't say I didn't get it, but I don't
3  remember --
4      Q   I understand.
5      A   -- reading it.
6      Q   You recall, do you not, that at some
7  point Mr. Halloran forwarded the release to
8  Mr. Kenny who represented Delta Elevator?
9      A   I don't know what he did.
10      Q   Okay. You understood, did you not, that
11  the case against Delta had been settled, correct?
12      A   The release was signed, if that's what
13  you mean.
14      Q   Right.
15      A   Um-hm.
16      Q   And you informed Mr. Halloran that you
17  intended to pursue future compensation benefits in
18  your workers' compensation case, correct?
19      A   Yes.
20      Q   You instructed him that, as a matter of
21  fact --
22      A   Well --
23      Q   -- correct?
24      A   -- we had discussed it at the mediation.

Page 141

1  He said that he would do the workers' comp,
2  continue with it.
3      Q   Right. And when you settled the Delta
4  case in October of 2000 --
5      A   That's when that happened.
6      Q   Well, you made a determination at that
7  point to pursue the disability benefits, correct?
8  I mean, that's what you instructed Mr. Halloran,
9  to continue the workers' compensation case, right?
10      A   When we were at mediation, we agreed and
11  he -- he and I to continue with the workers'
12  compensation case.
13      Q   Okay.
14      A   Okay? And that was going -- that was
15  part of settling -- getting rid of Delta Elevator.
16      Q   Right. But as we just looked at in the
17  long letter that Mr. Halloran wrote to you --
18      A   Um-hm.
19      Q   -- and in the conversations that you
20  said you had with Mr. Halloran, he disagreed with
21  the strategy, correct, of going forward on the
22  disability benefits because he didn't believe that
23  your case was as strong as you thought it was. I
24  understand he agreed that he would represent you,

Barbara Cordi-Allen

11/15/2005

1  but he advised you not to do that and you
2  instructed him to go forward, correct?
3      A   Obviously, there -- yeah, because --
4  definite contradictions, yes. So I did because
5  there are definite contradictions.
6      Q   And then in this letter --
7      A   Um-hm.
8      Q   -- okay, he again says, "I advise you
9  and this is the course of action which I do not
10 favor. I feel that you are better off settling
11 for a net proceed of 150,000, and pursuing health
12 insurance coverage through your existing plan, but
13 I will of course comply with your wishes." And
14 that's what we discussed, correct?
15     A   That's not what was discussed with Delta
16 Elevator. When we were at the hearing, that is
17 not what was discussed or supposedly on the table.
18 It was their giving insurance company --
19 insurance, medical insurance. This here, do you
20 know what this is? In case you want to know, me
21 paying full medical, which I'm doing. There is
22 nothing through the city. I'm paying like 1300 a
23 month. That's what this says. (Indicating.)
24     Q   Okay. And so you had a disagreement

1  with Mr. Halloran about what strategy to --
2      A   No, he had a disagreement with himself
3  over what he was saying. He wasn't telling me the
4  same thing twice.
5      Q   I understand.
6      A   That was the problem.
7      Q   But with respect to the workers'
8  compensation case --
9      A   Um-hm.
10     Q   -- okay, you instructed him to go
11 forward in seeking disability benefits, correct?
12     A   He -- we -- it's not I. It's we. He
13 agreed with me at mediation that we would go
14 forward with workers' comp. We both did.
15     Q   Right. But by October 2000 --
16     A   That's the same time, isn't it?
17     Q   -- he was instructing you, was he not --
18     A   Well, he was flipping. Waffling,
19 flipping, whatever you want to call it.
20     Q   Well, he disagreed with your strategy,
21 correct?
22     A   He disagreed with his own strategy.
23     Q   Ms. Cordi-Allen, in October of 2000 --
24     A   Right.

1      Q   -- okay, Delta Elevator case, you had
2  signed the release and you instructed Mr. Halloran
3  to have the money from the Delta Elevator --
4      A   Um-hm.
5      Q   -- placed into escrow, correct?
6      A   No. No. I knew nothing about escrow.
7  He put it in escrow.
8      Q   Well --
9      A   I -- I don't know that you people do
10 that. I'm not a lawyer.
11     Q   You understood, we've talked about this
12 a number of times today, you understood that the
13 workers' compensation carrier had a lien, correct?
14     A   Yes.
15     Q   And you understood that when Delta paid
16 you $235,000 --
17     A   Um-hm.
18     Q   -- okay, that the workers' compensation
19 carrier's lien attached to those moneys, correct?
20     A   Right. To that date.
21     Q   Correct.
22     A   Um-hm. See, I still had trouble with my
23 leg. Okay? I still need more -- I need to get
24 another brace. They have to pay. So I have --

1  you know, it's not done and over. They're still
2  going to have to pay for anything that happens to
3  my leg and my needs and that. So there's no set
4  and dry number, because I don't know what's going
5  to happen when I'm 80 years old, if I live that
6  long. I probably won't. But, you know, if I need
7  another wheelchair or whatever, you know, that's
8  going to add to their lien, if you want. Do you
9  see what I'm saying? Because they're the ones
10 that have to pay for it. It's open ended. So
11 that's what I'm getting...
12         MR. REVERE: Two minutes?
13         MR. SMALL: Sure. Off the record.
14         (Off record.)
15         MR. SMALL: Mark that as the next
16 one, please.
17         (Document marked as Exhibit No. 16.)
18     Q   Ms. Cordi-Allen, I'm going to now show
19 you what's been marked as Exhibit No. 16.
20         (Document exhibited to witness.)
21     Q   And ask you to take a look at that. Do
22 you recognize that document?
23     A   Um-hm.
24     Q   You had mentioned earlier a statement

Barbara Cordi-Allen

11/15/2005

Page 146

1  with check marks?
2      A   Yes, this is it.
3      Q   Is this the document —
4      A   Yes.
5      Q   -- you were referring to?
6      A   Yes.
7      Q   Okay.  And this here is titled
8  Settlement Statement, is it not?
9      A   Yes.  Oh, I'm sorry.  I didn't know.  I
10 thought you were going to keep talking.
11     Q   And if you turn to page 2 please --
12     A   Yeah.
13     Q   -- halfway down the page there's a
14 signature there?
15     A   Yes.
16     Q   And that's your signature?
17     A   Yes.
18     Q   Okay.  And this here says gross
19 settlement, 235,000, less attorneys' fees of
20 $78,332.33?
21     A   Where is that, Ken?
22     Q   I'm sorry, on page 1.
23     A   Oh, on the first page again.  Okay.
24     Q   Is that correct?

Page 147

1      A   That's what it says.
2      Q   Okay.  And then there's a listing of
3  disbursements --
4      A   Yes.
5      Q   -- which total on page 2 $29,946.22.
6  Now, I'm not going to test you on your math,
7  although I know you have an advanced degree in
8  mathematics, but --
9      A   No, just a regular one.
10     Q   -- assuming that that's correct, that's
11 the way it's laid out, correct?
12     A   Um-hm.
13     Q   Now, you put some check marks?
14     A   No.  Mr. Halloran put those check marks.
15     Q   Okay.  Based on a discussion with you?
16     A   Yes.
17     Q   Okay.  And so you had a discussion with
18 Mr. Halloran that you questioned some of the
19 expenses that had been incurred in this case; is
20 that correct?
21     A   Yes.
22     Q   And one of those expenses was an Icon
23 Office Solutions for $264.26?
24     A   Yes.  Um-hm.

Page 148

1      Q   And another one was the mediation
2  consultants combined of 2,000?
3      A   Right.
4      Q   And Analytical Resources of 1,000?
5      A   Right.
6      Q   Connecticut Law Tribune of $43.85?
7      A   Um-hm.
8      Q   And an airline expense of $2,622.50; is
9  that right?
10     A   Um-hm.
11     Q   Okay.  None of the others have check
12 marks, okay?
13     A   Right.
14     Q   So is it fair, Ms. Cordi-Allen, that you
15 reviewed these expenses, selected the ones that
16 you believed you wanted to have more information
17 about before agreeing to, and discussed that with
18 Mr. Halloran, correct?
19     A   No, I discussed these with Mr. Halloran.
20 He had no idea what some of them were.  And I
21 asked him.  And I questioned airline expenses to
22 California, usually you fly for 200, $300 at the
23 most, why it's $2600.  That's ridiculous, unless
24 you hire a private jet.  And I just felt that --

Page 149

1  and mediation, why that was down there twice, and
2  that these were concerns before anything was
3  settled with his figures.
4      Q   Okay.  So you raised some questions with
5  Mr. Halloran about this document?
6      A   I did.
7      Q   And he put a check mark on those items
8  that you discussed with him, correct?
9      A   Right.  Um-hm.
10     Q   So the ones that don't have a check
11 mark, you didn't have an issue with at that time,
12 correct?
13     A   Well, I think he explained some of them
14 to me, what they were.  So that's probably what
15 happened.
16     Q   Okay.  And if we turn the page to
17 page 2 --
18     A   Um-hm.
19     Q   -- it says, "Less repayment of workers'
20 compensation lien of $126,720.45."  Do you see
21 that?
22     A   Yeah.
23     Q   Okay.  Now, that is the balance I think
24 you will find of Mr. Halloran's attorneys' fees,

38 (Pages 146 to 149)

Page 150

1    minus the expenses, leaves -- well, that's right,
2    so you correctly point out that the repayment of
3    the lien of the moneys from the settlement from
4    Delta was less than what we understood the lien to
5    be at this time; isn't that right?
6        A    Yeah.  Um-hm.
7        Q    So it didn't repay the lien in full,
8    correct?
9        A    According to this, no.
10       Q    Correct.  Okay.
11            Now, it says right below that, and I
12   apologize for the copy job; it's not the
13   greatest --
14       A    It's okay.
15       Q    -- but I think it says, I instruct my
16   attorney, R. Bart Halloran, not to -- I don't know
17   what the word is -- but the above listed amount
18   until further order of the Compensation Commission
19   or the court.  Do you see that there?
20       A    Right.
21       Q    Is that Mr. Halloran's writing or your
22   writing?
23       A    No, that's his writing.  Please.
24       Q    Right below that there's a signature.

Page 151

1    Do you see that there?
2        A    Yes.
3        Q    That is your signature?
4        A    Yes.
5        Q    Now, when you signed this document, was
6    that before or after Mr. Halloran had added in the
7    handwritten remarks?
8        A    I believe it was after.
9        Q    Okay.  And you instructed Mr. Halloran
10   not to release the money, correct, until an order
11   of the Compensation Commission or the court; is
12   that correct?
13           MR. REVERE:  Do you want the
14   question read back to you?
15           THE WITNESS:  Yeah, would you,
16   Paul -- I'm sorry.
17           MR. SMALL:  That's okay.
18           WITNESS:  What's your name?  Ken.
19   Right?
20           MR. SMALL:  Go ahead.
21           (Question read.)
22       A    If -- he was supposed to get back to me
23   with these answered before any distribution
24   happened, so that's probably why that was there.

Page 152

1        Q    But you had a conversation with
2    Mr. Halloran concerning this document and the
3    funds, correct?
4        A    Yeah.
5        Q    And there's a circle there around the
6    126,720.45; do you see that there?
7        A    Um-hm.
8        Q    And down below it says, R. Bart Halloran
9    guarantees that no attorneys' fee payments will be
10   paid or charged to Barbara Cordi-Allen or John
11   Allen.  Barbara Cordi-Allen and John Allen are --
12   are and will not be responsible for attorneys'
13   fees or expenses for the workers' compensation
14   case.
15       A    Right.
16       Q    Okay.  And then he signs it?
17       A    Right.
18       Q    So you had a discussion with
19   Mr. Halloran on that day that Mr. Halloran would
20   represent you on the workers' comp case without
21   any further charge; is that correct?
22       A    Well, I told him -- my conversation with
23   him was, Bart, you said it verbally, but you never
24   gave me anything in writing.  I said so I want it

Page 153

1    in writing.  So he wrote it.
2        Q    Okay.  And he agreed to represent you in
3    the workers' compensation case for no charge,
4    correct?
5        A    Well, he did that when he took the case
6    from Brian Doyle.
7        Q    That's fine.
8        A    So this is the first time that he put it
9    in writing, though.
10       Q    Right.  But he did that, correct, he put
11   it in writing?
12       A    Right.
13       Q    And he signed it?
14       A    Right.
15       Q    And is that your husband's signature
16   also on this document?
17       A    Yes.
18       Q    Where were you when you signed this
19   document?
20       A    My living room.
21       Q    So Mr. Halloran came to your home?
22       A    Um-hm.
23       Q    And was there anybody else with him when
24   he came?

39 (Pages 150 to 153)

Barbara Cordi-Allen

Page 154

```
1        A    No.
2        Q    And you had an opportunity to ask
3   questions of Mr. Halloran?
4        A    Probably. I wouldn't, you know.
5        Q    Because you raised some questions,
6   didn't you?
7        A    Oh, I thought you meant something else.
8   Okay.
9        Q    Now, at some point after the release
10  that we looked at of the Delta Elevator case —
11       A    Um-hm.
12       Q    -- did you request that the Delta
13  Elevator case be reopened?
14       A    I may have. I can't say yes or no, but
15  I may have. I don't remember, but -- I would have
16  loved to have gone to trial.
17       MR. REVERE: Can we go off the
18  record for just a quick second?
19       (Off record.)
20       Q    You would like to add something,
21  Ms. Cordi-Allen?
22       A    Yeah.
23       MR. REVERE: Why don't you refer to
24  what you were talking about.
```

Page 155

```
1        A    I questioned the mathematics in the
2   breach of contract, because he was supposed to
3   take moneys after workers' comp was paid back and
4   he didn't, and I said, I'm not going to break my
5   contract, and it has to go to, you know, higher
6   authorities. So that's why that was in there. I
7   just didn't -- you know, I couldn't think why it
8   was in there. I'm sure that was it. Because I
9   questioned him. He goes, oh, don't worry about
10  it. And I'm like, Don't worry about it? This is
11  legal.
12       Q    All right. So you had a conversation
13  with Mr. Halloran at the time this document was
14  executed --
15       A    Um-hm.
16       Q    -- that you believed that --
17       A    He was breaking my contract.
18       Q    Well, let me finish the question,
19  please.
20            -- that the mathematics were
21  incorrect; is that right?
22       A    Yes.
23       Q    Okay. And the reason you believed that
24  was -- let me ask you this. Do you recall -- was
```

Page 156

```
1   this signed around December --
2        A    Yes.
3        Q    -- of 2000; is that --
4        A    Yes.
5        Q    -- correct?
6        A    Yes.
7        Q    Okay. And the reason you believe that
8   the mathematics were wrong was because the -- this
9   is your belief, just so I understand it --
10       A    Yeah.
11       Q    -- was that out of the Delta settlement
12  the lien should come off first --
13       A    Yes.
14       Q    -- before he received any payment?
15       A    Yes.
16       Q    Okay.
17       A    That's my contract, which is not the
18  standard contract in Connecticut.
19       Q    I understand. Okay. So if -- let me
20  ask you, though. If the workers' compensation
21  lien was more than 235,000 --
22       A    Um-hm, he got zero.
23       Q    And what would you get?
24       A    If it was more? It probably was, wasn't
```

Page 157

```
1   it? I thought it was.
2        Q    So what would you get?
3        A    They were wiping it out, weren't they?
4        Q    So what would you get?
5        A    In terms of what? I thought it was
6   negotiated.
7        Q    I want to do the mathematics for you,
8   Ms. Cordi -- actually, I want you to do them for
9   me. If you got $235,000 from Delta --
10       A    Um-hm. And it was 198 you said, right?
11       Q    Well, I think it was more, because 198
12  was as of March, so it had increased, correct?
13       A    Yes.
14       Q    And you understood that the workers'
15  comp was entitled to any future benefits, correct?
16       A    Um-hm.
17       Q    So if we say that the amount of the
18  workers' comp lien --
19       A    Um-hm.
20       Q    -- was exceeding 235,000 --
21       A    Right.
22       Q    -- the way you understood your contract
23  was --
24       A    Um-hm.
```

LegaLink Boston
(617) 542-0039

Barbara Cordi-Allen

11/15/2005

Page 158

1    Q    -- okay, what would Mr. Halloran have
2    received?
3    A    Zero.
4    Q    What would you have received?
5    A    What would I have received?
6    Q    Right.
7    A    Zero.
8    Q    So had we done the mathematics from your
9    perspective, just so I understand, everything
10   would have gone to the workers' comp carrier --
11   A    No.
12   Q    -- you would have received zero, and
13   Mr. Halloran would have received zero?
14   A    No, that was not what was discussed.
15   Q    What was discussed?
16   A    They were going to wipe out their lien,
17   and there was going to be -- and I would get
18   medical insurance. And then from that, you
19   subtract that from the Delta Elevator amount, and
20   then what's left you take a third of that,
21   something like that. That's what my contract
22   said --
23   Q    Okay.
24   A    -- and I never broke my contract, yet

Page 159

1    three times I got three different contracts.
2    Q    I understand. But you didn't take that
3    deal, though, did you, Ms. Cordi-Allen?
4    A    Which one?
5    Q    The deal where they would wipe out their
6    lien. You didn't accept that deal, correct?
7    A    I think that's what this is.
8    Q    No, you never agreed to waive your claim
9    for workers' compensation benefits, did you?
10   A    To waive my future workers' comp
11   benefits.
12   Q    You never agreed to that, correct?
13   A    My future worker comp benefits, no.
14   Q    And you never -- and in fact you went to
15   a hearing on it, right?
16   A    I did.
17   Q    And so in fact the city of Hartford and
18   the workers' compensation carrier never waived
19   their workers' compensation lien, did they?
20   A    Sure they did.
21   Q    No, they didn't, because they got money,
22   didn't they, and didn't --
23   A    Well, no, because, like you said,
24   Mr. Small, their lien was more than Delta

Page 160

1    Elevator, right?
2    Q    Exactly.
3    A    So there's money that Mr. Halloran got.
4    So how come he got money when the city of Hartford
5    didn't get it all? So that would have put
6    Mr. Halloran at zero and the city of Hartford
7    still waiting for a negative amount or a debit.
8    Q    But the workers' compensation lien,
9    Ms. Cordi-Allen, can only attach to amounts you
10   recover from a third source. Do you understand
11   that that's how it works?
12   A    Yeah, that's a lien.
13   Q    And so you only received 235,000,
14   correct, that was the amount that Delta Elevator
15   gave you, correct?
16   A    Right.
17   Q    So had the workers' compensation lien
18   come out first, as you have indicated your
19   contract indicated, right --
20   A    Um-hm.
21   Q    -- there would be nothing left after the
22   workers' compensation carrier was paid, correct?
23   A    That was -- well, except that's not what
24   was discussed because --

Page 161

1    Q    With whom?
2    A    With whoever he was in the room with
3    with Delta Elevator, because we would have gone to
4    trial to get my millions of dollars that he was so
5    strong that he could get, and he never followed
6    through or worked toward that.
7    Q    Well, Ms. Cordi-Allen, he wrote to you
8    on numerous occasions --
9    A    Um-hm.
10   Q    -- telling you that he had had the
11   workers' comp carrier agree to waive the lien --
12   A    Um-hm.
13   Q    -- and that it would be a net result to
14   you of $150,000 --
15   A    Um-hm.
16   Q    -- right, we talked about that, we
17   looked at those documents, correct?
18   A    Um-hm.
19   Q    And we talked about the conversations
20   you had with Mr. Halloran?
21   A    Plus medical insurance.
22   Q    And you had those conversations that you
23   had with Mr. Halloran, correct?
24   A    Um-hm. Yeah.

41 (Pages 158 to 161)

Barbara Cordi-Allen

11/15/2005

Page 162

1      Q    But you wanted to continue going on your
2  workers' compensation case, correct?
3      A    For future benefits, yes.
4      Q    And so the workers' compensation
5  carrier, I think you would agree with me, never
6  waived its lien for amounts paid, correct?
7      A    They never waived their lien.
8      Q    That's right.
9      A    They had to have.  They got their money.
10 Where did they get their money from if they
11 didn't?
12     Q    Well, if they got their money,
13 Ms. Cordi-Allen, then they didn't waive their
14 lien, correct, they got paid something, correct?
15     A    They didn't get it all and they should
16 have gotten it all.  They should have gotten a
17 hundred percent.
18     Q    And according to you, had they gotten a
19 hundred percent, there would be zero left for both
20 Mr. Halloran and for you, correct?  Correct?
21     A    That's fine, yeah, you're right.  But I
22 also -- that $235,000, okay -- and I called
23 Mr. Halloran.  When he came to our house and said
24 we had to sign the check, I'm thinking about it,

Page 163

1  and I was on a lot of medicine, not because I
2  wanted to be on it, because I was told I had to be
3  on it because of this RSD crap, and having, you
4  know, been warned by other doctors, I definitely
5  feel I was overmedicated.  I threw the medicine
6  out.  I still felt the same.  So obviously I
7  didn't need -- it wasn't helping me, it was
8  poisoning me.  And I told him to send that check
9  back to Delta Elevator so the city wouldn't get a
10 penny and make sure he proceeded with the workers'
11 comp case.
12     Q    And Mr. Halloran informed you that he
13 wouldn't?
14     A    And he refused.
15     Q    That's right?
16     A    Um-hm.
17     Q    And he indicated --
18     A    But --
19     Q    Let me ask the questions, because we're
20 getting into arguments, and I don't want to do
21 that.  Okay?
22     A    Okay.
23     Q    He informed you, did he not,
24 Mr. Halloran, that he wouldn't move to reopen the

Page 164

1  Delta case, correct, he informed you of that?
2      A    He may have.
3      Q    And, in fact, you discussed that with
4  the Workers' Compensation Commission, that you had
5  asked Mr. Halloran to reopen the Delta case,
6  correct?
7      A    I don't remember that.
8          MR. SMALL:  Mark this.
9          (Document marked as Exhibit No. 17.)
10     Q    Ms. Cordi-Allen, I'm going to show you
11 what's been marked as Exhibit 17.
12         (Document exhibited to witness.)
13     Q    And ask you to take a look at that,
14 please.
15         (Witness perusing document.)
16     Q    Have you had a chance to review this
17 document, Ms. Cordi-Allen?
18     A    Um-hm.
19     Q    Okay.  This is a series of e-mails dated
20 March 28, '01?
21     A    Um-hm.
22     Q    And the documents -- these are documents
23 that you produced in this case.  It's Bates
24 labeled BCA 01537 at the bottom right-hand page,

Page 165

1  and it's from a BCordialle@aol.com.  Was that your
2  e-mail address at this time?
3      A    Yeah.
4      Q    Okay.  And if you look at the e-mail
5  that you wrote to Mr. Halloran, it appears to be
6  in response to Mr. Halloran's e-mail?
7      A    Um-hm.
8      Q    Mr. Halloran's e-mail is dated 3/28/01
9  at 11:08 a.m. Pacific standard time?
10     A    Um-hm.
11     Q    And in this e-mail he informs you -- do
12 you recall getting this e-mail?
13     A    I think I -- I think I did.  I think I
14 did.
15     Q    And he informs you, does he not, that he
16 would not -- that the Delta Elevator case was
17 settled, that they had provided a release, and he
18 will not move to reopen the case, correct?
19     A    Right.
20     Q    And he informs you in this letter that
21 he is holding the net proceeds in escrow?
22     A    Um-hm.
23     Q    And down at the bottom he says, If you
24 wish to question the advice I gave you about

42 (Pages 162 to 165)

Page 166

1 settlement, my reasoning, the law, or any other
2 part of the representation I have provided, you
3 are free to do so. Despite my specific request
4 that you converse only with me, you saw fit today
5 to call Coleman Levy and register various
6 complaints. I have discussed your matter with
7 Attorney Levy and Attorney Droney and they approve
8 of the manner in which I have handled, and agree
9 with the advice I have given, as did
10 Magistrate Egan and Commissioner Frankel. Did I
11 read that correctly?
12     A    That's what it says.
13     Q    Did you call Mr. Coleman Levy?
14     A    I did.
15     Q    And why did you do that?
16     A    I could not get my file from
17 Mr. Halloran. I still don't have it, complete.
18 He's still withholding material that he won't give
19 me. I told him -- well, like it says here, things
20 like they sent me to some doctor for a vocational
21 rehab. Nobody showed up to drive me. Okay? I
22 called the company and I even called the doctor's
23 office, who's in my backyard, and I said nobody
24 came. Called the van company. The guy was lost,

Page 167

1 never showed up.
2         Bart Halloran, Well, you weren't
3 there. I'm like, I wasn't there? I've been
4 sitting here with my coat on. I called him and I
5 sent him an e-mail dated and timed. I said, Bart,
6 before 9:00, nobody came. And then he's telling
7 me I wasn't home for my 9:00 appointment in my
8 backyard, yet I not only called long distance, I
9 also had a dated and timed e-mail which is here.
10 Nobody showed up. But he didn't listen, didn't
11 listen at all.
12     Q    If you listen to my question, though,
13 Ms. Cordi-Allen --
14     A    You asked me why, right, what I said?
15     Q    Did you call to complain about
16 Mr. Halloran?
17     A    Yes.
18     Q    Okay. And aside from the driver not
19 showing up, Mr. Halloran not listening, what other
20 complaints did you have at that time to Mr. Levy?
21         (Witness perusing document.)
22     A    Here, where it says here, and little did
23 I even remember this e-mail at all, it says that
24 there was to be an investigation of expenses.

Page 168

1 This hasn't happened.
2     Q    Now, is this your memory or are you
3 simply reading the document?
4     A    It's right here.
5     Q    Does that comport with your memory?
6     A    That's what I told you, yes.
7     Q    Okay.
8     A    And --
9     Q    Do you recall if you, when you met with
10 Mr. Levy, threatened to bring --
11     A    I don't know Mr. Levy.
12     Q    Did you not meet with Mr. Levy?
13     A    I don't know who he is. He's in the
14 firm. I think he owns it.
15     Q    Did you call an attorney to complain
16 about Mr. Halloran?
17     A    I told his firm about him.
18     Q    Okay. Who did you talk to?
19     A    I said Mr. Levy --
20     Q    Okay.
21     A    -- but I didn't meet with him.
22     Q    It was via telephone?
23     A    Um-hm.
24     Q    Did you at that time threaten legal

Page 169

1 action against Mr. Halloran or the firm?
2     A    Was I going to sue Mr. Halloran or the
3 firm? The firm had nothing to do with my case.
4     Q    What about Mr. Halloran?
5     A    Mr. Halloran, he was to return to me my
6 file and he wouldn't.
7     Q    Okay. This is as of March of '01?
8     A    Yes.
9     Q    So as of March of '01 you were demanding
10 your file be returned?
11     A    There were parts of it that -- personal
12 things that he had of mine, that -- my clothes.
13 I, along with numerous other people, we had --
14 it's a steel building, and there was action taken
15 by Hartford Steam Boiler about air quality in the
16 school, and there was a study done. He demanded
17 that from me. He took that. I don't have that
18 back as of today. He still has that. He won't
19 give it to me. And those -- those are personal
20 properties that had -- that's not that stuff.
21 These were my personal things that belonged to me
22 that he took. He had no business to keeping my
23 stuff, and I couldn't get those things back from
24 him --

Barbara Cordi-Allen

11/15/2005

Page 170

1    Q    Well, let me ask you --
2    A    -- and I still don't have them back.
3    Q    Let me ask you then. As of March of
4    '01, the date of these e-mails, according to your
5    testimony, you had already asked Mr. Halloran for
6    your file?
7    A    For my clothes and my file. It was like
8    a workers' comp file, but not --
9    Q    Well, he was still representing you in
10   the workers' comp, wasn't he?
11   A    No, no, no, no. This was like everybody
12   was getting sick at work. So I had like a file
13   like about asthma and that, but that had nothing
14   to do with this case, but he took it, he wanted
15   that.
16          (Witness' cell phone ringing.)
17   Q    A separate file?
18   A    Separate, right, exactly.
19   Q    So you were asking him for that file?
20   A    Right, exactly.
21   Q    And you had called Mr. Levy to complain
22   about Mr. Halloran?
23   A    Right.
24   Q    Okay. When you spoke with Mr. Levy, did

Page 171

1    you indicate that you were considering filing an
2    action against Mr. Halloran?
3    A    I don't recall that. I don't recall
4    that.
5    Q    Okay.
6    A    And --
7    Q    Now, you also indicate here,
8    Ms. Cordi-Allen, that you requested of
9    Mr. Halloran information about reopening the Delta
10   Elevator case?
11   A    Um-hm, that's what this says.
12   Q    What was your understanding about the
13   ability to reopen a case?
14   A    What was mine?
15   Q    Correct.
16   A    I don't think that this case was -- all
17   the issues were ever resolved, so -- it wasn't
18   fragmented. It was supposed to be Delta Elevator
19   and workers' comp — I shouldn't say Delta
20   Elevator. Delta Elevator and anybody else who
21   should have been brought in on this.
22   Q    When you say anybody else, who are you
23   referring to?
24   A    The city of Hartford.

Page 172

1    Q    And so on the next page over you
2    indicate, about the fourth line down, The city
3    knew about the elevator and never notified us --
4    A    Yes.
5    Q    -- this was serious due to the injuries
6    and that there were other reports filed?
7    A    Yes.
8    Q    So as of March of '01, did you believe
9    that Mr. Halloran should have sued the city of
10   Hartford?
11   A    Definitely.
12   Q    For what?
13   A    For what?
14   Q    Um-hm.
15   A    Negligence. Gross negligence, since
16   they knew about that elevator. Eight people fell
17   into it by the way. They never fixed it. They
18   never put out of order. I was crushed in it. The
19   principal told everybody I tripped. The eye
20   witnesses -- and he was sworn at. He was
21   subsequently removed from his position. And that
22   elevator was not licensed to be operating. I
23   found out. I found out and I'm not a lawyer.
24   Somebody told me, they said, I bet you that had no

Page 173

1    permit. No permit. And it would have been closed
2    down, I was told.
3    Q    Did you have any discussions with
4    Mr. Halloran in March of 2001 questioning why he
5    didn't do anything with the city of Hartford about
6    bringing a case against them?
7    A    In March? I began to -- you know, I was
8    wondering, questioning, especially after what
9    his -- his employees were saying about him and his
10   lack of interest, and I started finding out things
11   about him.
12   Q    What kind of things were you finding out
13   about him?
14   A    That he really wasn't interested in
15   pursuing this, working for me. He -- I felt
16   strange that all of a sudden he started writing
17   e-mails. It's not normal. And all of a sudden
18   that happened. And I just had these strange
19   feelings, and like — and I don't even know
20   anything about computers, and somehow my kid
21   showed me how to copy these, and so I started
22   copying things because I just had bad vibes. He
23   didn't listen, he never listened to me, obviously.
24          I knew what my family was like. I

44 (Pages 170 to 173)

Page 174

1  know what they do, and I really can't get into it
2  because there are investigations going on.  He
3  didn't listen, but there have been convictions.
4  So obviously Barbara was right, and there's a
5  whole lot more coming down the pike that I can't
6  say for legal reasons, you know, outside of this,
7  because there are arrests pending, but I know what
8  I'm talking about, and a lawyer should listen.
9        Q   I'm sorry, when you say arrests, are you
10 talking about your brother again?
11       A   Yeah, my family.
12       Q   Okay.
13       A   But, you know, you listen.  And he
14 didn't listen.  He just -- so I just had my
15 thoughts, you know, and --
16       Q   Okay.  So just so I understand, as of
17 March of 2001, you were questioning his allegiance
18 to you because of his involvement with the city of
19 Hartford --
20       A   Um-hm.
21       Q   -- the Adrian's Landing bit?
22       A   Yeah, definitely.
23       Q   You were questioning -- as of March of
24 2001 you believed he should have brought a case

Page 175

1  against the city of Hartford --
2        A   Um-hm.
3        Q   -- and you indicated that to him?
4        A   Um-hm, because of gross negligence.  It
5  wasn't like -- like you slip on, you know, in a
6  building and you break your arm or something like
7  this.  They knew.  And I'll tell you, Ken, it was
8  a very rough school, one of the worst in the
9  country for safe -- you know, for kids and that.
10 I loved it.  The kids did nothing to me, ever.
11 You know, and yet you're -- because you can't fix
12 an elevator, and you choose to operate it without
13 a permit.  And he didn't know this?  And he's a
14 lawyer.  And I'm a stupid high school teacher and
15 I knew this.  That's insulting.
16       MR. SMALL:  So I think I'm going
17 to -- we can go off the record for a second.
18       (Off record.)
19       MR. SMALL:  Why don't we go back on
20 the record.
21       At this point we're going to suspend
22 the deposition, and we'll pick it up again by
23 agreement of counsel.
24       (Off record at 4:07 p.m.)

Page 176

1            C E R T I F I C A T E
2  COMMONWEALTH OF MASSACHUSETTS
3  BRISTOL, SS
4
5        I, Lori-Ann London, Registered
6  Professional Reporter and Notary Public in and for
7  the Commonwealth of Massachusetts, do hereby
8  certify:
9        That, BARBARA CORDI-ALLEN, the witness
10 whose deposition is hereinbefore set forth, was
11 duly sworn by me and that such deposition is a
12 true record of the testimony given by the witness
13 to the best of my knowledge, skill, and ability.
14       I further certify that I am neither
15 related to, nor employed by, any of the parties in
16 or counsel to this action, nor am I financially
17 interested in the outcome of this action.
18       IN WITNESS WHEREOF, I have hereunto set
19 my hand and seal of office this 27th day of
20 November 2005.
21                              _____
22                              Lori-Ann London, RPR
23                              Notary Public
24 My commission expires: 6/15/2012

Page 177

1            E R R A T A   S H E E T
2        I, BARBARA CORDI-ALLEN, the within-named
3  deponent do hereby certify that I have read the
4  foregoing transcript of my testimony, and further
5  certify that said transcript is a true and
6  accurate record of said testimony (with the
7  exception of the following corrections listed
8  below):
9  Page     Line          Correction
10 ____     ____     _____
11 ____     ____     _____
12 ____     ____     _____
13 ____     ____     _____
14 ____     ____     _____
15 ____     ____     _____
16 ____     ____     _____
17 ____     ____     _____
18 ____     ____     _____
19 ____     ____     _____
20     Signed under the pains and penalties of
21 perjury this     day of          , 2005.
22
23                              _____
24                              BARBARA CORDI-ALLEN

Page 178

1

2

3

Volume:    II

Pages:     178-356

Exhibits:  18-39

4          UNITED STATES DISTRICT COURT

5          DISTRICT OF MASSACHUSETTS

6                           NO. 05-30083-MAP

7       - - - - - - - - - - - - - - - - - - - - - - x

8    Barbara Cordi-Allen and John Allen,

9                    Plaintiffs,

10       v.

11   R. Bartley Halloran and

12   R. Bartley Halloran, P.C.,

13                    Defendants.

14       - - - - - - - - - - - - - - - - - - - - - - x

15

16      CONTINUED DEPOSITION OF BARBARA CORDI-ALLEN

17           Thursday, November 17, 2005

18                    10:30 a.m.

19             HINSHAW & CULBERTSON LLP

20       One International Place, Third Floor

21           Boston, Massachusetts 02110

22

23   Reporter:  Lori-Ann London, RPR

24

Barbara Cordi-Allen, Vol. 2                                                          11/17/2005

Page 179

```
1    A P P E A R A N C E S :
2
3        By Paul Revere, III, Esquire
4        LAW OFFICES OF PAUL REVERE, III
5        226 River View Lane
6        Centerville, Massachusetts 02632
7        508.778.7126
8        Appearing for the Plaintiffs
9
10       By Kenneth D. Small, Esquire
11       HINSHAW & CULBERTSON LLP
12       Fort Hill Square
13       One International Place, Third Floor
14       Boston, Massachusetts 02110
15       617.213.7000
16       Appearing for the Defendant
17
18   ALSO PRESENT:
19
20       John Allen
21
22
23
24
```

Page 180

```
1              I N D E X
2
3    CONTINUED DEPOSITION OF:           PAGE
4    BARBARA CORDI-ALLEN
5
6    EXAMINATION BY MR. SMALL            182
7                                          X
8            E X H I B I T S
9    NO.                       PAGE
10   18  Complaint                  183
11   19  E-mail, 4/25/01, BCA 01575    190
12   20  E-mail, 4/25/01, BCA 01586    212
13   21  E-mail, 5/4/01, BCA 01604     220
14   22  E-mail, 5/4/01, BAC 01604     226
15   23  Letter, 5/10/01, Halloran to  230
16       Cordi-Allen
17   24  E-mail, 5/12/01, Cordi-Allen to  242
18       Halloran
19   25  E-mail, 5/21/01, to Bureau of  247
20       Elevators from Cordi-Allen, BCA
21       01611
22   26  E-mail dated 5/23/01          250
23   27  E-mail dated 5/24/01          254
24   28  E-mail dated 5/24/01          259
```

Page 181

```
1              E X H I B I T S
2    NO.                          PAGE
3    29  E-mail dated 5/26/01         262
4    30  Letter dated 5/29/01         269
5    31  E-mail dated 5/30/01         274
6    32  Decision regarding motion to  288
7        withdraw
8    33  Decision of Compensation Review  293
9        Board
10   34  Finding and Award            303
11   35  Disbursement Sheet           309
12   36  Answers to Interrogatories   311
13   37  Document dated March 27, 2004  334
14   38  Letter dated 5/24/01         346
15
16
17
18
19
20       *Original exhibits retained by Mr. Small
21
22
23
24
```

Page 182

```
1              P R O C E E D I N G S
2
3            CONTINUED EXAMINATION
4    BY MR. SMALL:
5        Q    Good morning, Ms. Cordi-Allen.  We're
6    back on the record.
7        A    Um-hm.
8        Q    You understand you're still under oath?
9        A    Yeah.
10       Q    You mentioned last time we were here
11   that you were currently under Duragesic and
12   Hydrocodone medications; is that correct?
13       A    Yes.
14       Q    Are you under those medications today as
15   well?
16       A    Yes.
17       Q    Any other medications that you've taken
18   today?
19       A    No.
20       Q    And will your medications that you're on
21   today prevent you from testifying truthfully
22   today?
23       A    Truthfully?
24       Q    Right.
```

2 (Pages 179 to 182)

Page 183

1    A    No, but they will, as you know, make me
2  loopy, whatever, spacey, so -- I'm very tired.
3    Q    If you have any problems understanding
4  my questions, just ask me to repeat, ask me to
5  restate. If you answer the question, I'm going to
6  assume you understand my question. Is that okay?
7    A    Sure. And I thank you for your help.
8    Q    Ms. Cordi-Allen, we were here on Tuesday
9  during your deposition. Between that time and
10 today, have you done anything to prepare for
11 today's deposition?
12   A    Not at all, nothing.
13   Q    Have you reviewed any additional
14 documents?
15   A    I didn't review anything. I went home
16 and I went to bed.
17      (Document marked as Exhibit No. 18.)
18   Q    Ms. Cordi-Allen, I'm going to show you
19 what's been marked as Exhibit No. 18 in your
20 deposition.
21      (Document exhibited to witness.)
22   Q    And ask you to take a look at that
23 document, please.
24      (Witness perusing document.)

Page 184

1    A    Okay.
2    Q    Have you seen this document before?
3    A    I don't think so.
4    Q    This purports to be a complaint filed by
5  the city of Hartford dated April 20th,
6  2001. Do you see that up top there?
7    A    Um-hm.
8    Q    Were you aware in April of 2001 that the
9  city of Hartford had filed a complaint to assert
10 its workers' compensation lien against you?
11   A    I think I've -- I think I found out
12 about that at a workers' comp hearing. I wasn't
13 told about it before. I had no knowledge. It was
14 never -- Bart Halloran never shared it with me, to
15 the best of my recall.
16   Q    You were aware, were you not, in April
17 of 2001 that the workers' compensation carrier was
18 seeking to recover a lien of approximately
19 $204,968?
20   A    No.
21   Q    Does that sound about right to you, that
22 that was the amount of the workers' compensation
23 lien?
24   A    I -- I don't think that is the correct

Page 185

1  figure.
2    Q    Okay. What do you think the correct
3  figure is?
4    A    Well, based on what you showed me
5  yesterday, I think it's probably about at least
6  $80,000 less.
7    Q    In the workers' compensation lien?
8    A    Um-hm. It should be. I think the other
9  was ballooned, inflated, whatever you want to call
10 it.
11   Q    Now, Ms. Cordi-Allen, I'm going to
12 direct your attention, please, to page 5 --
13   A    Page 5.
14   Q    -- paragraph 20, and do you see where it
15 says, "The net proceeds the plaintiff received out
16 of the 235,000-dollar settlement was $126,730.45."
17 Do you see that there?
18   A    Um-hm.
19   Q    Was that the number you're referring to
20 when you're saying it should be $80,000 less or
21 some other number?
22   A    I don't know how that was calculated.
23 No, I don't think so.
24   Q    Okay.

Page 186

1    A    That's not $80,000. See, this is
2  proceeds. I'm not talking about proceeds. What
3  you asked me is not proceeds.
4    Q    So you understood that the 126,000 was
5  the proceeds from the 235,000 --
6    A    No, you just told me that.
7    Q    Let me finish my question.
8        You understood, did you not, or
9  -- strike that.
10       You understand that the $126,730.45
11 reflected in paragraph 20 of Exhibit 18 represents
12 the net proceeds from the settlement paid by Delta
13 of 235,000, correct?
14   A    I -- no, I disagree with this because it
15 says the plaintiff received. I did not receive
16 anything.
17   Q    Well, you didn't receive it in fact
18 because there was a lien, correct?
19   A    Incorrect. It was put in escrow.
20   Q    Why was it put in escrow?
21   A    Because Bart Halloran refused to return
22 it because, i.e., he wouldn't have gotten paid.
23 And it was my lawsuit to do what I wanted to do
24 with it, not his, but he did not listen to me. He

3 (Pages 183 to 186)

Page 187

1  didn't -- obviously, he didn't do anything that we
2  wanted in our interest.
3      Q   Ms. Cordi-Allen, I'm going to show you
4  again Exhibit No. 16, which is the settlement
5  statement that we looked at on Tuesday.
6          (Document exhibited to witness.)
7      A   Um-hm.
8      Q   And if you recall on the settlement
9  statement there was a number that you circled
10  there --
11     A   I didn't circle it.
12     Q   -- or Mr. Halloran circled of $126,720,
13  correct?
14     A   Right.
15     Q   And per your instructions, you
16  instructed Mr. Halloran to place that into escrow,
17  correct, and not to pay that out until further
18  order of the compensation --
19     A   I did not.
20     Q   Why is that written on the document, do
21  you know?
22     A   What is? I can't --
23          (Mr. Revere indicating.)
24     A   Because I questioned his breaking my

Page 188

1  contract and taking a different percentage before
2  workers' comp was paid back versus what my
3  contract said, which was the only weighing factor
4  why I signed with him. I would never have signed
5  with him for what -- this contract that he
6  proposed is not the contract I signed.
7      Q   That's not a contract, though,
8  Ms. Cordi-Allen. That's a settlement statement.
9  And as we discussed on Tuesday, you signed that,
10  did you not?
11     A   There were stipulations here that --
12     Q   Answer my question. Did you sign that
13  document?
14     A   Yes, I did.
15     Q   Thank you.
16          Now, Ms. Cordi-Allen, I'm just going
17  chronologically. The last exhibit we looked at
18  was Exhibit 18, which is dated April 20th, 2001.
19  At that time Mr. Halloran was representing you in
20  your workers' compensation case; is that correct?
21     A   I don't know. With that date, I don't
22  know.
23     Q   Okay. I'm going to represent to you
24  that there was a hearing at the workers'

Page 189

1  compensation board dated April 24 --
2      A   Was it 24? Okay.
3      Q   -- 2001 --
4      A   Um-hm.
5      Q   -- that Mr. Halloran appeared on your
6  behalf. Does that help refresh your memory?
7      A   Well, he didn't appear on my behalf. He
8  appeared to withdraw, which I had no idea about.
9      Q   Okay.
10     A   That's what the purpose was of the
11  meeting.
12     Q   Yeah, I think that that one came a
13  little bit later, so I don't want to get confused
14  about different hearings. The April 24th letter,
15  there was a hearing where Commissioner Miles
16  ordered Mr. Halloran to send the 126-some-odd-
17  thousand dollars to Mr. Pomeranz's office; do you
18  recall that?
19     A   At some point he did. They said that
20  they wanted to release the money.
21     Q   So you understood, did you not, that
22  Mr. Halloran was under an order from the
23  commissioner to send that money to Mr. Pomeranz?
24     A   I think that's what they discussed.

Page 190

1      Q   Okay.
2          (Document marked as Exhibit No. 19.)
3      Q   Ms. Cordi-Allen, I'm going to show you
4  what's been marked as Exhibit No. 19 and ask you
5  to take a look at that document, please.
6          (Document exhibited to witness.)
7          (Witness perusing document.)
8      Q   Have you had a chance to review Exhibit
9  No. 19?
10     A   I've looked at it.
11     Q   Okay.
12     A   I didn't read it, though.
13     Q   This e-mail from Mr. Halloran to you is
14  dated April 25th, 2001?
15     A   Um-hm.
16     Q   Do you recall receiving this e-mail?
17     A   I think so.
18     Q   Okay. And in the second paragraph down
19  Mr. Halloran indicates that at the hearing
20  yesterday, which is the one we talked about,
21  April 24th, '01, the Commissioner ordered
22  Mr. Halloran to turn over to Pomeranz the balance
23  held in escrow, and that he would be issuing a
24  check to them. Do you see that there?

Barbara Cordi-Allen, Vol. 2

11/17/2005

Page 191

1    A    Yeah.
2    Q    Okay.
3         THE STENOGRAPHER:  I can't hear.
4         MR. REVERE:  If you're going to
5    speak, speak so she can hear and speak to Ken,
6    okay?
7    Q    Now, if you look at the fourth line,
8    fourth paragraph down, please, it says:
9         "You have a right to seek other
10   counsel and to have other counsel review the file,
11   and if they deem appropriate, try to reopen the
12   case against Delta.  As I have repeatedly told
13   you, I would be a witness in that case and could
14   not, therefore, act as your attorney.  My
15   testimony as to what was done, the reason it was
16   done, and the effect of the release and the nature
17   of our discussions has been set out in my earlier
18   letters to you."
19        Do you see that there in this
20   e-mail?
21   A    Yeah, I see it.
22   Q    Were you in April of 2001 seeking the
23   advice of other counsel in relation to either the
24   Delta Elevator case or the workers' compensation

Page 192

1    case?
2    A    At this time?
3    Q    We're talking April of 2001.
4    A    I don't think so.
5         THE WITNESS:  I need to write
6    something.  So can we stop a minute?
7         MR. SMALL:  Let's go off the record.
8         (Off record.)
9         THE WITNESS:  Okay.  I'm all set.
10        MR. SMALL:  Read back the last
11   question, please.
12        (Question read.)
13   Q    In any event, Ms. Cordi-Allen, by April
14   of 2001, you and Mr. Halloran -- strike that.
15        In April of 2001 you were
16   instructing Mr. Halloran to reopen the Delta
17   Elevator case; is that correct?
18   A    Definitely.
19   Q    And it's true he refused to do that; is
20   that right?
21   A    Oh, definitely he said that.
22   Q    What did he tell you that you can recall
23   about reopening the case?
24   A    That he told me?  Well, I remember

Page 193

1    hearing from his office that he had no interest in
2    this case from his assistant.
3    Q    Okay.  We're -- I'm going to cut you
4    off.  I'm going to try to move this along today.
5    My question is very specific, Ms. Cordi-Allen.
6    We're talking about reopening the Delta Elevator
7    case, and I want you to focus on that question and
8    recall discussion that you may have had with
9    Mr. Halloran about the decision to reopen the
10   Delta Elevator case.
11   A    I told him that when he took the case he
12   told me the value of it, and in no way did this
13   come close to what he put on the table to me, and
14   I felt that a lot more work should have been done.
15   Witnesses were not deposed, and I wasn't happy,
16   and I feel there was a lot more research that
17   should have been and could have been done.
18        And I questioned why I wasn't sent
19   to other doctors for opinions, since he wasn't
20   happy with my doctors.  He told me he was going to
21   send me to other doctors and he never did, and
22   that was part of the discussion.
23        And it just seemed really -- I
24   overheard a conversation with him talking to

Page 194

1    another lawyer that -- right in front of us, that
2    he would not -- in fact, it was at this hearing,
3    April 20th, I think, I think -- is that --
4    April 20th or something like that?
5    Q    April 24th.
6    A    24th.  Okay.  He spoke with an attorney
7    and he said that he would not take any case that
8    wasn't worth in the millions, and this attorney
9    said, Well, I'll keep that in mind in terms of
10   referrals.  And I'm like, What the heck is he --
11   you know, here he's saying one thing and he's
12   doing something completely different.  And things
13   weren't settling well with me.  I think I started
14   wondering what really was going on, and I had my
15   concerns.
16   Q    Okay.
17   A    I guess that's, you know.
18   Q    You had these concerns by April of 2001,
19   correct?
20   A    I -- yeah.  Oh, yeah.  Once his
21   secretary told me that he had more interest in
22   Adrian's Landing than in my case, I'm like what
23   the heck, you know.
24   Q    You've mentioned that several times

5 (Pages 191 to 194)

Barbara Cordi-Allen, Vol. 2

11/17/2005

Page 195

1  during the deposition, Ms. Cordi-Allen. What
2  secretary are you referring to?
3      A    Jean Baril.
4      Q    And where were you when this
5  conversation took place?
6      A    In his office.
7      Q    And do you recall when that was?
8      A    It was in the fall of 2000.
9      Q    Okay. And she indicated -- you had a
10  conversation with her?
11     A    Um-hm.
12     Q    Okay. And can you tell me everything
13  you recall about that conversation?
14     A    I said, you know, Why is it that he
15  doesn't call me back? Because I had concerns why
16  I wasn't sent to Yale New Haven Hospital to see a
17  pain specialist and why other doctors weren't
18  brought in and why people weren't deposed.
19  Because I asked one of my students who was right
20  there when it happened, I said, Were you ever
21  deposed? No. Because my students and their
22  parents, to this day I still get calls, and it's
23  been nine years.
24          And they were -- I felt there was a

Page 196

1  lot that wasn't done that should have been done,
2  basically, in order to prepare for this case, and
3  I don't feel that -- well, one of the things --
4  you mentioned some man, Cunningham, yesterday, and
5  I think that's the elevator guy, but this guy was
6  so old they didn't think he'd be able to fly from
7  California or Arizona or wherever, somewhere out
8  west, here and make it. I was told by his
9  paralegal that he was so old and frail. I'm like,
10  What kind of a witness is that?
11     Q    Okay. Let's --
12     A    You know, so I had my questions.
13     Q    Okay. So you --
14     A    It started adding up, I guess, Ken, you
15  know.
16     Q    So in the fall of 2000 you had these
17  questions. This was after -- we looked at the
18  release that was signed in October of 2000, we
19  looked at that last time you were here --
20     A    Um-hm.
21     Q    -- do you recall that?
22          So in the few months following that,
23  in 2000, you began to question what had happened
24  with the case?

Page 197

1      A    It was all around that time.
2      Q    And you had a conversation with
3  Mr. Halloran's paralegal about the expert that he
4  had chosen?
5      A    Yes.
6      Q    And that was around that time, fall of
7  2000?
8      A    Yeah.
9      Q    Okay.
10     A    I really -- to be honest with you, I
11  can't remember, you know, but I would say, you
12  know.
13     Q    Okay. And that was with Miss -- is it
14  Baril as well?
15     A    Yes. Well, she was one and Maureen
16  Keating I think her last name was. She was a
17  paralegal. So between both of them, you know,
18  like -- and I remember Maureen, when she went to
19  the other firm, even she told me, she goes, I'm
20  not one bit happy. And I said, Well, you know
21  what, think about yourself, and maybe you should
22  go to law school because you -- you know, the
23  paralegals do all the work, a lot of it. I told
24  her, I said, Think about yourself. You've got a

Page 198

1  kid, you know, and do what you've got to do, but
2  those are the two people that I spoke with.
3      Q    Okay. So when -- let's talk about the
4  conversation you had about -- with Miss Baril
5  about Adrian's Landing.
6      A    Um-hm.
7      Q    You went to go see Mr. Halloran at his
8  office, is that what happened, or why were you
9  there?
10     A    Maybe -- I don't remember. I could have
11  been to drop off bills, medical bills, that had to
12  be paid, and sometimes we went there for that.
13     Q    Was anybody else present?
14     A    I don't remember.
15     Q    And what --
16     A    It could have been.
17     Q    And have you told me everything you
18  recall about that conversation that you had with
19  Ms. Baril?
20     A    Right now nothing else stands out. That
21  was quite -- you know, I remember that because
22  that was very upsetting, you know, to hear that,
23  you know, like your lawyer really didn't care
24  about you or your case, and then Adrian's Landing,

6 (Pages 195 to 198)

Page 199

1  I mean, I knew they wanted to bring the Patriots
2  to Hartford but that's about all I knew. I don't
3  even know who Adrien is, but...
4      Q    Upon learning that from Ms. Baril that
5  Mr. Halloran was involved in the Adrian's Landing,
6  did you do anything as a result of learning that
7  information?
8      A    Stored it. You know, I listen to
9  people, you know. That was my job teaching, you
10  know, you listen to the kids and, you know, you'd
11  remember things and, you know --
12     Q    Okay.
13     A    -- just in case something ever happened,
14  you know.
15     Q    Now, you also said that you had a
16  conversation with the paralegal concerning the
17  choice of experts --
18     A    Yes.
19     Q    -- in the case. Mr. Cunningham?
20     A    Yes.
21     Q    Did that conversation take place before
22  or after you had executed the release in October
23  of 2000?
24     A    I really don't remember.

Page 200

1      Q    Can you put it into some time frame of
2  when you had that conversation with the paralegal?
3      A    It probably was in the fall.
4      Q    Fall of 2000?
5      A    I would say -- I will guess, you know.
6      Q    And where were you when you had that
7  conversation?
8      A    It was either on the phone or in the
9  office, but I remember -- I remember that. I
10  mean, you can check his age. It's the only way
11  I -- you know what I mean?
12     Q    So this conversation, the paralegal
13  indicated to you that the expert that Mr. Halloran
14  had chosen was old and frail?
15     A    Um-hm.
16     Q    Okay.
17     A    Yes.
18     Q    Did she anything else?
19     A    They were having -- I think she said
20  something that they were having a hard time
21  finding an elevator expert.
22     Q    A different one than --
23     A    Any. But I find that very hard to
24  believe. I've been told differently.

Page 201

1      Q    Who have you been told differently by?
2      A    State police, Connecticut.
3      Q    What did they say to you?
4      A    They questioned why Mr. Halloran never
5  called the state. They said 95, 99 percent of all
6  elevator accidents start with the Department of
7  Elevators, and they said, We don't understand why
8  he never called us, and they pulled the file on
9  the elevator.
10     Q    Okay. We're going to get into that, but
11  just so I don't forget, do you recall when you had
12  that conversation with the state police?
13     A    Maybe in -- it may have been in the
14  summer of 2001. 2000 -- I don't think it was
15  2002. I think it was -- it may have been 2001,
16  but somebody suggested I call the Department of
17  Elevators --
18     Q    Okay.
19     A    -- or Bureau of Elevators, something
20  like that, but the state police work out of there.
21     Q    If you look back at Exhibit 19,
22  please --
23     A    19.
24     Q    -- the e-mail --

Page 202

1      A    Um-hm.
2      Q    -- the fifth paragraph down Mr. Halloran
3  writes, "Simply put, you signed a release after a
4  lengthy mediation process agreeing to a settlement
5  approved by an experienced magistrate and signed a
6  form approving the fee and disbursements."
7      A    Um-hm.
8      Q    "You can now claim that you were forced
9  to sign and that you did not approve the
10  disbursements, but, frankly, the lengthy letters
11  explaining the problems with the case, the reasons
12  for settlement, and the documents themselves all
13  run counter to these assertions."
14          Did I read that correctly?
15     A    Yes.
16     Q    Do you believe that you were forced to
17  sign the settlement documents?
18     A    Yes.
19     Q    And who forced you to sign those?
20     A    Bart Halloran.
21     Q    Prior to bringing this lawsuit, had you
22  ever filed any kind of claim against Mr. Halloran?
23     A    No.
24     Q    And if you look down at the next

Page 203

1  paragraph, Ms. Cordi-Allen, Exhibit 19?
2      A    The -- which one, I'm sorry?
3      Q    Exhibit 19.
4      A    No, no, which paragraph?
5      Q    The next one down.
6      A    The next one. Okay.
7      Q    Mr. Halloran writes, "You will remember
8  that I strongly advised you to settle the case
9  with the compensation carrier rather than turn
10  over the money to them." That's -- you agree with
11  that, correct, he advised you to settle the case
12  with the workers' compensation carrier, correct?
13      A    Rather than turn the money over to them,
14  no. I told him to send the money to Delta
15  Elevator.
16      Q    Okay. But focus on the workers'
17  compensation carrier. I'm not telling you -- I'm
18  not asking you what happened. I'm asking you what
19  he advised you. We talked a lot the last time you
20  were here about the fact that Mr. Halloran had
21  advised you to settle with the workers'
22  compensation carrier and you disagreed with that,
23  remember we talked about that on Tuesday?
24      A    Yes.

Page 204

1      Q    So here again he writes to you --
2      A    Um-hm.
3      Q    -- reminding you that he advised you to
4  settle the case with the compensation carrier.
5      A    Um-hm.
6      Q    Okay. So he again gave you that advice,
7  correct.
8      A    It's here in writing.
9      Q    Okay. And if you look down, the next
10  paragraph, Mr. Halloran again advises you to
11  settle the workers' compensation case, correct?
12      A    Yes.
13      Q    And he -- then in the next paragraph
14  down he indicates to you that he could try to
15  negotiate with the workers' compensation carrier
16  to get them to pay additional moneys; do you see
17  that there?
18      A    Yes.
19      Q    Okay. Do you recall having any
20  conversations with Mr. Halloran concerning whether
21  he should go and try to negotiate with the
22  workers' comp carrier to get additional moneys for
23  you?
24      A    This was not what the settlement was

Page 205

1  that you discussed yesterday.
2      Q    We're talking about the workers'
3  compensation case?
4      A    I'm talking about workers' comp.
5      Q    Right. And Mr. Halloran advised you, we
6  talked about this at length, he advised you to
7  settle the workers' compensation case, and you did
8  not take that advice, correct?
9      A    Right.
10      Q    Okay. And in this e-mail he again is
11  advising you to settle the workers' compensation
12  case, correct?
13      A    Yes.
14      Q    Okay. And now I'm focussing you on the
15  paragraph that says, "I think you should
16  reconsider the option of settling with the
17  workers' compensation carrier"; do you see that
18  there, Ms. Cordi-Allen?
19      A    Yes.
20      Q    And he says, "It is possible that I can
21  get them to pay some more money making the
22  settlement to you worth around 200,000 rather than
23  150,000." Do you see that there?
24      A    Yes.

Page 206

1      Q    So in April of 2001 Mr. Halloran is
2  advising you that he believes that he might be
3  able to get you additional money from the workers'
4  compensation carrier --
5      A    Um-hm.
6      Q    -- in effort to settle the workers'
7  compensation case, correct?
8      A    Yeah.
9      Q    Okay. Did you have any discussions with
10  Mr. Halloran concerning whether he should
11  negotiate with the workers' compensation carrier
12  to attempt to get additional funds?
13      A    I told him if I were to settle it would
14  have to be for $500,000 plus medical insurance,
15  and there's nothing here about medical insurance,
16  their supplying medical insurance, and what -- you
17  told me yesterday and saw in black and white,
18  there was no medical insurance, yet there was in
19  another document. So things keep flip-flopping,
20  but it was $500,000.
21      Q    So you --
22      A    And then he said to me -- and it's in
23  writing -- that that means I'd have to get
24  $750,000 to take a third off of it, and I'm like,

Page 207

1  No, read my contract. And we have that document,
2  I believe, it's in an e-mail.
3      Q   Well, I'll represent to you just on that
4  that I haven't seen any e-mail like that, so if
5  you have one I'd ask you to produce it.
6      A   Bart Halloran's got it.
7          MR. REVERE: Let's go off the record
8  for a second.
9          (Off record.)
10     Q   So at some point you informed
11  Mr. Halloran that you would settle the workers'
12  compensation case but it would require a payment
13  of approximately $500,000 plus medical insurance
14  and perhaps some other things; is that a fair
15  statement?
16     A   Yes.
17     Q   So your -- so Mr. Halloran stating that
18  he could possibly get you additional funds to
19  bring your total up to about $200,000 would have
20  been unacceptable, correct?
21     A   Yes.
22     Q   Okay. In two paragraphs down he says,
23  "I am worried that you will lose the total
24  temporary case. If you do, we will have thrown

Page 208

1  away over $125,000 of tax-free money and possibly
2  as much as $200,000. Once you lose, there will be
3  absolutely no incentive to settle the case." Do
4  you see that there?
5      A   Yeah.
6      Q   Do you see that in the e-mail?
7      A   Um-hm.
8      Q   So Mr. Halloran is warning you that if
9  you lose the case you're not going to get any
10  money, is that correct, you're going to lose the
11  100 and --
12     A   -- 25,000.
13     Q   Right.
14     A   That's what it says.
15     Q   Did you understand that, that that was
16  the risk of going forward with the workers'
17  compensation case?
18     A   Yeah.
19     Q   And if you would turn, please,
20  Ms. Cordi-Allen, to the third page of this
21  document --
22     A   Um-hm.
23     Q   -- which is Bates labeled BCA 01578, and
24  this is an e-mail that you wrote to Mr. Halloran

Page 209

1  on April 30th, 2001, I believe, and about in the
2  middle of this paragraph you write, "I did
3  investigate with the retirement board and you were
4  to follow up on that. I would max out at 40,000.
5  That puts me at a million dollar loss at least. I
6  want all the money I would have made plus pain and
7  suffering, et cetera. I am looking forward to you
8  answering my questions and sending the requested
9  information. It seems to me if I reopen my case
10  with Delta all of the 235,000 will be returned at
11  my prior request to Delta."
12     A   Um-hm.
13     Q   Just focussing on that, when you say you
14  investigated with the retirement board, what did
15  you mean on that?
16     A   I called them up and I asked them about
17  what my retirement would be.
18     Q   Okay. As opposed to what?
19     A   Not being told, I would assume.
20     Q   Okay.
21     A   It says -- that's what it says.
22     Q   And they told you that you would max out
23  at $40,000?
24     A   Right, that's what my retirement would

Page 210

1  be.
2      Q   And when you say, "That puts me at a
3  million dollar loss at least --
4      A   Correct.
5      Q   -- what did you mean by that?
6      A   What did I mean?
7      Q   Yeah.
8      A   There was an economist.
9          MR. REVERE: Economist.
10     A   Economist study done, but it was at an
11  extremely high interest rate, which is not
12  available, about moneys that I would lose, and it
13  was like only until I retired. And I asked him, I
14  said, What about the rest of my life, the impact
15  on my retirement? There was no economist study
16  done on my impact of what the effects would be on
17  my retirement years. You know, I mean, if you're
18  going to do an economist study, you do the whole
19  thing.
20     Q   So you were questioning the --
21     A   The mathematics.
22     Q   Let me finish the question.
23          You were questioning the expert
24  Mr. Halloran had retained on your behalf about

Barbara Cordi-Allen, Vol. 2

11/17/2005

Page 211

1  your damages; is that correct?
2      A    I was questioning -- I only got one
3  document. I don't know if there was another one.
4      Q    Okay.
5      A    And I -- you know, like I said, all I
6  was given was the one of my work -- until my
7  working age of retirement, which I don't know that
8  I would have retired at that point. You know,
9  like, I don't know what it was, maybe 55. I don't
10  remember. But there was nothing that I saw or was
11  given, and I kept asking for, for the impact on my
12  retirement, because the figures obviously change
13  quite a bit.
14      Q    And further down this paragraph you say,
15  "I am not one bit happy." What were you upset
16  about at this time you wrote this e-mail?
17      A    What was I upset about?
18      Q    Yeah.
19      A    Being offered $150,000.
20      Q    Were you unhappy about the
21  representation Mr. Halloran had offered you?
22      A    Was I? I was unhappy with the $150,000,
23  and the way things were going, I just felt that,
24  considering my injury and the impact of what it's

Page 212

1  done to my life and the economics, it should have
2  been quite a bit different.
3          (Document marked as Exhibit No. 20.)
4          (Document exhibited to witness.)
5      Q    Ms. Cordi-Allen, I'm going to show you
6  now what's been marked as Exhibit No. 20 and ask
7  you to take a look at that, please.
8      A    Yes.
9      Q    Have you had a chance to look at that
10  e-mail?
11      A    Um-hm.
12      Q    Okay. This is an e-mail dated April 25,
13  2001 --
14      A    Yes.
15      Q    -- from you to Mr. Halloran; is that
16  correct?
17      A    Yes.
18      Q    And this says, "Alex Palmieri called me
19  from the state" --
20      A    Right.
21      Q    -- "that there were no incident or
22  accident reports made to them by the certified
23  operator of the registrant, i.e., the school." Do
24  you know who Alex Palmieri is?

Page 213

1      A    That's the elevator, the Department of
2  Elevators. He may be one of the state cops. I
3  don't know who he is, somebody there.
4      Q    Okay.
5      A    That's when I called, I told you. It
6  was in the spring instead of the summer.
7      Q    So this relates to your call to the
8  Bureau of Elevators?
9      A    Yes.
10      Q    So you were aware in April of 2001 that
11  there had been no incident or accident reports
12  made to the Bureau of Elevators; is that correct?
13      A    Yes.
14      Q    And you were aware that someone had
15  requested the file from the Department of
16  Elevators?
17      A    Yes.
18      Q    And you believe that it was Mr. Kenny,
19  is that correct, the opposing counsel in the Delta
20  Elevator case?
21      A    It says I was told that -- from this
22  person that whoever got it had an office in
23  Hartford and Bridgeport, and Mr. Halloran didn't
24  but Mr. Kenny did. So I guess that it was

Page 214

1  Mr. Kenny. That's what it said, it seems like.
2      Q    Do you recall -- did you have a
3  conversation with Mr. Palmieri on the phone?
4      A    Of course. It says he called me.
5      Q    And so the information that you're
6  relating in this e-mail was --
7      A    Was from him.
8      Q    -- was from Mr. Palmieri?
9      A    Yes.
10      Q    So Mr. Palmieri informed you in April of
11  2001 that the elevator had not been inspected?
12      A    Yes.
13      Q    And he informed you that it had -- last
14  prior inspection was in 1995; is that correct?
15      A    Yes, um-hm.
16      Q    And it says here that -- well he said
17  that you should have taken this up in court. Do
18  you see that there?
19      A    Yes.
20      Q    What did Mr. Palmieri say about that in
21  April of 2001?
22      A    That my attorney, like I said before,
23  should have started the lawsuit with the state of
24  Connecticut Bureau of Elevators and he did not,

10 (Pages 211 to 214)

Page 215

1 and he would have found out, one, that this
2 elevator was not inspected and it had no permit to
3 be operating. It was illegally being run. The
4 maintenance records on the elevator were not sent
5 to the state. Eight people had fallen into the
6 elevator. None of those injuries or incidences
7 were reported to the state. And they told me
8 since the city of Hartford, Delta Elevator,
9 whoever it is, did not fix the elevator, they
10 would have fixed it. They would have come in with
11 their experts, their elevator experts, and fixed
12 it immediately, and that that should have been
13 where this -- where my attorney should have
14 started this lawsuit or his investigation for
15 finding out what work was done, what the state's
16 intervention may have -- you know, all that,
17 whatever the state does with elevators. That's
18 what he told me.
19     Q    And you're questioning Mr. Halloran, are
20 you not, on why this wasn't done by him, correct?
21     A    They asked me to ask him. They said,
22 Why don't you ask him why he didn't call for the
23 file, and why did Kenny get it, and I just -- I
24 had no idea. Somebody -- yeah, the man, Alex

Page 216

1 Palmieri, is the one I spoke with.
2     Q    Did you have any conversations with
3 Mr. Halloran concerning the city of Hartford
4 Bureau of Elevator file?
5     A    Yes.
6     Q    Can you tell us what those conversations
7 were that you recall?
8     A    Which ones? What are you talking about,
9 city of Hartford? There were two, I think.
10     Q    Two conversations?
11     A    No, two files.
12     Q.   Okay.
13     A    Which files are you talking about?
14     Q    Why don't you identify the two files for
15 me.
16     A    I think there's one at the school and
17 one at the Board of Education, I think. That's
18 what Mr. Halloran said, I think.
19     Q    So this is all dealing with the
20 elevator?
21     A    Yes.
22     Q    And you had conversations with
23 Mr. Halloran about these two files?
24     A    He told me about them.

Page 217

1     Q    Okay. When did he tell you about them?
2     A    I don't remember.
3     Q    Before or after you wrote this e-mail?
4     A    Before.
5     Q    So Mr. Halloran knew about the files
6 before you wrote this e-mail?
7     A    Oh, yeah -- no, not the files at the
8 state. This is the file at the state. There are
9 three files --
10     Q    Okay.
11     A    -- evidently. One at the school, okay,
12 one at the city hall or Board of Education, I
13 don't know where, and the state, because the state
14 issues the permits. You know, the plaque cards
15 that go in the elevators, that's issued by the
16 state. That's what I found out.
17     Q    Okay.
18     A    Okay.
19     Q    So the file you're referring to in this
20 e-mail of Exhibit 20 --
21     A    Is the state of Connecticut's.
22     Q    The state of Connecticut file --
23     A    Right, exactly.
24     Q    -- that Mr. Halloran, according to what

Page 218

1 you're saying, wasn't aware of --
2     A    Exactly.
3     Q    -- or didn't call for?
4     A    Exactly.
5     Q    Did you have any conversations with
6 Mr. Halloran concerning the state file?
7     A    I sent him this e-mail, but he never
8 responded, to the best of my knowledge, as to why
9 he didn't.
10     Q    Did you ever have any further
11 conversations with anyone at the Bureau of
12 Elevators?
13     A    Yes.
14     Q    When were those conversations?
15     A    Probably around this time, afterwards.
16     Q    Okay. And what was the substance of
17 those conversations?
18     A    What could be done to make sure nobody
19 else found themselves in my situation, what they
20 could do to make sure the elevators were fixed,
21 they were very, very upset what happened to me.
22 And he said, Had we known when somebody got hurt
23 the first time when — you know, because like I
24 said, eight people fell into the elevator, and

11 (Pages 215 to 218)

Page 219

1  they said, We would have fixed it immediately, and
2  I wouldn't be in the situation, we wouldn't be
3  here.
4      Q.  Did you ever talk to any other attorneys
5  besides Mr. Halloran concerning the file at the
6  Bureau of Elevators?
7      A   Only if they're attorneys down there.
8      Q   So you didn't seek counsel or new
9  counsel or different counsel in April of 2001
10 concerning the file at the Bureau of Elevators?
11     A   I don't think so.  I don't think so.  I
12 think -- I don't -- like I said, I don't know.
13 You know, they may have said something to a state
14 attorney or something.
15     Q   You don't know that?
16     A   I don't know, no.
17     Q   So the answer to my question was no?
18     A   I don't think so.  That's -- I don't
19 recall, you know.
20         MR. SMALL:  Do you need to consult
21 with your counsel?  There's no question pending
22 here.
23         MR. REVERE:  No.  Just read --
24         THE WITNESS:  Do you have this?

Page 220

1          MR. REVERE:  She's marking it.  I'm
2  reading it as you're looking at it.
3          (Document marked as Exhibit No. 21.)
4      Q.  Ms. Cordi-Allen, have you now had a
5  chance to review Exhibit No. 21?
6      A   Yes.
7      Q   Do you recall drafting this e-mail to
8  Mr. Halloran?
9      A   No.
10     Q   It's dated at the bottom May 4th, 2001?
11     A   Um-hm.
12     Q   And it says BCordialle.  That's your
13 e-mail account, correct?
14     A   Yes.
15     Q   You don't doubt that this was an e-mail
16 that you sent?
17     A   Oh, no, I just don't remember.
18     Q   In fact, this was a document produced by
19 your counsel in this matter, and I'd like to walk
20 through this document a little bit.
21         In the first line, Ms. Cordi-Allen,
22 you write, "You still have not responded as to why
23 you did not get the file from the state and your
24 opposing lawyers did and did not disclose it.  You

Page 221

1  did not respond as to why you did not know that
2  the city did not notify the state of injuries as
3  regulated by state law.  You are to investigate
4  the state and the city."
5          Did I read that correctly?
6      A   Yes.
7      Q   Okay.  And are you referring here,
8  again, to the file at the Bureau of Elevators that
9  we discussed previously?
10     A   Yes.
11     Q   And this relates, does it not, to a
12 claim against or a potential claim against the
13 city of Hartford; is that right?
14     A   Well, workers' comp rates are different
15 if it's -- if the city is found to be negligent.
16     Q   So did this --
17     A   It's double workers' comp rate, I
18 believe, something like that.
19     Q   So this file from the city -- from the
20 Bureau of Elevators, excuse me --
21     A   Um-hm.
22     Q   -- dealt with your claim for workers'
23 compensation?
24     A   Yes.

Page 222

1      Q   Did it also deal with a potential suit
2  against the city of Hartford unrelated to the
3  workers' compensation?
4      A   He never filed a lawsuit against the
5  city.
6      Q   Is that a question or a statement?
7      A   No, I'm telling you he never filed a
8  lawsuit, so...
9      Q   Did you want him to file a suit against
10 the city?
11     A   If there could have been one, there
12 should have been one.  I would have gone along
13 with one.  I would have agreed to suing the city.
14     Q   Do you believe as you sit here today
15 that a suit could have been brought against the
16 city of Hartford?
17     A   Yes.
18     Q   Okay.  And what do you base that belief
19 on?
20     A   Gross negligence.
21     Q   And is that gross negligence similar to
22 what we're looking at here?
23     A   Yes.
24     Q   Okay.  So then the failure to request

Page 223

1    the file at the Bureau of Elevators would have had
2    an impact on whether or not to bring a claim
3    against the city of Hartford; is that a fair
4    statement?
5        A    I think it would have.  It would have
6    definitely helped.
7        Q    And in fact if you look a little bit
8    further down this e-mail --
9        A    Um-hm.
10       Q    -- in the second paragraph beginning
11   with "also" --
12       A    Um-hm, yes.
13       Q    -- if you look down, three lines down,
14   it says, "So is the state responsible.  I now know
15   that you are politically involved at both levels."
16       A    Yes.  Um-hm.
17       Q    And I'm going to go back just two
18   sentences before -- one sentence before what I
19   just read and it says, "I am aware now that the
20   city caused this injury due to their not reporting
21   to the state"?
22       A    Yes.
23       Q.   Okay.  So there you're raising an issue
24   that you believe the city of Hartford was

Page 224

1    responsible for your injury; is that correct?
2        A    Definitely.
3        Q    And you informed Mr. Halloran your
4    belief that the city of Hartford was responsible,
5    correct?
6        A    I told him my conversations with the
7    Bureau of Elevators, and they said to me that the
8    elevator would have been fixed had they known
9    about it and I wouldn't have gotten hurt, I'd be a
10   happy camper.
11       Q    And then you say, "I now know you are
12   politically involved at both levels"?
13       A    Um-hm.
14       Q.   What did you mean by that?
15       A    He was involved with the city and state
16   politics.
17       Q    Okay.  And did this also have to do with
18   his involvement with Adrian's Landing?
19       A    Yes.  Um-hm.
20       Q    So in May of 2001 you questioned
21   Mr. Halloran not bringing a case against the city
22   of Hartford, you also questioned Mr. Halloran's
23   involvement with Adrian's Landing and other
24   political organizations; is that correct?

Page 225

1        A    They were concerns.
2        Q    And a little bit further down it says,
3    "You should have been on top of both.  In fact, I
4    have talked with another lawyer and he wants to
5    know about the state and city lawsuits.  Did you
6    bring any?  If not, why not?  This should have
7    been done, especially with the information on the
8    city I found out."  Do you see that there?
9        A    Um-hm.
10       Q    Who was the other lawyer that you spoke
11   with?
12       A    It could have been the person at the
13   state elevators.  There's -- I think there was an
14   attorney there, because they were very, very upset
15   that I was hurt, and I think one of the people
16   there was an attorney that works at the Bureau of
17   Elevators.
18       Q    Besides the Bureau of Elevators, did you
19   talk to any other attorney concerning this matter?
20       A    No, unless it -- you weren't my lawyer
21   then, right, so...
22       Q    So the answer to my question is no?
23       A    I don't.
24       Q    Did you answer the question?

Page 226

1        A    I don't remember speaking with anybody
2    outside of that.
3        Q    And you questioned whether or not
4    Mr. Halloran brought any lawsuits against the city
5    or the state, correct?
6        A    Where is that?
7        Q    It says, "He wants to know about the
8    state and city lawsuits.  Did you bring any?  If
9    not, why not?"
10       A    Okay.
11       Q    Do you agree with me?
12       A    That's what it says.
13       Q    Did you have any communication or
14   correspondence with Mr. Halloran concerning a
15   potential lawsuit against the city of Hartford or
16   the state of Connecticut besides this e-mail?
17       A    I don't recall.
18       Q    Mr. Halloran ever respond to you?
19       A    Not to my recollection.  I don't -- I
20   don't recall.  I don't recall getting a response.
21          (Document marked as Exhibit No. 22.)
22       Q    Ms. Cordi-Allen, have you now had a
23   chance to review Exhibit No. 22?
24       A    Yeah.

13 (Pages 223 to 226)

Barbara Cordi-Allen, Vol. 2

11/17/2005

Page 227

1    Q   This purports to be an e-mail from you
2  to Mr. Halloran dated May 4, 2001; is that
3  correct?
4    A   That's what it says, yeah.
5    Q   Do you recall drafting this e-mail?
6    A   No.
7    Q   At the bottom it's BCordialle.  You
8  don't -- I know you don't remember, but you don't
9  deny that this is your e-mail, do you?
10   A   Exactly, right.
11   Q   In fact, this was a document produced by
12 your counsel in this case.
13       And on the second paragraph down,
14 Ms. Cordi-Allen, it says, "I still am waiting for
15 a response from you about why you did not contact
16 the state building inspector, elevators, about my
17 injuries"?
18   A   Right.
19   Q   And that relates, again, to what the
20 prior e-mail referred to was Mr. Halloran's
21 failure to request the file from the state; is
22 that correct?
23   A   Yes.
24   Q   Okay.  And you say, "Bart, I trust that

Page 228

1  it is NOT too late," and "not" is capitalized.
2  What did you mean by "not too late"?
3    A   He could pursue workers' comp for double
4  damages.
5    Q   Did that also have to do with an
6  independent claim against the city, a lawsuit
7  against the city?
8    A   If he could have brought one for them
9  not doing their job.
10   Q   So that referred to both the workers'
11 comp and a claim against the city of Hartford,
12 correct?
13   A   Whatever -- you know, whatever he could
14 have done with that information.
15   Q   So the answer to my question is yes?
16   A   Yes, I would guess.
17   Q   And it says, "That would not be good,
18 and I definitely would have to pursuit that
19 further."
20   A   Um-hm.
21   Q   What did you mean when you say, I would
22 have to pursue that further -- and I think it's a
23 typo, it should have said pursue that further.
24 But what did you mean when you wrote that?

Page 229

1    A   Bring it to the commissioner.
2    Q   Were you also questioning whether or not
3  you would have to pursue something against
4  Mr. Halloran further for if it was too late to
5  bring a claim against the city?
6    A   No.
7    Q   In the last line, Ms. Cordi-Allen, it
8  says, "A lawyer spoke with told me it should
9  have been done and lawsuits on them filed.  I want
10 an explanation.  Barbara."
11   A   Um-hm.
12   Q   Do you recall the lawyer that you spoke
13 with?  Is this still somebody --
14   A   It's probably the state attorney.
15   Q   Okay.  And when you say lawsuits should
16 have been filed on them, you're referring now to
17 the state and to the city; is that correct?
18   A   And workers' comp, because I think
19 that -- I'm not sure if damages is -- if
20 negligence is an extra case --
21   Q   Okay.
22   A   -- besides a, you know, regular workers'
23 comp case.
24   Q   We've already talked about the fact that

Page 230

1  you had your workers' compensation case,
2  correct --
3    A   Um-hm.
4    Q   -- that you were pursuing?
5    A   Yes.
6    Q   And in this e-mail you're questioning
7  Mr. Halloran, are you not, why he did not bring
8  lawsuits against the city of Hartford and the
9  state of Connecticut for their actions involving
10 the elevator --
11   A   Um-hm.  Yes.
12   Q   -- is that correct?
13   A   Um-hm.  Yes.
14   Q   Correct, yes?
15   A   Yes.  I said yes.
16       MR. SMALL:  Let's take a break.
17       (Off record.)
18       (Mr. Allen not present.)
19       (Document marked as Exhibit No. 23.)
20   Q   Ms. Cordi-Allen, I'm going to show you
21 what's been marked as Exhibit No. 23 and ask you
22 to take a look at that document, please.
23   A   Yeah.
24       (Document exhibited to witness.)

14 (Pages 227 to 230)

Page 231

1           (Witness perusing document.)
2       Q    Ms. Cordi-Allen, have you had a chance
3   to review Exhibit No. 23?
4       A    Yeah.
5       Q    This is a letter to you from
6   Mr. Halloran dated May 10th, 2001; is that
7   correct?
8       A    Yes.
9       Q.   Do you recall this letter?
10      A    Not really, but...
11      Q    This letter, Mr. Halloran indicates, was
12  sent certified mail.  You don't deny that you
13  received this letter, though, do you?
14      A    No, I just don't remember it.
15      Q    In the first -- excuse me -- first line
16  of the second paragraph it says, First, if you
17  wish to make a complaint to the bar about my
18  actions, that is your right."
19          As of May 10, 2001, had you
20  considered filing a complaint with the bar against
21  Mr. Halloran?
22      A    I don't remember.
23      Q    Had you discussed with Mr. Halloran that
24  you were considering filing?

Page 232

1       A    I don't remember.
2       Q    On page 2 of this letter,
3   Ms. Cordi-Allen, Mr. Halloran states, "I have not
4   agreed to," and it's, "One, sue the city of
5   Hartford on any claim, including any claim from
6   the failure of the elevator, or any claim relating
7   to your employment."  Do you see that there?
8       A    Yes.
9       Q.   Okay.  And that comports with your
10  memory, does it not, that Mr. Halloran refused to
11  file a claim against the city of Hartford?
12      A    No.
13      Q    That's different than your memory?
14      A    Yes.
15      Q    What is your memory?
16      A    He was going to file a lawsuit from
17  injuries resulting from my left leg, foot being
18  crushed in the elevator.
19      Q    Okay.  But as of -- we just looked at
20  several e-mails, did we not, in May where you were
21  questioning why he didn't bring a claim, correct?
22      A    Yes.
23      Q    And in this letter he says to you that
24  he is not going to sue the city of Hartford,

Page 233

1   correct?
2       A    Yes.
3       Q    And my question relates to your memory
4   that -- your memory is also that in around May of
5   2001 he told you he was not going to file a suit
6   against the city of Hartford, correct?
7       A    That's what this says.
8       Q    Right.
9       A    This is the first time I saw that.
10      Q    What about, does your memory indicate
11  that Mr. Halloran agreed to file a suit against
12  the city of Hartford in the spring of 2001?
13      A    That he agreed to bring one?
14      Q    Why don't we strike that.  Let me break
15  this down a little bit.  Okay?
16          We had reviewed e-mails where you
17  questioned why a lawsuit was not filed against the
18  city of Hartford, correct?
19      A    Yes.
20      Q    And then we see a response from
21  Mr. Halloran where he is informing you that he had
22  not agreed to file a suit against the city of
23  Hartford.  Do you see that in this letter here?
24          (Mr. Revere indicating.)

Page 234

1       A    It says so here now.
2       Q    Okay.  And in fact one of the
3   allegations in this lawsuit is that Mr. Halloran
4   in fact didn't bring a suit against the city of
5   Hartford, correct?
6       A    Yes.
7       Q    Okay.  And what I'm asking you is, in
8   the time frame April or May of 2001, which is the
9   time frame we're talking about right now, do you
10  recall Mr. Halloran telling you that he was not
11  going to file a suit against the city of Hartford?
12      A    Prior to this?
13      Q    Around this time.
14      A    This was the first time --
15      Q    Okay.
16      A    -- that that ever came up to my
17  knowledge.
18      Q    So you knew at least as of May 10, 2001
19  that Mr. Halloran was not going to pursue a claim
20  against the city of Hartford, correct?
21      A    Yeah.
22      Q    Thank you.
23          And in No. 2 he says, "File any
24  additional workers' compensation claims, including

Barbara Cordi-Allen, Vol. 2

11/17/2005

Page 235

1  any claims for your arms or neck."
2        So you knew as of May 10, 2001 that
3  Mr. Halloran was not going to file any additional
4  workers' compensation claims, correct?
5     A    Additional?
6     Q    I'm referring to No. 2, "File any
7  additional workers' compensation claims, including
8  any claims for your arms or neck." You knew as of
9  May 10, 2001 that Mr. Halloran was not going to
10 file any additional workers' compensation claims
11 including any claims for your arms or neck,
12 correct?
13       THE WITNESS:  Can I speak with Paul
14 a minute?
15       MR. SMITH:  No, there's a question
16 pending --
17       MR. REVERE:  No.
18       MR. SMALL:  -- you need to answer my
19 question.
20    A    These were -- that's what this says.
21    Q    Okay.  So Mr. Halloran is informing you
22 on May 10, 2001 --
23    A    Yeah.
24    Q    -- that he is not going to do that,

Page 236

1  correct?
2     A    Right.
3     Q    So the answer is yes?
4     A    Right.
5     Q    Okay.  And as of May 10, 2001 you were
6  aware that Mr. Halloran had not agreed to file any
7  claims against any healthcare professional,
8  including Dr. Wise --
9     A    Um-hm.
10    Q    -- correct?
11    A    Yes.
12    Q    And he agreed -- and as of May 10, 2001,
13 we can agree Mr. Halloran was still representing
14 you in the workers' compensation case, correct?
15    A    Yes.
16    Q    Okay.  And he says in No. 5 that
17 Mr. Halloran has not agreed to take on any new
18 matter of any kind for you, correct?
19    A    Yes.
20    Q    So you were aware as of May 10, 2001
21 that Mr. Halloran was not going to take on any new
22 matters for you, correct?
23    A    Yes.
24    Q    Okay.  Two paragraphs down --

Page 237

1     A    Wait a minute.  Can I read the one
2  before it first?
3     Q    Take your time.  Of course.
4        (Witness perusing document.)
5        MR. REVERE:  We don't care about
6  anything else.  We care about what questions Ken
7  is asking you now.  Just stick to what he's asking
8  you.  Okay?
9        THE WITNESS:  Yeah.
10    Q    In the paragraph that I'm referring to,
11 Ms. Cordi-Allen, which begins, "Your recent
12 actions," do you see that there?
13    A    Yes.
14    Q    It indicates that you sent Attorney
15 Pomeranz the confidential communication of the
16 retainer agreement?
17    A    Yes.
18    Q    Did you do that?
19    A    Yes, I did.
20    Q    Why did you do that?
21    A    Because Mr. Pomeranz represented the
22 city, and they were not -- the contract was
23 breached and the city was not getting what the
24 per -- the mathematics were incorrect, the

Page 238

1  percentages were wrong, and there was going to
2  be -- there was a violation of my contract, which
3  I was not under any condition going to be cited
4  for doing something illegal, and that to me was
5  illegal.
6     Q    When you say your contract, you're
7  referring to the retainer agreement with
8  Mr. Halloran?
9     A    Yes.
10    Q    And you're I believe citing --
11    A    That's --
12    Q    -- let me ask the questions.
13       You're citing how the division of
14 funds is supposed to be disbursed; is that
15 correct?
16    A    The percentage, it was not -- I told him
17 it was not a regular contract, and Commissioner
18 Miles assumed that it was a traditional contract,
19 he even said it at the hearing, that it was 33 1/3
20 percent.  And I'm like, No, read the contract.
21 Nobody read the contract or was aware of it.  So I
22 wanted him to make sure, because I was not going
23 to lie or break the law or --
24    Q    But you understood that Attorney

16 (Pages 235 to 238)

Barbara Cordi-Allen, Vol. 2                                                          11/17/2005

Page 239

1  Pomeranz represented your opposition in the
2  workers' compensation case, correct?
3     A   Yeah.
4     Q   On page 3, Ms. Cordi-Allen, the first
5  full paragraph beginning, "I have attempted," do
6  you see that?
7     A   Yeah.
8     Q   Mr. Halloran indicates that you were
9  insulting to his former associate, Steven Berrizi,
10 Paralegals Jean Brennan and Maureen Keating.  Do
11 you believe that you displayed insulting conduct
12 toward Mr. Halloran's office?
13    A   No.
14    Q   Do you know why Mr. Halloran would
15 indicate that you had?
16    A   Yes.
17    Q   Why is that?
18    A   Mr. Berrizi acted unprofessionally and
19 unethically to me, and in fact he threw something
20 or snatched a card or something.  It was about
21 some kind of a business card, maybe from my
22 doctor, whatever, and he was real nasty to me,
23 very nasty.  Like, why don't you just get a job.
24 He said that.  And I was like, What are you

Page 240

1  talking about?  You know, I'm injured, he's
2  driving me somewhere, comes to my house.  He was
3  rude and obnoxious.  And I told Bart Halloran, I
4  said, That man is not to come to my house, come
5  near me, drive me, anything, ever again, and I
6  want him completely away from us.  To be honest
7  with you, I didn't feel safe with him.
8     Q   Now, he also says that you made unfair
9  comments about Mr. Halloran's representation to
10 other members of his firm, including Coleman Levy
11 and Kenny Levine.  We talked last time you were
12 here about a conversation you had with Mr. Levy or
13 Mr. Levine.  Were there other contacts that you
14 had with those gentlemen?
15    A   I don't know them, so I don't recall.
16    Q   Did you have any meetings or any
17 conversations with anyone else at Mr. Halloran's
18 firm concerning Mr. Halloran's representation of
19 you?
20    A   Not that I recall.
21    Q   Okay.  On page 4, the second full
22 paragraph, Mr. Halloran once again indicates that
23 he believes he could get an additional 50 to
24 $100,000 to settle the workers' compensation

Page 241

1  claim.  Do you recall, we saw that in a prior
2  e-mail today in a different exhibit, do you recall
3  that?
4            (Witness perusing document.)
5     A   No, it was different.
6     Q   Okay.  How is it different?
7     A   Well, now -- the other was $200,000,
8  right?  And now he's changing.  You know, the most
9  he could get then was -- the most then was
10 200,000, and now he's changing his figures again.
11    Q   Well, what he says, does he not, is
12 supplement this with at least an additional 50,000
13 and possibly as much as $100,000 to settle your
14 claim, correct?
15    A   Yes.
16    Q   And you instructed him not to continue
17 negotiating with Mr. Pomeranz; isn't that right?
18    A   I told him what I would settle for.
19    Q   And was that that $500,000 figure?
20    A   Yes.  Um-hm.
21    Q   Do you know if he ever relayed that
22 figure to Mr. Pomeranz?
23    A   No, I never saw that he did.
24    Q   Now, down -- the last paragraph,

Page 242

1  Ms. Cordi-Allen, on page 5 states:
2            "I will wait a week before I take
3  any further action in your case.  If you do not
4  wish to accept my advice or if you instead wish to
5  proceed with whatever complaint or action you wish
6  to file against me, I will withdraw from the
7  workers' compensation case and respond to those
8  complaints."
9            What complaint or action were you
10 thinking of filing against Mr. Halloran in May of
11 2001?
12    A   I don't know that I was.  He was my
13 lawyer at that time.
14            (Document marked as Exhibit No. 24.)
15    Q   Ms. Cordi-Allen, I'm now going to show
16 you what has been marked as Exhibit No. 24 and ask
17 you to take a look at that, please.
18            (Document exhibited to witness.)
19            (Witness perusing document.)
20    Q   Ms. Cordi-Allen, have you had a chance
21 to review Exhibit No. 24?
22    A   Yeah.
23    Q   Do you recall drafting this e-mail on
24 May 12th, 2001?

17 (Pages 239 to 242)

Page 243

1    A    No.
2    Q    That's your e-mail address, though, is
3    it not?
4    A    Yeah.
5    Q    You don't deny that this is an e-mail --
6    A    I just don't remember it.
7    Q    In fact, this was a document that was
8    produced by your counsel in this litigation.
9         In this e-mail, Ms. Cordi-Allen, you
10    indicate that you received a copy of the file on
11    the elevator from the state; is that correct?
12    A    Yes.
13    Q    And you imply that Mr. Halloran is not
14    working on your workers' compensation case because
15    he is not going to be further compensated; is that
16    correct?
17    A    According to my contract, he wouldn't
18    have gotten anything.
19    Q    So you're questioning his handling of
20    the workers' compensation case; is that correct?
21    A    I was -- I -- according to this, it
22    seems like I was concerned about it.
23    Q    And you state in here, "Brian Doyle
24    cannot take the case back, so you will be my

Page 244

1    paralegal until the day I die."
2    A    Right.
3    Q    What did you mean by that?
4    A    He took the case from my lawyer, who was
5    my workers' comp lawyer, and any bills, whatever,
6    in the future till the day I die have to be
7    submitted to workers' comp, and that's his
8    responsibility.
9    Q    So you expected Mr. Halloran to be your
10    paralegal; is that correct?
11    A    He was responsible.
12    Q    So the answer is yes?
13    A    Yes.
14    Q    And midway down this e-mail you question
15    Mr. Halloran, "Have you filed a lawsuit against
16    the state and the city?" Do you see that there?
17    A    No. Okay, yes, now I do.
18    Q    Now, again, that's referring to a
19    lawsuit against the city of Hartford and the state
20    of Connecticut?
21    A    Yes.
22    Q    And it indicates here you spoke
23    previously with Maureen and she did say that cases
24    can be reopened?

Page 245

1    A    Yes.
2    Q    Now Maureen was --
3    A    His paralegal.
4    Q    And you had a conversation with her
5    about reopening the Delta case?
6    A    Yes.
7    Q    Do you recall that conversation?
8    A    It says I did, so -- and I remember her
9    saying that.
10    Q    Do you recall exactly what she said?
11    A    If there's new evidence, they can reopen
12    cases. Cases can be reopened, um-hm. I mean,
13    this here was a lot of new evidence, the state
14    file.
15    Q    You understood Miss Keating was not a
16    lawyer, correct?
17    A    She was a paralegal, but very -- she --
18    Q    Okay. My question --
19    A    She's a paralegal.
20    Q    -- Ms. Cordi-Allen, is you understood
21    that she was not a lawyer, correct?
22    A    Um-hm. Yes.
23    Q    Now, a little bit further down this
24    paragraph, Ms. Cordi-Allen, you write, "If this

Page 246

1    isn't resolved and these cases filed and I get my
2    total permanent disability, I will have to file a
3    malpractice lawsuit on your firm."
4         Did I read that correctly?
5    A    Um-hm.
6    Q    When you say "these cases filed," you're
7    referring to the cases against the city and the
8    state, correct?
9    A    Yes, I -- wait a minute.
10    Q    And then when you say "and get my total
11    permanent disability," you're referring to the
12    workers' compensation case, correct?
13    A    Wait a minute.
14         (Witness perusing document.)
15    A    I believe so.
16    Q    And you tell Mr. Halloran that unless
17    those things happen you're going to file a
18    malpractice lawsuit on his firm, correct?
19    A    Yes.
20    Q    So as of May 12, 2001, you informed
21    Mr. Halloran that you were contemplating a
22    malpractice suit on his firm if certain things
23    were not done, correct?
24    A    Malpractice, yes.

18 (Pages 243 to 246)

Page 247

```
1      Q    Thank you.
2           (Document marked as Exhibit No. 25.)
3      Q    Ms. Cordi-Allen, I'm now going to show
4   you what's been marked as Exhibit No. 25.
5      A    Um-hm.
6      Q    This purports to be a letter dated
7   May 21, 2001 --
8      A    Yeah.
9      Q    -- from you to the Bureau of Elevators.
10     A    Yes.
11     Q    Did you draft this letter?
12     A    Yes.
13     Q    Do you recall if you sent this letter?
14     A    Yeah, I should have. I don't -- I
15  don't -- I don't doubt that I would have sent it
16  if I wrote it, because it was an effort for me to
17  write this.
18     Q    And in fact this is a document produced
19  by your counsel in this case, and down below it
20  says BCordialle, which is your e-mail address,
21  correct?
22     A    Um-hm.
23     Q    And in this letter you write to file a
24  formal complaint on the city of Hartford; is that
```

Page 248

```
1   correct?
2      A    Yeah.
3      Q    And their attorney, Rick Kenny; is that
4   correct?
5      A    Yeah.
6      Q    And the state of Connecticut; is that
7   right?
8      A    Yeah.
9      Q    Did the Bureau of Elevators ever contact
10  you as a result of your letter?
11     A    They told me to write this.
12     Q    Who told you to write this?
13     A    The Bureau of Elevators.
14     Q.   Okay.
15     A    They needed something in writing,
16  because previous to this, I had spoken with them,
17  and they were very upset about my injuries, and
18  they wanted to make sure that elevator was
19  inspected and working and nobody else would be
20  hurt.
21     Q    So they requested that you write them a
22  letter?
23     A    Yes.
24     Q    Did they follow up with you after you
```

Page 249

```
1   wrote this letter to them?
2      A    I believe so.
3      Q    What happened?
4      A    I believe they went out there and
5   inspected the elevator and went through the files,
6   and I don't know if they brought citations on the
7   city or not.
8      Q    Did you ever receive a copy of any
9   complaints that were filed from the Bureau of
10  Elevators?
11     A    I don't know what they did with it
12  outside of I believe they -- to the best of my
13  recollection, that they went out there and became
14  involved to make sure that they finally fixed the
15  elevator before someone was killed in it.
16     Q    Do you know this or are you speculating?
17     A    They told me.
18     Q    Who told you?
19     A    Bureau of Elevators.
20     Q    When did they tell you this?
21     A    The time I was communicating with them
22  in the spring of '01.
23     Q    You file a complaint here also against
24  Attorney Rick Kenny?
```

Page 250

```
1      A    Um-hm.
2      Q    Aside from this complaint to the Bureau
3   of Elevators, have you filed any other complaint
4   against Mr. Kenny?
5      A    No. Actually, I messed up, it shouldn't
6   have been -- this is -- he's the one for Delta,
7   right?
8      Q    Correct.
9      A    So I should have added Delta in there.
10          MR. SMALL:  Let's go off the record,
11  please.
12          (Lunch recess taken at 12:15 p.m.)
13          (Back on the record at 1:05 p.m.)
14          (Document marked as Exhibit No. 26.)
15     Q    Ms. Cordi-Allen, I'm now showing you
16  what's been marked as Exhibit No. 26 in this
17  deposition and ask you to take a look at the
18  series of e-mails dated May 22nd, 2001.
19          (Document exhibited to witness.)
20          (Witness perusing document.)
21     Q    Have you had a chance to review these
22  e-mails, Ms. Cordi-Allen?
23     A    I don't remember.
24     Q    You don't deny that these were an e-mail
```

19 (Pages 247 to 250)

Page 251

1  that you sent to Mr. Halloran and one he returned
2  to you, do you?
3      A   That's what it says.
4      Q   Down at the bottom it says Wednesday,
5  May 23, 2001, America on Line, BCordialle; do you
6  see that?
7      A   Um-hm.
8      Q   That's your e-mail address, was it not?
9      A   Yes.
10     Q   This was a document that was produced by
11 your counsel in this litigation, and I'm going to
12 direct your attention, please, to the e-mail
13 toward the bottom of the page, which is dated
14 5/22/01 at 6:53 p.m., and it says -- you write to
15 Mr. Halloran, "You continue to act irresponsible."
16 Do you know what you meant when you told
17 Mr. Halloran that he was acting irresponsible?
18     A   Where is that, Ken, which line?
19     Q   Fifth line down.
20     A   Okay. I'm sorry.
21         (Witness perusing document.)
22     A   Um-hm. What did it mean? It says here
23 regarding this man named Soldier. He was -- did
24 you ask me for a yes or no?

Page 252

1      Q   I asked you --
2      A   I'm sorry, I don't want to --
3      Q   I asked you what you meant by --
4      A   All right. You don't need to repeat it.
5  I understood it now. Soldier is or was, whatever,
6  a vocational counselor for other side who did an
7  evaluation to see what careers I could have,
8  whatever, but I think that's the right title, but
9  nobody showed up to bring me to that appointment,
10 and Bart accused me of not being at my house when
11 a driver came to my house to drive me there, and I
12 sent him an e-mail before 9:00, and I said, Bart,
13 nobody's here. What do I do? I had called him
14 long distance and I told, you know, some other
15 people friends and that what am I going to do? I
16 can't get there. So I was at my house. Obviously
17 I was on the computer typing a letter to him and
18 it was dated and timed.
19         So, you know, here he was blaming me
20 for not being at my house, yet he knew, because I
21 had talked with him and sent him an e-mail that
22 was not only dated but also timed prior to my
23 appointment, that nobody's here. So, you know, he
24 was yelling at me, Well, you weren't there. And

Page 253

1  I'm like, Wait a minute. I was here. You know,
2  start listening to me.
3      Q   It also indicates that you believed he
4  was intentionally discriminating against you.
5      A   Um-hm.
6      Q   In what way was he discriminating
7  against you?
8      A   I was his client. I was disabled. I
9  was in a very bad situation. My injury was very,
10 very severe and he didn't care. He could care
11 less.
12     Q   And you write here that you have shared
13 with others --
14     A   Um-hm.
15     Q   -- in your lack of professional handling
16 of this case?
17     A   Um-hm.
18     Q   Who else did you share that information
19 with?
20     A   Who else? I don't even remember, but
21 people that I knew, whatever. I don't remember
22 specifically.
23     Q   Now, directing your attention to
24 Mr. Halloran's e-mail, which is above this --

Page 254

1      A   Um-hm.
2      Q   -- he informs you, does he not, his
3  belief that a lawsuit against the state or the
4  city would not be successful; is that correct?
5      A   It says state, they're talking about the
6  state here.
7      Q   So he informs you his belief that a
8  lawsuit against the state would fail, correct?
9      A   That's what he said.
10     Q   He informed you of that, correct?
11     A   Yes, that's what he said here.
12     Q   Okay. Did you have any other
13 conversations with Mr. Halloran concerning the
14 chances of success of a lawsuit against the state
15 of Connecticut in connection with the elevator?
16     A   Did I have any other --
17         MR. SMALL: Repeat the question.
18     A   -- conversations --
19         WITNESS: Would you repeat it,
20 please?
21         (Question read.)
22     A   I don't recall.
23         (Document marked as Exhibit No. 27.)
24     Q   Ms. Cordi-Allen, I'm now going to be

20 (Pages 251 to 254)

Page 255

1    showing you Exhibit No. 27.
2        (Document exhibited to witness.)
3    A    27, okay.
4    Q    And ask you to take a look at that,
5    please.
6        (Witness perusing document.)
7    A    Um-hm.
8    Q    This is an e-mail from you dated
9    May 24th, 2001. Do you recall this e-mail?
10   A    No.
11   Q    Do you deny that this is an e-mail that
12   you sent to Mr. Halloran?
13   A    That's what it says, so I don't deny it.
14   Q    And in fact this is a document that was
15   produced by your counsel in connection with this
16   case.
17       In the first line, Ms. Cordi-Allen,
18   you say, "I have been told to pursuit a
19   malpractice lawsuit for your handling of my
20   injury. This came from a very prestigious lawyer
21   and firm." Do you see that there?
22   A    Yes.
23   Q    As of May 24, 2001, had you been advised
24   to pursue a malpractice lawsuit against

Page 256

1    Mr. Halloran and his firm?
2    A    Is that when he -- when did he withdraw?
3    I -- I -- I don't know the date.
4    Q    Just answer my question.
5    A    I don't remember that.
6    Q    Well, you say here, do you not, that you
7    were told to pursue a malpractice lawsuit by a
8    very prestigious lawyer and firm. You write that
9    to Mr. Halloran, do you not?
10   A    Yeah.
11   Q    Did you have any discussions with any
12   lawyers in May of 2001 concerning Mr. Halloran's
13   handling of your case?
14   A    Yes.
15   Q    With whom did you speak with?
16   A    I don't know.
17   Q    More than one attorney?
18   A    It could have been -- I have no idea who
19   it was. It could have been somebody I knew from
20   town.
21   Q    Well, you write here --
22   A    I don't know.
23   Q    -- a very prestigious lawyer and firm.
24   A    Um-hm.

Page 257

1    Q    Do you --
2    A    Yeah.
3    Q    Allow me to --
4    A    That's what it says.
5    Q    Okay. Allow me to ask the question.
6    A    Okay.
7    Q    Do you recall any attorney that you met
8    with to discuss the handling by Mr. Halloran of
9    your case?
10   A    No, not at this time.
11   Q    So is this true when you wrote this that
12   you had discussed it with a prestigious lawyer and
13   firm?
14   A    Yes, but I -- you said that. You know,
15   if I wrote it, I wrote it, and this is what
16   happened, but I don't know whom, because I know a
17   lot of people.
18   Q    So you don't recall as you sit here
19   today who you may have spoken with?
20   A    Exactly, at -- I don't know what events
21   are around this date either, which is important to
22   answering.
23   Q    But you informed Mr. Halloran that you
24   had been advised to pursue a malpractice claim

Page 258

1    against him, correct?
2    A    That's what it says, yes.
3    Q    Well, that's what you say, correct?
4    A    Right. In this, right? Yes.
5    Q    And then you continue that Mr. Halloran
6    had had ample time to respond to the state file
7    and did not, correct?
8    A    Yes. Um-hm.
9    Q    And you give him another opportunity to
10   file a lawsuit on the state and the city and to
11   reopen Delta, correct?
12   A    Yes.
13   Q    And then you complain that Mr. Halloran
14   did not do his job, correct?
15   A    Correct.
16   Q    So you believed as of May 24th, 2001
17   that Mr. Halloran had failed to do his job
18   properly; is that correct?
19   A    Yes.
20   Q    Now, it also says, "As I told Jean, you
21   should pay more attention to your clients than
22   Adrian's Landing." Now, is Adrian's Landing, that
23   what we had been talking about previously about
24   the land development with the Patriots?

Barbara Cordi-Allen, Vol. 2

11/17/2005

Page 259

1    A    Yes.  I think that's like mistyped.
2  It's supposed to be as Jean told me.  It's typed
3  wrong.
4    Q    So you were aware obviously as of
5  May 24, 2001 that Mr. Halloran had some
6  involvement with Adrian's Landing?
7    A    Yes.
8        MR. REVERE:  Off the record.
9        (Off record.)
10    Q    Ms. Cordi-Allen, I'm sorry, directing
11  your attention again to Exhibit 27, we talked
12  about you had been told to pursue a malpractice
13  claim against Mr. Halloran?
14    A    Um-hm.
15    Q    Prior to this lawsuit, did you file a
16  malpractice claim against Mr. Halloran?
17    A    No.
18        (Document marked as Exhibit No. 28.)
19        (Document exhibited to witness.)
20    Q    Ms. Cordi-Allen, I'm now showing you
21  Exhibit No. 28, which purports to be an e-mail from
22  you to Mr. Halloran dated May 24th, 2001 with the
23  subject, Lawsuit, state and city.  Do you see that
24  there?

Page 260

1    A    Yeah.
2    Q    Is this an e-mail that you wrote to
3  Mr. Halloran on or about that date and time?
4    A    That's what it says, it's dated that.
5    Q    And down below it says, BCordialle under
6  America On Line.  That's your e-mail address,
7  correct?
8    A    Yes.
9    Q    And in fact this was a document produced
10  by your counsel in connection with this
11  litigation.
12        You write, Ms. Cordi-Allen, that you
13  just spoke with attorneys and they told you that
14  there was a way of suing the state for not
15  inspecting that elevator which led to your injury.
16  Do you see that --
17    A    Yes.
18    Q.    -- where you wrote that?
19    A    Um-hm.
20    Q    Do you recall with whom you spoke?
21    A    No, I don't.
22    Q    Did you in fact speak with attorneys
23  concerning filing a suit against the city --
24    A    If I wrote it, I did.

Page 261

1    Q    -- or the state?
2        So you did talk to some attorneys,
3  you just don't recall who?
4    A    Exactly.
5    Q    And you instruct Mr. Halloran that you
6  want to bring a suit on the state and the city,
7  correct?
8    A    Um-hm.
9    Q    You need to be verbal.
10    A    Yes.  Sorry.  First time.
11    Q    And you also instruct him that you want
12  to reopen the Delta Elevator case, correct?
13    A    Yes.
14    Q    And you write at the end, "Idiots did
15  this to me and I have no choice but to suit,"
16  S-U-I-T.  I think it's supposed to say sue.  What
17  idiots were you referring to?
18    A    Anybody that was supposedly working on
19  the elevator, had knowledge of that elevator
20  malfunctioning, or were parties to it.
21    Q    Aside from these e-mails,
22  Ms. Cordi-Allen, that we're looking at, did you
23  ever have a discussion with Mr. Halloran or an
24  oral communication concerning a potential

Page 262

1  malpractice against Mr. Halloran or his firm
2  around this time in May of 2001?
3    A    Outside of the e-mails?
4    Q    Correct.
5    A    We didn't talk.
6    Q    So the only communication was through
7  e-mail?
8    A    That's the only way he communicated.
9        (Document marked as Exhibit No. 29.)
10        (Document exhibited to witness.)
11    Q    Ms. Cordi-Allen, I'm now showing you
12  what's been marked Exhibit No. 29 in this case,
13  which purports to be an e-mail from you to
14  Mr. Halloran dated May 26, 2001.
15    A    Um-hm.
16    Q    Do you recall this e-mail?
17    A    No.
18    Q    That's your e-mail address at the
19  bottom, correct?
20    A    Um-hm.  Yes.
21    Q    And this is a document produced --
22    A    Yes.
23    Q    -- by your counsel in this case.
24        You don't deny that this was an

22 (Pages 259 to 262)

Barbara Cordi-Allen, Vol. 2

11/17/2005

Page 263

1  e-mail that you drafted, do you?
2      A    No.
3      Q    In the first line it says, "As a
4  response to a lawsuit filed on me by the city of
5  Hartford," and I'm going to direct your attention,
6  Ms. Cordi-Allen, to a document previously marked
7  as Exhibit No. 18, which was the complaint filed
8  by the city of Hartford --
9      A    Right.
10     Q    -- and I think you indicated in your
11  prior testimony that you were not aware that the
12  city of Hartford had filed a complaint against
13  you?
14     A    No, I --
15     Q    Does this e-mail help -- let me finish.
16          Does this e-mail help refresh your
17  recollection that you were in fact aware that the
18  city of Hartford had filed a suit to collect its
19  workers' compensation lien?
20     A    I found out about this at a hearing, I
21  believe, but I don't think I saw this document.
22     Q    You knew --
23     A    I don't --
24     Q    Okay.  You knew, however, as of May 26,

Page 264

1  2001 certainly that the city of Hartford had filed
2  a suit against you, correct?
3          (Mr. Allen left room.)
4      A    What date?
5      Q    May 26th, 2001.
6      A    Yes, yes, yes.
7      Q    An you believe that the filing of this
8  complaint gave Mr. Halloran an opportunity to
9  countersue for injuries as a result of the
10  elevator injury, correct?
11     A    Yeah.  Yes.  Sorry.
12     Q    You also indicate that the lawsuit that
13  you wanted Mr. Halloran to bring should be on
14  behalf of your husband, Mr. Allen; is that
15  correct?
16     A    This new one?  This here one in this
17  letter, right?
18     Q    You state here, "This lawsuit should
19  also be brought by my husband and family for
20  suffering."  Do you see that there?
21     A    Right.  Um-hm.
22     Q    So you're requesting on May 26, 2001 for
23  Mr. Halloran to file a lawsuit against the city of
24  Hartford to include in that lawsuit claims for

Page 265

1  your husband and family for their suffering; is
2  that correct?
3      A    Additionally.
4      Q    What do you mean by additionally?
5      A    Well, this is -- was -- this here was
6  regarding another one.  There should have already
7  been one in place.  So when -- if he were to file
8  this one, as well as whatever was filed in the
9  past or should have been filed in the past, on
10  this one here I also wanted my family and my
11  husband to also be included in this one as well as
12  what they were included in before.
13     Q    Well, you knew, however, didn't you,
14  that Mr. Halloran in fact did not file a claim
15  against the city of Hartford, we've already
16  discussed that, you knew that, correct?
17     A    No.  No.  For whom?  You see -- for me
18  or for my husband?
19     Q    Ms. Cordi-Allen, we went through a
20  series of exhibits today --
21     A    Right.
22     Q    -- where we discussed that you were
23  instructing Mr. Halloran to file a claim against
24  the state of Connecticut and the city of Hartford,

Page 266

1  correct?
2      A    Right.
3      Q    And we went through a number of
4  exhibits, did we not, where Mr. Halloran informed
5  you that he would not file a claim against the
6  state and against the city, correct?
7      A    That's -- for me?
8      Q    Correct.
9      A    Okay.  Yeah.  I'm not saying for me.
10  Okay?
11     Q    And we also went through a number of
12  e-mails where you informed Mr. Halloran that if he
13  didn't file a suit against the city or the state
14  you were going to file a malpractice case,
15  correct?
16     A    I don't know if it was just for those
17  reasons, but --
18     Q    Among --
19     A    Among.
20     Q    -- other reasons those were included,
21  correct?
22     A    Yes.
23     Q    Okay.  Thank you.
24          And so in this e-mail Exhibit No. --

LegaLink Boston
(617) 542-0039

Barbara Cordi-Allen, Vol. 2                                                     11/17/2005

Page 267

1    A   29.
2    Q   -- 29 you're also instructing
3  Mr. Halloran to bring a claim on behalf of your
4  husband and family for their suffering, correct?
5    A   And any additional lawsuits.
6    Q   Correct.
7    A   And any additional lawsuits, yes, yes.
8    Q   But you knew as of May 26, 2001, we just
9  talked about this, you knew that there had not
10 been a claim filed against the city of Hartford or
11 the state of Connecticut as a result of the
12 injuries incurred in the elevator incident,
13 correct?
14   A   For me.
15   Q   Correct.
16   A   For me, yes. Not for my husband, for
17 me. That's why -- this here is different. Am I
18 right?
19   Q   Were you aware that there had been a
20 suit brought on behalf of your husband against the
21 city of Hartford or the state of Connecticut?
22   A   I had not received my file or all
23 communications from Mr. Halloran probably until --
24 and I still don't have it complete, so I don't

Page 268

1  know what -- everything that he's done and not
2  done.
3    Q   Ms. Cordi-Allen --
4    A   What he was supposed to do and what he
5  did do, I don't --
6    MR. SMALL: Let's go off the record.
7    (Off record.)
8    MR. SMALL: Would you go back on
9  kindly, and would you kindly read my last
10 question, please?
11   (Question read.)
12   A   No.
13   Q   Sometime around May, Ms. Cordi-Allen, of
14 2001 Mr. Halloran informed you that he intended to
15 withdraw as your counsel in the workers'
16 compensation case; is that correct?
17   A   Somewhere around there, yeah.
18   Q   So you understood that he was going to
19 seek to withdraw as counsel, correct?
20   A   Could you repeat that? Because I didn't
21 -- I don't think I knew.
22   (Question read.)
23   A   No.
24   Q   Didn't you just state that he told you

Page 269

1  that he was going to withdraw?
2    A   I didn't know he was going to. He
3  basically did at the hearing.
4    Q   In May of 2001, correct?
5    A   It was somewhere around there. I don't
6  know the date offhand.
7    (Document marked as Exhibit No. 30.)
8    Q   Ms. Cordi-Allen, I'm going to show you
9  what's been marked as Exhibit No. 30 in this case.
10   A   Um-hm.
11   Q   And ask you if you've seen this document
12 before.
13   A   No, I did not.
14   Q   So this was cc'd to you, and are you
15 testifying today that you never saw this document
16 or that you just don't recall seeing this
17 document?
18   A   I will say I never saw it.
19   Q   This purports to be a letter from
20 Mr. Halloran to Commissioner Miles at the Workers'
21 Compensation Commission --
22   A   Yeah.
23   Q   -- seeking to withdraw as counsel from
24 your matter. You knew, I think we discussed, that

Page 270

1  Mr. Halloran moved at the hearing to withdraw?
2    A   Right.
3    Q   And this was a follow-up written request
4  to be withdrawn; is that correct?
5    A   Oh, I thought this was before the
6  hearing, this letter. I don't know the date, Ken.
7    Q   I'll represent to you this letter was
8  after the date of the hearing.
9    A   Oh, okay. I thought it was before the
10 hearing then. I'm sorry. That's why I said that
11 I didn't get this, I didn't see this, because I
12 thought it was before the hearing, because I found
13 out at the hearing, if that makes sense to you.
14   Q   Okay. But you knew he was withdrawing
15 as counsel?
16   A   At the hearing I found out.
17   Q   And he testified at that hearing, did he
18 not, that the attorney-client relationship had
19 broken down, correct?
20   A   That's what he said.
21   Q   And did you disagree with that?
22   A   Yes.
23   Q   Why did you disagree with that?
24   A   Well, there were things that he said

24 (Pages 267 to 270)

Page 271

1  that were not true, they were fragments, and I
2  told the commissioner, I said, Commissioner Miles,
3  I said, he doesn't communicate, and when people
4  don't communicate, answer your phone calls or let
5  you know what's going on and keep you abreast and
6  don't listen, okay, and obviously there was a big
7  problem with him listening, then you're going to
8  have problems. And I get along with everybody. I
9  worked in the worst -- hate to say it, but
10 probably one of the worst schools in the country.
11 I got along fine with everybody, parents,
12 everybody. I had too many parents involved in the
13 school where nobody can get parents out. So I
14 have a very good record of working with people and
15 people liking me and being very successful at it.
16        However, the problem wasn't me. It
17 was lack of communication and keeping the doors of
18 communication open and his fragmenting to the
19 commissioner statements that were completely taken
20 out of context to make it look like I was not
21 saying the truth when in fact in e-mails it's
22 documented that, for example, I told him, Do not
23 contact my doctors until I have -- he wanted to
24 contact them for an evaluation, and I said, Please

Page 272

1  don't contact them until I have an appointment
2  coming up so they know what I'm -- where I'm at at
3  this stage.
4        He told the commissioner, he goes,
5  She told me not to contact her doctors. No, I
6  didn't say that. I said, I'm going for an office
7  visit, and after they see me, then call them.
8  Completely out of context. No, I wanted it to
9  look that way to -- and it's on tape and I'm sure
10 that's -- it's on record that he said that. And I
11 was like, I didn't say that. Of course he had to
12 talk to my doctors.
13    Q.  So --
14    A   And he always did talk to my doctors,
15 but I wanted them to see me, where I was at that
16 given -- you know, at the upcoming appointment.
17 That's -- but that wasn't conveyed to the
18 commissioner. That's his problem of
19 communicating, not mine.
20    Q    But you were able to say your feelings
21 toward the commissioner, were you not?
22    A.  I wouldn't say so, no.
23    Q    You weren't able to testify at the
24 hearing?

Page 273

1    A    No. No.
2    Q    Now, this is dated as of May 29, 2001 --
3    A    Um-hm.
4    Q    -- this letter. So by May 29, 2001,
5  Ms. Cordi-Allen, you had already requested that
6  Bart reopen the Delta Elevator case?
7    A    Um-hm.
8    Q    And he said no, correct?
9    A    Yes.
10   Q    You instructed him to file a claim
11 against the city of Hartford?
12   A    Yes.
13   Q    And he said no, correct?
14   A    Correct.
15   Q    You had instructed him to file a claim
16 against the state of Connecticut and he said no,
17 correct?
18   A    Yes.
19   Q    You had threatened a malpractice case
20 against him, correct?
21   A    If I needed to because of those other
22 cases, yes.
23   Q    The answer to my question is yes?
24   A    Yes.

Page 274

1    Q    And yet you didn't believe that as of
2  May 2001 the attorney-client relationship had
3  broken down?
4    A    No. No, I think there were problems.
5    Q    You've answered the question. Thank
6  you.
7        (Document marked as Exhibit No. 31.)
8    Q    Ms. Cordi-Allen, I'm showing you what's
9  been marked as Exhibit No. 31.
10   A    Um-hm.
11   Q    And ask you to take a look at that,
12 please.
13       (Document exhibited to witness.)
14       (Witness perusing document.)
15   A    Um-hm.
16   Q    Have you had a chance to review
17 Exhibit 31?
18   A    Yeah.
19   Q    And I'm going to direct your attention
20 to an e-mail from BCordialle@aol.com on May 30th,
21 2001, at 3:44 p.m.
22   A    Um-hm.
23   Q    Do you recall that e-mail,
24 Ms. Cordi-Allen?

25 (Pages 271 to 274)

Page 275

1    A    No.
2    Q    That's your e-mail address, though, is
3  it not?
4    A    Um-hm.  Yes.
5    Q    And you don't deny that you wrote this
6  e-mail, do you?
7    A    No, just don't remember it.
8    Q    Now, in this e-mail, as you recall, this
9  is the day after Mr. Halloran wrote the letter
10  seeking to withdraw as counsel, the previous
11  exhibit, okay?  I'm just trying to put that in
12  context for you, okay?
13    A    Okay.  Um-hm.
14    Q    And you write, "Return to me my personal
15  belongings" -- and you also write everything in
16  capital letters.  Was there a reason for that?
17    A    Probably the kids left it on lock.  I'm
18  not really good with computers, so whatever it is,
19  it is.
20    Q    You write, Return to me my personal
21  belongings.  I am referring this to the bar and
22  have been warned of a pay-off by the city."  Let's
23  break that down.  When you say "I am referring
24  this to the bar --

Page 276

1    A    Um-hm.
2    Q    -- what did you mean by that?
3    A    I sent it to the legal bar.
4    Q    In Connecticut?
5    A    Yes.
6    Q    When you say you sent it, you filed a
7  complaint against Mr. Halloran --
8    A    Yes --
9    Q    -- with the bar --
10    A    -- I did.
11    Q    -- sometime after you wrote this e-mail?
12    A    Yes.
13    Q    Please allow me to ask my questions,
14  then you can answer them, okay.
15         Sometime after you wrote this
16  e-mail?
17    A    Yes.
18    Q    Do you recall when that was?
19    A    No, I don't.
20    Q    But it was shortly after he moved to
21  withdraw from the case?
22    A    I really -- to be honest with you, I
23  don't remember.
24    Q    Okay.  You say, "I have been warned of a

Page 277

1  pay-off by the city."  What did you mean by that?
2    A    I have no idea.
3    Q    Did someone inform you that Mr. Halloran
4  had received a pay-off by the city?
5    A    I -- if anything, I know that I was -- I
6  may have been told by people I worked with that
7  the city was doing things with people.  A lot of
8  people in the city are under investigation in
9  Hartford and all the other cities that have been
10  put to jail for paying off.  So it's a very common
11  thing in Connecticut for the cities to be corrupt
12  in a lot of different things --
13    Q    And then --
14    A    -- and the state, too.
15    Q    And then further down in your e-mail you
16  again say, "I have no problem pursuiting this
17  against you."  Do you see that there?
18    A    No.  Wait a minute.  I have to --
19    Q    Six lines down.
20    A    Okay.
21    A    "I have no problem pursuiting this
22  against you."  Do you see that there?
23    A    Yes.
24    Q    Are you indicating a potential claim for

Page 278

1  malpractice against Mr. Halloran in that sentence?
2    A    No.  This is about going to the bar, I
3  believe, and violating the contract.
4    Q    Okay.  But then you say, "Your record is
5  clear.  You have had problems in the past, and it
6  was told to me by various attorneys that you were
7  sued, and one told me you settled."
8    A    Yeah.  Um-hm.
9    Q    Okay.  So it seems to be that you're
10  indicating some type of a lawsuit against
11  Mr. Halloran, are you not?
12    A    That -- no, no.  What it says is that he
13  had problems, and there were many grievances that
14  were brought against him is what I was told.
15    Q    When you write that you were told by
16  various attorneys --
17    A    Yes.
18    Q    -- who are those attorneys?
19    A    I don't even remember their names, but a
20  couple dozen.
21    Q    So you spoke with a couple of dozen
22  attorneys --
23    A    Um-hm.
24    Q    -- about Mr. Halloran?

26 (Pages 275 to 278)

Page 279

1    A    About -- yeah. Um-hm.
2    Q    And where did you speak to these couple
3    of dozen attorneys?
4    A    On the phone.
5    Q    So you called attorneys?
6    A    Yes --
7    Q    And --
8    A    -- regarding taking over my case.
9    Q    So this dealt with taking over the --
10   A    Yes.
11   Q    -- workers' compensation case?
12   A    Um-hm.
13   Q    Do you recall any of the names of the
14   attorneys that you spoke with?
15   A    One was Ricassi & Davis because they
16   were my first choice, and I don't remember the
17   rest, but there were quite a few.
18   Q    And did you discuss with these couple of
19   dozen attorneys Mr. Halloran's representation of
20   you in both the Delta Elevator case and the
21   workers' compensation case?
22   A    I think they knew about it because it
23   was in a journal, law journal, or something.
24   Q    What do you mean it was in a law

Page 280

1    journal?
2    A    Well, because I filed a grievance
3    against him.
4    Q    So -- well, this is dated May 30th,
5    2001.
6    A    Um-hm.
7    Q    Had you already filed your grievance
8    against Mr. Halloran as of this date that you're
9    writing this e-mail?
10   A    Oh, no, I don't think so.
11   Q    So, again, you state here you have
12   talked to various attorneys?
13   A    Right. Well, I started calling once he
14   withdrew, because I wanted -- I needed
15   representation for my workers' comp.
16   Q    Did you discuss with any of these
17   attorneys pursuing a malpractice case against
18   Mr. Halloran?
19   A    Yes. Well, you mean -- not --
20   Q    I think you've answered the question.
21   A    As time went on, I -- as time went on.
22   Maybe not on -- at the very beginning. Initially
23   it was for workers' comp.
24   Q    Okay. But at some point you had

Page 281

1    conversations with attorneys, I'm not including
2    Mr. --
3    A    Right. Yes.
4    Q    -- Revere about pursuing a claim against
5    Mr. Halloran?
6    A    Yes. Um-hm.
7    Q    Do you recall when those discussions
8    were?
9    A    Maybe -- maybe within a year or so
10   later, two years later, year and a half. I don't
11   remember exactly.
12   Q    Do you recall who those attorneys were?
13   A    No.
14   Q    What did they advise you?
15   A    Many of them said that they were --
16        MR. REVERE: I have to object to
17   what they advised her filing a malpractice case.
18   That's attorney-client privilege. The fact of the
19   conversation is one thing. The contents --
20        MR. SMALL: Well --
21        MR. REVERE: Do you want to talk
22   about this off the record for a second?
23        MR. SMALL: That's fine.
24        (Off record.)

Page 282

1    Q    Ms. Cordi-Allen, in this e-mail, again,
2    directing your attention to the 5/30/01 e-mail,
3    you again raise the issue of Adrian's Landing that
4    we've talked about?
5    A    Yes.
6    Q    And that's the same land deal that we
7    have discussed previously?
8    A    Trying to bring the Patriots to
9    Hartford.
10   Q    Right.
11   A    You said land deal. I don't know about
12   a land deal.
13   Q    You also state, "I will contact the
14   police if my material is not returned to me."
15   A    Um-hm.
16   Q    The material, are you referring to your
17   files and other material?
18   A    Right, and my personal belongings.
19   Q    Did you ever contact the police
20   concerning --
21   A    I did.
22   Q    And when was that?
23   A    When I didn't get my things, within a
24   couple weeks.

27 (Pages 279 to 282)

Barbara Cordi-Allen, Vol. 2

11/17/2005

Page 283

1    Q    And what was the result of that?
2    A    I got some of my things, not all of
3    them.
4    Q    What do you think is still missing,
5    Ms. Cordi-Allen, from --
6    A    And it's very important, and he
7    documented to the bar that he does have it, the
8    air quality study of Weaver High School and my
9    workers' comp file from previous unrelated things
10   that he demanded that he have.
11   Q    You had filed a previous workers'
12   compensation claim?
13   A    Yes.
14   Q    And what did that relate to?
15   A    I broke my arm at work on the ice.
16   There was -- and then I had to have surgery to cut
17   the bone back, which was very successful.
18   Q    And when was that?
19   A    I don't even remember. I think -- I
20   think '98. I don't --
21   Q    So it was after the elevator accident?
22   A    Oh, '98. Oh, that was later, huh? No,
23   then it was maybe two years before. Maybe '95.
24   Q    Besides the arm accident and injuries

Page 284

1    relating to the elevator accident, had you filed
2    any other workers' compensation claims?
3    A    I just -- we were told to notify
4    workers' comp because of the air quality at the
5    school, and I did that. A bunch of us got asthma
6    there, and as a result, Ken, they put in a new air
7    system, that's what we wanted, because the kids
8    were sleeping and there was no oxygen in the
9    classrooms. It was all carbon dioxide. We got
10   them to fix the building, but I don't know what
11   happened -- I never took action against them for
12   the air quality. Just, you know, to let them know
13   in case we got Legionnaires' disease or something
14   like that.
15   Q    We discussed the fact that you filed a
16   grievance with the state bar against Mr. Halloran.
17   A    Yes.
18   Q    Do you have a copy of the grievance that
19   you filed?
20   A    No.
21         THE WITNESS: Do you have it? I
22   gave you everything I have.
23         MR. REVERE: No.
24         MR. SMALL: I don't have a copy.

Page 285

1    Would you -- is there any possibility that you
2    still have one within your files or records?
3         MR. REVERE: Go off the record for a
4    second.
5         (Off record.)
6         MR. SMALL: Let's go back on.
7         MR. REVERE: We'll agree to
8    supplement our document request by taking a second
9    look to see if she has the attorney grievance
10   complaint that was filed.
11        MR. SMALL: Thank you.
12   Q    Ms. Cordi-Allen, I'm going to represent
13   to you that it appears from the documents that I
14   have reviewed that the grievance was filed with
15   the state bar in June of 2001. Does that comport
16   with your memory?
17   A    No, I don't remember what day at all.
18   Q    Okay.
19   A    If you said that, I have no reason --
20   but I don't remember.
21   Q    So you don't have any reason to disagree
22   with that, correct?
23   A    No, I just don't remember the date, Ken,
24   at all.

Page 286

1    Q    To the best of your recollection, can
2    you tell me what you complained about to the bar?
3    A    Breach of contract, probably, not
4    returning my file. At that time I didn't even
5    have my file, I couldn't get it from him, he
6    wouldn't give it to me. So in order to get to
7    another lawyer I had nothing to give them. And
8    not working for me, not listening to me. And
9    telling the commissioner the truth, i.e., when he
10   said that I told him not to contact my doctors and
11   I didn't say that. I said contact them after I
12   see them, gave him full permission to contact my
13   doctors, he had every right, but I wanted him to
14   contact them after I saw them, but he didn't
15   represent the truth to the commissioner. And his
16   fees and that, I probably put in that he didn't
17   honor my contract, but I -- I'd have to look at it
18   to recall.
19   Q    Do you recall if you complained about
20   his handling of the Delta Elevator case?
21   A    I wouldn't doubt it. I mean, it seems
22   like I should have.
23   Q    And do you recall if you complained
24   about the fact that Mr. Halloran hadn't filed a

28 (Pages 283 to 286)

Page 287

1  claim against the city of Hartford or the state of
2  Connecticut?
3      A   I may have.
4      Q   You just don't recall?
5      A   I don't recall.
6      Q   What was the result, if any, of your
7  grievance with the state bar?
8      A   I think they kept it on file along with
9  the others.
10     Q   Are you aware of them taking any
11 disciplinary actions against Mr. Halloran?
12     A   No.
13     Q   No, you're not aware or no, they didn't?
14     A   I'm not aware, to my recollection.
15     Q   Ms. Cordi-Allen, have you ever filed a
16 grievance with any bar organization against anyone
17 else besides Mr. Halloran?
18     A   Yeah, I did.
19     Q   Who else did you file a complaint
20 against?
21     A   A doctor.
22     Q   Who was that?
23     A   Thomas Moran.
24     Q   What's the name?

Page 288

1      A   Thomas Moran, a relative.
2      Q.  When was that?
3      A   '99.
4      Q   Didn't you in fact ask the grievance
5  committee of the state of Connecticut to review
6  why Attorney Pomeranz broke your contract that you
7  had with Mr. Halloran?
8      A   I don't remember. May -- I don't
9  remember.
10     Q   And in fact didn't you also complain to
11 the state grievance committee about Attorney
12 Doyle?
13     A   I don't remember.
14     Q   Did Mr. Doyle send you a copy of his
15 file that he had on your workers' compensation
16 case?
17     A   No, I don't believe so.
18     Q   And in fact didn't you request that the
19 statewide grievance committee investigate
20 Mr. Doyle for his failure to send you the file?
21     A   I don't -- don't remember.
22         (Document marked as Exhibit No. 32.)
23     Q   Ms. Cordi-Allen, before we get to the
24 next exhibit, do you recall attending a hearing at

Page 289

1  the Workers' Compensation Board sometime in July
2  of 2001 where the subject of that hearing was
3  Mr. Halloran's motion to withdraw?
4      A   I thought that was in May.
5      Q   That was his -- I can't really answer
6  questions for you, Mrs. Cordi-Allen.
7      A   Okay. I don't remember the date.
8      Q   Do you recall attending a hearing to
9  discuss Mr. Halloran's motion to withdraw?
10     A   Yes.
11     Q   And do you recall what the result of
12 Mr. Halloran's motion to withdraw was?
13     A   He was allowed to withdraw; is that --
14     Q   I'm going to direct your attention,
15 please, to Exhibit No. 32, and ask you if you've
16 seen that document before?
17         (Document exhibited to witness.)
18     A   No.
19     Q   This is a document produced by you in
20 connection with this litigation, which appears to
21 be Commissioner Miles' decision on Mr. Halloran's
22 motion to withdraw dated July 17, 2001, and if you
23 turn to page 2 --
24     A   Um-hm.

Page 290

1      Q   -- it indicates that you spoke on the
2  record at some length and stated that you had
3  filed a grievance containing many allegations
4  against Attorney Halloran.  Does that help refresh
5  your memory as to the timing of when you filed the
6  grievance with the state bar, that it was sometime
7  in -- between May and July of 2001?
8      A   Yeah.
9      Q   And you indicated at the hearing, did
10 you not, that you believed that Attorney Halloran
11 had not acted in your best interest, correct?
12     A   That's what it says.
13     Q   And that you had misled her in many ways
14 concerning the settlement of your case against
15 Delta Elevator?
16     A   That's what this says.
17     Q   And the end result, you would agree with
18 me, is Commissioner Miles found that the attorney-
19 client relationship had broken down to the extent
20 that there exists a mutual breakdown of trust and
21 confidence between the attorney and claimant, and
22 he allowed Mr. Halloran's motion to withdraw,
23 correct?
24     A   That's what it says.

29 (Pages 287 to 290)

Barbara Cordi-Allen, Vol. 2

11/17/2005

Page 291

1   Q   Is that correct?
2   A   Yes.
3         (Mr. Allen came back in.)
4   Q   Ms. Cordi-Allen, you appealed
5   Commissioner Miles' decision; is that correct?
6   A   Yeah. Yes.
7   Q   I don't -- do you recall what manner you
8   appealed, was it a written or oral request?
9   A   No. No, I don't.
10   Q   Did you understand, however, that
11   certainly as of July 17, 2001 Mr. Halloran no
12   longer represented you in the workers'
13   compensation case?
14   A   Yes.
15   Q   You've answered the question. Thank
16   you.
17         Do you recall what grounds you
18   appealed Commissioner Miles' decision?
19   A   That Mr. Hal -- yes.
20   Q   And what were those grounds?
21   A   That Mr. Halloran knew this case, he had
22   my material, he signed on to take this case, he
23   took it from Brian Doyle, he demanded it, which I
24   didn't want to give it to him, but he demanded

Page 292

1   that he have it, because I wanted every lawyer
2   working separately. I wanted my workers' comp
3   lawyer to be independent of the Delta Elevator,
4   whoever was responsible for my injuries on the
5   elevator, I wanted those to be separate, and
6   Mr. Doyle could not come back on.
7   Q   That's because he was a representative
8   of the union; is that why?
9   A   Yes. Yes. So it put -- it would put me
10   at a great disadvantage not to -- to have a lawyer
11   pick up whatever he did or didn't do and not know
12   the case and the little intricacies about it, and
13   that -- also that he misinformed Mr. Miles of my
14   contract, and he also misinformed Mr. Miles that
15   I -- he said, like I said before, he told
16   Mr. Miles that I said do not contact my doctors.
17   He said, I can't work like that. She told me not
18   to contact her doctors. And I didn't say that,
19   and it's in black and white in an e-mail. I said,
20   Please don't contact my doctors until I see them
21   in an upcoming visit and then call them. But he
22   didn't tell Commissioner Miles that.
23         It was a selective document,
24   selective wording, whatever you want to call it.

Page 293

1   He pick and chose what -- you know, he didn't tell
2   the whole thing. And I get along with everybody.
3   Believe me, I get along with everybody, but you
4   got to communicate and that was my whole thing was
5   that he did not communicate, and I told him that.
6   I said, If you don't want problems, you
7   communicate, and he did not return my phone calls.
8   Whenever I asked him something, I never heard from
9   him, and I found it very strange that all of a
10   sudden I got e-mails from him.
11         (Document marked as Exhibit No. 33.)
12   Q   Ms. Cordi-Allen, I'm now going to show
13   you what's been marked Exhibit No. 33 in this
14   case --
15         (Document exhibited to witness.)
16         (Witness perusing document.)
17   Q   -- which is the Compensation Review
18   Board Workers' Compensation Commission dated
19   January 30th, 2002. Have you ever seen the
20   decision in the case of Barbara Cordi-Allen,
21   Claimant Appellant v. City of Hartford, Employer,
22   and Constitution State Service, Insurer,
23   Respondents-Appellees on the motion of
24   Mr. Halloran to withdraw as counsel?

Page 294

1   A   I don't recall.
2   Q   In any event, you knew, did you not,
3   that the commissioner upheld Commissioner Miles'
4   approval of Mr. Halloran's motion to withdraw,
5   correct?
6   A   Yes.
7         MR. SMALL: Go off the record,
8   please.
9         (Off record.)
10         MR. SMALL: Back on.
11   Q   Ms. Cordi-Allen, after Mr. Halloran
12   withdrew as counsel in the workers' compensation
13   case --
14   A   Um-hm.
15   Q   -- did you seek the assistance of other
16   counsel?
17   A   Yes.
18   Q   And you testified earlier that you spoke
19   with several dozen attorneys; is that --
20   A   Yes.
21   Q   -- accurate?
22   A   Or about, or a lot, you know, it was a
23   lot, just interviewing them.
24   Q   And at some point you selected an

30 (Pages 291 to 294)

Page 295

1  Attorney Grabow?
2      A    Yes.
3      Q    Besides Attorney Grabow, do you recall
4  any of the other attorneys that you met with
5  concerning your workers' compensation case?
6      A    Ricassi & Davis, and I don't remember
7  the other firms, but that one stuck out because
8  they were our first choice.
9      Q    And why did you not select them to take
10  the case?
11      A    They wouldn't.  They said to me they
12  wouldn't touch anything Bart Halloran was ever
13  involved in, and they don't practice law the way
14  he does, whatever that meant.
15      Q    Who said that?
16      A    Ricassi & Davis, whoever the lawyer was.
17      Q    You don't recall who the lawyer was?
18      A    No.
19      Q    Do you recall any of the other law firms
20  that you may have met with?
21      A    I can't remember any names, no, not
22  offhand.
23      Q    At some point you retained Mr. Grabow,
24  though, correct?

Page 296

1      A    Yes.
2      Q    And how did you come to meet Mr. Grabow?
3      A    I went to his office and interviewed
4  him.
5      Q    Did somebody provide you with his name?
6      A    I don't remember.
7      Q    You don't recall how you --
8      A    No, I don't.
9      Q    -- were you referred to him in any way?
10      A    No, not offhand, I can't remember.
11      Q    And he agreed to represent you in the
12  workers' compensation case?
13      A    Yes.
14      Q    Did he give you an indication of the
15  likelihood of success in the case?
16      A    I don't believe so.  I don't recall.  I
17  knew it was going to be a lot of work for him
18  picking up or trying to pick up.
19      Q    You mean pick up, meaning taking over
20  the file?
21      A    Yeah, yeah, yeah, learning their,
22  whatever, putting it together again.
23      Q    Did he ever indicate to you the
24  difficulty that you would have in obtaining a

Page 297

1  successful result in the case?
2          MR. REVERE:  I want to object here
3  on attorney-client.
4          THE WITNESS:  Yeah, that --
5          MR. SMALL:  Well, she's raised the
6  issues of fees in the case, and I think this is
7  all relevant, the amount of fees that she paid in
8  the case, the reasonableness of those fees that
9  she paid in the case are all at issue in this
10  case.
11          MR. REVERE:  Okay.  As long as we
12  stick -- that's why I objected, okay, to make sure
13  that we stay in this narrow area, okay?  Yeah,
14  that's all.
15      A    Repeat please, Ken.
16          MR. SMALL:  I just want to get it on
17  the record.
18          Repeat the question please, Lori.
19          (Question read.)
20      A    I don't remember.  I don't believe so,
21  but I don't recall.  I can't be definite.  I don't
22  remember.
23      Q    Did you work with anyone else in
24  Attorney Grabow's office besides Attorney Grabow?

Page 298

1      A    No.
2      Q    There was no associate on the case or
3  anything of that nature?
4      A    No.
5      Q    Do you believe Attorney Grabow
6  adequately represented you in the workers'
7  compensation case?
8      A    Can we change the verb?
9      Q    You can answer my question.
10          MR. REVERE:  Yeah.
11      A    Yes.
12      Q    Is he still representing you in
13  connection with that matter?
14      A    Yeah, that's why I was going to ask you
15  to change it.
16      Q    Did Mr. Grabow ever tell you that the
17  file that he obtained from Mr. Halloran was not
18  adequate?
19      A    That the file?
20      Q    Yeah, that was a bad question.  Let me
21  withdraw it.
22      A    Yeah.
23      Q    Did Mr. Grabow ever indicate to you that
24  he had questions about Mr. Halloran's

Page 299

1  representation of you in the workers' compensation
2  case?
3      A   I don't know that I should answer that.
4  Can I speak with Paul?
5          MR. SMALL: Sure.
6          THE WITNESS:  That's confidential.
7          MR. REVERE:  Let's go off the record
8  for a moment, okay?
9          (Off record.)
10         MR. REVERE:  Let's go back on the
11 record.  This is Attorney Revere's statement we
12 just had off the record.  Counsel for defendant
13 and counsel for plaintiff due to the involvement
14 of claims regarding the plaintiff having to incur
15 fees to continue the workers' compensation matter
16 that was first started by Mr. Halloran have agreed
17 that the attorney-client privilege as to
18 Mr. Grabow is waived as to questions relating to
19 the quality of work of Mr. -- Mr. Grabow's and
20 Miss Halloran's [sic] discussions as to the
21 quality of work of Mr. Halloran, extensive work,
22 and its impact on her claims.  Okay?
23         MR. SMALL:  We'll take it question
24 by question.  You can --

Page 300

1          MR. REVERE:  Yeah.
2          MR. SMALL: -- object as you see
3  fit, Mr. Revere.
4          THE WITNESS:  Would you ask me a
5  question?
6          MR. SMALL:  Lori-Ann will repeat the
7  question, please.
8          (Question read.)
9      A.  Yes.
10     Q   What did he say to you?
11     A   He questioned why I wasn't sent to --
12 why I was not sent to well-known, expert doctors
13 for my condition.
14     Q   Anything else?
15     A   He would not have put the case together
16 the way it was put together.
17     Q   Did Mr. Grabow send you to different
18 doctors?
19     A   Yes, he did.
20     Q   So you had the opportunity to do that
21 then?
22     A   Recently, after the workers' comp
23 hearing I did.
24     Q   You didn't do that before the --

Page 301

1      A   No.
2      Q   -- before the hearing.
3          Did you sign a contract with
4  Mr. Grabow concerning his fees?
5      A   Yes.
6      Q   And how is Mr. Grabow to be paid for his
7  services?
8      A   He gets a third off of proceeds.
9      Q   So it's a contingency fee agreement?
10     A   Yes.
11     Q   Did Mr. Grabow or did you -- did you and
12 Mr. Grabow agree that Mr. Grabow could get
13 anything more than one-third of the recovered
14 proceeds?
15     A   No, I don't -- I don't -- I'll say no,
16 to the best of my knowledge.  I don't recall if
17 there was anything different.
18     Q   And Mr. Grabow represented you
19 throughout the course of the workers' compensation
20 hearing, correct?
21     A   Yes.
22     Q   And he presented witnesses for you on
23 your behalf, correct?
24     A   No.

Page 302

1      Q   There were no expert witnesses that
2  testified on your behalf?
3      A   No.
4      Q   Were there expert reports submitted?
5      A   Yes.
6      Q   And the city of Hartford and the
7  workers' compensation carrier were represented as
8  well, correct?
9      A   Yes.
10     Q   That was by Mr. Pomeranz's office?
11     A   Yes.
12     Q   They submitted expert reports on their
13 behalf, correct?
14     A   I believe so.
15     Q   What was the result of the workers'
16 compensation hearing?
17     A   We have an open case.
18     Q   Was there ever a finding, an award,
19 made?
20     A   Commissioner Miles said that I wasn't --
21 I don't even remember, because I think there's
22 different things floating around.  Something that
23 I'm not disabled or, no, there was no finding of
24 RSD, something like that.

32 (Pages 299 to 302)

Page 303

1     (Document marked as Exhibit No. 34.)
2     Q   I'm now showing you what has been marked
3   as Exhibit No. 34 in this case, which purports to
4   be the finding and award in your workers'
5   compensation case.  Have you seen this document
6   before?
7     (Document exhibited to witness.)
8     (Witness perusing document.)
9     A   I think so.
10    Q   And it's dated March 19th, 2004, and on
11  page 2 of this report drafted by Commissioner
12  Miles he states that the issues are that you claim
13  you are totally disabled due to the compensable
14  injuries suffered on January 10, 1997 and its
15  sequelae, most significantly her claim for reflex
16  sympathy dystrophy, RSD.  The claimant seeks
17  temporary total benefits as of June 7, 2001 and
18  continuing.
19        Does that adequately reflect the
20  issues that you believe were --
21    A   Yes.
22    Q   -- put forth on the hearing?
23    A   Yes.
24    Q   Commission Miles also wrote that the

Page 304

1   respondents' position is that the claimant is not
2   totally disabled; that she does not have RSD; and
3   that she doesn't qualify for discretionary
4   benefits due to her failure to look for work
5   within her restrictions.  Does that adequately
6   reflect the position of the city of Hartford --
7     A   Yes.
8     Q   -- and the workers' comp carrier?  Yes?
9     A   Yeah, I said yes.
10    Q   Ms. Cordi-Allen, you testified earlier
11  today that you believed that the failure of the
12  state to inspect the elevator --
13    A   Yes.
14    Q   -- was relevant to your workers'
15  compensation case?
16    A   Yes.
17    Q   Was the fact that the state not
18  inspecting the elevator and its file that you
19  testified earlier, was that part of your hearing
20  at the workers' compensation board?
21    A   No, not that I -- you mean at this
22  hearing?
23    Q   Throughout the whole proceeding, the
24  course of these proceedings.

Page 305

1     A   Oh.  I don't know.
2     Q   Well, if you believed it to be relevant
3   to your case, would you be surprised if it wasn't?
4     A   I -- I can't answer that.  I -- I'm not
5   a lawyer, so...
6     Q   You were certainly aware of the state's
7   file by the time Attorney Grabow took over the
8   representation, correct?
9     A   Yes.
10    Q   If we turn to page 8 of this Exhibit
11  No. 34 --
12    A   Okay.
13    Q   -- in fact Commissioner Miles found the
14  testimony and the opinions rendered by the experts
15  for the city of Hartford and the workers'
16  compensation carrier to be more persuasive and
17  convincing on the key issues of RSD and work
18  capacity; isn't that right?
19    A   Yeah.
20    Q   And Commissioner Miles ruled, did he
21  not, that you did not present sufficient evidence
22  to support a claim for total disability or
23  disability under the Osterland holding?  That's
24  paragraph B there.

Page 306

1     A   That's what it says.
2     Q   Okay.  He did, however, award you
3   benefits under 31-308A, correct?
4     A   Yes.
5     Q   And as a result of a calculation based
6   on earning capacity and the amount of weeks
7   allowed, he awarded you $31,018.89; is that
8   correct?
9     A   Yes.
10    Q   Was that amount paid by the workers'
11  compensation carrier?
12    A   Yes.
13    Q   And it does say the file shall remain
14  open for further determinations at the request of
15  the claimant, the respondents, or the commission?
16    A   Yes.
17    Q   Did you file an appeal of Commissioner
18  Miles' --
19    A   No.
20    Q   -- decision?
21        How does the file remain open?
22    A   How does it --
23    Q   You've indicated --
24    A   We can go in any time we have -- we're

Page 307

1  going back in. Now that I've seen the best
2  doctors in the country we're going back in,
3  because they have diagnosed me with RSD and they
4  have looked, these other doctors -- Dr. Selden, I
5  think that's the one, he looked at an x-ray of my
6  back or my arm or something and said I didn't have
7  RSD in my leg. What can I say? It makes no
8  sense. He didn't look, for some reason, at my
9  file. So we're going in with the best doctors and
10  opening up a new case, so they'll have to start
11  all over again. That's Mr. Grabow's plan.
12      Q.  Do you know when you intend to open a
13  new case?
14      A.  No. He's -- he's making the decisions.
15  It should be soon. I don't know.
16      Q.  So you never appealed this decision; you
17  simply are intending to bring a new claim?
18      A.  Richard Grabow told me you could not
19  appeal this. It was basically a waste of time and
20  money. He's doing it now his way.
21      Q.  So you're saying after this decision of
22  March 19, 2004 you were seen by some other
23  doctors?
24      A.  Yes.

Page 308

1      Q.  Who are they?
2      A.  Dr. Michna and Dr. Kirkpatrick.
3      Q.  And where were they located?
4      A.  Dr. Michna is in Boston and Kirkpatrick
5  is in Florida.
6      Q.  And who sent you to these two doctors?
7      A.  The RSD foundation told me about them.
8      Q.  You mentioned previously that your
9  agreement with -- I'm sorry, were there any other
10  doctors besides Michna and Kirkpatrick?
11      A.  New ones?
12      Q.  Yes.
13      A.  No.
14      Q.  Have you retained Dr. Michna and
15  Dr. Kirkpatrick to render an opinion --
16      A.  They already have.
17      Q.  -- on your condition?
18      A.  They have.
19      Q.  Okay. Through Attorney Grabow or
20  through your treatment with them?
21      A.  I don't know. What do you -- I mean --
22      Q.  Do you not understand my question?
23      A.  Probably, yeah. Could you rephrase it?
24      Q.  Yes. You say they've rendered an

Page 309

1  opinion. To you have they rendered this opinion
2  or in some legal capacity have they rendered the
3  opinion?
4      A.  In writing you mean?
5      Q.  Correct.
6      A.  They sent it to -- I think they sent it
7  to Richard Grabow, I believe, and I think maybe
8  they sent me a copy. At least I know I got one
9  from Dr. Kirkpatrick. He's the No. 1 RSD doctor
10  in the country, or he's very, very famous for it.
11      Q.  What part of Florida?
12      A.  Tampa.
13      Q.  Now, you had testified previously that
14  your agreement with Attorney Grabow is that he
15  would recover one-third of any proceeds?
16      A.  That he would, yes.
17      Q.  And then we looked at the finding and
18  the award and Commissioner Miles awarded you
19  $31,018.89; is that correct?
20      A.  That's what it says.
21      Q.  Does that comport with your memory?
22      A.  Yeah, I believe so.
23          MR. SMALL: Mark that, please.
24          (Document marked as Exhibit No. 35.)

Page 310

1      Q.  Ms. Cordi-Allen, I'm going to show you
2  what's been marked as Exhibit No. 35 --
3          (Document exhibited to witness.)
4      A.  Um-hm.
5      Q.  -- which appears to be a disbursement
6  sheet?
7      A.  Um-hm.
8      Q.  Is that your signature?
9      A.  Yes.
10      Q.  Twice?
11      A.  Yes.
12      Q.  Do you recall this document?
13      A.  Yes. Um-hm.
14      Q.  And this indicates, does it not, that
15  the settlement was for $31,018.89?
16      A.  Yes.
17      Q.  And this appears to be attorneys' fees
18  of 25 percent --
19      A.  Yes.
20      Q.  -- which is less than the one-third --
21      A.  Yes.
22      Q.  -- of 7,754.72, correct?
23      A.  Yes.
24      Q.  And case expenses of $2,814.01 for

Page 311

1   10,568.73; is that right?
2       A   Yes.
3       Q   And then a net amount to you of 20,450?
4       A   Yes.
5       Q   Did you receive the $20,450.16?
6       A   Yes.
7       Q   And you authorized Attorney Grabow to
8   recover $10,568.73?
9       A   Yes.
10      Q   Aside from the $31,018.89 recovered as a
11  result of Commissioner Miles' decision, have you
12  received any additional benefits as a result of
13  the workers' compensation claim?
14      A   I got something for when I got hurt.  Is
15  that what you're talking about?  Before Richard
16  Grabow or after Richard Grabow?
17      Q   As a result of Commissioner Miles'
18  decision.
19      A   Miles, no.
20      Q   Are you aware of Attorney Grabow
21  receiving any additional compensation besides this
22  10,568.73 that's listed here?
23      A   Not to my recollection.
24          (Document marked as Exhibit No. 36.)

Page 312

1           (Document exhibited to witness.)
2       Q   Ms. Cordi-Allen, I'm going to show you
3   Exhibit No. 35, which are your answers to
4   interrogatories.  You indicated last time we were
5   here that you have actually signed a copy of your
6   answers to interrogatories; is that correct?
7       A   Yes.
8       Q   So you had a chance to review these
9   answers and assist your counsel in preparing them;
10  is that correct?
11      A   Yeah.
12          MR. SMALL:  Mr. Revere, I'll
13  represent to you that I don't have a signed copy,
14  so for today's deposition I'm going to assume that
15  there is a signed copy somewhere and that one will
16  be provided to me.  Okay?
17          MR. REVERE:  Want her to sign the
18  one we've got right here?
19          MR. SMALL:  No, I don't want to
20  stop.  We'll keep going.
21          MR. REVERE:  For the record, we will
22  provide a signed copy and news to counsel that one
23  hadn't.
24      Q   Ms. Cordi-Allen, I'm going to direct

Page 313

1   your attention, please, they're not numbered, but
2   to interrogatory No. 12.
3       A   Oh, okay.
4       Q   And it states in your answer that you
5   incurred at least $20,000 to procure the services
6   of another lawyer —
7       A   Um-hm.
8       Q   — with respect to the workers'
9   compensation proceeding.  Besides Attorney Grabow,
10  did you retain any other lawyer in connection with
11  the workers' compensation proceeding?
12      A   Just Paul —
13      Q   Okay.
14      A   — if you want to consider this part of
15  it.
16      Q   No, this is a different action.  In the
17  workers' compensation proceeding in Connecticut —
18      A   Um-hm.
19      Q   — have you retained any other lawyer
20  besides Mr. Grabow?
21      A   No.
22      Q   And you testified earlier, did you not,
23  based on Exhibit No. 35 that the total amount of
24  compensation received by Mr. Grabow was $7,754.72

Page 314

1   plus $2,814.01 for case expenses, correct?
2       A   Um-hm.  Yes.
3       Q   So in fact that's not true, is it, your
4   answer to interrogatory No. 12 that you have
5   incurred at least $20,000 in connection with your
6   workers' compensation proceeding?
7       A   Well, going down — I didn't — when
8   this came up, I didn't even look at that, so —
9   but there were a lot of other — since
10  Mr. Grabow's been involved, there are a lot of
11  other expenses that we've incurred, like going to
12  other doctors and whatnot, so — like going to
13  Florida and — for Mr. Grabow's case.
14      Q   Ms. Cordi-Allen, did you understand when
15  you reviewed these and signed these that you were
16  signing them under the pains and penalties of
17  perjury?
18      A   I just trusted my lawyer to do these.  I
19  did not do these.
20      Q   With all due respect, Ms. Cordi-Allen,
21  if we turn to — underneath response to
22  interrogatory No. 18, and it says there, does it
23  not, signed under the pains and penalties of
24  perjury?  You see that there, don't you?

35 (Pages 311 to 314)

Page 315

```
 1      A   Um-hm.
 2      Q   Do you understand what perjury means?
 3      A   This doesn't have my signature on it,
 4  so... I think you're, you know.
 5          MR. REVERE:  Can we go off the
 6  record for a second?
 7          (Off record.)
 8          MR. SMALL:  Lori-Ann, would you mind
 9  repeating the last question, please?
10          (Question read.)
11      A   Not telling the truth.
12      Q   Did you review these answers to
13  interrogatories before you signed them?
14      A   I don't remember.
15      Q   Do you understand that interrogatories
16  are the same as a sworn statement?
17      A   Well, I -- the questions, these are
18  questions.
19          THE STENOGRAPHER:  I can't
20  understand you?
21      A   These are questions, right,
22  interrogatories are questions?  You know,
23  statements are different than questions, so
24  they're different.
```

Page 316

```
 1      Q   Did you understand, Ms. Cordi-Allen, in
 2  putting these together and in answering my
 3  interrogatories and in signing under the pains and
 4  penalties of perjury that you were swearing to the
 5  accuracy and truthfulness of your answers?
 6      A   All my answers are true.
 7      Q   Can you repeat my -- if you can answer
 8  my question, please.
 9      A   Yes.  I guess, yes.
10      Q   You would agree with me, would you not,
11  that Mr. Grabow has been compensated as we
12  discussed in Exhibit 35 $7,754.72 for attorneys'
13  fees, and $2,814.01 for expenses, correct?
14      A   So far.
15      Q   Correct?
16      A   So far.
17      Q   So the answer to my question is yes?
18      A   Yes.
19      Q   And so in fact you have not incurred,
20  have you, at least $20,000 in procuring
21  representation in the workers' compensation case
22  after Mr. Halloran?
23      A   No, that's not correct.
24      Q   You've incurred $20,000?
```

Page 317

```
 1      A   I've had to get doctors out of town and
 2  out of state and go to them, and I owe him for his
 3  ongoing work since '04.  I'm not done with
 4  workers' comp by any means.
 5      Q   Did you sign a new contract with
 6  Mr. Grabow?
 7      A   It's the same contract.
 8      Q   You don't owe him anything, do you,
 9  unless you recover?
10      A   I don't know what he's going to charge
11  me for fees because he's incurring fees and
12  expenses.
13      Q   But, Ms. Cordi-Allen, you certainly
14  would agree with me when you sign a contract you
15  don't expect to ever be -- somebody to be released
16  from that contract, do you?
17      A   By mutual consent people can break
18  contracts, by mutual consent.
19      Q   And have you agreed with Mr. Grabow that
20  you are going to enter into a new contract where
21  he would be compensated even if he didn't recover
22  anything in addition to what he's already
23  recovered for you?
24      A   Have I?
```

Page 318

```
 1      Q   Yes.
 2      A   He's still my lawyer.  We haven't
 3  changed our attorney-client relationship.
 4      Q   Okay.  And so you'd agree with me,
 5  wouldn't you, then that Mr. Grabow operating on
 6  the contract you signed with him only gets
 7  compensated if he recovers additional funds for
 8  you, correct?
 9      A   I don't know about expenses.  I really
10  don't.
11      Q   Plus expenses, correct?
12      A   Well, according to my other lawyer,
13  that -- from what he said, you're always
14  responsible for expenses, so I don't -- I disagree
15  with what you're saying.  You know, Bart Halloran
16  said to me, and you're the one that put it out
17  there, that if we lose this case you're
18  responsible for expenses.  So I -- you know,
19  there's a contradiction there.  I don't know how
20  Connecticut law is, but I would assume what's good
21  for one is good for all, but I don't know.
22      Q   Ms. Cordi-Allen, did you see Dr. Michna
23  and Dr. Kirkpatrick for treatment of your RSD --
24      A   Yes.
```

36 (Pages 315 to 318)



Page 319

1  Q  -- or only in -- okay. Or only in
2  specifically with your workers' compensation
3  matter?
4  A  No, treatment. Dr. Kirkpatrick was to
5  diagnose me and see what can be done or, you know,
6  find out what is going on. These doctors are
7  saying I don't have RSD. Then what the heck is it
8  and what can be done? And he said, You've got
9  RSD.
10         And Dr. Michna's been treating me,
11  and, unfortunately, what he's been doing, I've had
12  reactions to the medicine and -- I'm very
13  sensitive to medicine, so... but they're the cream
14  of the crop, so -- and he said I have RSD too,
15  so... And I don't know any of these doctors,
16  they're far away from me, they have nothing to
17  gain.
18  Q  Ms. Cordi-Allen, do you have any
19  knowledge or idea of exactly how much the workers'
20  compensation lien was at any time?
21  A  I thought it was about 120,000,
22  something like that.
23  Q  Well, we've seen documents both today
24  and two days ago that --

Page 320

1  A  They're all over the place --
2  Q  Well --
3  A  -- the numbers.
4  Q  -- not really. Because if we look at
5  Exhibit 18, which is the complaint filed against
6  you by the city of Hartford --
7         (Document exhibited to witness.)
8  Q  -- they indicate that as of
9  April 2001 --
10  A  Um-hm.
11  Q  -- on paragraph 14, that the lien was
12  204,968. Do you see that?
13  A  Yeah.
14  Q  Now, assuming that that's correct, okay,
15  that that number is correct, they paid you an
16  additional 31,000 --
17  A  Yes.
18  Q  -- correct?
19  A  Um-hm.
20  Q  So that would bring, using their
21  numbers --
22  A  Um-hm.
23  Q  -- the amount of the lien to over
24  235,000, correct?

Page 321

1  A  Right.
2  Q  Now, just so I understand the way you
3  view the contract that you had with
4  Mr. Halloran --
5  A  Um-hm.
6  Q  -- let's assume that the lien was for
7  235,000 --
8  A  Right.
9  Q  -- based on these numbers, and you
10  collected $235,000 from Delta Elevator --
11  A  Yeah.
12  Q  -- you would agree with me, wouldn't
13  you, that the city of Hartford and the workers'
14  compensation insurer would have a right to the
15  entire amount of 235, correct, based on that --
16  A  Yes.
17  Q  -- amount of its lien?
18  A  Yes.
19  Q  Leaving nothing for Mr. Halloran,
20  correct?
21  A  Exactly, definitely.
22  Q  And nothing for you --
23  A  Exactly.
24  Q  -- correct?

Page 322

1  A  And that's why I engaged in that
2  contract.
3  Q  Now, if you turn, please, in your
4  answers to interrogatories, interrogatory No. 2,
5  now, again, we're going to assume for the sake of
6  this argument on representations of your counsel
7  and yourself that interrogatories were indeed
8  signed by you.
9  A  Um-hm. Okay.
10  Q  And there's an accounting here under
11  your paragraph A, Breach of Contract, where you
12  claim that the accounting was inconsistent with
13  the terms of the retention agreement and resulted
14  in you receiving $0 from the settlement.
15         And you say, If the distribution had
16  been calculated in accordance with the agreement,
17  Mr. Halloran would be entitled to 26,000 and you
18  would be entitled to 52,000.
19         Now, we just talked about the fact
20  that using the numbers that the city of Hartford
21  provided the lien in fact would be 235,000,
22  correct?
23  A  Incorrect.
24  Q  Well, did we not just go through that,

Barbara Cordi-Allen, Vol. 2                                                      11/17/2005

Page 323

1    Ms. Cordi-Allen, in saying the city of Hartford
2    filed a complaint against you for $204,968?
3        A    Yes, you did.
4        Q    And they paid you an additional 31,000?
5        A    Oh, that had nothing to do with
6    Mr. Halloran.
7        Q    I understand. But it's part of the
8    lien, Ms. Cordi-Allen?
9        A    No. No. It's not part of the lien.
10   That was done and over. That was done and over in
11   '01. This happened in '04. Mr. Grabow went in
12   '04.
13       Q    I understand the timing,
14   Ms. Cordi-Allen.
15       A    Um-hm.
16       Q    Let's go on your argument then.
17       A    There was no money left.
18       Q    No question pending.
19            There's 204,000 --
20       A    Um-hm.
21       Q    -- to the city of Hartford. So
22   according to your calculations, had it been done
23   according to the way you interpret your contract,
24   just so I understand, you would take the 204,968

Page 324

1    from the 235; is that correct?
2        A    I disagree with the 204,000.
3        Q    Well, did you file anything in the
4    workers' compensation hearing?
5        A    I told Mr. Miles. Did he listen to me,
6    no.
7        Q    Okay. So no commissioner agreed with
8    you, correct, and they were --
9        A    No commissioner -- Mr. Miles did not
10   listen to me. Okay? And I know why, but -- it's
11   very obvious, but I'm not going to even get into
12   that.
13       Q    Do you find that a lot of people don't
14   listen to you, Ms. Cordi-Allen?
15       A    Well, no. When it's political, I think
16   -- I think there are other agendas, and I've had
17   some conversations that I'm not going to discuss,
18   not with my attorney, but with other people, so --
19   but the thing is that -- and, by the way, just as
20   an aside if you want, what I've said to you and
21   what Mr. Halloran has put in print was put in
22   print in Mr. Halloran's e-mails were found to be
23   contradictory, so I guess I wasn't wrong. But the
24   $204,000 is incorrect as far as I'm concerned, but

Page 325

1    I don't -- I can't say --
2        Q    But the city of Hartford believes it to
3    be correct, doesn't it? I mean, it filed a
4    complaint against you, correct?
5        A    I cannot --
6        Q    Ms. Cordi-Allen, look at Exhibit No. 18.
7    Let's not argue with what's written on the
8    document, okay? The city of Hartford filed a
9    complaint --
10       A    Um-hm.
11       Q    -- did it not, and alleged $204,968 --
12       A    That's what they allege.
13       Q    -- and 8 cents --
14       A    Alleged.
15       Q    -- correct? That's what they claimed.
16       A    That's what they alleged, um-hm.
17       Q    And they made that representation in the
18   workers' compensation hearing?
19       A    I have no idea what they put in there.
20       Q    Did you ever challenge the amount of
21   their lien?
22       A    Yes, I did.
23       Q    Where did you challenge it?
24       A    I told Mr. Miles that I disagreed with

Page 326

1    it.
2        Q    And what did he say?
3        A    He -- I don't think he looked at
4    anything.
5        Q    Okay.
6        A    I don't know what he did, because he
7    goes off on his own, you know, in his chambers,
8    you know, and...
9        Q    Because he's part of this conspiracy?
10       A    No, that's where he -- you know, he does
11   what he does and then he goes for a couple weeks
12   and reads or whatever.
13       Q    If we assume that their number is
14   correct, though, the 204,968.08 --
15       A    Um-hm.
16       Q    -- according to your calculation, you
17   would deduct that from the 235,000; is that right?
18       A    Yes. That's what --
19       Q    And you would end up with approximately
20   -- you're the math doctorate -- you'd end up with
21   approximately 30,000?
22       A    Right.
23       Q    And so out of that 30,000 you then would
24   receive two-thirds of that and Mr. Halloran would

Page 327

1  receive one-third?
2     A   No.
3     Q   Okay.  Why not?
4     A   I believe expenses are supposed to be
5  part of that; am I incorrect?
6     Q   Okay.  Fair enough.  So out of the
7  30,000 you'd first deduct expenses, correct?
8     A   Yes.
9     Q   All right.  And then from what's left
10  over after the expenses, you then would get
11  two-thirds and Mr. Halloran would get a third?
12     A   Yes.  Yes, I believe so.
13     Q   Okay.  So in your answer to No. 2 you
14  say, If the distribution had been calculated in
15  accordance with the agreement, Mr. Halloran would
16  be entitled to $26,111.11 and you would have been
17  entitled to $52,222.22.  Now, that's using the
18  number, is it not, of assuming that the workers'
19  compensation lien was approximately 125, 126,000,
20  correct?
21     A   He took $78,000, right?  And I can't
22  even think of how these numbers came about without
23  doing a lot of work, but that $78,000 -- okay, if
24  235,000 -- okay, so to get 278,000, that's like a

Page 328

1  third of 235,000, if -- it's close to that.  It
2  probably is that.  Let me see, times three.
3  That's four.  It is, exactly, that's right, okay.
4  So $78,333.33 is a third of the 235,000.  Okay?
5  But that's not allowing for the lien.  That's
6  coming off the top.
7     Q   Okay.  And I understand your position is
8  on the breach of contract that the lien should
9  have come off before the distribution of the
10  funds?
11     A   That's what my contract reads.
12     Q   And so if we assume that Hartford's is
13  correct, the number, which is 204,968.08, and you
14  take that right off the 235, it brings you down to
15  30,000-some-odd dollars, correct, the math, my
16  math is correct, is it not?
17     A   If we went -- okay, this is calculated
18  one method, okay, and you're calculating it a
19  whole different way.
20     Q   How am I calculating it a different way?
21     A   I think what you're proposing is taking
22  the lien off the top, the way my contract was
23  negotiated and written -- and actually it wasn't
24  negotiated, it was suggested by Mr. Halloran.

Page 329

1     Q   Was to take the lien off the top, wasn't
2  it?
3     A   Right, I believe so.
4     Q   So if you collected 235,000 from
5  Delta --
6     A   Right.
7     Q   -- and you took the lien off the top,
8  which we'll assume is 204,968.08, which is what
9  Hartford filed in its complaint, and it leaves you
10  with a balance of $30,000, does it not?
11     A   If it was -- see, I don't know the
12  figures.  To be honest with you, I don't know the
13  figures, where these calculations came from.
14     Q   I'm not asking you the figures,
15  Ms. Cordi-Allen.  You'll agree with me the Delta
16  Elevator settlement was 235, correct?
17     A   Yes.
18     Q   And you'd agree with me that Hartford
19  alleged that its lien was $204,968.08, correct?
20     A   That's what they said in that document.
21     Q   That was my question.  That's what they
22  alleged, correct?
23     A   That's what they alleged.
24     Q   And if we took 204,968.08 from 235,000

Page 330

1  we'd end up with approximately 30,000, correct?
2     A   Yes.
3     Q   So if Hartford's lien is correct --
4     A   Um-hm.
5     Q   -- then your receipt of $52,222.22 would
6  be incorrect; would you agree with me on that
7  statement?
8     A   If Mr. Halloran was getting one-third,
9  then I should be getting two-thirds, correct?
10     Q   Right.  And if Hartford's number is
11  correct, if Hartford's lien number is correct --
12     A   Right, yes.
13     Q   -- and you took that number from the
14  235,000 --
15     A   Okay.
16     Q   -- it would leave you a balance of
17  30,000 from which you'd first deduct expenses and
18  then you would receive two-thirds of that balance,
19  correct?
20     A   Right, which would be twice
21  Mr. Halloran's, right?
22     Q   Correct.
23     A   Okay.
24     Q   But it wouldn't be 52,222, would it?

Page 331

1    A    I don't know what figures were used for
2  the lien on -- by the city of Hartford.
3    Q    But if we assume that they're correct --
4    A    If you're using those figures, then it
5  all depends on what figures you use.
6    Q    Let me finish.
7         If we use their figures --
8    A    Okay.
9    Q    -- then your number of $52,222 is
10  incorrect; would you agree with me on that?
11    A    If you use those figures, it would be
12  different.
13    Q    Thank you.
14         If you'd turn, please, to the next
15  page --
16    A    Um-hm.
17    Q    -- under the paragraph C --
18    A    Yeah.
19    Q    -- about two-thirds of the way down you
20  begin with, "Furthermore," it's the first -- it's
21  hard to say -- (Indicating.)
22    A    Okay.
23    Q    It says, Furthermore, Halloran
24  misrepresented the amount of money which you could

Page 332

1  receive from a settlement if she waived her
2  workers' compensation rights; do you see that
3  sentence there?
4    A    Um-hm.
5    Q    And you say, When in fact he knew that
6  he intended to charge her fees and expenses in
7  excess of $108,000. Do you see that there?
8    A    Yeah.
9    Q    Now, are you basing that on -- just so I
10  understand where you got the numbers for that, is
11  that -- is that based on Exhibit No. 16, the
12  settlement statement?
13    A    I don't know. My attorney did this. So
14  I don't -- I really --
15    Q    Well, did you read them,
16  Ms. Cordi-Allen?
17    A    Did I read these?
18    Q    Yes. Did you read the answers?
19    A    I went over them and, you know.
20    Q    Is your attorney going to be a witness
21  in this case?
22    A    I don't know. I have -- but my attorney
23  did these. I mean, if you want, I can try to
24  figure things out, but my attorney's the one that

Page 333

1  did this work. I don't -- you know, so I trust
2  that he knows what he's doing.
3    Q    Your attorney being Mr. Revere?
4    A    Yes.
5    Q    Did you discuss with Mr. Revere the
6  content of the answers to interrogatories?
7    A    I don't recall doing that.
8    Q    Did you read these prior to signing the
9  answers to interrogatories?
10    A    Did I read them? I believe I read them.
11  Did I get bills or whatever and numbers and all
12  that and recalculate everything? No, I did not,
13  because I trusted that my lawyer -- but I can -- I
14  can look at this now and -- if you want and try to
15  figure out exactly --
16    Q    I don't want you to do that. So, in
17  other words, when you signed these, you weren't
18  swearing to the calculations in here, were you?
19    A    I -- I would assume that they were all
20  correct.
21    Q    But you didn't go and check them, did
22  you?
23    A    Did I? No.
24    Q    Ms. Cordi-Allen, have you retained an

Page 334

1  expert in this case?
2    A    Did I? No. I just have my attorney.
3  But I believe there were e-mails regarding some of
4  this stuff with Bart Halloran that you probably --
5  well, you should have, and that's where a lot of
6  the numbers I believe came from.
7         (Document marked as Exhibit No. 37.)
8    Q    Ms. Cordi-Allen, I'm going to show you
9  now what's been marked as Exhibit No. 37 and ask
10  you to take a look at that document, please.
11         (Document exhibited to witness.)
12         (Witness perusing document.)
13    Q    Have you had a chance to review Exhibit
14  No. 37, Ms. Cordi-Allen?
15    A    Yes.
16    Q    This document is dated March 27, 2004.
17    A    Um-hm.
18    Q    Do you recognize this document?
19    A    No, I don't.
20    Q    Is this your handwriting?
21    A    No, it's not.
22    Q    If you turn to the second page --
23    A    Um-hm.
24    Q    -- is that your handwriting?

Page 335

1  A  Yes. Um-hm.
2  Q  Do you know who this letter was sent to,
3  if anyone?
4  A  No, I don't. It's not signed to anybody
5  -- it's not addressed to anybody.
6  Q  The fourth paragraph down --
7  A  Where?
8  Q  Exhibit 37.
9  A  From what page?
10     MR. REVERE: First page.
11  A  First page, okay.
12  Q  Ms. Cordi-Allen, this document was
13  produced by your counsel in this case, okay?
14  A  (Witness nodded.)
15  Q  In the fourth paragraph down --
16  A  Um-hm.
17  Q  -- it indicates again that you filed a
18  grievance with the bar?
19  A  Um-hm.
20  Q  And that numerous lawyers had told you
21  that they were afraid of him --
22  A  Um-hm.
23  Q  -- and would get back at them if they
24  took the case?

Page 336

1  A  Yes. Um-hm.
2  Q  Who were the numerous lawyers?
3  A  Connecticut lawyers, the ones I called.
4  Q  Can you provide me with any names?
5  A  No, I can't. I don't remember their
6  names.
7  Q  What did they say?
8  A  Many of them saw that I filed a
9  grievance against him, and they were pretty happy
10  I did, and they told me, they said, Be very
11  careful of him. And I'm like, What? And they
12  said, Be very careful of him. They said, We can't
13  take the case, he'll get back at us. And I'm
14  like, What are you talking about?
15  Q  Would you have any records to help
16  refresh your memory of who these lawyers were?
17  A  No, they were phone conversations. And
18  then others said, you know, He broke your
19  contract. You should file breach of contract.
20  And I told them about workers' comp, what was
21  going on there, and they said, I guess he appoints
22  the commissioners and judges.
23  Q  Who's he?
24  A  Bart Halloran.

Page 337

1  Q  So Mr. Halloran, you were informed,
2  appoints the judges and the commissioners?
3  A  Um-hm, he's on a panel or something.
4  That's what I was told. I don't know.
5  Q  In the next paragraph you see you say,
6  "The bar did nothing. They seem to be afraid of
7  him and the corruption in Connecticut"?
8  A  Um-hm.
9  Q  What corruption are you referring to?
10  A  Political, a lot of political stuff in
11  Connecticut.
12  Q  Anything specific?
13  A  Well, just about every major city down
14  there has been busted. The governor's in jail. I
15  don't get involved with politics. I go and do my
16  job and leave, so...
17  Q  You also believe that the workers'
18  compensation office was corrupt; is that correct?
19  A  Do I believe that? I -- I think that --
20  what did I think? Just what I said. Where is
21  that?
22  Q  I'm asking you. I'm not referring you
23  anywhere.
24  A  Oh. I think when you're appointed there

Page 338

1  are political favors, I know there are. I mean,
2  you know.
3  Q  So you believe --
4  A  You know, do I believe that one
5  politician will take care of another politician?
6  Yeah.
7  Q  Okay. So you believe the workers'
8  compensation office was corrupt as well?
9  A  I think anything political, you know, I
10  would --
11  Q  So the answer is yes?
12  A  I wouldn't -- I don't know if they are
13  or not, but I -- anybody involved with politicians
14  or buddies or whatever, I mean, I wouldn't trust
15  -- I wouldn't think anybody could be completely
16  independent, put it that way, or unbiased, if
17  that's a better word.
18  Q  So the answer to my question,
19  Ms. Cordi-Allen, is you did in fact feel that the
20  workers' compensation commission was corrupt,
21  correct?
22  A  No, not corrupt, could be biassed, could
23  be biassed towards their friends. I don't know.
24  Q  If you look down here, Ms. Cordi-Allen,

Page 339

1  you write, "With the corruption at the capitol, I
2  feel that the workers' comp office is equally
3  corrupt." Did I read that correctly?
4      A   I don't know. Where is it?
5      Q   Seventh paragraph down.
6      A   It could be. I wouldn't put anything
7  past anybody in Connecticut.
8      Q   Did you believe that when you wrote it?
9      A   Do I believe that? I -- having seen
10 what was coming out of Roland's office, and he's
11 in federal jail, okay, and if he appoints the
12 commissioners, I -- I would not doubt anything.
13     Q   So you felt that the workers'
14 compensation commission was corrupt, yes or no?
15     A   I felt it? I would say probably. And
16 based on what I was told by other lawyers, that
17 they were afraid of going against Mr. Halloran or
18 saying anything or picking up a case, I think
19 other people may have been afraid of him. Like I
20 said, I don't know the man, other than trying --
21 you know, that he was supposed to do this case
22 and, you know, he sold himself as being, you know,
23 the best and top lawyer and he could do this and
24 he could do that and --

Page 340

1      Q   Did you file a complaint against
2  Commissioner Miles as well?
3      A   Commissioner Miles? I don't think I
4  did. I don't think so. It wouldn't have done any
5  good if I wanted to anyways.
6      Q   What about Commissioner Frankel, did you
7  file a complaint against Commissioner Frankel?
8      A   I don't recall. I don't believe so.
9      Q   Ms. Cordi-Allen, on the last page of
10 this document --
11     A   Um-hm.
12     Q   -- the last full paragraph, you state,
13 "I am planning, if this isn't resolved, to meet
14 with national media and tell them what I know
15 about Connecticut and the political corruption."
16     A   Um-hm.
17     Q   "This will also go into the
18 discrimination and racism."
19     A   Um-hm.
20     Q   Have you testified today about the
21 political corruption you believed was going on in
22 the state of Connecticut?
23     A   I know a lot about public corruption,
24 and I really can't get into it because I have

Page 341

1  spoken to people.
2      Q   Who have you spoken to?
3      A   Federal authorities.
4      Q   Okay. You filed a complaint with the
5  federal authorities?
6      A   Actually, they called me.
7      Q   Okay. Now, is this in relation to your
8  brother or is this in relation to Mr. Halloran and
9  your representation?
10     A   Well, it's political corruption. That's
11 all I can say.
12     Q   Does it involve Mr. Halloran?
13     A   You know, I met with Springfield
14 authorities because of what's going on in the
15 area, but I would never say who or what I ever
16 spoke to anybody about. You can't do that.
17     Q   Does it involve Mr. Halloran?
18     A   Springfield?
19     Q   It's a yes or no question,
20 Ms. Cordi-Allen. Please, it's late.
21         MR. REVERE:  Just answer. Does it
22 involve Mr. Halloran?
23     A   I don't speak -- believe I spoke to
24 Springfield authorities about Mr. Halloran.

Page 342

1      Q   Okay. Do you know if you ever sent this
2  letter or document to anyone?
3      A   No. I didn't sign it.
4      Q   You have a computer at home?
5      A   Yeah.
6      Q   Same computer you had in 2004?
7      A   No.
8      Q   No?
9      A   Uhn-uhn.
10     Q   Do you still own the computer that you
11 had in 2004?
12     A   No.
13     Q   Is it in your family?
14     A   (Witness nodded.)
15     Q   Do you have access to it?
16     A   No, I think we dumped it. We've got a
17 new one.
18     Q   Do you maintain files that you save
19 documents on?
20     A   I press Open Apples S or whatever, you
21 know, the save thing, is that -- but that goes
22 into the computer, doesn't it?
23     Q   Did you print out all the e-mails that
24 you --

Page 343

1    A    No.
2    Q    -- corresponded with Mr. Halloran?
3    A    No, because I -- I wish I did, but I
4    didn't.  I didn't -- it seemed very strange for
5    him to start e-mailing me, and then I just got
6    more and more uncomfortable, and I'm like, What is
7    going on?  So then I asked my kids how to do it,
8    and they saved some of it, printed it, whatever
9    they did.
10    Q    Ms. Cordi-Allen, you at one time
11    requested that Mr. Halloran bring a malpractice
12    case against Dr. Kruger; is that correct?
13    A    I asked him if he was responsible for
14    what happened to me, you know, for my having RSD
15    so late that it could have been arrested.
16    Q    Did you ever pursue a complaint against
17    Dr. Kruger?
18    A    No.
19    Q    You also requested Mr. Halloran to
20    pursue a malpractice claim against Dr. Wise,
21    correct?
22    A    Yes.
23    Q    Did you ever pursue a claim against
24    Dr. Wise?

Page 344

1    A    No.
2    Q    You also asked Mr. Halloran to
3    investigate a potential malpractice claim against
4    Dr. Donaldson; isn't that correct?
5    A    I don't know who he is.  He's not my
6    doctor, is he?
7         MR. REVERE:  Are you looking for
8    Bart's letter where he mentions all the doctors?
9         MR. SMALL:  Exhibit 19.  Go off the
10    record for a second.
11         (Off record.)
12         (Document exhibited to witness.)
13    Q    Ms. Cordi-Allen, I'm going to show you
14    again what we've previously marked as Exhibit 19
15    in this case.
16    A    Um-hm.
17    Q    And turn to page 2, please, and at the
18    very bottom of the page you write, Bart -- about
19    -- toward the bottom you say, I was not pleased at
20    all yesterday, as I did get a call from
21    Dr. Kruger's office that WC called and authorized
22    physical therapy.  This is a result of seeing
23    Dr. Donaldson.  What is his liability for causing
24    this to happen to me?

Page 345

1         Did you ever file a claim against
2    Dr. Donaldson?
3    A    No.  I can't remember who he is, though.
4    I remember one doctor -- Donaldson --
5         THE STENOGRAPHER:  I can't hear you.
6    A    I'm just thinking to myself if Donaldson
7    was a doctor from -- I don't know.  I can't place
8    him.  But he was not my doctor.
9    Q    And if you turn to the last page of
10    Exhibit 19 --
11    A    Um-hm.
12    Q    -- again, just to put this in context,
13    this is dated April 30th, 2001.
14    A    Um-hm.
15    Q    You ask Mr. Halloran, How does one file
16    on a commissioner messing up.  Did you ever file
17    any complaints against Commissioner Frankel or
18    Commissioner Miles?
19    A    Not to my recollection, no.
20         (Mr. Allen left the room.)
21    Q    Ms. Cordi-Allen, do you recall a
22    Dr. Watson?
23    A    Watson.  Yes.
24    Q    Do you believe that Dr. Watson provided

Page 346

1    you with adequate medical care?
2    A    He's one of the best doctors in the
3    world.
4    Q    So the answer is yes?
5    A    Yes.
6         (Document marked as Exhibit No. 38.)
7    Q    Ms. Cordi-Allen, I'm going to show you
8    what's been marked as Exhibit 38, please --
9         (Document exhibited to witness.)
10    Q    -- which is a document dated May 24th,
11    2001, and it's a letter from you to a Mr. John
12    Mastropietro at the workers' compensation
13    commission.
14    A    Um-hm.
15    Q    Do you recall this document?
16    A    No.
17    Q    At the bottom again is your America on
18    Line e-mail address?
19    A    Um-hm.  Right.
20    Q    And this is a document that was produced
21    by your counsel in this matter.
22    A    Right.
23    Q    Do you deny that this was a document
24    created by you?

43 (Pages 343 to 346)

Page 347

1    A    No.
2    Q    And did you in fact send this to the
3  workers' compensation commission?
4    A    I don't really remember this letter at
5  all but...
6    Q    In the second full paragraph,
7  Ms. Cordi-Allen, it says, I am filing a complaint
8  on Commissioner Frankel --
9    A    Um-hm.
10    Q    -- he has been most unprofessional, and
11  it is my feeling that he has been intentionally
12  blowing me off?
13    A    Um-hm.
14    Q    Did you believe that Commissioner
15  Frankel was unprofessional?
16    A    Yes.
17    Q    And did you believe that he was blowing
18  you off?
19    A    Yes.
20    Q    Because he wouldn't listen to you?
21    A    That time, the time element, the case
22  has been dragged out forever and we weren't
23  getting any hearings, and he started talking about
24  country clubs and this and that. And I'm like,

Page 348

1  This has got nothing to do with my being here or
2  who was a member there. That's not professional.
3    Q    And further in the letter you say, I
4  will tell you that the city has racially
5  discriminated on me and also by my being disabled.
6           You believe that the city had
7  racially discriminated against you?
8    A    Yes.
9    Q    In what respect?
10    A    There were a lot of racial issues where
11  I worked, and it was well known that if you wanted
12  to -- if you wanted to change from one career to
13  another, whatever, you had to be certain ethnic
14  groups at different times, which was ridiculous,
15  and that's why Hartford's a mess.
16    Q    So why believe you were the victim of
17  racial discrimination?
18    A    Was I? Yes, definitely.
19    Q    Did you ever file a complaint?
20    A    No. It was their loss. I was happy
21  doing what I was doing.
22    Q    You also believe that the city
23  discriminated against you because you're disabled?
24    A    Yes.

Page 349

1    Q    In what respect?
2    A    Because if I could tutor, I could have
3  worked, and they should have provided me a job,
4  but they told me I couldn't work. It's
5  contradiction, because I tutored for two years
6  while I was there, and then they're telling you
7  you can tutor but you can't teach, but I tutored
8  while I was there, which is teaching.
9    Q    And on the last page here you state, I
10  do not want Commissioner Frankel on my case. I
11  want you to take charge and move this along. I
12  have talked with many attorneys and all question
13  as to the stalling.
14    A    Right.
15    Q    What attorneys had you spoken with?
16    A    I don't remember. But like I said to
17  you before, it was taking forever, the stalling.
18  That's exactly what it was. Obviously four years
19  later -- four and a half years later to get a
20  hearing is ridiculous.
21    Q    Ms. Cordi-Allen, you were involved with
22  a lawsuit in Truro, Massachusetts; is that
23  correct?
24    A    Um-hm. Yes.

Page 350

1    Q    What did that concern?
2    A    Getting building permits.
3    Q    Is that lawsuit still pending?
4    A    Yes.
5         (Mr. Allen came back in.)
6    Q    And did you have some sort of run-in
7  with the town manager of Truro?
8    A    I think he was afraid that we were going
9  to file a case against the town of Truro for not
10  giving me my building permits when they were
11  ordered by the court, and I hired Paul Revere.
12         MR. REVERE: Can we go off the
13  record for just a second?
14         (Off record.)
15    Q    Ms. Cordi-Allen, you also -- you were
16  treated at Baystate --
17    A    Yes.
18    Q    -- is that correct?
19    A    Um-hm.
20    Q    And you wanted Mr. Halloran to bring a
21  malpractice case against Baystate, didn't you?
22    A    Yes. I asked him to investigate that.
23    Q    Did you ever bring a suit against
24  Baystate?

44 (Pages 347 to 350)

Page 351

1   A   No.
2   Q   Ms. Cordi-Allen, are you familiar with a
3   lawsuit that was filed in Hampden County,
4   Springfield District Court with a Louis Hyder and
5   Michael J. Hyder versus yourself, your husband and
6   a Catherine Allen?
7   A   Yes.
8   Q   Do you recall what the reason this
9   lawsuit was filed?
10  A   I've spoken with the Feds about it. I'd
11  rather not get into it. I've been advised I
12  really shouldn't be talking about it.
13  Q   Who is Louis Hyder?
14  A   They're my cousins, and they're very
15  shady, and I -- I don't want to expose what I
16  know, so...
17  Q   Is this lawsuit still going on?
18  A   No.
19  Q   How was it resolved?
20  A   I think things were kind of dropped, you
21  know. They started threatening me, like whatever
22  you know, keep it to yourself, stuff like that.
23  Finally it's done and over. Then some people have
24  been convicted and still there's more coming

Page 352

1   and...
2   Q   Did any of the involvement of Mr. or
3   Mrs. Hyder in this lawsuit involve Mr. Halloran or
4   his representation of you?
5   A   No.
6       THE WITNESS: Can we go off record?
7       (Off record.)
8       MR. SMALL: Back on.
9       By agreement of counsel, I'm going
10  to suspend questioning on that subject, and at the
11  end we'll just suspend the deposition, and if need
12  be, we can ask further questions on that.
13      MR. REVERE: Off the record for just
14  a second.
15      (Off record.)
16      MR. SMALL: Back on.
17  Q   Ms. Cordi-Allen --
18  A   Yes.
19  Q   -- are you familiar with a lawsuit that
20  was filed in Hampden Superior Court on or about
21  December 13, 2000 entitled Cordi-Allen v. Cordi?
22  A   That's my brother, um-hm, my ex-brother.
23  Oh, wait a minute. That might not be. Is it
24  Cordi-Allen or Cordi?

Page 353

1   Q   Cordi-Allen v. Cordi?
2   A   Okay. All right.
3   Q   There was a trustee involved?
4   A   Yeah. My mother died.
5   Q   Are you familiar with this case?
6   A   Yeah, that was my mother's estate.
7   Q   Were you represented by counsel in this
8   case?
9   A   Yes.
10  Q   Who was that?
11  A   Fenton.
12  Q   Fenton?
13  A   Fenton, slash, Glasser.
14  Q   Out of Springfield?
15  A   Yes.
16  Q   And this case was disposed of in April
17  of 2003; is that right?
18  A   Yes.
19      MR. SMALL: All right. Why don't we
20  go off the record for a few minutes.
21      (Off record.)
22      MR. SMALL: Back on, please.
23      Ms. Cordi-Allen, at this time I have
24  no further questions. I'm going to suspend the

Page 354

1   deposition based on the statements made previously
2   in the deposition. Thank you.
3       (Off record at 4:00 p.m.)

Page 355

```
 1              C E R T I F I C A T E
 2    COMMONWEALTH OF MASSACHUSETTS
 3    BRISTOL, SS
 4
 5          I, Lori-Ann London, Registered
 6    Professional Reporter and Notary Public in and for
 7    the Commonwealth of Massachusetts, do hereby
 8    certify:
 9          That, BARBARA CORDI-ALLEN, the witness
10    whose deposition is hereinbefore set forth, was
11    duly sworn by me and that such deposition is a
12    true record of the testimony given by the witness
13    to the best of my knowledge, skill, and ability.
14          I further certify that I am neither
15    related to, nor employed by, any of the parties in
16    or counsel to this action, nor am I financially
17    interested in the outcome of this action.
18          IN WITNESS WHEREOF, I have hereunto set
19    my hand and seal of office this 28th day of
20    November 2005.
21          _____
22          Lori-Ann London, RPR
23          Notary Public
24    My commission expires: 6/15/2012
```

Page 356

```
 1              E R R A T A  S H E E T
 2          I, BARBARA CORDI-ALLEN, the within-named
 3    deponent do hereby certify that I have read the
 4    foregoing transcript of my testimony, and further
 5    certify that said transcript is a true and
 6    accurate record of said testimony (with the
 7    exception of the following corrections listed
 8    below):
 9    Page    Line         Correction
10    ____    ____    _____
11    ____    ____    _____
12    ____    ____    _____
13    ____    ____    _____
14    ____    ____    _____
15    ____    ____    _____
16    ____    ____    _____
17    ____    ____    _____
18    ____    ____    _____
19    ____    ____    _____
20        Signed under the pains and penalties of
21    perjury this      day of          , 2005.
22
23          _____
24          BARBARA CORDI-ALLEN
```

46 (Pages 355 to 356)

# LAW OFFICES OF R. BARTLEY HALLORAN, P.C.
## ONE LEWIS STREET
### HARTFORD, CONNECTICUT 06103

R. BARTLEY HALLORAN
HENRY K. SNYDER*

TELEPHONE (860) 493-1923
FACSIMILE (860) 493-1924

*Also admitted in New York

## RETAINER AGREEMENT

I. **PARTIES** - I, _Barbara Cordi-Allen_, (hereafter the "Client") retain the Law Offices of R. Bartley Halloran, P.C. to investigate, and, if warranted, to represent me in a claim or claims against any party or parties arising out of the following incident: _Crush injury to right foot 1/10/97._ _left_

II. **FEES** - The Client agrees that the Law Offices of R. Bartley Halloran, P.C. shall receive fees of thirty-three and one third percent (33 1/3 %) of the recovery whether by way of settlement or award, after deduction of liens, costs and expenses, including payback of any Workers' Compensation benefits. The Client authorizes the Law Offices of R. Bartley Halloran, P.C. to deduct said fees, liens, costs and expenses out of monies received from said party or parties. If all or any part of the settlement or award is to be paid in installments (a "structured settlement") the fee shall be based upon the present cost of such settlement or award; all fees, liens, costs and expenses will be paid from the first monies received.

It is agreed that this employment is on a contingent fee basis. If no recovery is made, the client shall not owe the Law Offices of R. Bartley Halloran, P.C. any sum as attorneys' fees.

III. **COSTS AND EXPENSES** - Costs and expenses include court fees, investigation expenses, expert fees, and all other disbursements incurred in the prosecution or settlement of this action. The Law Offices of R. Bartley Halloran, P.C. agrees to advance all out-of-pocket costs and expenses in connection with this litigation. Upon settlement of the case the Law Offices of R. Bartley Halloran, P.C. is authorized to deduct these costs and expenses from any settlement or award after the legal fee has been deducted.



B. Cordi-Allen
EXHIBIT NO. 2
11-15-05
L. LONDON

IV.  **WAIVER** - There is a statute which sets forth fee limits in contingent fee contracts, which limits are set forth in attached Exhibit A.  The law allows voluntary waiver of this statute.  In view of the complex nature of this case, the expense involved in prosecuting this case, the agreement by the Law Offices of R. Bartley to advance all costs and expenses on the Client's behalf, and the expertise of the Law Offices of R. Bartley Halloran in handling cases of this nature, the Client hereby knowingly waives the statutory fee limits.  In no event, will the fee exceed thirty-three and one third percent (33 1/3 %).

V.  **REFERRING COUNSEL** - _____ is participating counsel in this matter and will share in the fee paid to the Law Offices of R. Bartley Halloran, P.C.

VI.  **SERVICES** - This fee agreement applies to all services rendered up to, and including, the award of damages by the trier of fact, but not to matters ancillary to the above claims, such as probate court proceedings, guardianships, and appeals.

VII. **DISPUTES** - Any disagreements which arise between the Law Offices of R. Bartley Halloran, P.C. and the Client, with respect to fees and costs and expenses due, shall be settled by binding arbitration.

Dated at _Long Meadow_ this _21_ day of _July_, 1997.

THE LAW OFFICES OF                    THE CLIENT
R. BARTLEY HALLORAN


_____        

## EXHIBIT A

Connecticut General Statutes Section 52-251c

33 1/3% of the first $300,000.00
25% of the next $300,000.00
20% of the next $300,000.00
15% of the next $300,000.00
10% of any amount in excess of $1,200,000.00

RETURN DATE: February 3, 1998 :    SUPERIOR COURT

BARBARA CORDI-ALLEN, ET AL    :    J.D. OF HARTFORD

V.    :    AT HARTFORD

DELTA ELEVATOR SERVICES
    CORPORATION    :    JANUARY 5, 1998


<u>COMPLAINT</u>

<u>FIRST COUNT</u>:    Barbara Cordi-Allen v. Delta Elevator Services
                    Corporation

1.    On January 10, 1997 and at all times relevant hereto, the plaintiff, Barbara Cordi-Allen, was a resident of Longmeadow, Massachusetts and was employed at Weaver High School in Hartford, Connecticut as a mathematics teacher.

2.    On January 10, 19997, the co-plaintiff, John Allen, was the husband of plaintiff, Barbara Cordi-Allen.

3.    On January 10, 1997 and at all times relevant hereto, the defendant, Delta Elevator Service Corporation, was a corporation existing under the laws of the Commonwealth of Massachusetts with a principal place of business at One Farm Springs, Farmington, Connecticut.

B. Cordi-Allen

EXHIBIT NO. 3
11-15-05
L. LONDON

4.    On January 10, 1997 and for a long time prior thereto, the defendant, Delta Elevator Services Corporation, contracted with the City of Hartford to provide service to elevators located at Weaver High School, 415 Granby Street, Hartford, Connecticut, including the elevator known as "the west elevator" at said location.

5.    On or about January 10, 1997, Delta Elevator Services Corporation inspected, examined, repaired, tested and/or adjusted the elevators located at Weaver High School, 415 Granby Street, Hartford, Connecticut, including the elevator known as "the west elevator" at said location.

6.    Prior to January 10, 1997, the defendant had received numerous complaints that the west elevator at Weaver High School was malfunctioning in that when said elevator stopped at various floors, it did not stop so that it was level with the floor.

7.    On January 10, 1997, the plaintiff, Barbara Cordi-Allen, used the west elevator at Weaver High School in an attempt to travel from the third floor to the fourth floor of said building.

**BCA 01838**

8.   On January 10, 1997, the plaintiff, Barbara Cordi-Allen, sustained severe personal injuries as hereinafter set forth when the west elevator in which she was a passenger malfunctioned.

9.   As the plaintiff, Barbara Cordi-Allen, attempted to exit the elevator, her left foot became caught in the west elevator which had come to rest approximately one foot below the level of the fourth floor, causing her to trip and allow the elevator doors to close upon her left foot.

10.  The injuries, losses and damages sustained by Barbara Cordi-Allen were caused by the negligence of the defendant, Delta Elevator Services Corporation, in one or more of the following ways:

(a)     In that they negligently and carelessly failed to properly maintain said elevator;

(b)     In that they negligently and carelessly failed to properly inspect said elevator;

(c)     In that they negligently and carelessly adjusted said elevator improperly so that it would stop level with the floor prior to the plaintiff's being injured;

    (d)       In that they negligently and carelessly failed to warn the plaintiff that the elevator was malfunctioning;

    (e)       In that they negligently and carelessly failed to properly repair said elevator prior to the plaintiff being injured;

    (f)       In that they negligently and carelessly failed to shut down said elevator even though they knew or should have known that continued use of said elevator while it was malfunctioning presented a hazard to the plaintiff and others;

    (g)       In that even though they knew or should have known that their failure to adjust or repair said elevator was hazardous to the safety of potential users, they failed to take any action to protect said potential users.

11.  As a result of the negligence and carelessness of the defendant, as aforesaid, the plaintiff, Barbara Cordi-Allen, sustained a severe dislocation and fracture of her left foot.  The nerves, bones, muscles and blood vessels of said foot were affected by the trauma sustained by the plaintiff. All of the above injuries have caused the plaintiff constant pain and suffering, great mental anguish, distress of mind and

a shock to her nervous system.  Some or all of the plaintiff's

injuries are, or are likely to be, permanent in nature.

12. As a result of the defendant's negligence as

aforesaid, the plaintiff has been caused to expend monies for

medical treatment in an effort to cure herself, all to her

loss and damage.

13. As a further result of the defendant's negligence as

aforesaid, the plaintiff has been caused lose time from her

employment, to her further loss and damage.

SECOND COUNT: John  Allen  v.  Delta  Elevator  Services
Corporation

1. Paragraphs 1 through 13 of the First Count are

hereby incorporated and made Paragraphs 1 through 13 of the

Second Count as if fully set forth herein.

14. The plaintiff, John Allen, husband of the plaintiff,

Barbara Cordi-Allen, has lost the consortium of his wife by

reason of the injuries negligently inflicted upon her by the

defendant, Delta Elevator Services Corporation, and

BCA 01841

he has suffered mental and emotional anguish and has had to render care and assistance to his wife by reason of said injuries and has had to curtail virtually all of his family leisure time activities, all of which has caused and will cause him loss and damage.

BCA 01842

WHEREFORE, the plaintiffs claim:

1.    Monetary damages;

2.    Such other relief as the Court may deem just and equitable.

Dated at Hartford, Connecticut this 5th day of January, 1998.

                              PLAINTIFFS


                              By_____
                                 R. Bartley Halloran
                                 Law Offices of R. Bartley Halloran
                                 One Lewis Street
                                 Hartford, Connecticut 06103
                                 (860) 493-1923
                                 Juris No. 412123
                                 Their Attorney

BCA 01843

RETURN DATE: February 3, 1998 :    SUPERIOR COURT

BARBARA CORDI-ALLEN, ET AL   :    J.D. OF HARTFORD

V.                      :    AT HARTFORD

DELTA ELEVATOR SERVICE CORP. :    JANUARY 5, 1998


### STATEMENT OF AMOUNT IN DEMAND

The amount, legal interest or property in demand is not less than Fifteen Thousand ($15,000.00) Dollars, exclusive of interest and costs.

PLAINTIFFS


By_____
R. Bartley Halloran
Law Offices of R. Bartley Halloran
One Lewis Street
Hartford, Connecticut 06103
(860) 493-1923
Juris No. 412123
Their Attorney

RETURN DATE: FEBRUARY 3, 1998    :    SUPERIOR COURT

BARBARA CORDI-ALLEN AND
JOHN ALLEN    :    J. D. OF HARTFORD

    VS.    :    at HARTFORD

DELTA ELEVATOR SERVICES
CORPORATION    :    JANUARY 15, 1998

MOTION TO INTERVENE CITY OF HARTFORD/BOARD OF EDUCATION
AS CO-PLAINTIFF AND TO FILE INTERVENING COMPLAINT

The subscriber respectfully represents:

1.   At the time of the personal injuries suffered by the plaintiff in the above entitled action, he was in the employ of the subscriber within the scope of the Workers' Compensation Act and said injuries arose out of and in the course of his employment.

2.   By virtue of the personal injuries for which the plaintiff seeks recovery in the above entitled action, the subscriber has paid and has become obligated to pay a sum of money to the plaintiff under the terms of the Workers' Compensation Act of this State.

3.   After the plaintiff brought said action, the subscriber became aware of it and the court to which it was returnable.

ORAL ARGUMENT NOT REQUESTED.
TESTIMONY NOT REQUIRED.

**BCA 01828**



B. Cordi-Allen
EXHIBIT NO. 4
11-15-05
L. LONDON

LAW OFFICES
POMERANZ, DRAYTON & STABNICK, LLC
95 GLASTONBURY BOULEVARD · GLASTONBURY, CONNECTICUT 06033-4412 · (860) 657-8000 · JURIS NUMBER 47367

The subscriber, therefore, respectfully moves that it be permitted to intervene in said action as co-plaintiff and file an intervening complaint, a copy of which is hereto annexed.

CO-PLAINTIFF
CITY OF HARTFORD/BOARD OF EDUCATION

By _____
Anne Kelly Zovas, Esq.
Pomeranz, Drayton & Stabnick
95 Glastonbury Blvd.
Glastonbury, CT  06033-4412
(860) 657-8000
Juris No. 47367

<u>ORDER</u>

The above motion having been heard, and it is appearing that the same ought to be granted, it is hereby

ORDERED:    That City of Hartford/Board of Education be permitted to intervene in said action as a co-plaintiff and file an intervening complaint.

Dated at _____, Connecticut, this _____ day of _____, 19 __.

BY THE COURT

_____
Judge/Clerk

**BCA 01829**

LAW OFFICES
POMERANZ, DRAYTON & STABNICK, LLC
95 GLASTONBURY BOULEVARD · GLASTONBURY, CONNECTICUT 06033-4412 · (860) 657-8000 · JURIS NUMBER 47367

## CERTIFICATION

THIS IS TO CERTIFY THAT a copy of the foregoing was mailed on January 15, 1998 to R. Bartley Halloran, Esq., Law Offices of R. Bartley Halloran, One Lewis Street, Hartford, CT 06103; and by certified mail to: Delta Elevator Services Corporation, c/o Otis Elevator, 1 Farm Springs, Farmington, CT 06032 in accordance with Section 120 of the Practice Book.

Anne Kelly Zovas, Esq.

110-0142

**BCA 01830**

CV 98                              :    SUPERIOR COURT

BARBARA CORDI-ALLEN AND
JOHN ALLEN                         :    J.D. OF HARTFORD

     VS.                           :    at HARTFORD

DELTA ELEVATOR SERVICES
CORPORATION                        :

### INTERVENING COMPLAINT OF
### CITY OF HARTFORD/BOARD OF EDUCATION

1.  On or about January 10, 1997 and for some time prior thereto, the plaintiff was employed by the co-plaintiff, City of Hartford/Board of Education.

2.  On or about the aforesaid date, the plaintiff was caused to suffer bodily injuries.

3.  The employment of said Barbara Cordi-Allen by this co-plaintiff was within the scope of the Workers' Compensation Act of the State of Connecticut and her injuries arose out of and in the course of her employment.

4.  After the occurrence of said accident, the said Barbara Cordi-Allen, notified this co-plaintiff of same and of her injuries and this co-plaintiff provided her with medical attention and has expended sums for said medical attention, and may be obliged to expend further sums in the future on account thereof, in accordance with the Workers' Compensation Act.

**BCA 01831**

LAW OFFICES
POMERANZ, DRAYTON & STABNICK, LLC
95 GLASTONBURY BOULEVARD · GLASTONBURY, CONNECTICUT 06033-4412 · (860) 657-8000 · JURIS NUMBER 47387

5.  As a further result of the aforesaid accident, this co-plaintiff was obliged to expend sums of money for the payment of compensation, in addition to the medical payments mentioned above and may be obliged to expend further sums in the future in payment for such further compensation as may be awarded by the Compensation Commissioner or as may be agreed upon between the parties and approved by the said Commissioner.

6.  As a further result of the aforesaid accident, this co-plaintiff was obliged to expend sums of money for the continuation of insurance benefits pursuant to Connecticut General Statutes §31-284b and may be obliged to expend further sums in the future for said insurance benefits.

7.  The plaintiff, Barbara Cordi-Allen, has instituted an action known as a third party action under the terms of Connecticut General Statutes, Section 31-293, entitled BARBARA CORDI-ALLEN AND JOHN ALLEN V. DELTA ELEVATOR SERVICES CORPORATION, returnable February 3, 1998 in the Superior Court, Judicial District of Hartford/New Britain @ Hartford to recover damages which the named defendant is alleged to be legally liable.

The co-plaintiff claims that any damages recovered in said action shall be so paid and apportioned that it will be reimbursed

**BCA 01832**

# LAW OFFICES OF R. BARTLEY HALLORAN
## ONE LEWIS STREET
### HARTFORD, CONNECTICUT 06103

TELEPHONE (860) 493-1923
FACSIMILE (860) 493-1924

October 5, 1999

Workers' Compensation Commission
First District Office
999 Asylum Avenue
Hartford, CT 06103

RE: <u>Barbara Cordi-Allen v. City of Hartford/Board of Education</u>
Compensation File Number: 100112917

Dear Commissioner,

Please enter the appearance of The Law Offices of R. Bartley Halloran on behalf of the claimant Barbara Cordi-Allen in the above captioned matter. This office appears in lieu of Ferguson & Doyle, P.C.

Kindly see that all future correspondence is directed to our office.

Thank you for your courtesy.

Very truly yours,

Jean M. Baril
Legal Assistant to R. Bartley Halloran

/jmb

cc: Attorney Brian A. Doyle



BCA 01374

MAR.20.2000  2:03PM  POM-DRAY-STABNICK                    NO.767  P.2

LAW OFFICES

# POMERANZ, DRAYTON & STABNICK, LLC

95 GLASTONBURY BOULEVARD
GLASTONBURY, CONNECTICUT 06033-4412
TELEPHONE (860) 657-8000
(800) 246-6541
FAX (860) 657-8835

DOUGLAS L. DRAYTON
JAMES L. POMERANZ
RICHARD T. STABNICK
LUCAS D. STRUNK
JASON M. DODGE
ANNE KELLY ZOVAS
RICHARD L. AIKEN, JR.
MARGARET E. McGRAIL
MICHAEL J. McAULIFFE
KRISTEN L. FRAZIER

EDWARD S. POMERANZ
(1903-1991)

March 20, 2000

**Via Fax #493-1924**
R. Bartley Halloran, Esq.
One Lewis Street
Hartford, CT 06103

**Via Fax #724-3921**
Richard J. Kenny, Esq.
Rome McGuigan Sabanosh, P.C.
One State Street
Hartford, CT 06103

RE:  Barbara Cordi-Allen
      City of Hartford
VS:  Delta Elevator Services Corp.
D/A: 1/10/97
      062 CB D4D4940H

Gentlemen:

This is in follow-up to our letter dated March 14, 2000
confirming the pretrial for March 22 and advising you of our
workers' compensation lien.

The figures you were given did not take into account the health
insurance payments paid by the City of Hartford through the end
of March.  The correct lien is broken down as follows:

| | |
|---|---:|
| Medical | $ 47,578.44 |
| Temporary total | $  8,814.00 |
| Permanent partial | $ 42,997.00 |
| (City) Salary continuation | $ 66,853.00 |
| (City) Health insurance to 3/31/00 | $ 29,679.14 |
| TOTAL LIEN: | $195,921.58 |

Very truly yours,

Kathy Ciolkosz
Paralegal/Ext.134

#110-0142

BCA 00064

# LAW OFFICES OF R. BARTLEY HALLORAN
## ONE LEWIS STREET
### HARTFORD, CONNECTICUT 06103

TELEPHONE (860) 493-1923
FACSIMILE (860) 493-1924

October 2, 2000

HAND DELIVERED

Mr. and Mrs. John Allen
143 Ardsley Road
Longmeadow, MA 01106

Dear Barbara and John,

I have been on trial in a medical malpractice case in New London, a case which I just settled. As I have explained to you, each case has to be judged on its own merit, with a full consideration of liability, damages, potential defenses, collateral sources and human factors. The case I just settled, which involved a misdiagnosis resulting in death, was settled for less than what you will receive. The reason for the settlement involved causation - did the malpractice cause the death - an issue on which I felt we would lose. I tell you this to emphasize that the best judgments are made by an objective view of all the facts.

I have told you unequivocally that you should settle your case for the current offer of One Hundred and Fifty thousand dollars net to you. I believe that the odds of doing better at trial, for you, are so remote that it is nearly impossible to do better. I told you at the mediation that the workers compensation carrier will be the big winner if we win at trial, not you. Fees and costs will increase. A jury will have to accept every one of our claims to succeed, and give a generous award. Even if the jury does give a generous award, the problem of offsets, paybacks and credits will diminish the net value of the award to such an extent that you will almost certainly be worse off than if you accept the settlement. Any trial will be emotionally and physically draining, an ordeal that I do not believe that Barbara will be able to successfully complete. Finally, we told the magistrate at the pretrial that if the net of One hundred and Fifty Thousand Dollars was paid, and medical insurance continued, we would accept that amount. You authorized me to make this statement, a statement I made in front of the magistrate.



B Cadi-Allen
EXHIBIT NO. 14
11-15-05
L. LONDON

Mr. and Mrs. John Allen
October 2, 2000
Page 2

In order to assist you in your analysis of the value of the settlement, I came up to your house and tried to thoroughly explain all of the aspects of the settlement. As I told you at the very beginning of this case, the key to resolution of the matter was to co-ordinate workers compensation benefits, teacher retirement, and any payment from third parties, achieving the maximum net result for you. This settlement does that, a point I wish to make clear by explaining again in writing the various claims, liens, and setoffs, describing previous cases and discussing the law.

## I. THE WORKERS COMPENSATION CLAIM

### A. *The right to reimbursement*

As I have told you, the employer has a right to reimbursement by law. This law is Connecticut General Statute 31-293. The employer has a right to get back every dime that has been paid up to the date of the verdict or settlement. In your case this amount is over **Two Hundred and Thirty Thousand ($230,000.00) Dollars.**

In addition to amounts that have been paid, an employer who has paid workers comp benefits is entitled not only to reimbursement for benefits paid, but can receive credit for future compensation payments. In Enquist v. General Datacom, 218 Conn. 19 (1991), the Supreme Court of the State of Connecticut held that the claim of the employer takes precedence over the claim of the injured worker pursuant to the statute, *including an amount equal to the present value of any probable benefits which it will become obligated to pay,* and is entitled to a credit for any unknown future benefits against the net proceeds of a lawsuit.

The most authoritative textbook on workers compensation in Connecticut was written by Angelo Sevarino and is entitled Connecticut Workers Compensation in Connecticut.  On Page 410 of the book, he describes the likelihood of getting a carrier to waive its entire lien as "highly unlikely". This comports both with my own experience and with what I have told you.

Mr. and Mrs. John Allen
October 2, 2000
Page 3

**It is extremely unusual to get the workers compensation carrier to waive its entire lien. I have been able to accomplish this for you in this settlement.**

Even if the workers compensation carrier owes you past due benefits, a claim which is contested, it will not have to pay you those benefits if we try this case and win.

Even if the workers compensation carrier owes you future benefits, i.e. 10 years of partial disability benefits, it will not have to pay you those benefits if we try this case and win.

Even if the workers compensation carrier owes you future medical benefits for the treatment of RSD, a claim which is contested, or the back, or the knee, or your foot, it will not have to pay those benefits if you win the case.

To summarize, under Connecticut General Statute 31-293 the City of Hartford has the right to insist on payment of all past due benefits, all potential future benefits, all future medical payments, and the present value of all future benefits actually owed from either a settlement or a verdict. As I explained to you at your home, this means that even if we got a verdict of over Five Hundred Thousand Dollars, you would in fact be worse off than you are today under the certain settlement. I calculate this as follows:

Mr. and Mrs. John Allen
October 2, 2000
Page 4

|  | Settlement | Verdict ($500,000) |
|---|---|---|
| Attorneys fees and expenses | $85,000 | $210,000 |
| Repayment of workers comp | | |
| Past benfits | 0 | $230,000 |
| Net to Barbara Cordi Allen | $150,000 | $70,000 |

In addition, in accordance with the <u>Enquist</u> case, you would receive no benefits from workers compensation until they owed you more than Seventy Thousand Dollars. You have repeatedly suggested that you believe that the future value of your workers compensation case is so great that you do not feel that exceeding the amount owed in the future will be a problem. **I strongly disagree with your position for several reasons.**

1) A 31-308a claim is very difficult
2) Even if we were to succeed on this very difficult claim, any victory would be offset by a simultaneous increase in the amount of the workers compensation lien on the verdict.

**B. *The right to benefits for temporary partial disability benefits.***

You have received temporary total disability benefits, and specific disability payments. The only types of benefits which might be available to you are the benefits for total disability under 31-307(c) , or payments for partial disability under 31-308a.

There is no chance that you will receive total disability benefits under C.G.S. 31-307(c). To be eligible for such benefits you must be totally disabled, unable to perform any type of work.

Mr. and Mrs. John Allen
October 2, 2000
Page 5

These benefits have been awarded in cases of blindness, amputation of both feet or hands, permanent paralysis or imbecility. They will not be awarded in your case.

This leaves a claim for benefits under 31-308a. You correctly point out that the commissioner has the authority and *discretion* to award up to 520 weeks of pay at your **base rate of compensation, without adjustments for cost of living or children. Your base rate is $678.88.**

As I explained last Saturday, there are many, many hurdles to receiving the entire 520 weeks of temporary disability benefits. You seem to be of an understanding that the winning of these benefits is a virtual certainty, greatly enhancing the value of the workers compensation case. **I have clearly told you that I disagree with this assessment, and feel that the chances of receiving a substantial award of temporary partial disability payments are remote.** I base this opinion on the following reasons:

1) C.G.S. 31-308a merely gives a commissioner the ability to make an additional award. These benefits are discretionary. The decision of whether or not to award the benefits is based on a number of factors including **age, training, marketability, education, and the severity of injury.**

Barbara, you are a well educated, intelligent and well-trained individual. These factors all will weigh against the awarding of the benefits, forcing the commissioner to find that the severity of the injury is such that you are unable to return to work. Although I do not in any way wish to minimize the severity of your injury, I know that we will at least be confronted with the following issues in attempting to establish that the injury alone is sufficient to justify the awarding of these benefits:

Mr. and Mrs. John Allen
October 2, 2000
Page 6

1) Is the broken foot alone sufficient to establish a total disability? In my opinion the commission will not find a disability severe enough to justify meaningful payments on the basis of the original injury alone. In order to make the award, he will have to find that the RSD exists, and is related to the injury, and additionally that it is sufficiently disabling. I know that you believe that this is a foregone conclusion. It is my responsibility to tell you **it is not**. In attempting to establish the above proposition you will encounter the following obstacles.

a) Benefits will not be awarded where the reasons the claimant cannot obtain employment is due to reasons other than her work-related injury. <u>Mucha v. Caval Tool and Machine Co.</u>, 12 Conn. Work Comp. Rev. Op. 128 (1994) The commissioner cannot award benefits if it found that the Claimant may be suffering from a dimunition of earning capacity due to a separate condition unrelated to the workers compensation injury. <u>Matteson v. American Standard</u>, 11 Conn. Workers Comp Rev. Op. 74 (1993).

This means that the workers comp defense lawyers will introduce all of the psychiatric testimony, the drug related testimony, the same opinions obtained by the defendants in the current case, and the disputed evidence on RSD . In order for you to succeed, the commissioner will have to find that:

a) there is a pain condition, whether it is called RSD or some other name;
b) that pain condition is so disabling that you have experienced a wage loss;
c) no other condition is disabling and contributing to that wage loss.

*This will be very difficult to prove. Reviewing the medical reports I find the following opinions:*

Mr. and Mrs. John Allen
October 2, 2000
Page 7


A.  *PRE-EXISTING UNRELATED CONDITION*

The workers compensation carrier will claim that if you are
disabled, it is as a result of a pre-existing unrelated psychiatric
condition. They will offer the following evidence.

1) Report of Dr. McQuire dated November 28, 1990 "patient
anxious and having difficulty in her family, prescribed valium";
2) Report of Dr. McQuire dated June 1, 1992 "Mrs. Cordi-Allen
upset about her husband, not sleeping well, weight down to 103";
3) Report of Dr. McQuire April 28, 1994 "problems with work,
unhappy";
4) Report of Dr. McQuire January 25, 1995 "Bad things
Happening". Described as "unhappy" and receiving Vicodim;
5) *Report of Dr. McQuire dated March 6, 1996 "things are "bad"
in work* headache, steroids;
6) Dr. Hazratji, August 14, 1996 **history of over 60 fractures,**
eight year history of headaches increased relating to kidnapping.
*CT SCAN OF HEAD, AUGUST 12, 1999 WHICH REVEALED CEREBRAL ATROPHY*
*ADVANCED FOR AGE;*
7) *CT SCAN AUGUST 12, 1999 REVEALING A PROGRESSION OF THE*
*ATROPHY;*


B.  *RESIDUAL WORK CAPACITY/DISABILITY CAUSED BY UNRELATED*
*CONDITION:*

8) Report of Dr. Kruger dated February 11, 1997 suggesting
return to work in September, "multiple issues" suggests counselling
to deal with anger;
9) Report of Visiting Nurses Association, angry about accident
and focused on negative;
10) Novacare report 10/28/97 indicating depression
11)April 7, 1997 report of Dr. Santoro "**RETURN TO WORK IN
SEDENTARY CAPACITY VERY ANGRY**".
12) Dr. Kruger, April 30, 1998 "Mrs. Cordi-Allen outlines an
extensive list of people in institutions who she is mad at, who she
feels have done her wrong and have worsened her situation.
**RECOMMENDS RETURN TO EMPLOYMENT**;
13) Dr. Kruger 6/4/98 "concerned about amount of narcotics"

Mr. and Mrs. John Allen
October 2, 2000
Page 8

14) Dr. McQuire 9/22/98 weight eight months after original injury 120 pounds, weight 9/22/98 98 pounds.

15) Dr. Sklar, 9/29/98 "I am very hard pressed to come up with an explanation for this patient's pain."

**16) Reports of Dr. Beverly Wise October 9/1998 through October 27, 1999.:**

A) "still has several lawsuits in progress and when she has trouble with insurance company, she calls the president and has lawyer threaten lower staffs' jobs. It seems to work for her"

B) Diagnosis - Chronic Pain with both psychological and medical aspects to it.

C) "Someone with whole anxiety spectrum who tends to catastrophize ... very defensive, strong perfectionistic streak and extremist, speaks in melodramatic ways."

D) Concern about "Underlying personality disorder because of her tendency to be melodramatic, catastrophize and being socially rejecting. Extreme style, resistant to therapy or to looking at herself. Tended to focus on her pain and her physical problems.

E) Described as "passive/aggressive and angry and determined that the world would apologize to her for all the wrongs that had been done to her. "She would blame everything on the accident, including the development of gray hairs."

F) Dr. Wise does not see depression going away until **interpersonal issues are resolved.
November 12, 1998 report (In her deposition Dr. Wise expanded this opinion saying she was referring to family problems)**

G) December 17, 1998 report "She's had another mutually angry/frustrated interaction with yet another 'asshole' M.D. a surgeon this time.

H) 1/21/99 report "Still getting revenge upon her husband and her daughter, anger at school system because she never even made department head in 24 years because of politics and racism. "What seems to work is to join in her rage"

I) January 28, 1999 report Dr. Wise angry that Mrs. Cordi-Allen had discovered her salary and took pleasure in the fact that she earned more than Dr. Wise."

J) Threatens to leave husband if he questions how much medication she takes. 2/11/99

Mr. and Mrs. John Allen
October 2, 2000
Page 9

K) March 18, 1999 "Maybe, just maybe she's starting to get enough revenge and the anger can start to decrease."

L) **April 8, 1999 advised Mrs. Cordi-Allen that it was in her therapeutic interest to settle the legal case as soon as possible so that healing can begin.**

M) June 2, 1999 mother's death complete malpractice "So she's suing everybody. Wow. I lost count of the number of lawsuits, reports and complaints to the police she described. Sounds like anger in the family way and the tendency is to blame others as well as a number of references to the supernatural."

N) Claimed brother threatened to kill her.  Dr. Wise did not believe that this threat had actually occurred.

O) Anger at brother, never able to count on the ones closest to her. Reference to Dr. Heller.

P) July 14, 1999 focused on brother, cousins and all her legal issues, decided to put her brother in jail. Complaining about her daughters and her husband.  Story keeps changing to cover inconsistencies the way it did when I first saw her. Exploiting her weight loss as a weapon. (July 21, 1999. Said on one hand she is angry at her mother and doesn't miss her mother, but on the other hand felt her mother's spirit enter her body and cannot start mourning her mother's death until she gets her brothers and others in jail.")

Q) August 5, 1999 "Probably not in her interest to open up this treatment to defendants"

R) Mrs. Cordi Allen has escalated the litigations and is going after the Springfield mayor in the press;

S)  In her deposition Dr. Wise testified that Mrs. Cordi Allen's symptoms increased after the death of her mother, and that "When people are paid to be sick it doesn't necessarily help them to be well." Whenever there is something in her life that distresses her, for instance her mother's death, rather than dealing with some of her own feelings inside she puts her anger out there and tries to attack whoever she thinks is responsible."

_Dr. Wise, on July 14, 1999 told me that the most serious psychological problems are unrelated to the elevator accidedent._

Mr. and Mrs. John Allen
October 2, 2000
Page 10

17) Reports of Dr. Heller
A) Diagnosis "significant character pathology, paranoia, and Thought Disorder with disorganization warranting antispychotic medication. Informed by Dr. Wise that coping mechanism was to file a lawsuit, so she had to be careful with her.
B) July 15, 1999 - antipsychotic medication. Sleeping 16 hours a day with Valium prescribed by Dr. Reuben.  Rage at brother, overwhelmed at loss of mother.
C) July 21, 199 still focused on her brother. Paranoid and disorganized.
D) August 3, 1999 problems with brother and two cousins and had called the FBI about one and reported the other to the Board of Medicine. Paranoid.
E) Deposition Diagnosis poor boundaries, character pathology. Dealt very poorly with death of her mother. "Was very enmeshed and over-involved with her mother, never properly separated from her mother. Mistrustful and paranoid."

18) Deposition of Dr. Hazratji. "Concerned that Mrs. Cordi-Allen was over medicated. Unsteadiness and light-headedness could be explained by either medications or cerebral atrophy."

19) Dr. Richlin, defense expert. "Physical examination and clinical presentation did not support a diagnosis of RSD and could not find neuropathic pain." Recommended medically supervised detoxification;

20) Report of Dr. Selig.
Outer brain loss consistent with dementia. Whether or not she has dementia cannot be fully determined. Needs to be hospitalized and withdrawn from all of her present medications, including Celexa. "None of the foregoing is substantially related to the January 10, 1997 incident. It is my opinion that Mrs. Cordi Allen has a longstanding personality disorder with paranoid dependent and histrionic features. In my opinion she has both consciously exaggerated her physical symptoms in order to obtain attention from her family as well as sympathy from others.

Mr. and Mrs. John Allen
October 2, 2000
Page 11


## C. OTHER LIMITATIONS ON TEMPORARY PARTIAL DISABILITY BENEFITS

Even if the commissioner agrees that you are disabled, as a result of RSD, he can award only benefits up to the time of the hearing. <u>Perri v. Mitchell Motors</u>,3259 CRB 6-96 (June 1997). The Commissioner can only award 308a benefits from the date of cessation of specific until today. **Again I caution you that I think this result is extremely unlikely.**

## OTHER FACTORS INVOLVING THE SETTLEMENT

As I demonstrated above, a verdict of over Five Hundred Thousand Dollars would leave you with less than half the money you are receiving as a result of this settlement. Actually, the breakeven number is even higher than that, because the court would have to offset any collateral source benefits which you have received. Your disability pension is a collateral source. Thus, if you try the case, not only do we have to subtract the workers compensation payments, we also have to subtract collateral sources. Any net you receive would be used as a credit against workers compensation benefits owed, making the receipt of those benefits extraordinarily unlikely.

Another reason to settle is that it will avoid the pain and humiliation of having all of the personal issues discussed with the psychiatrist and the psychologist from being revealed. You have asked why these treatments are admissable. Simply put, we are claiming that you are disabled as a result of the negligence of the defendants. We cannot limit their inquiries into other reasons why you might be disabled, including psychiatric conditions.

Unfortunately, the inquiry into those conditions will be painful. I have not listed all of the things your doctors said in this report, trying to avoid needless harm to you, your husband and your children.

Mr. and Mrs. John Allen
October 2, 2000
Page 12

If you settle the case, none of these matters need be discussed. But this is not the reason to settle. The reason to settle is that you will not achieve a better result by trying the case.

**CONCLUSION**

I have rarely felt as strongly as I do in this case that you must take the offer of a net of One Hundred and Fifty Thousand Dollars. You will still receive your pension, and the pension related medical insurance. At trial, the defense will raise many negative factors, so that the likelihood of an award which would exceed this amount is nil. In addition, if we lose this case, a factor which cannot be discounted, you would be liable not only for the expenses of trial, about Fifty Thousand Dollars, but also liable for the defendants costs, which approximate at least that amount.

Please do not take this risk. I have worked very hard on your case, and have achieved as good a result as you are going to get under these circumstances. I have never known anyone who would prefer the money to the absence of the injury, but in the end, you should listen to the objective advice and settle this case.

As I need to go into court on Thursday, I will need to hear from you as soon as possible.

Sincerely yours,

R. Bartley Halloran

## GENERAL RELEASE

### TO ALL WHOM THESE PRESENTS SHALL COME OR MAY CONCERN

GREETING:  Know Ye, That, We, JOHN ALLEN and BARBARA CORDI-ALLEN of Longmeadow, Massachusetts for and in consideration of the sum of TWO HUNDRED THIRTY-FIVE THOUSAND ($235,000.00) DOLLARS and other valuable consideration, lawful money of the United States of America to me in hand, paid by DELTA ELEVATOR SERVICES CORPORATION, the receipt of which is hereby acknowledged, have remised, released and forever discharged, and by these presents do for ourselves, our heirs, executors and administrators, remise, release and forever discharge the said DELTA ELEVATOR SERVICES CORPORATION, its successors and assigns, executors or administrators, of and from all, and all manner of action and actions, cause and causes of action, suits, debts, dues, sums of money, accounts, reckoning, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever in law or in equity, which against the said DELTA ELEVATOR SERVICES CORPORATION, we ever had, now have or which our heirs, executors or administrators, hereafter can, shall or may have for, upon or by reasons of any matter, cause or thing whatsoever from the beginning of the world to the day of these presents.

And especially in connection with a claim for injuries sustained on January 10, 1997 at Weaver High School in Hartford, Connecticut which are the basis of a lawsuit entitled Barbara Cordi-Allen, et al v. Delta Elevator Services Corporation, docketed at the Superior Court for the Judicial District of Hartford at Hartford and bearing Docket No. CV-98-0576805S.



B. Cordi-Allen

EXHIBIT NO. 23

11-15-05

L. LONDON

BCA 01700

Signed this _3_ day of _October_, 2000.

WITNESSED BY:

_____

_____

_____

_____

_____
Barbara Cordi-Allen


_____
John Allen


STATE OF CONNECTICUT:
                : SS:
COUNTY OF HARTFORD  :


    Personally appeared Barbara Cordi-Allen, signer and sealer of the foregoing instrument and acknowledged the same to be her free act and deed before me.


_____
Notary Public
Commissioner of the Superior Court


**BCA 01701**

STATE OF CONNECTICUT:
:  ss:
COUNTY OF HARTFORD  :


Personally appeared John Allen, signer and sealer of the foregoing instrument and acknowledged the same to be his free act and deed before me.

_____

Notary Public
Commissioner of the Superior Court

BCA 01702

BARBARA CORDI-ALLEN and JOHN ALLEN
INJURIES OF 1/10/97
SETTLEMENT STATEMENT


GROSS SETTLEMENT                        $235,000.00

LESS Attorneys Fees
                                        (78,333.33)

LESS Disbursements:

| | |
|---|---:|
| Edle Enterprises | 9.65 |
| Applied Investigative | 705.80 |
| Superior Court Clerk | 185.00 |
| Frederick E. DiNardi | 35.60 |
| Hartford Orthopaedic | 10.23 |
| Legal Copy Specialist | 85.51 |
| Dr. David Kruger | 250.00 |
| QuadraMed Corp. | 35.47 |
| ATLA Exchange (research) | 345.00 |
| Jeff Blank, PhD | 2,000.00 |
| Joseph Cunningham | 800.00 |
| Baystate Medical Center | 14.73 |
| IKON Office Solutions | 264.26 |
| Baystate Medical Center | 25.00 |
| Mediation Consultants | 1,000.00 |
| Mediation Consultants | 1,000.00 |
| Joseph Cunningham | 3,200.00 |
| QuadraMed Corp. | 19.15 |
| Jeff Blank, PhD | 2,825.00 |
| Analytic Resources | 1,000.00 |
| Niziankiewicz and Miller | 229.97 |
| Joe Cunningham | 550.00 |
| Connecticut Law Tribune | 43.85 |
| Federal Express | 11.00 |
| David Richlin, MD | 1,750.00 |
| Associated Reporter | 604.00 |
| Federal Express | 12.75 |
| Niziankiewicz and Miller | 210.62 |
| Airline Expenses (California) | 2,623.50 |
| Hotel & Lodging (California) | 477.53 |
| Douglas Merrill, MD | 1,751.00 |
| Aiken and Welch | 674.50 |
| Steven Selden, MD | 1,500.00 |
| David Richlin, M.D. | 600.00 |
| Niziankiewicz and Miller | 224.99 |
| Associated Reporter | 891.00 |

20


B. Cordi-Allen
EXHIBIT NO. 16
11-15-05
L. LONDON

| | |
|---|---|
| nneth Selig, MD | 675.00 |
| diation Consultants | 700.00 |
| iankiewicz and Miller | 471.70 |
| | 6.00 |
| thopedic Associates | 50.00 |
| in Management | 150.00 |
| | 6.00 |
| in Management | 1,000.00 |
| deral Express | 11.33 |
| draMed Corp. | 16.83 |
| draMed Corp. | 15.25 |
| D.M. Associates | 354.00 |
| diation Consultants | . 525.00 |

(29,946.22)

ss Repayment of Workers Compensation lien

(126,720.45)

*ust   my attorney R Bob Halloran, not to*

PROCEEDS TO CLIENTS

*to above listed amount until further order of the*

We hereby agree to the above settlement amount, attorneys fees, sbursements and net figure to ourselves. We believe said amounts be fair, just and reasonable.

We also agree to be responsible for any outstanding medical lls which have not been paid in connection with this matter which re not outlined above.

Dated this ___ day of _____, 2000.

*nsation Commissioner or the court.*

Barbara Cordi-Allen
------------------------
Barbara Cordi-Allen

John Allen
------------------------
John Allen

*Bobby Halloran guarantee that no attorneys fee payments will be paid or charged to Barbara Cordi-Allen and of John Allen. Barbara Cordi Allen of John Allen are + will not be responsible for attorneys fees or expenses for the worked comp. case. R Bob Hn*

20

# LAW OFFICES OF R. BARTLEY HALLORAN
## ONE LEWIS STREET
### HARTFORD, CONNECTICUT 06103

TELEPHONE (860) 493-1923
FACSIMILE (860) 493-1924

October 12, 2000

Mrs. Barbara Cordi-Allen
143 Ardsley Road
Longmeadow, MA 01106

Dear Barbara,

   Please be advised that I have forwarded the signed release to Rick Kenney and have asked that payment of this settlement be processed. The attorneys for the City of Hartford have been advised that you wish to pay the proceeds of the settlement to the compensation insurer and pursue future compensation benefits. I have requested a pre-formal hearing before a Commissioner to discuss the future course of this compensation matter.

   I again advise you that this is a course of action which I do not favor. I feel that you are better off settling for a net proceed of $150,000 and pursuing health insurance coverage through your existing plan, but I will, of course, comply with your wishes.

   We will advise you immediately once a hearing date is set down.

Very Truly Yours,

R. Bartley Halloran

RBH/jmb



RETURN DATE: JUNE 5, 2001       :       SUPERIOR COURT

CITY OF HARTFORD, ET AL         :       J. D. OF HARTFORD

VS.                             :       AT HARTFORD

BARBARA CORDI-ALLEN             :       APRIL 20, 2001

<u>COMPLAINT</u>

<u>FIRST COUNT</u> - (Breach of Contract)

    1.  The plaintiff, City of Hartford, (hereinafter referred to as "Hartford") is a municipality within the State of Connecticut, with a principal place of business located at 550 Main Street, Hartford, Connecticut.

    2.  The plaintiff, Constitution State Service Company (hereinafter referred to as "CSSC") a Montana Corporation, was authorized to do business in the State of Connecticut, with a Connecticut office located at One Tower Square, Hartford, Connecticut.

    3.  At all times relevant to this action, the plaintiff administered  workers' compensation claims for the plaintiff, City of Hartford.



4.  The defendant, Barbara Cordi-Allen, resides at 143 Ardsley Road, Longmeadow, Massachusetts, and was a former employee for the plaintiff, City of Hartford.

5.  On January 10, 1997, the defendant, Barbara Cordi-Allen, was in the employ of the plaintiff, Hartford, when she was involved in an incident whereby her foot sustained a crush injury when she was caught in an elevator that failed to level.

6.  The aforementioned injuries arose out of and in the course of her employment with the plaintiff, Hartford.

7.  As a result of the accident, the plaintiff, Hartford, provided and paid for medical care and attention for the defendant, Barbara Cordi-Allen in the amount of $52,719.79 and may become obligated to expend further sums in the future on account thereof and in accordance with the Workers' Compensation Act of the State of Connecticut.

8.  As a result of the accident, the plaintiff, Hartford, provided and paid for health insurance benefits on behalf of the defendant, Barbara Cordi-Allen, in the amount of $33,584.29 and may become obligated to expend further sums in the future on account thereof.

2

9.   As a further result of the aforesaid accident, the plaintiff was obligated to expend sums of money for the payment of compensation to the defendant, Barbara Cordi-Allen in the amount of $118,664.00, in addition to the afore-described medical payments, and may be obliged to expend further sums in the future for such further compensation as may be awarded by the Workers' Compensation Commission or as may be agreed upon by the parties and approved by said Commission.

10.   As a result of the aforesaid injuries sustained by the defendant, Barbara Cordi-Allen, the defendant, Barbara Cordi-Allen brought a liability claim against a negligent third party.

11.   Pursuant to Connecticut General Statute §31-293, the plaintiffs intervened in the aforementioned action asserting a proper lien on the money the plaintiffs had expended to date and may become obligated to expend in the future.

12.   On or about September 5, 2000, the plaintiffs and defendant participated in a court ordered mediation conducted by former United States Magistrate Owen Egan, in hopes of settling the aforementioned third party action.

3

13. As a result of that mediation, an agreement was reached between all parties. The negligent third party was to pay the defendant, Barbara Cordi-Allen $235,000.00.

14. As part of the settlement of that third party action, the defendant, Barbara Cordi-Allen agreed to settle her pending workers' compensation claim with the plaintiff, Hartford, if Hartford waived its lien under Connecticut General Statute §31-293 of $204,968.08 in full.

15. The defendant, Barbara Cordi-Allen, as part of that oral agreement was to execute a stipulation agreement memorializing the agreement and having that document approved by the Workers' Compensation Commission.

16. In reliance upon the defendant, Barbara Cordi-Allen, representation that she would close out her workers' compensation claim, the plaintiffs filed a release and withdrawal in Superior Court of their intervening complaint.

17. The plaintiffs assert that there was a binding contract in place following the agreement made with the defendant, and that the plaintiffs relied upon that contract in filing a withdrawal.

LAW OFFICES
POMERANZ, DRAYTON & STABNICK, LLC
95 GLASTONBURY BOULEVARD · GLASTONBURY, CONNECTICUT 06033-4412 · (860) 657-8000 · JURIS NUMBER 47567

Bart: I am not ignoring questions. In fact you are. You still have not responded as to why you did not get the file from the State and your opposing lawyers did and did not disclose it. You did not respond as to why you did not know that the City did not notify the State of injuries, as regulated by State law.    You are to investigate the State and the City. Both have a great impact on causing my injuries as well as my workers comp. The economist report was provided when we picked it up in your office one month ago. We still never went over it with you. The figures do not seem correct by simple arithmetic. I notified you and the commissioner as to the need of an emergency hearing. It was for lack of medical treatment, mri requested twice by Kruger, as continued problems from seeing Dr. Watson on 2/3/97 as a result of the elevator incident. This appointment was paid for, and accepted by workers comp. There is a copy in your file. My miles have not been paid, my doctors have not been paid, my medicine has not been paid, my brace has not been replaced, Dr. Kruger said I should be with a foot brace and the knee brace doesn't fit. I want the commissioner to make them responsible for my knee and back as well as my arm, foot, rsd, arthritis, osteoporosis, osteopenia, and psychological suffering. Dr. Pierangelo is the arthritis doctor and his bills have not been paid by w.c. and need to be. I am going to physical therapy due to the injury caused by Donaldson. You need to address that also. Also, I have not been paid for almost 2 years. The state should be mandating a minimum payment, until the total is dealt with. I did get an appt. with Soja for MAY 23. That is 1 month away. I thought Mr. Miles wasn't going to allow that. I will check to see if I have another appointment scheduled.

Also, you have just thrown numbers without any financial planning. I don't like that. Also, I have calculated my loss. I have calculated what others have been given for their job not being given back to them, $850,000. I am aware now that the City caused this injury due to their not reporting to the State. So is the State responsible. I now know that you are politically involved at both levels. I question why you did not request these files and you say you are not going to do anything about it? Bart, this is ridiculous. I also got hurt by falling because of my leg. You need to report that injury to w.c. I recall it being mentioned about lawyers giving a wink of their eye etc. I do not want any back room deals. I am quite alarmed that the file from the State was not known to you and the City's violation wasn't either. You should have been on top of both. In fact, I have talked with another lawyer and he wants to know about the State and City lawsuits. Did you bring any? If not, why not? This should have been done. Especially with this information on the city I found out, I reviewed the double damages as well. I now brought it to your attention and I trust that you are dealing with it. This is your responsibility and I have not closed this case with you. I wait for your explanation and an EMERGENCY appt. with w.c. It is 1 1/2 weeks after the commissioner told you to seek one and asked if you knew how. As I told you, this has been going on for 2 years. This should have been addressed a long time ago. I wait for your response. Barbara

Cordi-Allen
EXHIBIT NO. 21
11-17-05
L. LONDON

BCA 01604

Subj:   **Re: Jeff ordered by Travelers to say what they wanted to hear**
Date:   4/25/01 12:15:10 PM Pacific Daylight Time
From:   BCordialle
To:  RHALLORAN@mail.ldlaw.com

Bart:  Alex Palmieri called me from the State that there were NO INCIDENT or accident reports made to them by the certified operator of the registrant ie, the school.  He said that someone did request the file. The lawyer who got the file has an office in Hartford and Bridgeport and obviously wasn't you.  It seems like Rick Kenney.  The state would have inspected the elevator, and should have.  Also, the elevator WAS NOT INSPECTED.  Last prior inspection was in 1995!!!  The state said that they were to have been notified within 24 hours of the injury.  He said that you should have taken this up in court.  His number is 860-685-8340.  Please respond.  This is definately pointing to double damages.  Why didn't you call for the file?  I would like to know.  Barb



EXHIBIT NO. 26
L. LONDON

**BCA 01586**

# LEVY & DRONEY, P.C.
### ATTORNEYS & COUNSELLORS AT LAW

R. BARTLEY HALLORAN
Direct Dial: (860)676-3222
E-Mail: rhalloran@ldlaw.com

May 10, 2001

Mrs. Barbara Cordi-Allen
143 Ardsley Road
Longmeadow, MA 01106

Dear Barbara:

I have reviewed your latest e-mail, which is simply a repetition of complaints and questions which I have answered before. I am sending you this Certified letter so that we both have a record of the answers I have given to you.

First, if you wish to make a complaint to the bar about my actions, that is your right. I have tried to zealously represent you while at the same time dissuade you from taking actions which would hurt your case. I did obtain what I consider to be an excellent result, a result which you have sabotaged by your actions after the settlement was reached. I feel that you are on a losing and self-destructive course in turning in the over One Hundred Thousand Dollars of proceeds to the carrier and insisting on pursuing a total temporary disability claim when your primary treating physician, the two examining physicians and the retained experts in the third party case all say that you have a residual work capacity.



May 10, 2001
Page 2

I have not agreed to:

1. Sue the City of Hartford on any claim, including any claim from the failure of the elevator, or any claim relating to your employment.
2. File any additional workers compensation claims, including any claims for your arms or neck.
3. File any malpractice claims against any health care professional, including Dr. Wise, a Massachusetts practitioner.
4. File for any emergency hearing unless I first receive a letter from you stating what the medical treatment is that you claim you need and what doctor says it is related to the original injury.
5. Take on any new matter of any kind for you.

As you know, I insist on a written agreement which defines the scope of services. The agreement which you have defines the services to be rendered and limits those services to the results of the elevator accident case. I have agreed to take no fee on the workers compensation case, as I have been paid in the third party case. This is an enormous benefit to you, which you will lose if I no longer represent you.

Your recent actions have severely compromised your claim. By sending to Attorney Pomerantz the confidential communication of the retainer agreement you have breached the attorney/client privilege    This is a serious legal mistake, as he can now request copies of all of our correspondence, including these letters and e-mails in which I have advised

LEVY & DRONEY, P.C.

May 10, 2001
Page 3

you concerning the problems in your case. Once the privilege is broken, all documents which would be protected by the privilege can be discoverable. Again, this is a serious legal mistake, and your unilateral action in sending the retainer agreement to him not only did no good, it hurt your case.

I have attempted to steer you toward the most likely successful conclusion of your case, but have not been able to do so. I have taken exceptional steps to try to keep you informed, fully explain all of your options and return your numerous phone calls and e-mails. I have done this despite your insulting conduct toward my former associate, Steven Berrizi, my paralegals, Jean Brennan and Maureen Keating, and your unfair comments about the representation you have received to other members of my firm, including Coleman Levy and Kenny Levine. I have met and alleviated the concerns of the physicians you have threatened, including Dr. Kruger and Dr. Wise. I had to deal with ancillary matters, including going to the Cape to depose town officials who claimed you threatened them, and have had to deal with the problems caused by your legal problems with the members of your own family.

I have warned you to be on guard against depression, and have encouraged you to seek professional help when I felt that you were becoming depressed and unable to make rational decisions. You responded to this treatment, gaining weight and assisting in the resolution of the third party claim.

LEVY & DRONEY, P.C.

May 10, 2001
Page 4

Unfortunately, your recent actions raise these same concerns. Your letters have become rambling and repetitive, and the last one contained numerous grammatical errors, atypical of your correspondence. Your refusal to consider the parameters of the workers compensation system, and the limits on awards, has gone beyond poor judgement and are frankly irrational.

I strongly urge you to reconsider your position. As I have told you repeatedly, I believe that the workers compensation carrier would be willing to give back the money we have paid to them, over $125,000.00, and supplement this amount with at least an additional $50,000 and possibly as much as $100,000 to settle your claim. The alternative is to try, and in my opinion lose, the total disability claim, leaving you with a partial disability claim under Connecticut General Statute 31-308a. **These are limited benefits, which cannot exceed the amount of weeks assigned for specific disability. The specific disability award in your case is 50% of the foot, or 62.5 weeks of compensation.**

**If you lose the total disability claim and win a partial disability claim, the most that the Commissioner can award you is 62.5 weeks of compensation, which is less than Forty Thousand Dollars. You will have given up over Two Hundred Thousand Dollars to obtain less than Forty Thousand Dollars.**

Even if you succeed on the total disability claim, you will face further litigation with the pension, which will claim the compensation as an offset to the amount they owe you. You could lose the pension if you win the total disability claim.

May 10, 2001
Page 5


    I am trying to diplomatically tell you that your position makes no sense. The job of a lawyer is not to simply try cases, it is to give advice. If you do not feel capable of making a decision, or if as I suspect your ongoing pain and underlying psychiatric conditions are clouding your judgment, then other options such as the appointment of a conservator can be explored. I urge you, in the strongest possible terms, to explore these options, either with me, or with another attorney.

    Barbara, I do not write to you with these hard remarks out of anger, or even frustration. I sincerely believe you are making a catastrophic legal mistake, and I am trying to do my best to represent you, even with the impediments you are placing in my path. Please rethink your position.

    I will wait a week before I take any further action in your case. If you do not wish to accept my advice, or if you instead wish to proceed with whatever complaint or action you wish to file against me, I will withdraw from the workers compensation case and respond to those complaints.

                        Sincerely yours,



                        R. Bartley Halloran

Bart: I am being straight forward. I have been told to pursuit a malpractice lawsuit for your handling of my injury. This came from a very prestigious lawyer and firm. You have been given ample time to respond to the "State file" and did not. I am giving you this opportunity to state your filing of a lawsuit on the State, the City, and reopening Delta. It was your responsibility to research and you failed. I have proof that you did not get the file, and that Rick Kenney did. You have brought us financial burden, pain and suffering. I have been in communication with people about you and as I told you, I will never sign my rights away. I do not have to play investigator and question what you did and did not do. You did not do your job. Are you going to go to court and file? It is a simple yes or no. I wait for a response. And you have not communicated about a June 5 hearing. What is that? Who goes? For what? Are we supposed to be prepared? Bart, as I told Jean, you should pay more attention to your clients than Adriennes landing. I have all of my phone bills. I cannot tell you how upset we are. It is up to you to clear it up.Barbara

Ciordi-Allen
EXHIBIT NO 27
11-17-05
L. LONDON

**BCA 01644**

# LEVY & DRONEY, P.C.
### ATTORNEYS & COUNSELLORS AT LAW

R. BARTLEY HALLORAN
Direct Dial: (860) 676-3222
E-Mail: rhalloran@ldlaw.com

May 29, 2001

Honorable Michael S. Miles
Workers' Compensation Commissioner
First District
999 Asylum Avenue
Hartford, CT 06105

Re:  <u>Cordi-Allen v. City of Hartford</u>

Dear Commissioner Miles:

As you know I represent the claimant, Barbara Cordi-Allen, in the above captioned matter.  Since our last meeting, I am sorry to report that Mrs. Cordi-Allen and I have seen such a deterioration in the lawyer/client relationship that I am no longer able to represent her in this matter.

I respectfully request permission to withdraw my appearance in this matter. As I am unsure of the procedure to be used in this matter, never having previously sought permission to withdraw for a client, I am asking that whatever procedure you determine appropriate be conducted to consider this request.

Thank you for your consideration of this request.

Very truly yours,

R. Bartley Halloran

cc:  Mrs. Barbara Cordi-Allen
     James Pomeranz, Esquire

**From:** Halloran
**To:** "BCordialle@aol.com".GWIA.LD_DOMAIN
**Date:** 5/30/01 4:14PM
**Subject:** Re: complaint to go to Bar

I have sent you your file. If you claim that there is some object or paper not in the file, please be specific and I will try to find any such object.

Your allegations about payoffs from the city are both totally unfounded and libelous. You know that you have absolutely no proof of such an action, and that any statement you make about me in this context is in reckless disregard of the truth.

I agree that I am far from perfect, but I did try very hard in your case. It is most unfortunate that you choose to blame volunteer activity by me given for the sake of the community for your problems. The file will speak for itself, and I am very confident that anyone who reviews your file will find that I acted professionally, in a competent manner, and on your behalf.


Bart Halloran

CONFIDENTIALITY NOTE

This electronic mail transmission, along with any accompanying documents, contains information from the law firm of Levy & Droney, P.C. which is confidential, and / or legally privileged. The information is intended only for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this telecopied information is strictly prohibited and that the document should be returned to this firm immediately. In this regard, if you have received this email in error, please notify us immediately.


>>> <BCordialle@aol.com> 05/30/01 03:44PM >>>
SEND ME ALL OF MY FILE. RETURN TO ME MY PERSONAL BELONGINGS. I AM REFERRING THIS TO THE BAR, AND HAVE BEEN WARNED OF A PAYOFF BY THE CITY. AS YOU HAVE PROVED, YOU HAVE BEEN PAID RIDICULOUS BILLS YOU SUBMITTED, AND HAVE VIOLATED MY CONTRACT. I DID NOT GIVE YOU A CASE AGAINST THE ELEVATOR COMPANY. IT IS OBVIOUS YOU HAVE VISUAL PROBLEMS AND CANNOT READ. YOU SHOULD READ THE CONTRACT WE BOTH SIGNED. I HAVE NO PROBLEM PURSUITING THIS AGAINST YOU. YOUR RECORD IS CLEAR. YOU HAVE HAD PROBLEMS IN THE PAST, AND IT WAS TOLD TO ME BY VARIOUS ATTORNEYS THAT YOU WERE SUED AND ONE TOLD ME YOU SETTLED. YOU ARE FAR FROM PERFECT AND FAR FROM WHAT YOU THINK YOU ARE. I KNOW ALL YOU WANT IS MONEY IN YOUR POCKET AND NEVER THOUGHT I WOULD FIND OUT ABOUT YOUR NOT OBTAINING THE STATE FILE ON THE ELEVATOR AND YOU DID NOT KNOW THAT THE ELEVATOR HAD NOT BEEN INSPECTED BY THE STATE AND THAT THE CITY DID NOT REPORT INJURIES, INCLUDING MINE, AS REQUIRED BY LAW. YES, YOU ARE A POLITICIAN AND YOU THOUGHT MORE ABOUT ADRIEN'S LANDING THAN YOUR CLIENTS. I WILL CONTACT THE POLICE IF MY MATERIAL IS NOT RETURNED TO ME.


**CC:**          Keating


Cordi-Allen
EXHIBIT NO: 31
11-17-05
L. LONDON

BARBARA CORDI-ALLEN          : CORAM
**CLAIMANT**

                            : WORKERS' COMPENSATION
                              COMMISSIONER
                              HON. MICHAEL S. MILES

VS.

CITY OF HARTFORD            : STATE OF CONNECTICUT
**EMPLOYER**

                            : FIRST DISTRICT OFFICE

CONSTITUTION STATE SERVICE  : FILE NO. 100112917
**INSURER**

**RESPONDENTS**             : July 17, 2001

**APPEARANCES:**

    Barbara Cordi-Allen, 143 Ardsley Road, Long Meadow, Massachusetts 01106, appeared at this hearing.

    R. Bartley Halloran, Esq., c/o Levy & Droney, 74 Batterson Park Road, P. O. Box 887, Farmington, CT 06034, represented the Claimant.

    Jason M. Dodge, Esq., c/o Pomeranz, Drayton & Stabnick, 95 Glastonbury Boulevard, Glastonbury, CT 06033, represented the Respondent-Employer, and Insurer.



1

BCA 00372

Amy Ravitz, Esq., c/o Anthem Blue Cross/Blue Shield of Connecticut, P. O. Bo 655, North Haven, CT 06473, appeared on behalf of Anthem Blue Cross/Blue Shield of Connecticut.

### MEMORANDUM RE: Motion to Withdraw Appearance

Pursuant to statutory notice to all parties, the undersigned conducted a hearing in the above-captioned matter at the First District, Workers' Compensaiton Commission, on July 9, 2001.

The Claimant's counsel, R. Bartley Halloran, petitioned the Commission to grant his Motion to Withdraw Appearance in the above-captioned case. Attorney Halloran states that there has been a deterioration in the lawyer/client relationship and, therefore, he is no longer able to represent her in this matter. Attorney Halloran further states that the Claimant has filed a grievance against him alleging numerous types of breaches of the attorney/client relationship.

The Claimant spoke on the record at some length. She stated that she has filed a grievance containing many allegations against Attorney Halloran. She has indicated that Attorney Halloran has breached his contract with her. She stated that Attorney Halloran had not acted in her best interest and, in effect, had misled her in many ways concerning settlement of her third party case in Superior Court which arose out of the same incident which is of present concern.

It is further noted for the record that neither counsel for the Respondent nor counsel for Anthem Blue Cross/Blue Shield of Connecticut had objection to the Motion.

**BCA 00373**

I find that the attorney/client relationship has broken down to the extent that there exists a mutual breakdown of trust and confidence between the attorney and claimant.

**THEREFORE, ATTORNEY HALLORAN'S MOTION TO WITHDRAW AS COUNSEL FOR THE CLAIMANT IS HEREBY GRANTED.**

A request for continuance of her formal proceeding presently scheduled for August 2, 2001, will be considered by the undersigned by the undersigned as a result of this Memorandum.

Michael S. Miles, Commissioner
Workers' Compensation
Acting for the First District

3

BCA 00374

BARBARA CORDI-ALLEN          : CORAM
**CLAIMANT**

                            : WORKERS' COMPENSATION
                                  COMMISSIONER
                              HON. MICHAEL S. MILES

VS.

CITY OF HARTFORD            : STATE OF CONNECTICUT
**EMPLOYER**

                            : FIRST DISTRICT OFFICE

CONSTITUTION STATE SERVICE   : FILE NO. 100112917
**INSURER**

      **RESPONDENTS**         : March 19, 2004

**APPEARANCES:**

      Richard Grabow, Esq., c/o Mester, Grabow & Miller, LLC, 10 Grand Street, Hartford, CT 06106, represented the Claimant.

      Michael McAuliffe, Esq., c/o Pomeranz, Drayton & Stabnick, 95 Glastonbury Boulevard, Glastonbury, CT 06033, represented the Respondent-Employer, and Constitution State Service.

                  **FINDING AND AWARD**

      Pursuant to proper statutory notice to all parties, Formal proceedings were held before the undersigned at the First District, Hartford, commencing June 3, 2003, July

1



28, 2003, October 1, 2003, and January 8, 2004. The record was closed March 5, 2004, upon the filing of proposed findings and briefs.

### ISSUES:

The Claimant claims she is totally disabled due to the compensable injuries suffered on January 10, 1997 and its sequelae, most significantly her claim of Reflex Sympathetic Dystrophy (RSD). The Claimant seeks temporary total benefits as of June 7, 2001 and continuing.

The Respondent's position is that the Claimant is not totally disabled, that she does not have RSD, and that she doesn't qualify for discretionary benefits due to her failure to look for work within her restrictions.

### BASED ON THE EVIDENCE PRESENTED, THE FOLLOWING FACTS ARE FOUND:

1.    On January 10, 1997, the Claimant, Barbara Cordi-Allen, was employed by the Respondent City of Hartford as a math teacher.

2.    While in the course of and arising out of her employment, the Claimant suffered a compensable injury when her left foot was crushed in a school building elevator.

3.    The Injury involved the breaking of several bones in the Claimant's left foot.

4.    The Claimant was transported by ambulance to St. Francis Hospital where she was diagnosed with several fractures/dislocations in her left foot.

5.    Since the date of her injury, the Claimant has been treated or examined or evaluated by a number of doctors, including Dr. David Kruger, Dr. Watson, Dr. Pulai, Dr. Berson, Dr. Turco, Dr. Wise, Dr. Selden, Dr. Merrill, Dr. Richlin, Dr. Hazratji, Dr. Heller, Dr. Selig, Dr. Kost, Dr. Steinberg, Dr. Donaldson, Dr. Reuben, Dr. Santoro, Dr. Pierangelo, and Dr. Spellman.

6.    As a result of her compensable foot injury, the Claimant underwent three surgical procedures to her left foot.

7.    Eventually, Dr. Kruger assigned a permanent partial impairment to the left foot of 50 percent. By way of compromise a rating of 42.5 percent was agreed upon, with a maximum medical improvement date of April 7, 1998. The 42.5 percent disability rating is equal to 53.13 weeks, which the Claimant was paid.

2

8.      Reference is made to Claimant's Exhibits A and B, two green binders, containing approximately 150 pages of medical reports. Reference is further made to Respondent's Exhibit 1, a black binder, containing again over a hundred pages of medical reports. Some reports are duplicate, offered by both the Claimant and Respondent.

9.      Needless-to-say, the medical files in this case are replete with a plethora of medical information and opinions reflecting on diagnoses and disability.

10.     The Claimant 's position is that the medical documentation overwhelming supports her claimed condition of RSD and the claim for total disability benefits.  The Respondents counter that the Claimant has not met her burden of proof and that the medical supports its defense that the Claimant neither has RSD or is totally disabled.

11.     On August 1, 1997, the Claimant was evaluated by Dr. Pulai who diagnosed the Claimant with Stage 2 RSD.  Dr. Pulai recommended lumbar sympathetic blocks, which were performed, and were not successful in alleviating Claimant's pain.

12.     The Claimant has treated at Baystate Pain Management Center with various medications, including Oxycontin, a narcotic medication, Vicodin and Neurontin have been prescribed.  The Claimant currently takes 20 mgs of Oxycontin twice a day.

13.     The Claimant testified she also takes Hydrocodone, another narcotic medication four times a day, 10 mgs. per dosage.

14.·    Dr. Kruger referred the Claimant to Dr. Pierangelo, a rheumatologist. Dr. Pierangelo has diagnosed the Claimant with RSD.

15.     Dr. Kruger further referred the Claimant to his orthopedic partner, Dr. Gerald Berson, who opined that the Claimant is suffering from a left mid-foot arthritis and an RSD pain syndrome.

16.     Dr. Berson further stated that the Claimant has diffuse complaints which do not necessarily correlate with her injury, but typical of RSD-type pain.

17.     Dr. Berson has prescribed orthodics for the Claimant's left foot.

18.     The Claimant has treated with Dr. Mohammed Hazratji, a neurologist. Dr. Hazratji ordered a Nerve Conduction Study which results were negative.   However,

3

he supports the claim that the RSD condition is consistent with a Nerve Conduction Study.

19.     Dr. Hazratji diagnosed the Claimant with RSD.

20.     As part of her treatment at the Baystate Medical Center, Dr. Pulai referred the Claimant to Dr. Scott Reuben, an anesthesiologist and pain specialist. Dr. Reuben diagnosed the Claimant with Stage 2 or 3 RSD. Dr. Reuben treated the Claimant with narcotic medication, analgesics, and muscle relaxants.

21.     Dr. Reuben performed a procedure called a Bier block, the purpose of which was to arrest the progression of the RSD and minimize the Claimant's pain. The procedure was not successful.

22.     Dr. Reuben also prescribed Neurontin, a medication often used in neurologic-type pain cases, to treat the RSD. Claimant remained on Neurontin for approximately six months, and it was not successful in reducing any of her pain.

23.     At Baystate, the Claimant was also prescribed Celebrex, a nonsteroidal anti-inflammatory drug, as well as Ambien, a sleeping medication. The Claimant testified that since June of 2001 she only takes the narcotics Oxycontin and Hydrocodone as mentioned above.

24.     The Claimant has also been referred for psychological and psychiatric care, which is a recognized approach of treating a person suffering from excessive pain.

25.     Dr. Spellman, one of the Claimant's treaters, recommended that she live in a single-level home where it would not be necessary to climb stairs. Dr. Spellman further recommended that Claimant not drive, additional modifications to her living quarters, and to use a cane, which the Claimant purchased.

26.     The Claimant testified extensively and fluently concerning her every day severe and constant pain. She states her only relief is temporary after taking her medications. She states her pain has been constant and undiminished, and that any pressure whatsoever on the foot exacerbates her pain.

27.     The Claimant testifies that she cannot wear a shoe, that she cannot stand for very long, or walk more than 15 minutes. She experiences the side effects of the narcotics, including difficulty in concentration, confusion, fatigue and lack of energy. She claims that she retires at 7:30 p.m. and when she awakens, the pain is too severe for her to get out of bed. She, therefore, will take Oxycontin and wait for the pain to be alleviated to the extent that she can get out of bed. The Claimant does not do any real housework.

4

28.     The Claimant testified that there are coloration differences between her two feet and also temperature differentials, both symptoms being consistent with RSD.

29.     Although all of the medical opinions in this case are not expressed in this finding, the undersign finds that the above findings are sufficiently representative of the claims being made.

30.     The Respondents rely on several independent medical examinations as well as Commissioner-ordered examinations, the results of which differ with regards to the RSD diagnosis and total disability.

31.     Dr. Steven Selden, a Hartford orthopedic surgeon, conducted two Commissioner Examinations on the Claimant.

32.     Dr. Selden in the course of his examination in January, 1999, found no swelling of the Claimant's foot and minimal tenderness on palpitation and movement of her foot.  Dr. Selden did not find objective signs of RSD, such as exquisite tenderness or loss of bone as would be shown by x-ray.

33.     Dr. Selden's opinion on January 28, 1999, was that the Claimant was not totally disabled and that she was capable of sedentary-type work.  He further did not agree with the continued use of narcotic medications.

34.     Dr. Selden again examined the Claimant on November 11, 2003.  He reaffirmed his belief that the Claimant was at maximum medical improvement and there was no change in the 35 percent permanent partial impairment that he had assigned to her in 1999.

35.     Dr. Selden further opined that the Claimant was not totally disabled and that she was capable of light sedentary work which should not require any strenuous activity.

36.     Dr. Selden went on to state at his deposition that based upon his physical examination he saw no evidence of RSD and that typical signs of RSD were not present.

37.     All of Dr. Selden's deposition testimony is contained within the transcript marked as Respondent's Exhibit 1.

38.     Dr. James Donaldson, a board-certified neurologist on the staff of and practicing at the University of Connecticut Medical School, conducted an independent medical examination of the Claimant on February 19, 2001.  Dr. Donaldson gave deposition testimony which is included in Respondent's exhibits.

39.     Dr. Donaldson reviewed numerous medical records offered in this case.

40     Based upon Dr. Donaldson's review of the medical records and his own physical examination of the Claimant, Dr. Donaldson concluded that the Claimant did not have the RSD condition. He further opined that the Claimant's chronic pain was not caused by her foot injuries of January 10, 1997.

41.     It was Dr. Donaldson's opinion that the Claimant's chronic pain syndrome was far out of proportion to her injuries and more related to a psychiatric condition. Dr. Donaldson again found no evidence of RSD during the course of his physical examination.

42.     Dr. Donaldson further testified that the Claimant had a work capacity, was not totally disabled.

43.     Dr. Donaldson was also quite concerned with the high doses of medication being taken by the Claimant.

44.     Dr. David Richlin, board-certified in anesthesiology, and a pain management specialist, conducted an independent medical exam on behalf of the Respondents on February 29, 2000. Dr. Richlin also gave deposition testimony, which deposition is marked as a Respondent's exhibit.

45.     Dr. Richlin is the Director of the Pain Management Center at Mt. Sinai Medical Center.

46.     Based on his review of the medical records, Dr. Richlin offered an opinion that the Claimant does not suffer from RSD.

47.     Dr. Richlin further opined that the quantity of opiate medications ingested by the Claimant was significantly obscuring and distorting the Claimant's pain experience. Dr. Richlin found no evidence other than the Claimant's own subjective complaints that she was suffering from the RSD condition.

48.     Dr. Richlin further stated that the fact that a lumbar sympathetic block performed on the Claimant did not reduce her pain symptoms was further evidence that she did not suffer from RSD.

49.     Dr. Douglas Merrill conducted a review of the Claimant's medical records and offered deposition testimony on April 7, 2001. (See Respondent's Exhibit 1-5)

50.    It was Dr. Merrill's conclusion that the Claimant did not have signs of RSD.  Dr. Merrill went on to say that the Claimant had been afforded inappropriate treatment, including the long-term use of narcotic medications.

51.    The Claimant presented to Dr. Kenneth Selig for a psychiatric evaluation April 14, 2000.  Dr. Selig also gave deposition testimony which can be viewed in Respondent's Exhibit 1-6.

52.    It is disclosed in Dr. Selig's deposition that at the time of his examination of the Claimant, she was taking Oxycontin, Hydrocodone, Topomax, Valium, Ambien, and Celexa which, in his opinion, was simply too much.

53.    Dr. Selig opined the Claimant was suffering from psychiatric disorders that were related to her pain syndromes and that there were secondary gain factors involved.

54.    Dr. Selig concluded that a firm diagnosis was impossible due to many complicating factors including the overuse of narcotic and sedating medications and the Claimant's psychiatric disorder.

55.    Mr. David M. Soja, a certified rehabilitation counselor, reviewed the extensive medical evidence in this case and also conducted interviews with the Claimant on January 18, 2001, May 23, 2001, June 21, 2001, August 16, 2001 and August 22, 2001.  The total time Mr. Soja spent with the Claimant was approximately 11 hours.

56.    Mr. Soja subjected the Claimant to a battery of tests, in addition to his interviews.

57.    Mr. Soja opined that the Claimant had a vocational capacity for sedentary work.  He felt she had transferable skills based upon her graduate level college training that could be transferred and used, including being self-employed or working from her home.

58.    The Claimant receives approximately $2,900 a month from State Teacher's Retirement plan.

59.    The Claimant produced job searches from March 2, 2000 through September 29, 2000.  The Claimant also offered testimony that she performed other job searches, but did not have written documentation of same.  The Claimant also testified that she made phone calls inquiring about jobs after seeing ads in newspapers.

60.    Claimant testified that she contacted many school boards, some in Connecticut, some in Massachusetts, but was unsuccessful in attempting to find work within her restrictions.

**BASED ON THE FOREGOING, IT IS HEREBY FOUND, CONCLUDED AND ORDERED AS FOLLOWS:**

A)    After review of the extensive medical file in this case, I find the testimony and opinions rendered by Drs. Steven Selden, James Donaldson,  David Richlin, and Dr. Selig, to be the more persuasive and convincing on the key issues of Reflex Sympathetic Dystrophy and work capacity.

B)    I find, at this time, that the testimony of the Claimant and the medical evidence presented to support her claim do not rise to the level to reach the conclusion that she is totally disabled or disabled under the  Osterlund holding.

C)    It is found that the Claimant would have work capacity of $300.00 a week based upon two hours of tutoring, five times a week at $30.00 per hour.

D)    I find that the Claimant has provided sufficient evidence pursuant to Section 31-308a that she was seeking to find work within her restrictions and that she meets the qualifications set forth in 31-308a.

E)    The Claimant is hereby awarded 31-308a benefits based upon what she would have been earning in the Hartford school system versus what her present earning capacity is.

F)    The Claimant is awarded 308a benefits in the amount of $583.83 a week for the period of 53.13 weeks.  This Award in the amount of $31,018.89 has fully accrued and should be paid in a lump sum.  This calculation is made on the Claimant's maximum base compensation rate of $792.00 minus the rate of $209.17 based on her earning capacity of $300.00 a week.

G)    This file shall remain open for further determinations at the request of the Claimant, the Respondents, or the Commission.

**IT IS SO FOUND, CONCLUDED AND ORDERED.**

Michael S. Miles, Commissioner
Workers' Compensation
First District

8

UNITED STATES DISTRICT COURT DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BARBARA CORDI-ALLEN and JOHN ALLEN, Plaintiffs<br><br>v.<br>R. BARTLEY HALLORAN and R. BARTLEY HALLORAN, P.C., Defendants | CIVIL ACTION NO. 05-30083-MAP |

## PLAINTIFF BARBARA CORDI-ALLEN'S RESPONSE TO DEFENDANT R. BARTLEY HALLORAN, P.C.'S FIRST SET OF INTERROGATORIES PROPOUNDED TO BARBARA CORDI-ALLEN

### INTERROGATORY NO.1

Identify all persons with any knowledge of the facts, claims and/or allegations contained in the Complaint and for each such person, describe the knowledge and/or discoverable information he, she, or it has.

### RESPONSE TO INTERROGATORY NO. 1

1. R. Bartley Halloran, Attorney who represented Barbara Cordi-Allen, Levy and Droney, P.C., 74 Battery Park Road, Farmington, Connecticut 06034 - Mr. Halloran is a defendant in this matter. He has knowledge of all of his communications between himself and the plaintiffs and of his various actions relating to the claims of the Plaintiffs.

2. Barbara Cordi-Allen, 143 Ardsley Road, Longmeadow, Massachusetts 01106. Ms. Cord-Allen is a Plaintiff in this matter and is unemployed due to injuries which she received in the elevator accident which was the subject of the personal injury and worker's compensation actions which the Defendant R. Bartley Halloran was hired to pursue on behalf of Ms. Cordi-Allen. She has knowledge of: (I) her attorney-client communications between her and Mr. Halloran; (ii) Mr. Halloran's agreement to bring claims on behalf of John Allen against the City of Hartford and others for damages arising out of the injuries sustained by Ms. Allen; (iii) knowledge of Mr. Halloran's tactics to force the plaintiffs to sign an agreement that primarily benefitted Mr. Halloran; and (iv) how Mr. Halloran, once he obtained money from the settlement acted to have himself removed as counsel for her in the worker's compensation case, a matter which he had agreed to complete at no further fee to Ms. Cordi-Allen and causing her to expend fees on other attorneys to represent her.


Cordi-Allen<br>EXHIBIT NO. 36<br>11-17-05<br>L. LONDON

UNITED STATES DISTRICT COURT DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BARBARA CORDI-ALLEN and JOHN ALLEN,<br>Plaintiffs<br><br>v.<br>R. BARTLEY HALLORAN and R. BARTLEY<br>HALLORAN, P.C.,<br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION NO. 05-30083-MAP

### PLAINTIFF BARBARA CORDI-ALLEN'S RESPONSE TO DEFENDANT R. BARTLEY HALLORAN, P.C.'S FIRST SET OF INTERROGATORIES PROPOUNDED TO BARBARA CORDI-ALLEN

**INTERROGATORY NO.1**

Identify all persons with any knowledge of the facts, claims and/or allegations contained in the Complaint and for each such person, describe the knowledge and/or discoverable information he, she, or it has.

**RESPONSE TO INTERROGATORY NO. 1**

1. R. Bartley Halloran, Attorney who represented Barbara Cordi-Allen, Levy and Droney, P.C., 74 Battery Park Road, Farmington, Connecticut 06034 - Mr. Halloran is a defendant in this matter. He has knowledge of all of his communications between himself and the plaintiffs and of his various actions relating to the claims of the Plaintiffs.

2. Barbara Cordi-Allen, 143 Ardsley Road, Longmeadow, Massachusetts 01106. Ms. Cord-Allen is a Plaintiff in this matter and is unemployed due to injuries which she received in the elevator accident which was the subject of the personal injury and worker's compensation actions which the Defendant R. Bartley Halloran was hired to pursue on behalf of Ms. Cordi-Allen. She has knowledge of: (I) her attorney-client communications between her and Mr. Halloran; (ii) Mr. Halloran's agreement to bring claims on behalf of John Allen against the City of Hartford and others for damages arising out of the injuries sustained by Ms. Allen; (iii) knowledge of Mr. Halloran's tactics to force the plaintiffs to sign an agreement that primarily benefitted Mr. Halloran; and (iv) how Mr. Halloran, once he obtained money from the settlement acted to have himself removed as counsel for her in the worker's compensation case, a matter which he had agreed to complete at no further fee to Ms. Cordi-Allen and causing her to expend fees on other attorneys to represent her.

3.   John Allen,143 Ardsley Road, Longmeadow, Massachusetts 01106. Mr Allen is a Plaintiff in this matter and is currently employed by the United States Postal Service. He has knowledge of: (I) his attorney-client communications between her and Mr. Halloran; (ii) Mr. Halloran's agreement to bring claims on his behalf against the City of Hartford and others for damages arising out of the injuries sustained by Ms. Allen; (iii) knowledge of Mr. Halloran's tactics to force the plaintiffs to sign an agreement that primarily benefitted Mr. Halloran; and (iv) how Mr. Halloran, once he obtained money from the settlement acted to have himself removed as counsel for his wife's worker's compensation case, a matter which Halloran had agreed to complete at no further fee to Ms. Cordi-Allen and causing her to expend fees on other attorneys to represent her.

4.   Richard J. Kenny, attorney who represented Delta Elevator, Rome, McGuigan, Sabanosh, P.C., One State Street, Hartford, Connecticut. Mr. Kenny defended Delta Elevator in the action brought by Defendant R. Bartley Halloran on behalf of Barbara Cordi-Allen and John Allen.

5.   James L. Pomerantz, Attorney, Pomerantz, Drayton, and Stabnick, 95 Glastonbury Boulevard, Glastonbury, Connecticut 06033. Mr. Pomerantz represented the City of Hartford in Plaintiff Barbara Cordi-Allen's claims against the City of Hartford.

6.   Joe Melrose, United Technology Corporation Claims Office, One Farm Spring Road, Farmington, Connecticut 06032. Mr. Melrose was the claims manager for United Technologies with respect to the Plaintiff's claims against Delta Elevator, a subsidary of United Technologies and has information regarding the settlement of the claim.

7.   Mercedes Hurd, Occupation and Address Unknown. Ms. Hurd witnesses the signatures of Plaintiffs to the settlement agreement and may have information regarding the circumstance of the signing of the agreement.

8..  Brian Doyle, Ferguson and Doyle, Rocky Hill, Connecticut. Mr. Doyle represented Ms. Cordi-Allen in worker compensation matter prior to R. Bartley Halloran taking over the matter.

9. Magistrate Egan, Compensation Review Board, Workers' Compensation Commission, Capital Place, 21 Oak Street, Hartford, CT 06106

10. Commissioner Jesse Frankl, Compensation Review Board, Workers' Compensation Commission, Capital Place, 21 Oak Street, Hartford, CT 06106

11. John Mastrpietro, Chairman, Compensation Review Board, Workers' Compensation Commission, Capital Place, 21 Oak Street, Hartford, CT 06106

12. Steven Berrizi, Attorney, Address Unknown, former associate of R. Bartley Halloran who work on the Plaintiffs' matters

13. Richard Grabow, Attorney, Mester, Grabow, 10 Grand Street, Hartford, Connecticut.

Mr. Grabow has represented Ms. Cordi-Allen before the Worker's Compensation Commission following Mr. Halloran's withdrawal.

14. Keeper of Records, State of Connecticut, Bureau of Elevators, Middleton, Connecticut 06457. The keeper of records will have information regarding the inspections and licensing of the elevator in which Ms. Cordi-Allen was injured and, in particular, that the elevator had not been inspected and licensed and that Mr. Halloran in his representation did not attempt to obtain such records to prove gross negligence on behalf of Delta Elevator and/or the City of Hartford which resulted in the injuries to Plaintiff Barbara Cordi-Allen..

15. Keeper of Records, Hartford Public School System, 960 Main Street, Hartford, Connecticut. The keeper of records will have information regarding the inspections of the elevator in which Ms. Cordi-Allen was injured and, in particular, that the elevator had not been inspected and that Mr. Halloran in his representation did not attempt to obtain such records to prove gross negligence on behalf of Delta Elevator and/or the City of Hartford which resulted in the injuries to Plaintiff Barbara Cordi-Allen..

16. Jean Burril, Assistant to R. Bartley Halloran, Address Unknown

17. Maureen Keating, Assistant to R. Bartley Halloran, Address Unknown

## INTERROGATORY NO.2

State the basis for any damages you are seeking to recover from the Defendants in this lawsuit, including an itemization of those damages.

## RESPONSE TO INTERROGATORY NO. 2

The Complaint contains essentially three claims for damages on behalf of Barbara Cordi-Allen: (I) breach of contract relating to the distribution of proceeds from the settlement; (ii) Breach of contract for failure to represent Ms. Cordi-Allen in the worker's compensation proceeding; and (iii) breach of fiduciary duty.

A.    Breach of Contract – Distribution of Proceeds

Ms. Cordi-Allen and the Defendants entered into an agreement wherein the Defendants were to receive "fees of thirty three and one third percent (33 1/3%) of the recovery . . . after deduction of liens, costs and expenses including payback of any Worker's Compensation benefits." The gross settlement from the suit against Delta Elevator was $235,000.00. Mr. Halloran presented and accounting which provided him with thirty three and one third of the total settlement, not one third of the settlement after payment of liens, costs and expenses. The accounting was inconsistent with the terms of the retention agreement and resulted in the Allens receiving zero dollars from the settlement whereas Mr. Halloran received $78,333.33. If the distribution had been calculated in accordance with the agreement, Mr. Halloran would be entitled to $26,111.11 and the Allens to $52,222.22.

B.     Breach of Contract – Failure to Represent

When Mr. Halloran was originally retained by the Allens, he agreed to represent Ms. Allen in her worker's compensation proceeding. He affirmed this obligation in the accounting for the settlement with Delta Elevator. Mr. Halloran, however, did not complete this obligation and Ms. Cordi-Allen has been required to incur the cost of retaining another lawyer to represent her in the amount of at least $20,000.

C.     Breach of Fiduciary Duty

When Mr. Halloran agreed to represent Barbara Cordi-Allen, he was placed into a position of trust and confidence. He had a duty to pursue her interests and not others including his own. Mr. Halloran represented to Ms. Cordi-Allen that her claims was worth millions of dollars and that he had the skill and political connections to successfully pursue her claims. Mr. Halloran breached his fiduciary duty in a number of ways. First, Mr. Halloran failed to investigate the gross negligence of the City of Hartford in allowing the elevator which injured Ms. Cordi-Allen to operate for a number of years without regularly inspections and licensing, and after a history of malfunction. Such gross negligence would have allowed Ms. Cordi-Allen to pursue her claims outside of the worker's compensation forum. Mr. Halloran did not pursue those claims as he was chairman of the Capital City Economic Development Authority Board and did not want to pursue claims against the City as it would impact his actions on the Board. Second, Mr. Halloran breached his fiduciary duty by not fully pursuing claims against Delta Elevator because he did not want to cause problems with the ongoing negotiations with United Technology Corporation, the corporate parent of Delta, that was purchasing the naming rights for a football stadium to be used by the New England Patriots at the Adraien's Landing development which was overseen by Capital City Economic Development Authority. Mr. Halloran's own secretary Jean Burrill informed Ms. Cordi-Allen that he "cares more about Adraien's Landing than your lawsuit." Third, Mr. Halloran breached his fiduciary duties by calculating the funds which Ms. Cordi-Allen would receive from settlement of the claim against Delta in a manner which benefitted Mr. Halloran to the detriment of Ms. Cordi-Allen. That is he received nearly $80,000 from the settlement and Ms. Cordi-allen received zero dollars. Furthermore, in bullying Ms. Cordi-Allen into signing the settlement, Mr. Halloran misrepresented the amount which Ms. Allen would receive by accepting a settlement and also the amount she might receive if she went to trial on her claim. In particular, Mr. Halloran placed his interests before Ms. Cordi-Allen when he informed Ms. Cordi-Allen that her lifetime of disability was now only worth $500,000 in a jury verdict which was less than the millions of dollars he represented when he was retained. Furthermore, Halloran misrepresented the amount of money which she would receive from a settlement if she waived her worker's compensation rights by representing that the attorneys fees and expenses would be $85,000 and that she would receive $150,000, when, in fact, he knew that he intended to charge her fees and expenses in excess of $108,000, resulting in her receiving less than $127,000 if she accepted the settlement and waived her worker's compensation claim. In addition, he also misrepresented that she would receive only $70,000 from a $500,000 verdict without waiving the worker's compensation claim when in fact Ms. Cordi-Allen would receive more than $180,000. In doing so, Mr. Halloran abused his position of trust and breached his fiduciary duty so that he could get paid without having to try a case which he had obligated himself to try on behalf of Ms. Cordi-Allen. Finally, Mr. Halloran breached his fiduciary duty by using his influence to paint a picture of Ms. Cordi-Allen to the Worker's Compensation Board as an unstable individual who was trying to abuse the system when, in fact, Ms. Cordi-Allen simply was requesting that Halloran vigorously represent her and also questioning the decisions of Halloran who had breached his fiduciary duties by lying to Ms. Cordi-Allen about the value of the settlement and options available to her in the action against Delta. These breaches of duty have cost Ms. Cordi-Allen at least three million dollars of lost earnings, pain and suffering, and

disability which she might otherwise have recovered.

## INTERROGATORY NO.3

Please list and identify completely each person that you expect to call as an expert witness at trial, stating as to each such expert witness:

(a) full name, address, occupation, business address and relationship to the Plaintiff or Defendant, if any;

(b) educational background;

© experience in the subject matter at issue in this lawsuit;

(d) the subject matter or area on which each such person expects to testify;

(e) the substance of the facts and opinions to which each such person is to testify;

(f) a summary of the grounds for each opinion; and

(g) a list of books, treatises, articles and other works relied upon or considered by each such person regarding the subject matter on which the expert witness is expected to testify.

## RESPONSE TO INTERROGATORY NO.3

Ms. Cordi-Allen has not yet retained an expert witness.

## INTERROGATORY NO.4

If you claim that Defendant has made any admissions with respect to the subject matter of this lawsuit:

(a) Identify all witnesses to the admissions;

(b) Set forth the date, place and manner in which the admissions were made; and

(c) Set forth copies of each written admission and the details of each oral admission.

**RESPONSE TO INTERROGATORY NO. 4**

Ms. Cordi-Allen does not at this time claim that Defendant has made any admissions with respect to the subject matter of this lawsuit.

**INTERROGATORY NO.5**

State in full and complete detail the reasons why you sought legal representation

from the Defendants.

**RESPONSE TO INTERROGATORY NO.5**

Ms. Cordi-Allen sought legal representation from the Defendants because she was informed that R. Bartley Halloran was a qualified attorney with expertise in personal injury and worker's compensation matters who would professionally pursue her claims arising out of injuries which occurred to Ms. Cordi-Allen in an elevator accident on January 10, 1997.

**INTERROGATORY NO.6**

For each and every communication between you and the Defendants concerning

the allegations contained in the Complaint, please state:

(a) the date, time, and place of each communication;

(b) the identity of any and all partners, associates, employees, agents, or representatives of the defendants involved in the communication; and

© the contents of each communication, including what the defendants said to you and what you said to the defendants.

**RESPONSE TO INTERROGATORY NO. 6**

Objection to Interrogatory No. 6 - Plaintiff objects to this interrogatory as being overbroad and is calculated to harass Plaintiffs as it attempts to require plaintiff to provide details of communications for which defendant was present and, therefore, knowledgeable of all of the details of said communications to the same extent as Plaintiff

Response to Interrogatory No. 6 - Notwithstanding the objections, the communications that are subject of the complaint occurred from the beginning of Halloran's representation of Barbara Cordi-Allen in July, 1997, until the conclusion in 2001. The communications include meetings with Mr. Halloran where he induced Plaintiff Cordi-Allen to hire him as her attorney wherein he represented that her claim was worth millions of dollars. At various times, Ms. Burrill, Ms. Keating, or Mr. Berrazi were present.

The majority of the communications which serve as the basis of the Complaint occurred in the time period from late September/early October, 2000, through May, 2001, when Mr. Halloran terminated his representation. Of primary importance were communications with Ms. Cordi-Allen regarding the proposed settlement that followed mediation. Mr. Halloran communicated by letter dated October

2, 2000, in which he made the misrepresentations discussed in previous interrogatories regarding fees and expenses and value of recovery before a jury. These representations were made only one day before he obtained the signature of Cordi-Allen on a release to Delta Elevator which was witnessed by Mercedes Hurd. The signatures were obtained at a meeting which occurred at the Allens' house in Longmeadow.

Further meetings were held with the Allens after the signing of the settlement and a meeting was held with Commissioner Frankel at which time, the Commissioner spoke to Ms. Cordi-Allen and stated that she should accept $150,000.

Mr. Halloran also met with the Allens in December, 2000, to have them sign an accounting allowing distribution of the proceeds of the Delta settlement. At that meeting, Halloran insisted that the accounting was accurate and that the Allens needed to sign the agreement for the reason that Halloran was joining the firm of Levy and Droney. Present at that meeting were the Allens and Halloran.

After that meeting Halloran would only meet with Barbara Cordi-Allen at hearings before the Workmen's Compensation Board at which the attorneys listed in Interrogatory No. 1 were present. Halloran also began to communicate with Cordi-allen only through e-mail. Copies of those e-mails were provided by Counsel for Halloran to counsel for Cordi-Allen.

## INTERROGATORY NO.7

Identify each and every person or law firm you consulted for legal advice concerning the Delta Action and the Hartford Action.

## RESPONSE TO INTERROGATORY NO. 7

1. Brian Doyle, Ferguson and Doyle, Rocky Hill, Connecticut.

2. Richard Grabow, Attorney, Mester, Grabow, 10 Grand Street, Hartford, Connecticut.

## INTERROGATORY NO.8

For each and every communication between you and the person(s) or law firm(s) identified in Interrogatory No.7, state:

(a) the date, time, and place of each communication;

(b) the identity of any and all partners, associates, employees, agents, or

   representatives of the person(s) or law firm(s) involved in the

   communication; and

© the contents of each communication, including what you said to

   the person(s) or law firm(s) and what they said to you.

**RESPONSE TO INTERROGATORY NO. 8**

Objection to Interrogatory No. 8 - Plaintiff objects to this interrogatory as being overbroad and is calculated to harass Plaintiffs as it attempts to require plaintiff to provide details of communications which are subject to the attorney-client privilege.

**INTERROGATORY NO.9**

State in full and complete detail all things or matters which you contend

the Defendants:

(a) did, which should not have been done; and

(b) failed to do, which should have been done.

**RESPONSE TO INTERROGATORY NO. 9**

See Response to Interrogatory No. 2

**INTERROGATORY NO. 10**

State the basis for your allegations in Paragraph 9 of the Complaint that the Allens engaged the

Defendants to "represent her in claims against certain parties arising out of the Accident including

a claim against the City of Hartford on behalf of John Allen."

**RESPONSE TO INTERROGATORY NO. 10**

The retainer agreement provides that R. Bartley Halloran will represent Ms. Cordi-Allen with regard to "claims against any party or parties." Mr. Halloran stated that he would also represent and did represent Mr. Allen in claims which he had arising out of the same accident and in doing so was bound by the contractual terms and legal ethics to assert a claim against the City of Hartford for lack of consortium and similar claims arising out of the elevator injury

**INTERROGATORY NO. 11**

State the basis for your contention contained in Paragraph 18 of the Complaint that "[t]his

accounting was inconsistent with the terms of the Agreement as the attorneys fee was based upon

1/3 of the gross settlement, not the settlement after deductions for "liens, costs and expenses."

**RESPONSE TO INTERROGATORY NO. 11**

The terms of paragraph II of the retention agreement state that R. Bartley Halloran will receive thirty three and one third percent of the recovery "after deduction of liens, costs and expenses."

The accounting has R. Bartley Halloran receiving thirty three percent of the gross recovery, not the recovery after deduction of liens, costs and expenses.

## INTERROGATORY NO. 12

State the basis for your contention contained in Paragraph 26 [ sic] of the Complaint that

"[b]y withdrawing as counsel, Halloran breached the agreement to represent Barbara Cordi-Allen

in the worker's [sic] compensation proceeding."

## RESPONSE TO INTERROGATORY NO. 12

When Mr. Halloran was originally retained by the Allens, he agreed to represent Ms. Allen in her worker's compensation proceeding. He affirmed this obligation in the accounting for the settlement with Delta Elevator. Mr. Halloran, however, did not complete this obligation and Ms. Cordi-Allen has been required to incur the cost of retaining another lawyer to represent her in the amount of at least $20,000.

## INTERROGATORY NO. 13

State the basis for your contention contained in Paragraph 29 that "[t]he settlement

obtained on behalf of the Allens was negligible when compared to the injuries suffered by

Barbara Cordi-Allen in the Accident."

## RESPONSE TO INTERROGATORY NO. 13

Ms. Cordi-Allen has been totally disabled as a result of the injuries which she suffered in the elevator. Prior to the elevator accident Ms. Cordi-Allen earned more than $50,000 per year. Furthermore, Ms. Cordi-Allen has been in nearly constant pain since the elevator accident. The loss of income and the pain and suffering which Ms. Cordi-Allen has had to endure have a monetary value of millions of dollars. In contrast, the settlement negotiated by Halloran provided Ms. Cordi-Allen with no funds or, at most, just over $100,000, if she waived all worker's compensation claims.

## INTERROGATORY NO. 14

State the basis for your contention contained in Paragraph 31 of the Complaint that "[t]he

division of the settlement proceeds pursuant to the accounting provided by Halloran was

inconsistent with the terms of the retainer agreement."

## RESPONSE TO INTERROGATORY NO. 14

The terms of paragraph II of the retention agreement state that R. Bartley Halloran will receive thirty three and one third percent of the recovery "after deduction of liens, costs and expenses." The accounting has R. Bartley Halloran receiving thirty three percent of the gross recovery, not the recovery after deduction of liens, costs and expenses.

## INTERROGATORY NO. 15

State the basis for your contention contained in Paragraph 32 of the Complaint that

"[f]ailure to distribute the funds from the settlement in accordance with the retainer agreement

constituted a breach of the retainer agreement."

## RESPONSE TO INTERROGATORY NO. 15

The terms of paragraph II of the retention agreement state that R. Bartley Halloran will receive thirty three and one third percent of the recovery "after deduction of liens, costs and expenses." The accounting has R. Bartley Halloran receiving thirty three percent of the gross recovery, not the recovery after deduction of liens, costs and expenses. R. Bartley Halloran was contractually required to distribute these funds pursuant to the terms of paragraph II of the retention agreement and having not done so, he breached the agreement.

## INTERROGATORY NO. 16

State the basis for your contention contained in Paragraph 37 of the Complaint that

"Barbara Cordi-Allen was damaged as she had to obtain other counsel."

## RESPONSE TO INTERROGATORY NO. 16

When Mr. Halloran was originally retained by the Allens, he agreed to represent Ms. Allen in her worker's compensation proceeding. He affirmed this obligation in the accounting for the settlement with Delta Elevator. Mr. Halloran, however, did not complete this obligation and Ms. Cordi-Allen has been required to incur the cost of retaining another lawyer to represent her in the amount of at least $20,000.

## INTERROGATORY NO. 17

State the basis for your contention contained in Paragraph 41 of the Complaint that

"Halloran owed a duty to disclose these relationships because they were conflicts of interests

and/or created the appearance of impropriety."

**RESPONSE TO INTERROGATORY NO. 17**

The Connecticut Rules of Professional Conduct require that a lawyer have a duty of loyalty to the client and to not engage in relationships or activities which create a conflict of interest and/or the appearance of impropriety unless such relationship is fully disclosed and consented to by the client whose interest are affected. *See* Rule 1.7. Here, Mr. Halloran failed to fully disclose to Ms. Cordi-Allen his ongoing relationships with the City of Hartford and United Technologies pursuant to his position as chairman of the Capital City Economic Development Authority Board. Mr. Halloran did not investigate the gross negligence of the City of Hartford in allowing the elevator which injured Ms. Cordi-Allen to operate for a number of years without regularly inspections and licensing, and after a history of malfunction. Such gross negligence would have allowed Ms. Cordi-Allen to pursue her claims outside of the worker's compensation forum. Mr. Halloran did not pursue those claims as he was chairman of the Capital City Economic Development Authority Board and did not want to pursue claims against the City as it would impact his actions on the Board. Mr. Halloran also breached his fiduciary duty by not fully pursuing claims against Delta Elevator because he did not want to cause problems with the ongoing negotiations with United Technology Corporation, the corporate parent of Delta, that was purchasing the naming rights for a football stadium to be used by the New England Patriots at the Adraien's Landing development which was overseen by Capital City Economic Development Authority.

**INTERROGATORY NO. 18**

State the basis for your contention contained in Paragraph 42 of the Complaint that "[t]he failure to disclose these conflicts constituted a breach of the fiduciary relationship and the conflicts made it impossible for Halloran to appropriately represent the Allens' interests."

**RESPONSE TO INTERROGATORY NO. 18**

*See* Response to Interrogatory No. 18.

Signed under pains and penalties of perjury this 15th day of August, 2005.

_____

Barbara Cordi-Allen

As to Objections.

Paul Revere, III
(BBO 636200)
Law Offices of Paul Revere, III
226 River View Lane
Centerville, Massachusetts 02632
508-778-7126

Dated: August 15, 2005